_____ FILED    _____ ENTERED
_____ LODGED   _____ RECEIVED

JAN 1 2 2009    JS

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY _____ DEPUTY



**09-CV-00037-CMP**

UNITED STATES DISTRICT COURT, WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BOILERMAKERS NATIONAL ANNUITY
TRUST FUND, on behalf of itself and all others
similarly situated,

                                    Plaintiff,

        v.

WAMU MORTGAGE PASS THROUGH
CERTIFICATES, SERIES 2006-AR1; WAMU
MORTGAGE PASS THROUGH CERTIFICATES,
SERIES 2006-AR2, WAMU MORTGAGE PASS
THROUGH CERTIFICATES, SERIES 2006-AR3;
WAMU MORTGAGE PASS THROUGH
CERTIFICATES, SERIES 2006-AR4; WAMU
MORTGAGE PASS THROUGH CERTIFICATES,
SERIES 2006-AR6; WAMU MORTGAGE PASS
THROUGH CERTIFICATES, SERIES 2006-AR7;
WAMU MORTGAGE PASS THROUGH
CERTIFICATES, SERIES 2006-AR8; WAMU
MORTGAGE PASS THROUGH CERTIFICATES,
SERIES 2006-AR10; WAMU MORTGAGE PASS
THROUGH CERTIFICATES, SERIES 2006-
AR11; WAMU MORTGAGE PASS THROUGH
CERTIFICATES, SERIES 2006-AR12; WAMU
MORTGAGE PASS THROUGH CERTIFICATES,
SERIES 2006-AR13; WAMU MORTGAGE PASS
THROUGH CERTIFICATES, SERIES 2006-
AR14; WAMU MORTGAGE PASS THROUGH
CERTIFICATES, SERIES 2006-AR15; WAMU
MORTGAGE PASS THROUGH CERTIFICATES,
SERIES 2006-AR16; WAMU MORTGAGE PASS
THROUGH CERTIFICATES, SERIES 2006-
AR17; WAMU MORTGAGE PASS THROUGH
CERTIFICATES, SERIES 2006-AR18; WAMU

No.  **C09   0037** MJP

COMPLAINT FOR VIOLATION OF
SECTIONS 11, 12 AND 15 OF THE
SECURITIES ACT OF 1933

JURY TRIAL DEMANDED

COMPLAINT FOR VIOLATION OF SECTIONS 11, 12
AND 15 OF THE SECURITIES ACT OF 1933
Case No.

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
• TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

010094-11  280145 V1

*(left margin, handwritten)* Summons Iss.

*(left margin)* SEA2300QZ

1  MORTGAGE PASS THROUGH CERTIFICATES,
   SERIES 2006-AR19; WASHINGTON MUTUAL
2  BANK; WAMU ASSET ACCEPTANCE
   CORPORATION; DAVID BECK; DIANE
3  NOVAK; THOMAS GREEN; ROLLAND
   JURGENS; RICHARD CAREAGA AND WAMU
4  CAPITAL CORPORATION,

5                    Defendants.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

COMPLAINT FOR VIOLATION OF SECTIONS 11, 12
AND 15 OF THE SECURITIES ACT OF 1933
Case No.



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

010094-11  280145 V1

1

## TABLE OF CONTENTS

2

**PAGE**

3    I.    NATURE OF THE ACTION ...................................................................................2

4    II.   JURISDICTION AND VENUE ..............................................................................5

5    III.  PARTIES .............................................................................................................6

6    IV.   CLASS ACTION ALLEGATIONS .......................................................................13

7    V.    SUBSTANTIVE ALLEGATIONS ........................................................................14

8          A.    WMB's Deficient Lending Practices .........................................................16

9                1.    WaMu and its core home lending business.................................16

10               2.    WaMu abandons customary lending and business practices
                       in favor of much riskier loan products and company policies...................17

11               3.    WaMu's risky, nontraditional loan products ...............................18

12         B.    The Registration Statement and the Prospectuses Contained Material
13               Misstatements and Omissions of Fact...................................................21

14         C.    Disclosures Relating To WMB's Deficient Lending Practices ............................30

15         D.    WCC Plays Major Role in the Collapse of the Subprime Market .........................36

16   COUNT I  VIOLATION OF SECTION 11 OF THE SECURITIES ACT
         (Against All Defendants)..................................................................................37
17
     COUNT II  VIOLATION OF SECTION 12(a)(2) OF THE SECURITIES ACT
18       (Against all Defendants) ..................................................................................38

19   COUNT III  VIOLATION OF SECTION 15 OF THE SECURITIES ACT
         (Against Defendants WMAAC, the WaMu Trusts and the Individual Defendants).........40
20
     JURY TRIAL DEMANDED....................................................................................42

21

22

23

24

25

26

COMPLAINT FOR VIOLATION OF SECTIONS 11, 12
AND 15 OF THE SECURITIES ACT OF 1933 - i
Case No.



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

010094-11 280145 V1

1    Plaintiff alleges the following based upon the investigation of counsel, Schoengold Sporn

2    Laitman & Lometti, P.C., which included a review of United States Securities and Exchange

3    Commission ("SEC") filings by WaMu Asset Acceptance Corporation ("WMAAC") and WaMu

4    Mortgage Pass-Through Certificates Series 2006-AR1 Trust ("WaMu Series 2006-AR1 Trust"),

5    WaMu Mortgage Pass-Through Certificates Series 2006-AR2 Trust ("WaMu Series 2006-AR2

6    Trust"), WaMu Mortgage Pass-Through Certificates Series 2006-AR3 Trust ("WaMu Series

7    2006-AR3 Trust"), WaMu Mortgage Pass-Through Certificates Series 2006-AR4 Trust ("WaMu

8    Series 2006-AR4 Trust"), WaMu Mortgage Pass-Through Certificates Series 2006-AR6 Trust

9    ("WaMu Series 2006-AR6 Trust"), WaMu Mortgage Pass-Through Certificates Series 2006-

10    AR7 Trust ("WaMu Series 2006-AR7 Trust"), WaMu Mortgage Pass-Through Certificates

.11    Series 2006-AR8 Trust ("WaMu Series 2006-AR8 Trust"), WaMu Mortgage Pass-Through

12    Certificates Series 2006-AR10 Trust ("WaMu Series 2006-AR10 Trust"), WaMu Mortgage

13    Pass-Through Certificates Series 2006-AR11 Trust ("WaMu Series 2006-AR11 Trust"), WaMu

14    Mortgage Pass-Through Certificates Series 2006-AR12 Trust ("WaMu Series 2006-AR12

15    Trust"), WaMu Mortgage Pass-Through Certificates Series 2006-AR13 Trust ("WaMu Series

16    2006-AR13 Trust"), WaMu Mortgage Pass-Through Certificates Series 2006-AR14 Trust

17    ("WaMu Series 2006-AR14 Trust"), WaMu Mortgage Pass-Through Certificates Series 2006-

18    AR15 Trust ("WaMu Series 2006-AR15 Trust"), WaMu Mortgage Pass-Through Certificates

19    Series 2006-AR16 Trust ("WaMu Series 2006-AR16 Trust"), WaMu Mortgage Pass-Through

20    Certificates Series 2006-AR17 Trust ("WaMu Series 2006-AR17 Trust"), WaMu Mortgage

21    Pass-Through Certificates Series 2006-AR18 Trust ("WaMu Series 2006-AR18 Trust") and

22    WaMu Mortgage Pass-Through Certificates Series 2006-AR19 Trust ("WaMu Series 2006-

23    AR19 Trust") (collectively the "Issuers" or the "WaMu Trusts"), as well as regulatory filings and

24    reports and advisories about WMAAC and the WaMu Trusts, press releases and other public

25    statements issued by WMAAC and the WaMu Trusts, and their own internal investigation.

26    Plaintiff believes that substantial additional evidentiary support will exist for the allegations set

COMPLAINT FOR VIOLATION OF SECTIONS 11, 12
AND 15 OF THE SECURITIES ACT OF 1933 - 1
Case No.



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1  forth herein after reasonable opportunity for discovery. The claims asserted herein do not sound

2  in or arise from allegations of fraud.

### I.    NATURE OF THE ACTION

4      1.    This is a class action brought by the Boilermakers National Annuity Trust Fund

5  (the "Boilermakers Trust Fund") alleging violations of Sections 11, 12 and 15 of the Securities

6  Act of 1933, 15 U.S.C. § 77a, *et seq.* ("Securities Act"), on behalf of purchasers of WaMu

7  Mortgage Pass-Through Certificates Series 2006-AR1, Series 2006-AR2, 2006-AR3, Series

8  2006-AR4, Series 2006-AR6, Series 2006-AR7, Series 2006-AR8, Series 2006-AR10, Series

9  2006-AR11, Series 2006-AR12, 2006-AR13, 2006-AR14, Series 2006-AR15, Series 2006-

10  AR16, Series 2006-AR17, Series 2006-AR18 and Series 2006-AR19 Certificates (the

11  "Certificates" or the "WaMu Certificates") who purchased the Certificates, backed by pools first

12  lien single-family residential mortgage loans whose interest rates (after an initial fixed-rate

13  period) adjust monthly and which include a negative amortization feature, pursuant to or

14  traceable to the following Offerings:

15          a.    $1,474,448,100 Offering of Series 2006-AR1 Certificates on or about

16  January 26, 2006, issued by Defendant WaMu Mortgage Pass-Through Certificates Series 2006-

17  AR1 Trust (the "2006-AR1 Offering");

18          b.    $332,239,100 Offering of Series 2006-AR2 Certificates on or about

19  February 15, 2006, issued by Defendant WaMu Mortgage Pass-Through Certificates Series

20  2006-AR2 Trust (the "2006-AR2 Offering");

21          c.    $990,012,100 Offering of Series 2006-AR3 Certificates on or about

22  March 21, 2006, issued by Defendant WaMu Mortgage Pass-Through Certificates Series 2006-

23  AR3 Trust (the "2006-AR3 Offering");

24          d.    $909,714,200 Offering of Series 2006-AR4 Certificates on or about

25  April 20, 2006, issued by Defendant WaMu Mortgage Pass-Through Certificates Series 2006-

26  AR4 Trust (the "2006-AR4 Offering");



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1               e.     $448,667,100 Offering of Series 2006-AR6 Certificates on or about June

2  22, 2006, issued by Defendant WaMu Mortgage Pass-Through Certificates Series 2006-AR6

3  Trust (the "2006-AR6 Offering");

4               f.     $1,255,863,100 Offering of Series 2006-AR7 Certificates on or about

5  June 23, 2006, issued by Defendant WaMu Mortgage Pass-Through Certificates Series 2006-

6  AR7 Trust (the "2006-AR7 Offering");

7               g.     $1,208,887,100 Offering of Series 2006-AR8 Certificates on or about

8  July 25, 2006, issued by Defendant WaMu Mortgage Pass-Through Certificates Series 2006-

9  AR8 Trust (the "2006-AR8 Offering");

10             h.     $1,328,647,642 Offering of Series 2006-AR10 Certificates on or about

11  August 21, 2006, issued by Defendant WaMu Mortgage Pass-Through Certificates Series 2006-

12  AR10 Trust (the "2006-AR10 Offering");

13             i.     $1,615,625,100 Offering of Series 2006-AR11 Certificates on or about

14  August 22, 2006, issued by Defendant WaMu Mortgage Pass-Through Certificates Series 2006-

15  AR11 Trust (the "2006-AR11 Offering");

16             j.     $1,694,778,749 Offering of Series 2006-AR12 Certificates on or about

17  September 22, 2006, issued by Defendant WaMu Mortgage Pass-Through Certificates Series

18  2006-AR12 Trust (the "2006-AR12 Offering");

19             k.     $1,468,050,100 Offering of Series 2006-AR13 Certificates on or about

20  September 25, 2006, issued by Defendant WaMu Mortgage Pass-Through Certificates Series

21  2006-AR13 Trust (the "2006-AR13 Offering");

22             l.     $1,683,891,100 Offering of Series 2006-AR14 Certificates on or about

23  October 20, 2006, issued by Defendant WaMu Mortgage Pass-Through Certificates Series 2006-

24  AR14 Trust (the "2006-AR14 Offering");

25

26

COMPLAINT FOR VIOLATION OF SECTIONS 11, 12
AND 15 OF THE SECURITIES ACT OF 1933 - 3
Case No.



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

010094-11 280145 V1

1    m.    $868,034,100 Offering of Series 2006-AR15 Certificates on or about

2    October 23, 2006, issued by Defendant WaMu Mortgage Pass-Through Certificates Series 2006-

3    AR15 Trust (the "2006-AR15 Offering");

4    n.    $1,444,737,100 Offering of Series 2006-AR16 Certificates on or about

5    November 16, 2006, issued by Defendant WaMu Mortgage Pass-Through Certificates Series

6    2006-AR16 Trust (the "2006-AR16 Offering");

7    o.    $1,124,131,100 Offering of Series 2006-AR17 Certificates on or about

8    November 17, 2006, issued by Defendant WaMu Mortgage Pass-Through Certificates Series

9    2006-AR17 Trust (the "2006-AR17 Offering");

10    p.    $1,554,983,100 Offering of Series 2006-AR18 Certificates on or about

11    December 18, 2006, issued by Defendant WaMu Mortgage Pass-Through Certificates Series

12    2006-AR18 Trust (the "2006-AR18 Offering");

13    q.    $1,187,632,100 Offering of Series 2006-AR19 Certificates on or about

14    December 19, 2006, issued by Defendant WaMu Mortgage Pass-Through Certificates Series

15    2006-AR19 Trust (the "2006-AR19 Offering").

16    2.    The Certificates were issued pursuant to a Form S-3/A Registration Statement

17    filed with the Securities Exchange Commission by Defendant WaMu Asset Acceptance Corp. on

18    or about December 30, 2005, Registration No. 333-130795, and an amendment to the Form

19    S-3/A on January 3, 2006 (the "Registration Statement").

20    3.    The Offerings occurred in part in this District. The Certificates herein are

21    Mortgage Pass-Through Certificates collateralized by residential home loans originated by

22    Defendant Washington Mutual Bank ("WMB"), which, at all relevant times, was a commercial

23    and residential lender. The mortgages and liens on the mortgaged properties constituting the

24    Certificates' collateral were, as set forth in the Registration Statement, to be the principal source

25    by which Certificate purchasers were to obtain repayment of their investment plus interest. As

26    also set forth in the Registration Statement, the Certificate collateral was purportedly originated

COMPLAINT FOR VIOLATION OF SECTIONS 11, 12
AND 15 OF THE SECURITIES ACT OF 1933 - 4
Case No.



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

010094-11 280145 V1

1  by WMB pursuant to specific underwriting procedures and guidelines. The Underwriter of the

2  Offerings was WaMu Capital Corporation ("WCC", the "Underwriter" or the "Underwriter

3  Defendant"). The Underwriter was obligated to conduct meaningful due diligence to ensure that

4  the Registration Statement and Prospectuses contained no material misstatements or omissions,

5  including the stated manner in which the mortgages had been originated. The Underwriter

6  received substantial fees for its work in connection with the Offerings. At the time of the

7  Offering, the Certificates were issued at approximately par or $1000.00 face value per

8  Certificate.

9      4.      Following the issuance of the Certificates, disclosures began to emerge revealing

10  WMB routinely disregarded the underwriting guidelines in its mortgage loan origination. These

11  disclosures were confirmed by substantially higher rates of delinquencies and foreclosures on

12  collateral for such highly-rated debt issues. Plaintiff purchased certain WaMu Certificates

13  pursuant to the Registration Statement. However, as of the date the within action was

14  commenced, Plaintiff's investment suffered a loss in value of over *40 percent.* The claims

15  asserted herein under the Securities Act do not sound in or arise from allegations of fraud.

16                      **II.      JURISDICTION AND VENUE**

17      5.      The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and

18  15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.

19      6.      This Court has jurisdiction over the subject matter of this action pursuant to

20  Section 22 of the Securities Act, 15 U.S.C. § 77v.

21      7.      Venue is proper in this District pursuant to Section 22 of the Securities Act.

22  Many of the acts and transactions alleged herein, including the preparation and dissemination of

23  many of the material misstatements and omissions contained in the Registration Statement and

24  Prospectuses filed in connection with the Offerings, occurred in substantial part in this District.

25  Additionally, the Certificates were actively marketed and sold in this District. In addition,

26  Defendants' principal place of business in this District.

COMPLAINT FOR VIOLATION OF SECTIONS 11, 12
AND 15 OF THE SECURITIES ACT OF 1933 - 5
Case No.



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1

### III.    PARTIES

2      8.      Plaintiff, the Boilermakers National Annuity Trust Fund, is a Taft-Hartley benefit

3    fund with offices located in Kansas City, Kansas. Plaintiff, as set forth in the accompanying

4    certification, incorporated by reference herein, and the Class purchased WaMu Certificates

5    pursuant to the Registration Statement and Prospectus which contained material misstatements

6    and omissions of facts necessary to make the facts stated therein not misleading. Plaintiff and

7    the Class relied on the misstatements and omissions in the Prospectuses and have suffered

8    damages pursuant to Sections 11, 12 and 15 of the Securities Act.

9      9.      Defendant WaMu Mortgage Pass-Through Certificates Series 2006-AR1 Trust

10   was the issuing entity for the 2006-AR1 Offering. Per its filings with the SEC, WaMu Series

11   2006-AR1 Trust has listed 1201 Third Avenue, 17th Floor, Seattle, Washington 98101 as its

12   principal office location. The Trustee of the WaMu Series 2006-AR1 is Deutsche Bank Trust

13   Company, a Delaware Trustee. Defendant WaMu Series 2006-AR1 Trust is a trust formed under

14   the laws of the State of Delaware.

15     10.     Defendant WaMu Mortgage Pass-Through Certificates Series 2006-AR2 Trust

16   was the issuing entity for the 2006-AR2 Offering. Per its filings with the SEC, WaMu Series

17   2006-AR2 Trust has listed 1201 Third Avenue, 17th Floor, Seattle, Washington 98101 as its

18   principal office location. The Trustee of the WaMu Series 2006-AR2 is Christiana Bank & Trust

19   Company, a Delaware Trustee. Defendant WaMu Series 2006-AR2 Trust is a trust formed under

20   the laws of the State of Delaware.

21     11.     Defendant WaMu Mortgage Pass-Through Certificates Series 2006-AR3 Trust

22   was the issuing entity for the 2006-AR3 Offering. Per its filings with the SEC, WaMu Series

23   2006-AR3 Trust has listed 1201 Third Avenue, 17th Floor, Seattle, Washington 98101 as its

24   principal office location. The Trustee of the WaMu Series 2006-AR3 is Deutsche Bank Trust

25   Company, a Delaware Trustee. Defendant WaMu Series 2006-AR3 Trust is a trust formed under

26   the laws of the State of Delaware.

COMPLAINT FOR VIOLATION OF SECTIONS 11, 12
AND 15 OF THE SECURITIES ACT OF 1933 - 6
Case No.



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900 • Seattle, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

010094-11 280145 V1

12.    Defendant WaMu Mortgage Pass-Through Certificates Series 2006-AR4 Trust was the issuing entity for the 2006-AR4 Offering. Per its filings with the SEC, WaMu Series 2006-AR4 Trust has listed 1201 Third Avenue, 17th Floor, Seattle, Washington 98101 as its principal office location. The Trustee of the WaMu Series 2006-AR4 is Deutsche Bank Trust Company, a Delaware Trustee. Defendant WaMu Series 2006-AR4 Trust is a trust formed under the laws of the State of Delaware.

13.    Defendant WaMu Mortgage Pass-Through Certificates Series 2006-AR6 Trust was the issuing entity for the 2006-AR6 Offering. Per its filings with the SEC, WaMu Series 2006-AR6 Trust has listed 1201 Third Avenue, 17th Floor, Seattle, Washington 98101 as its principal office location. The Trustee of the WaMu Series 2006-AR6 is Christiana Bank & Trust Company, a Delaware Trustee. Defendant WaMu Series 2006-AR6 Trust is a trust formed under the laws of the State of Delaware.

14.    Defendant WaMu Mortgage Pass-Through Certificates Series 2006-AR7 Trust was the issuing entity for the 2006-AR7 Offering. Per its filings with the SEC, WaMu Series 2006-AR7 Trust has listed 1201 Third Avenue, 17th Floor, Seattle, Washington 98101 as its principal office location. The Trustee of the WaMu Series 2006-AR7 is Christiana Bank & Trust Company, a Delaware Trustee. Defendant WaMu Series 2006-AR7 Trust is a trust formed under the laws of the State of Delaware.

15.    Defendant WaMu Mortgage Pass-Through Certificates Series 2006-AR8 Trust was the issuing entity for the 2006-AR8 Offering. Per its filings with the SEC, WaMu Series 2006-AR8 Trust has listed 1201 Third Avenue, 17th Floor, Seattle, Washington 98101 as its principal office location. The Trustee of the WaMu Series 2006-AR8 is Christiana Bank & Trust Company, a Delaware Trustee. Defendant WaMu Series 2006-AR8 Trust is a trust formed under the laws of the State of Delaware.

16.    Defendant WaMu Mortgage Pass-Through Certificates Series 2006-AR10 Trust was the issuing entity for the 2006-AR10 Offering. Per its filings with the SEC, WaMu Series



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1    2006-AR10 Trust has listed 1201 Third Avenue, 17th Floor, Seattle, Washington 98101 as its

2    principal office location. The Trustee of the WaMu Series 2006-AR10 is Christiana Bank &

3    Trust Company, a Delaware Trustee. Defendant WaMu Series 2006-AR10 Trust is a trust

4    formed under the laws of the State of Delaware.

5        17.    Defendant WaMu Mortgage Pass-Through Certificates Series 2006-AR11 Trust

6    was the issuing entity for the 2006-AR11 Offering. Per its filings with the SEC, WaMu Series

7    2006-AR11 Trust has listed 1201 Third Avenue, 17th Floor, Seattle, Washington 98101 as its

8    principal office location. The Trustee of the WaMu Series 2006-AR11 is Christiana Bank &

9    Trust Company, a Delaware Trustee. Defendant WaMu Series 2006-AR11 Trust is a trust

10   formed under the laws of the State of Delaware.

11       18.    Defendant WaMu Mortgage Pass-Through Certificates Series 2006-AR12 Trust

12   was the issuing entity for the 2006-AR12 Offering. Per its filings with the SEC, WaMu Series

13   2006-AR12 Trust has listed 1201 Third Avenue, 17th Floor, Seattle, Washington 98101 as its

14   principal office location. The Trustee of the WaMu Series 2006-AR12 is Christiana Bank &

15   Trust Company, a Delaware Trustee. Defendant WaMu Series 2006-AR12 Trust is a trust

16   formed under the laws of the State of Delaware.

17       19.    Defendant WaMu Mortgage Pass-Through Certificates Series 2006-AR13 Trust

18   was the issuing entity for the 2006-AR13 Offering. Per its filings with the SEC, WaMu Series

19   2006-AR13 Trust has listed 1201 Third Avenue, 17th Floor, Seattle, Washington 98101 as its

20   principal office location. The Trustee of the WaMu Series 2006-AR13 is Christiana Bank &

21   Trust Company, a Delaware Trustee. Defendant WaMu Series 2006-AR13 Trust is a trust

22   formed under the laws of the State of Delaware.

23       20.    Defendant WaMu Mortgage Pass-Through Certificates Series 2006-AR14 Trust

24   was the issuing entity for the 2006-AR14 Offering. Per its filings with the SEC, WaMu Series

25   2006-AR14 Trust has listed 1201 Third Avenue, 17th Floor, Seattle, Washington 98101 as its

26   principal office location. The Trustee of the WaMu Series 2006-AR14 is Christiana Bank &



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

010094-11 280145 V1

1  Trust Company, a Delaware Trustee. Defendant WaMu Series 2006-AR14 Trust is a trust

2  formed under the laws of the State of Delaware.

3      21.    Defendant WaMu Mortgage Pass-Through Certificates Series 2006-AR15 Trust

4  was the issuing entity for the 2006-AR15 Offering. Per its filings with the SEC, WaMu Series

5  2006-AR15 Trust has listed 1201 Third Avenue, 17th Floor, Seattle, Washington 98101 as its

6  principal office location. The Trustee of the WaMu Series 2006-AR15 is Christiana Bank & 

7  Trust Company, a Delaware Trustee. Defendant WaMu Series 2006-AR15 Trust is a trust

8  formed under the laws of the State of Delaware.

9      22.    Defendant WaMu Mortgage Pass-Through Certificates Series 2006-AR16 Trust

10  was the issuing entity for the 2006-AR16 Offering. Per its filings with the SEC, WaMu Series

11  2006-AR16 Trust has listed 1201 Third Avenue, 17th Floor, Seattle, Washington 98101 as its

12  principal office location. The Trustee of the WaMu Series 2006-AR16 is Christiana Bank &

13  Trust Company, a Delaware Trustee. Defendant WaMu Series 2006-AR16 Trust is a trust

14  formed under the laws of the State of Delaware.

15      23.    Defendant WaMu Mortgage Pass-Through Certificates Series 2006-AR17 Trust

16  was the issuing entity for the 2006-AR17 Offering. Per its filings with the SEC, WaMu Series

17  2006-AR17 Trust has listed 1201 Third Avenue, 17th Floor, Seattle, Washington 98101 as its

18  principal office location. The Trustee of the WaMu Series 2006-AR17 is Christiana Bank &

19  Trust Company, a Delaware Trustee. Defendant WaMu Series 2006-AR17 Trust is a trust

20  formed under the laws of the State of Delaware.

21      24.    Defendant WaMu Mortgage Pass-Through Certificates Series 2006-AR18 Trust

22  was the issuing entity for the 2006-AR18 Offering. Per its filings with the SEC, WaMu Series

23  2006-AR18 Trust has listed 1201 Third Avenue, 17th Floor, Seattle, Washington 98101 as its

24  principal office location. The Trustee of the WaMu Series 2006-AR18 is Christiana Bank &

25  Trust Company, a Delaware Trustee. Defendant WaMu Series 2006-AR18 Trust is a trust

26  formed under the laws of the State of Delaware.



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1    25.    Defendant WaMu Mortgage Pass-Through Certificates Series 2006-AR19 Trust

2    was the issuing entity for the 2006-AR19 Offering. Per its filings with the SEC, WaMu Series

3    2006-AR19 Trust has listed 1201 Third Avenue, 17th Floor, Seattle, Washington 98101 as its

4    principal office location. The Trustee of the WaMu Series 2006-AR19 is Christiana Bank &

5    Trust Company, a Delaware Trustee. Defendant WaMu Series 2006-AR19 Trust is a trust

6    formed under the laws of the State of Delaware.

7    26.    Deutsche Bank Trust Company Americas ("DBTCA") is the Trustee of the Series

8    2006-AR1, 2006-AR3 and 2006-AR4 Trusts and maintains offices in New York County at 60

9    Wall Street, New York, New York 10005.

10    27.    Christiana Bank & Trust Company ("CBTC") is the Trustee of the Series 2006-

11    AR2, 2006-AR6, 2006-AR7, 2006-AR8, 2006-AR10, 2006-AR11, 2006-AR12, 2006-AR13,

12    2006-AR14, 2006-AR15, 2006-AR16, 2006-AR17, 2006-AR18 and 2006-AR19 Trusts and

13    maintains offices in Greenville, Delaware.

14    28.    Defendant Washington Mutual Bank ("WMB") is identified as the "sponsor and

15    servicer" of the certificates. The Prospectus represents that it selects the mortgage loans held for

16    sale pursuant to the certificate. The servicer was authorized to use its discretion as to its

17    servicing of the loans specified in the pooling agreement, and as to which mortgages to include

18    in the pool.

19    29.    Defendant WaMu Asset Acceptance Corporation ("WMAAC") is the Depositor

20    for the Offerings, and the Parent Company of Issuers. WMAAC is a wholly owned operating

21    subsidiary of Washington Mutual, Inc. ("WMI"). According to its SEC filings, WMAAC

22    maintains its principal offices located at 1301 Second Avenue, WMC 3501A, Seattle,

23    Washington 98101.

24    30.    WMAAC is a wholly owned subsidiary of WMI. WMI is also the Parent

25    Company of Washington Mutual Bank, the Sponsor and Master Servicer of the Certificates, as

26    well as the Originator of the underlying mortgage loan collateral.

COMPLAINT FOR VIOLATION OF SECTIONS 11, 12
AND 15 OF THE SECURITIES ACT OF 1933 - 10
Case No.



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

31.    Defendant David Beck ("Beck") was, during the relevant period, a Director, the President and Principal Executive Officer of WMAAC. Beck signed the December 30, 2005, Registration Statement Form S-3 and the January 3, 2006, Registration Statement Form S-3/A pursuant to which the WaMu Certificates were offered, either on behalf of himself or by the authorized Attorney-In-Fact.

32.    Defendant Diane Novak ("Novak") was, during the relevant period, a Director of WMAAC. Novak signed the December 30, 2005, Registration Statement Form S-3 and the January 3, 2006, Registration Statement Form S-3/A pursuant to which the WaMu Certificates were offered, either on behalf of herself or by the authorized Attorney-In-Fact.

33.    Defendant Thomas Green ("Green") was, during the relevant period, the Chief Financial Officer (Principal Financial Officer) of WMAAC. Green signed the December 30, 2005, Registration Statement Form S-3 and the January 3, 2006, Registration Statement Form S-3/A pursuant to which the WaMu Certificates were offered, either on behalf of himself or by the authorized Attorney-In-Fact.

34.    Defendant Rolland Jurgens ("Jurgens") was, at all times during the relevant period, the Controller (Principal Accounting Officer) of WMAAC. Jurgens signed the December 30, 2005, Registration Statement Form S-3 and the January 3, 2006, Registration Statement Form S-3/A pursuant to which the WaMu Certificates were offered, either on behalf of himself or by the authorized Attorney-In-Fact.

35.    Defendant Richard Careaga ("Careaga") was, at all times during the relevant period, the authorized Attorney-in-Fact for WMAAC. Careaga signed the December 30, 2005, Registration Statement Form S-3 and the January 3, 2006, Registration Statement Form S-3/A pursuant to which the WaMu Certificates were offered, as the authorized Attorney-In-Fact.

36.    Defendant Beck, Novak, Green, Jurgens and Careaga are collectively referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with WMAAC, possessed the power and authority to control the contents of WMAAC's

COMPLAINT FOR VIOLATION OF SECTIONS 11, 12
AND 15 OF THE SECURITIES ACT OF 1933 - 11
Case No.



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1    submissions to the SEC and the market, and participated in the drafting and editing of the

2    Registration Statement and Prospectuses. The Individual Defendants all conducted business and

3    had business residences at 1301 Second Avenue, WMC 3501A, Seattle, Washington 98101.

4        37.    The Individual Defendants were officers and/or directors of WMAAC at the times

5    the Registration Statement and Prospectuses for the Offerings became effective, and with their

6    consent, were identified as such in the Registration Statement. In addition, they each signed the

7    relevant Registration Statement or authorized them to be signed on their behalf.

8        38.    The Individual Defendants, as officers and/or directors, each had a duty to

9    promptly disseminate accurate and truthful information with respect to WMACC and the WaMu

10   Trusts, and to correct any previously issued statements issued by, or on behalf of WMAAC

11   and/or the WaMu Trusts that had become materially misleading. The Individual Defendants'

12   misrepresentations and omissions in the Prospectuses violated these specific requirements and

13   obligations. The Individual Defendants were signatories to the Registration Statement filed with

14   the SEC and incorporated by reference in the Prospectuses.

15       39.    The Defendants are all liable, jointly and severally, as participants in the issuance

16   of the WaMu Certificates, including issuing, causing, or making materially misleading

17   statements in the Prospectuses and omitting material facts necessary to make the statements

18   contained therein not misleading.

19       40.    Defendant WaMu Capital Corporation is an investment banking firm principally

20   located at 1301 Second Avenue, Seattle, Washington, 98101. WCC served as the Underwriter

21   for each of the WaMu Certificates Offerings. WCC was intimately involved in the

22   aforementioned Offerings and failed to perform the requisite level of due diligence in connection

23   with these Offerings. The Prospectuses disseminated in connection with the Offerings contained

24   material misstatements and omissions of material fact relating to the "Underwriting Practices"

25   employed in originating the underlying subprime mortgage loans. WCC is one of the leading

26   underwriters in mortgage- and asset-backed securities in the United States.

COMPLAINT FOR VIOLATION OF SECTIONS 11, 12
AND 15 OF THE SECURITIES ACT OF 1933 - 12
Case No.

010094-11 280145 V1

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1

## IV.     CLASS ACTION ALLEGATIONS

2          41.      Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal

3     Rules of Civil Procedure on behalf of a class consisting of all persons who purchased or acquired

4     the Certificates (the "Class") pursuant and/or traceable to the Registration Statement and

5     Prospectuses issued in connection with the Offerings from the effective date through the date of

6     the filing of this action.  Excluded from the Class are Defendants, their respective officers and

7     directors at all relevant times, members of their immediate families and their legal

8     representatives, heirs, successors or assigns and any entity in which Defendants have or had a

9     controlling interest.

10         42.      The members of the Class are so numerous that joinder of all members is

11    impracticable.  While the exact number of Class members is presently unknown to Plaintiff and

12    can only be ascertained through appropriate discovery, Plaintiff reasonably believes that there

13    are thousands of members in the proposed Class.  Record owners and other members of the Class

14    may be identified from records maintained by Defendants and/or the Trustee for the Trusts and

15    may be notified of the pendency of this action by mail, the internet or publication using the form

16    of notice similar to that customarily used in securities class actions.

17         43.      Plaintiff's claims are typical of the claims of the members of the Class as all

18    members of the Class are similarly affected by Defendants' wrongful conduct in violation of

19    statutory law complained of herein.

20         44.      Plaintiff will fairly and adequately protect the interests of the members of the

21    Class and has retained Schoengold, Sporn, Laitman & Lometti, P.C. and Hagens Berman Sobol

22    Shapiro LLP, counsel competent and experienced in class and securities litigation.

23         45.      Common questions of law and fact exist as to all members of the Class and

24    predominate over any questions solely affecting individual members of the Class.  Among the

25    questions of law and fact common to the Class are:

26

COMPLAINT FOR VIOLATION OF SECTIONS 11, 12
AND 15 OF THE SECURITIES ACT OF 1933 - 13
Case No.



010094-11 280145 V1

1    a.    whether the provisions of the Securities Act of 1933 were violated by the

2    Defendants as alleged herein;

3    b.    whether the Registration Statement and Prospectuses contained materially

4    untrue statements or omitted statements of material fact; and

5    c.    to what extent the members of the Class have sustained damages pursuant

6    to the statutory measure of damages.

7    46.    A class action is superior to all other available methods for the fair and efficient

8    adjudication of this controversy since joinder of all members is impracticable. Furthermore, as

9    the damages suffered by individual Class members may be relatively small, the expense and

10    burden of individual litigation make it impossible for members of the Class to individually

11    redress the wrongs done to them. There will be no difficulty in the management of this action as

12    a class action.

13    ## V.    SUBSTANTIVE ALLEGATIONS

14    47.    Currently, the United States is ensnared in a financial crisis arising, in material

15    part, from the greed which drove financial firms to issue billions of dollars of debt securities

16    "collateralized" or securitized with mortgages which only recently have been revealed to have

17    been recklessly underwritten and originated. The Plaintiff and Class as purchasers of the

18    Certificates have been the victims of just such wrongful practices, having purchased the

19    Certificates pursuant to Registration Statements which contained misstatements and omissions

20    concerning the mortgage collateral "securitizing" the Certificates. The WaMu Trusts and other

21    entities related to the Offerings, *i.e.*, the Depositor and Underwriter Defendant, had enormous

22    financial incentive to consummate the Offerings of the Certificates as quickly as possible since

23    they were paid upon completion a percentage of the total dollar amount of the Offerings sold to

24    investors. Since the risk of the underlying collateral failing was not assumed by either

25    WMAAC, the WaMu Trusts, the Trustee or the Underwriter, there was also enormous incentive

26

COMPLAINT FOR VIOLATION OF SECTIONS 11, 12
AND 15 OF THE SECURITIES ACT OF 1933 - 14
Case No.

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

010094-11 280145 V1

1    not to conduct full, complete and meaningful due diligence of the statements in the Registration

2    Statement including those relating to the underlying mortgage collateral.

3        48.    The structure of each Offering was generally the same. WMAAC filed a

4    Registration Statement Form S-3 with the SEC, initially on December 30, 2005, and thereafter

5    amended it by filing a Registration Statement Form S-3/A on January 3, 2006, in connection

6    with the issuance of various series and classes of debt securities which would be governed by

7    said Registration Statement. At some time at or subsequent to each Offering, the "Issuing

8    Entity" Trust was then formed under the laws of the State of Delaware, *i.e.,* WaMu Mortgage

9    Pass-Through Certificates Series 2006-AR1 Trust, for which a Prospectus was filed on behalf of

10    as entity responsible for issuing the Certificates therein.

11        49.    Typically, the loans are originated by the Sponsor, or in this case a subsidiary of

12    the Sponsor, WMB, who then disposes of its loans primarily by selling them to third parties and

13    through securitizations. The Sponsor works with the Underwriters and the rating agencies to

14    select the pool of mortgage loans and structure the securitization transaction. The Sponsor or

15    subsidiary thereof also services the mortgage loans. On the closing date of any given Offering,

16    the Sponsor conveys the initial mortgage loans and the related mortgage insurance policies to the

17    Depositor, who will in turn convey the initial mortgage loans and the related mortgage insurance

18    policies to the Trust, by way of the Trustee. The Certificates are backed by the Issuer, and

19    consist of, *inter alia,* the mortgage loans; collections in respect of principal and interest of the

20    mortgage loans received; and the amounts on deposit in the collection account, including the

21    payment account in which amounts are deposited prior to payment to the certificate holders. On

22    the payment date, the certificate holders receive payments from the Trustee based on the

23    particular tranche purchased; typically, available funds for each distribution date will equal the

24    amount received by the trustee and available in the payment account on that distribution date,

25    including interest which differs depending upon the tranche held.

26

COMPLAINT FOR VIOLATION OF SECTIONS 11, 12
AND 15 OF THE SECURITIES ACT OF 1933 - 15
Case No.



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

010094-11 280145 V1

50.    In connection with the WaMu Offerings, WMAAC, Washington Mutual Bank, the WaMu Trusts and the Underwriter Defendant prepared and disseminated a Registration Statement and Prospectuses that contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading that were reasonably relied upon by Plaintiff and the Class to their own detriment.

A.    **WMB's Deficient Lending Practices**

1.    **WaMu and its core home lending business**

51.    WaMu's residential lending business was a driving force of WaMu's overall operations during the Relevant Period. It is beyond dispute that WaMu's lending operations were a significant contributor to the Company's income and also generated a substantial portion of the Company's assets. For example, in both its 2006 Form 10-K, filed with the SEC on March 1, 2007, and its 2007 Form 10-K with SEC, filed on February 29, 2008, the Company stated that almost 70% of its net interest income was generated by residential real estate loans and related products. Similarly, in its Forms 10-K for 2006 and 2007, WaMu also stated that over 60% of the Company's overall average assets were generated by residential real estate loans and related products.

52.    Throughout the Period, WaMu originated – that is, "sold" to its borrowers – residential loans through its retail and wholesale lending operations, which were primarily issued through WaMu's Home Loans and Commercial Groups – mainly WMAAC.

53.    As a requirement to a WaMu home loan becoming effective, or "closing," WaMu had to underwrite and approve the loan. That is, WaMu must ensure that the borrower qualifies for the loan product in question under the Company's underwriting standards, based upon documentation of the borrower's credit history and score, income, debt level, and other factors.

54.    A critical requirement in residential loan underwriting is the home appraisal, which is supposed to be an independent assessment of the market value of the real estate pledged by the borrower as collateral against the WaMu loan.

COMPLAINT FOR VIOLATION OF SECTIONS 11, 12
AND 15 OF THE SECURITIES ACT OF 1933 - 16
Case No.

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

55.    After originating home loans, WaMu either (a) retained the loans as investments in its "held for investment" portfolio, which generally were reflected as assets in the Company's public financial reports and in other information disseminated to the public; or (b) held such loans for sale, and, accordingly, securitized or otherwise sold off such loans to third parties in due course, primarily through the Capital Markets Division of WaMu's Home Loans Group, WCC.

56.    As noted above, WaMu reported significant income from its home lending operations during the Class Period.  With regard to its loans "held for investment," however, WaMu was also required to maintain and publicly report a reserve amount for probable losses related to such loans (for example, losses from WaMu borrowers defaulting on their obligations to make mortgage payments).  WaMu referred to its loss reserve as its Allowance for Loan and Lease Losses (the "Allowance").  The larger this reserve amount the less profit WaMu was deriving from their sub-prime investments, and thus, WMB, WMAAC and the individual Defendants as executives of WMAAC understated the Allowance figure to increase the apparent success of the sub-prime mortgage portfolio.

**2.    WaMu abandons customary lending and business practices in favor of much riskier loan products and company policies**

57.    Within the last five years, WaMu began to promote, through its lending subsidiaries WMB and WMAAC, riskier loan products to both prime borrowers (borrowers who appeared to be substantially creditworthy) and subprime borrowers, while reducing the share of traditional, fixed rate loans it originated.  Specifically, the Company focused heavily on originating loan products, such as WaMu's "flagship" product, the Option ARM loan, and subprime loans that were "nonconforming"; that is, they did not meet the specifications required by the government-sponsored entities ("GSEs"), such as Freddie Mac or Fannie Mae.

58.    Traditionally, the GSEs provided liquidity to the home mortgage market by purchasing conforming loans and, in certain cases, securitizing the loans.  Conforming loans

COMPLAINT FOR VIOLATION OF SECTIONS 11, 12
AND 15 OF THE SECURITIES ACT OF 1933 - 17
Case No.



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

010094-11 280145 V1

1 | impose certain standards, such as specific debt-to-income ratio limits and documentation

2 | requirements. Nonconforming loans, on the other hand, may be for much larger dollar amounts

3 | than conforming loans and made to less credit-worthy buyers. Because these nonconforming

4 | loans were riskier, WaMu could charge much higher interest rates and fees for their origination.

5 | 59. While WaMu acknowledged publicly that it had altered its loan origination mix in

6 | favor of generating more loans with higher profit margins, WMB, WMAAC and the other

7 | Defendants did not come close to revealing the full extent of WaMu's actual plans and business

8 | practices. As explained below, the Company's concerted efforts to transform itself from a sleepy

9 | savings and loan into a high-margin bank began to include highly questionable and unlawful

10 | practices. These practices were implemented to artificially fuel the growth that WaMu craved

11 | for their own personal short-term gain, all at the expense of WaMu investors.

12 | **3.    WaMu's risky, nontraditional loan products**

13 | 60. In order to maximize the Company's loan volume and the appearance of growth

14 | and profitability, WaMu strayed from traditional, high-quality, and fixed-rate lending to promote

15 | instead numerous types of nontraditional loans. Principal among WaMu's exotic loans were its

16 | Option ARM loans, a form of adjustable rate mortgage (ARM) loans (a loan where, instead of a

17 | fixed rate of interest, the interest rate is periodically adjusted over the term of the loan based on

18 | indices such as Treasury securities or the London Interbank Offered Rate ("LIBOR")). As

19 | explained in greater detail below, Option ARM loans were unique among ARM loans in that

20 | they give the borrower the option each month to make either a full, interest-only, or a "minimum

21 | payment." Option ARMs were WaMu's self-proclaimed "flagship product" and made up the

22 | majority of WaMu's "prime" mortgage originations during the Class Period, as well as the

23 | majority of the loans in WaMu's "held for investment" portfolio of loans. For example, in the

24 | fourth quarter 2006, Option ARM loans comprised $63.6 billion – or 64% – of WaMu's entire

25 | $99.5 billion loan portfolio.

26

COMPLAINT FOR VIOLATION OF SECTIONS 11, 12
AND 15 OF THE SECURITIES ACT OF 1933 - 18
Case No.

010094-11 280145 V1

**HB**
HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1    61.    WaMu's Option ARM minimum payment option is based on the interest rate

2    charged during the introductory period, and is almost always significantly lower than the loan's

3    fully-indexed payment rate. The fully-indexed rate is calculated using an index rate plus a

4    margin. When the introductory or "teaser" period ends, typically after a period of several

5    months, the contractual interest rate charged on the loan increases to the fully-indexed rate and

6    adjusts monthly to reflect movements in the index. For example, a teaser rate of 1.75% on a

7    $350,000, 30-year loan would yield an initial monthly payment of approximately $1,250. Once

8    the rate adjusts to the fully-indexed rate on the same loan, for example, to a rate of 7.0%, the

9    monthly payment would increase from $1,250 to a monthly payment of approximately $2,329 –

10    an approximate monthly increase for the borrower of over $1,079, or nearly twice borrower's

11    initial payment.

12    62.    If a WaMu Option ARM borrower continues to make only a minimum monthly

13    payment after the introductory period ends, his or her payments may not be sufficient to cover

14    the interest accrued on his or her loan. This results in so-called "negative amortization" of the

15    Option ARM loan as unpaid interest is deferred and added to the loan's principal balance.

16    During the Class Period, WaMu "capped" the amount of negative amortization on its Option

17    ARM loans from 100% to 125% of the original loan balance. So if a WaMu borrower reaches

18    the negative amortization cap (or at least every 60 months), the borrower's WaMu loan was

19    subject to "recasting," where a new minimum monthly payment is calculated that is sufficient to

20    fully repay the principal balance of the loan, including any theretofore deferred interest, over the

21    remainder of the loan term using the fully-indexed rate then in effect.

22    63.    The Company falsely represented that it was managing the Company's risk

23    associated with its Option ARM products by ensuring compliance with appropriate underwriting

24    standards, appropriately monitoring loan performance and conducting risk modeling procedures,

25    when in fact it was not doing so. For example, although the Company claimed that it did not

26    offer Option ARM loans to subprime borrowers, as alleged in greater detail below, WaMu in fact



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1    issued Option ARM loans to borrowers with credit scores as low as 540, when any credit score

2    below 660 is generally considered subprime. Moreover, as discussed below, WaMu

3    inappropriately underwrote many of its Option ARM loans at the loan's introductory interest

4    rate, rather than, as the Prospectuses continually represent, at the loan's fully-indexed interest

5    rate. In other words, WaMu often qualified its Option ARM borrowers based their ability to pay

6    temporary, very low "teaser" interest rates rather than the much higher interest rates that would

7    be in place for the overwhelming majority of the Option ARM loan term.

8        64.    WaMu also offered stated-income loans, which are mortgages in which the lender

9    does not verify the borrower's income by examining their pay stubs, W-2s, bank statements, tax

10   documents or other records. Instead, WaMu simply asked the borrower for his or her income

11   and took any such representations at face value. Due to the lack of verification, stated-income

12   loans are particularly risky. While these loans were initially intended for self-employed

13   borrowers with good credit, WaMu extended them even to subprime borrowers. Similarly, "no-

14   doc" or "low-doc" loans refer to loan products offered to borrowers that require little to no

15   documentation from the borrower. When these loans were extended to borrowers with

16   purportedly good credit who simply did not wish to offer documentation, WaMu referred to them

17   as "Alt-A" loans.

18       65.    WaMu extended subprime mortgage loans, which are mortgages that are offered

19   to relatively less creditworthy borrowers, and, like the various non-traditional ARM products

20   described above, typically cannot be sold to GSEs such as Fannie Mae and Freddie Mac.

21       66.    Subprime lending is risky for lenders due to the frequently poor credit histories of

22   subprime borrowers, and the higher interest rates that typically are charged for such loans. The

23   Company falsely stated in its annual SEC filings that it mitigated credit risk in its subprime

24   lending through careful underwriting of these loans.

25       67.    Although WaMu claimed that WaMu issued the loans described above only to

26   borrowers that WaMu deemed qualified after "rigorous" underwriting for each of these loan

COMPLAINT FOR VIOLATION OF SECTIONS 11, 12
AND 15 OF THE SECURITIES ACT OF 1933 - 20
Case No.



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

products, as a matter of policy the Company in fact actively took undisclosed, unlawful and unsafe measures to increase its volume of such loans.

**B.    The Registration Statement and the Prospectuses Contained Material Misstatements and Omissions of Fact**

68.    The Registration Statement represented that all of the loans which made up the pool of residential, subprime mortgages used to support the Certificates were subject to certain underwriting guidelines which assessed the borrower's creditworthiness, including multi-level reviews of loan applications and appraisals.

69.    The Registration Statement disclosed that the underlying loans were originated and/or acquired by WMB. Each of the Registration Statements and Prospectuses contained a general Section setting forth the "Underwriting Standards" applied to the loans which made up the Trust:

> **Underwriting Standards**
>
> The mortgage loans to be transferred to each trust will be subject to the various credit, appraisal and underwriting standards described herein and in the prospectus supplement. ***The depositor expects that the originator of each of the loans will have applied, consistent with applicable federal and state laws and regulations, underwriting procedures intended to evaluate the borrower's credit standing and repayment ability and/or the value and adequacy of the related property as collateral.*** The depositor expects the credit, appraisal and underwriting standards described herein to be continuously revised based on opportunities and prevailing conditions in the residential mortgage market and the market for the depositor's mortgage pass-through certificates, mortgage-backed notes and mortgage trust certificates.
>
> The underwriting criteria applied by the originators of the mortgage loans transferred to a trust may vary significantly among originators. The mortgage loan sellers will generally review only a limited portion of the mortgage loans in any delivery of such mortgage loans for conformity with the applicable credit, appraisal and underwriting standards. For each originator of 20% or more of the mortgage loans transferred to a trust, the accompanying prospectus supplement will describe, to the extent material, the originator's origination program and how long the originator has been engaged in originating assets. The description will include, to the extent material, a description of the originator's experience in

COMPLAINT FOR VIOLATION OF SECTIONS 11, 12
AND 15 OF THE SECURITIES ACT OF 1933 - 21
Case No.

HAGENS BERMAN
SOBOL SHAPIRO LLP

1301 Fifth Avenue, Suite 2900 • Seattle, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

010094-11  280145 V1

originating mortgage loans of the type transferred to the trust and the originator's underwriting criteria for those mortgage loans.

The underwriting standards of any particular originator typically include a set of specific criteria by which the underwriting evaluation is made. However, the application of the underwriting standards does not imply that each specific criterion was satisfied individually. Rather, a mortgage loan will be considered to be originated generally in accordance with a given set of underwriting standards if, based on an overall qualitative evaluation, the loan is in substantial compliance with the underwriting standards. For example, a loan may be considered to comply with a set of underwriting standards, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors compensated for the criteria that were not satisfied or if the loan is considered to be in substantial compliance with the underwriting standards.

The depositor anticipates that some of the mortgage loans held by a trust for certain series of securities will have been originated based on underwriting standards and documentation requirements that are less restrictive than for other mortgage loan lending programs. In such cases, borrowers may have credit histories that contain delinquencies on mortgage and/or consumer debts. Some borrowers may have initiated bankruptcy proceedings within a few years of the time of origination of the related loan. In addition, loans held by a trust may have been originated in connection with a governmental program under which underwriting standards were significantly less stringent and designed to promote home ownership or the availability of affordable residential rental property regardless of higher risks of default and losses.

The mortgage loan seller's underwriting standards are intended to evaluate a prospective mortgagor's credit standing and repayment ability, and the value and adequacy of the proposed mortgage property as collateral. In the loan application process, prospective mortgagors generally will be required to provide information regarding such factors as their assets, liabilities, income, credit history, employment history and other related items. Each prospective mortgagor generally will also provide an authorization to apply for a credit report which summarizes the mortgagor's credit history. With respect to establishing the prospective mortgagor's ability to make timely payments, the mortgage loan seller may require evidence regarding the mortgagor's employment and income, and of the amount of deposits made to financial institution where the mortgagor maintains demand or savings accounts. If a prospective mortgagor meets certain eligibility criteria, the mortgage loan seller may waive some of its documentation requirements and may not obtain information about the mortgagor's income and assets or may obtain but not verify such information.



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900 • Seattle, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

In determining the adequacy of the property as collateral, an appraisal is made of each property considered for financing. The appraiser, or an agent on its behalf, is generally required to personally inspect the property and verify that it is in adequate condition and that construction, if new, has been substantially completed. However, in some cases an automated valuation method may be used, under which the appraiser does not personally inspect the property but instead relies on public records regarding the mortgaged property and/or neighboring properties. In either case, the appraisal normally is based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, a replacement cost analysis based on the current cost of constructing or purchasing a similar property. Some of the mortgage loans may be re-underwritten by a mortgage loan seller.

Certain states where mortgage properties may be located are "anti-deficiency" states, where, in general, lenders providing credit on on-to-four-family properties must look solely to the property for repayment in the event of foreclosure. See "Legal Aspects of the Mortgage Loans—Anti-Deficiency Legislation and Other Limitation on Lenders". Underwriting standards in all states (including anti-deficiency states) will require that the underwriting officers be satisfied that the value of the property being financed, as indicated by the independent appraisal, currently supports and is anticipated to support in the future the outstanding loan balance, and provides sufficient value to mitigate the effects of adverse shifts in real estate values.

In the case of a mortgage loan secured by a leasehold interest in a residential property, commercial property or mixed-use property the title to which is held by a third party lessor, the mortgage loan seller, or another party on its behalf, will be required to warrant, among other things, that the remaining term of the lease and any sublease be at least five years longer than the remaining term of the mortgage loan.

For any loan insured by the FHA, the mortgage loan seller is required to represent that the FHA loan complies with the applicable underwriting policies of the FHA. See "Description of Primary Insurance Policies—FHA Insurance." For any loan guaranteed by the VA, the mortgage loan seller will be required to represent that the VA loan complies with the applicable underwriting policies of the VA. See "Description of Primary Insurance Policies—VA Guarantees." The recent foreclosure or repossession and delinquency experience with respect to mortgage loans serviced by the servicer or, if applicable, the master servicer or a significant sub-servicer will be provided in the related prospectus supplement.

COMPLAINT FOR VIOLATION OF SECTIONS 11, 12
AND 15 OF THE SECURITIES ACT OF 1933 - 23
Case No.



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1  *See* WMAAC, December 30, 2005, Form S-3, at 43-45; *see also* WMAAC, January 5, 2006,

2  Form S-3/A at 43-45.

3      70.    The Prospectuses further disclosed and represented that all the underlying loans

4  were subject to underwriting guidelines which varied in the levels scrutiny depending on the

5  borrower, yet all of which stressed homeowner credit-worthiness and *in most cases, full*

6  *documentation would be required from the borrower prior to being approved for a loan:*

7                    **UNDERWRITING OF THE MORTGAGE LOANS**

8          **General**

9          All of the mortgage loans owned by the Trust have been originated
           in accordance with the underwriting guidelines of the sponsor as
10         described in this section.  Mortgage loans may have been
           underwritten directly by the sponsor or by correspondent lenders
11         with delegated underwriting approval.

12         The sponsor's underwriting guidelines generally are intended to
           evaluate the prospective borrower's credit standing and repayment
13         ability and the value and adequacy of the mortgaged property as
           collateral.  Some mortgage loans are manually underwritten, in
14         which case an underwriter reviews a loan application and
           supporting documentation, if required, and a credit report of the
15         borrower, and based on that review determines whether to
           originate a loan in the amount and with the terms stated in the loan
16         application.  Some mortgage loans are underwritten through the
           sponsor's automated underwriting system, described below.

17

18         Prospective borrowers are required to complete a standard loan
           application in which they provide financial information regarding
19         such factors as their assets, liabilities and related monthly
           payments, income, employment history and credit history.  Each
20         borrower also provides an authorization to access a credit report
           that summarizes the borrower's credit history.  In the case of some
21         mortgage loans originated under the sponsor's streamline
           documentation programs (described below), the prospective
22         borrower is not required to provide certain financial information,
           including information about income and assets.

23         **Evaluation of the Borrower's Credit Standing**

24         To evaluate a prospective borrower's credit history, the loan
           underwriter obtains a credit report relating to the borrower from
25         one or more credit reporting companies, usually in the form of a
           merged credit report.  The credit report typically contains
26         information relating to such matters as credit history with local and

COMPLAINT FOR VIOLATION OF SECTIONS 11, 12
AND 15 OF THE SECURITIES ACT OF 1933  - 24
Case No.



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

010094-11 280145 V1

national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, repossession, suits or judgments. In most cases the credit report provides a credit score for the borrower, which represents a numerical weighing of the borrower's credit characteristics. Credit scores are designed to assess a borrower's creditworthiness and likelihood to default on an obligation over a defined period (usually two to three years) based on a borrower's credit history. Credit scores do not necessarily correspond to the probability of default over the life of a mortgage loan because they reflect past credit history, rather than an assessment of future payment performance. In addition, credit scores only indicate general creditworthiness, and credit scores are not intended to specifically apply to mortgage debt. Credit scores range from approximately 250 to approximately 900, with higher scores indicating more favorable credit history. If the loan underwriter obtains credit scores from three credit reporting companies, the middle score generally is used, and if two credit scores are obtained, the lowest score generally is used. In the case of co-borrowers, the credit score for the borrower with the lowest credit score generally is used (determined for each borrower as described in the immediately preceding sentence). Minimum credit scores are required for some loan products and loan programs. Credit scores may not be available for some borrowers.

**Evaluation of the Borrower's Repayment Ability**

In evaluating a prospective borrower's ability to repay a mortgage loan, the loan underwriter considers the ratio of the borrower's mortgage payments, real property taxes and other monthly housing expenses to the borrower's gross income (referred to as the "housing-to-income ratio" or "front end ratio"), and the ratio of the borrower's total monthly debt (including non-housing expenses) to the borrower's gross income (referred to as the "debt-to-income ratio" or "back end ratio"). The maximum acceptable ratios may vary depending on other loan factors, such as loan amount and loan purpose, loan-to-value ratio, credit score and the availability of other liquid assets. Exceptions to the ratio guidelines may be made when compensating factors are present. For purposes of calculating the "front end" and "back end" ratios for an Option ARM Loan, the borrower's monthly mortgage debt is determined based on a minimum mortgage loan interest rate, which rate may be greater than the rate in effect for the mortgage loan during the initial fixed-rate period. This minimum rate is set by the sponsor's credit department from time to time, and varies according to occupancy status and other factors. In addition, for purposes of calculating these ratios for an Option ARM Loan with a 40-year term, the borrower's monthly mortgage debt is determined based on 30-year term.

COMPLAINT FOR VIOLATION OF SECTIONS 11, 12
AND 15 OF THE SECURITIES ACT OF 1933 - 25
Case No.

010094-11 280145 V1



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

**Evaluation of the Adequacy of the Collateral**

The adequacy of the mortgaged property as collateral generally is determined by an appraisal made in accordance with pre-established appraisal guidelines. At origination, all appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation, and are made on forms acceptable to Fannie Mae and/or Freddie Mac. Appraisers may be staff appraisers employed by the sponsor or independent appraisers selected in accordance with the pre-established appraisal guidelines. Such guidelines generally require that the appraiser, or an agent on its behalf, personally inspect the property and verify whether the property is in adequate condition and, if the property is new construction, whether it is substantially completed. However, in the case of mortgage loans underwritten through the sponsor's automated underwriting system, an automated valuation method may be used, under which the appraiser does not personally inspect the property but instead relies on public records regarding the mortgaged property and/or neighboring properties. In either case, the appraisal normally is based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, a replacement cost analysis based on the current cost of constructing or purchasing a similar property. For mortgage loans underwritten under the sponsor's streamline documentation programs, the appraisal guidelines in some cases permit the appraisal obtained for an existing mortgage loan to be used. Title insurance is required for all mortgage loans, except that for mortgage loans secured by shares of cooperative apartments, title insurance is not required for the cooperative apartment building (but a lien search is provided by the title company). Specific additional title insurance coverage is required for some types of mortgage loans.

**Documentation Programs**

*Each mortgage loan has been underwritten under one of three documentation guidelines for verification of the borrower's stated income and assets. Under the sponsor's full/alternative documentation program, the prospective borrower's stated income is verified through receipt of the borrower's most recent pay stub and most recent W-2 form or, in the case of self-employed borrowers or borrowers with more than 25% of their income from commissions, two years of personal (and, if applicable, business) tax returns. For self-employed borrowers, profit and loss statements may also be required. Under the full/alternative documentation program, the borrower's stated assets are verified through receipt of the borrower's two most recent bank or brokerage statements. In addition, the borrower's employment is verified with the employer by telephone.*

COMPLAINT FOR VIOLATION OF SECTIONS 11, 12
AND 15 OF THE SECURITIES ACT OF 1933  - 26
Case No.



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

The sponsor's low documentation program places increased reliance on the value and adequacy of the mortgaged property as collateral, the borrower's credit standing and (in some cases) the borrower's assets. It is available to borrowers with certain loan-to-value ratios, loan amounts and credit scores. Under this program, the income as stated in the borrower's loan application is not verified, although the borrower's employment may be verified by telephone. The borrower's stated income must be reasonable for the borrower's occupation and assets (as determined in the underwriter's discretion). Assets are required to be verified when used as a compensating factor to support the borrower's claimed income or when specific loan-to-value ratio or loan amount maximums are exceeded.

The sponsor has several "streamline" documentation programs under which the prospective borrower's income and assets either are not required to be obtained or are obtained but not verified. Eligibility criteria vary but may include minimum credit scores, maximum loan amounts, maximum debt-to-income ratios and specified payment histories on an existing mortgage loan (generally, a history of timely mortgage payments for the past twelve months, or for the duration of the mortgage loan if less than twelve months old) or on other debt. Purchase loans as well as refinance loans may be eligible under the streamline documentation programs. For some mortgage loans that qualify under these programs, the borrower's income and assets are not required to be obtained. For some other mortgage loans that qualify under these programs, the borrower's income and assets are obtained but not verified, the borrower's employment is verified with the employer by telephone, and the borrower's stated income must be reasonable for the borrower's occupation and assets (as determined in the underwriter's discretion).

A credit report for the borrower generally is required for all mortgage loans underwritten under the sponsor's full/alternative and low documentation programs, and for all but a small percentage of mortgage loans underwritten under the sponsor's streamline documentation program.

\*       \*       \*

**Quality Control Review**

The sponsor's credit risk oversight department conducts quality control reviews of statistical samplings of previously originated mortgage loans on a regular basis.

See WAMU 2006-AR1 Prospectus at S-28-31; *see also,* WAMU 2006-AR2 Prospectus at S-20-23, WAMU 2006-AR3 Prospectus at S-25-28, WAMU 2006-AR4 Prospectus at S-35-37,

COMPLAINT FOR VIOLATION OF SECTIONS 11, 12
AND 15 OF THE SECURITIES ACT OF 1933 - 27
Case No.



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

010094-11 280145 V1

1  WAMU 2006-AR6 Prospectus at S-19-21, WAMU 2006-AR7 Prospectus at S-38-40, WAMU

2  2006-AR8 Prospectus at S-22-24, WAMU 2006-AR10 Prospectus at S-28-31, WAMU 2006-

3  AR11 Prospectus at S-50-52, WAMU 2006-AR12 Prospectus at S-26-28, WAMU 2006-AR13

4  Prospectus at S-38-40, WAMU 2006-AR14 Prospectus at S-20-22, WAMU 2006-AR15

5  Prospectus at S-36-38, WAMU 2006-AR16 Prospectus at S-22-24, WAMU 2006-AR17

6  Prospectus at S-37-39, WAMU 2006-AR18 Prospectus at S-22-24 and WAMU 2006-AR19

7  Prospectus at S-39-41.

8      71.    The statements in the preceding paragraph contained misstatements and material

9  omissions including in connection with the underwriting of the collateral mortgages. As set forth

10 below, a material portion of the underlying collateral for the WAMU Certificates originated by

11 WMB were not in accordance with the stated credit, appraisal and underwriting standards set

12 forth above.

13     72.    Specifically, the Registration Statements set forth *Streamlined Underwriting*

14 *Criteria,* as set forth in ¶ 70, in conjunction with its *Automated Underwriting System* which the

15 Company claimed was based mainly on the borrower's credit report and credit score.

16         **Automated Underwriting System**

17         Some mortgage loans originated through the sponsor's retail and
           wholesale lending divisions have been underwritten in whole or in
18         part through the sponsor's proprietary automated underwriting
           system, known as Enterprise Decision Engine or "EDE". Based
19         on the borrower's credit report and the information in the
           borrower's loan application, the system either (a) approves the loan
20         subject to the satisfaction of specified conditions, which may
           include the receipt of additional documentation, or (b) refers the
21         loan application to an underwriter for manual underwriting. In
           making the underwriting decision, EDE distinguishes between ten
22         different levels of credit standing, based on both the credit score
           and other items in the borrower's credit report. The sponsor has
23         developed these ten levels of credit standing based on a statistical
           analysis of the past performance of approximately 193,000
24         mortgage loans originated by the sponsor for its own portfolio
           between 1998 and 2001. The sponsor has been using EDE for
25         underwriting of mortgage loans since January 2005. The sponsor
           has also used in the past, and currently uses, other automated
26         underwriting systems. All or some of the mortgage loans owned

COMPLAINT FOR VIOLATION OF SECTIONS 11, 12
AND 15 OF THE SECURITIES ACT OF 1933 - 28
Case No.



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

010004-11 280145 V1

1    by the Trust may have been underwritten through EDE or other
automated underwriting systems.

*See* WAMU 2006-AR1 Prospectus at S-30; *see also,* WAMU 2006-AR2 Prospectus at S-22,

WAMU 2006-AR3 Prospectus at S-27-28, WAMU 2006-AR4 Prospectus at S-37, WAMU

2006-AR6 Prospectus at S-21, WAMU 2006-AR7 Prospectus at S-40, WAMU 2006-AR8

Prospectus at S-24, WAMU 2006-AR10 Prospectus at S-31, WAMU 2006-AR11 Prospectus at

S-52, WAMU 2006-AR12 Prospectus at S-28, WAMU 2006-AR13 Prospectus at S-40, WAMU

2006-AR14 Prospectus at S-22, WAMU 2006-AR15 Prospectus at S-38, WAMU 2006-AR16

Prospectus at S-24, WAMU 2006-AR17 Prospectus at S-39, WAMU 2006-AR18 Prospectus at

S-24 and WAMU 2006-AR19 Prospectus at S-41.

73.    The statements in the preceding paragraph contained misstatements and material

omissions including that "credit risk" and "quality control" were materially disregarded, whether

manually or via modifying the criteria of the automated system, in favor of generating sufficient

loan volume to complete the massive Certificate securitizations as alleged herein and as set forth

below.

74.    Each Offering Prospectus, which incorporated the language of the Registration

Statement, set forth the applicable policy for granting *Exceptions* to certain borrowers that did

not meet the applicable underwriting standards:

**Exceptions To Program Parameters**

Exceptions to the sponsor's loan program parameters may be made
on a case-by-case basis if compensating factors are present. In
those cases, the basis for the exception is documented, and in some
cases the approval of a senior underwriter is required.
Compensating factors may include, but are not limited to, low
loan-to-value ratio, low debt-to-income ratio, good credit standing,
the availability of other liquid assets, stable employment and time
in residence at the prospective borrower's current address.

*See* WAMU 2006-AR1 Prospectus at S-30; *see also,* WAMU 2006-AR2 Prospectus at S-22,

WAMU 2006-AR3 Prospectus at S-27, WAMU 2006-AR4 Prospectus at S-37, WAMU 2006-

AR6 Prospectus at S-21, WAMU 2006-AR7 Prospectus at S-40, WAMU 2006-AR8 Prospectus

COMPLAINT FOR VIOLATION OF SECTIONS 11, 12
AND 15 OF THE SECURITIES ACT OF 1933 - 29
Case No.

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

010094-11 280145 V1

1    at S-24, WAMU 2006-AR10 Prospectus at S-31, WAMU 2006-AR11 Prospectus at S-52,

2    WAMU 2006-AR12 Prospectus at S-28, WAMU 2006-AR13 Prospectus at S-40, WAMU 2006-

3    AR14 Prospectus at S-22, WAMU 2006-AR15 Prospectus at S-38, WAMU 2006-AR16

4    Prospectus at S-24, WAMU 2006-AR17 Prospectus at S-39, WAMU 2006-AR18 Prospectus at

5    S-24 and WAMU 2006-AR19 Prospectus at S-41.

6         75.    The statements in the preceding paragraph contained misstatements and material

7    omissions including that the "guidelines" for determining exceptions were materially disregarded

8    in favor of generating sufficient loan volume to complete the massive Certificate securitizations

9    as alleged herein and as set forth below.

10    **C.    Disclosures Relating To WMB's Deficient Lending Practices**

11         76.    WMAAC is a wholly owned subsidiary of WMB. WMB was one of the top U.S.

12    lenders which offered home loans to the public. WMB operated as one of the nation's largest

13    and most successful mortgage finance companies until its massive exposure to subprime and alt-

14    A mortgage loans placed the company in the midst of the growing crisis in United States

15    mortgage lending in 2007 and 2008.

16         77.    As the real estate market in this country softened and interest rates increased,

17    WaMu began to feel the pressures which ultimately resulted in the collapse of the subprime

18    markets. In April 2007, WaMu reported a 20% decline in the Company's first quarter 2007

19    profit. Kerry Killinger, WaMu's CEO, warned of "unprecedented deterioration in the subprime-

20    mortgage market, but stated that WMB's home-lending unit would become profitable again by

21    year-end. Throughout 2007, WMB kept pushing ever-increasing sub-prime mortgage loan

22    volume through its system by loosening the Company's underwriting practices and introducing a

23    growing percentage of higher risk mortgage products, including adjustable-rate, interest-only

24    loans and "stated income" loans, where even W-2 wage earners did not have to bother verifying

25    their stated income levels.

26

COMPLAINT FOR VIOLATION OF SECTIONS 11, 12
AND 15 OF THE SECURITIES ACT OF 1933 - 30
Case No.



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 ● SEATTLE, WA 98101
TELEPHONE (206) 623-7292 ● FACSIMILE (206) 623-0594

010094-11 280145 V1

1    78.    According to the Wall Street Journal, the Securities Exchange Commission

2    ("SEC") announced in November 2007 that it was initiating an investigation into how WaMu

3    handled and reported on mortgage loans that may have been based on inflated home appraisals.

4    The SEC's inquiry is in its infancy and involves several possible issues, including whether

5    Washington Mutual accurately disclosed to investors of mortgage-backed securities how its

6    loans were appraised as well as whether Washington Mutual properly accounted for its loans in

7    financial disclosures to its investors.

8    79.    By December 2007, shares of Washington Mutual Bank had hit an 11-year low,

9    as the Company announced, according to the Seattle Times, that it would be cooperating with an

10   SEC inquiry stemming from allegations by the New York State Attorney General Andrew

11   Cuomo that WMB had made mortgage loans based on improperly inflated home loans

12   appraisals. That same month Attorney General Cuomo announced his office had filed suit

13   against First American and eAppriaselIT alleging that WaMu handpicked appraisers and

14   otherwise manipulated the appraisal process through eAppraiselIT (a wholly owned subsidiary of

15   First American) to increase values in appraisal reports related to WaMu loans.

16   80.    Not long after this announcement, WaMu announced that the Company had

17   posted its first annual loss since the mid-1980's due to a huge loss in the fourth quarter of 2007

18   of $1.87 billion.

19   81.    Following these announcements, the price of WaMu Certificates dropped

20   dramatically from over $1.00 face value to just over $.09175 as of January 31, 2008.

21   82.    On March 3, 2008, Fitch Ratings downgraded $2.3 billion worth of WaMu

22   mortgage pass-through certificates backed by first lien subprime mortgages originated by WaMu.

23   Fitch based its downgrade on "the deteriorating performance of [WaMu's mortgage] pools from

24   2007, 2006 and late 2005 with regard to continued poor loan performance and home price

25   weakness."

26

COMPLAINT FOR VIOLATION OF SECTIONS 11, 12
AND 15 OF THE SECURITIES ACT OF 1933 - 31
Case No.

HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

010094-11 280145 V1

1        83.     On March 6, 2008, Standard & Poor's downgraded the Company's long-term

2    credit rating to "BBB" from "BBB+" because of credit concerns.  Similarly, Dominion Bond

3    Rating Service Limited ("DBRS") downgraded all long-term debt ratings of WaMu and its

4    subsidiaries to BBB (high) from A (low) citing concerns that "credit losses in the Company's

5    residential mortgage portfolio will continue to increase at an accelerated pace given the fact that

6    WaMu's portfolio has significant exposure to high loan-to-value second mortgages and to the

7    regions that have experienced the most significant depreciation in house prices (such as

8    California and Florida)." At the same time, DBRS also lowered its short-term debt ratings of

9    WaMu from R-2 (high) to R 1 (low).  In lowering the Company's debt ratings, DBRS noted that

10    the "trend on all ratings remains Negative."

11        84.     On March 7, 2008, The Wall Street Journal reported that WaMu was approaching

12    private-equity funds, sovereign-wealth funds, and other investors about possible cash infusions.

13    On that same day, Merrill Lynch stated in a report that it expected the Company to report losses

14    of as much as $11.2 billion through 2009 as more borrowers defaulted on home loans.

15        85.     Thereafter, on March 7, 2008, Fitch Ratings lowered it ratings on the Company

16    citing "a variety of internal and external sources" who predicted that WaMu's first quarter 2008

17    earnings, along with earnings of other United States banks, will show "rapid deterioration" in its

18    home equity loans portfolio.  In addition, Fitch pointed out that "[a]pproximately 37% of WM's

19    total loan portfolio comprises residential mortgage and home equity loans in California," a state

20    where properties "appear to be deteriorating at a faster pace than those in more stable markets."

21        86.     On March 14, 2008, Moody's downgraded the Company's senior unsecured debt

22    rating from Baa2 to Baa3, one level above junk status. In lowering its rating, Moody's explained

23    that it "believes that remaining lifetime losses on [WaMu's residential mortgage loan] portfolio

24    will be higher than previously expected" and that "WaMu's required provisioning is likely to be

25    greater than $12 billion and that full year 2008 net losses could eliminate the company's

26

COMPLAINT FOR VIOLATION OF SECTIONS 11, 12
AND 15 OF THE SECURITIES ACT OF 1933 - 32
Case No.



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1   approximately $6 billion capital cushion above regulatory well capitalized minimums."

2   Moody's also placed a negative outlook on all WaMu entities.

3       87.    On March 27, 2008, Lehman Brothers issued a report setting forth revised

4   estimates for the Company's 2008 financial results, including an earnings loss of $2.84 per share

5   and a loan loss provision increase to $10 billion. The report also estimated that the Company

6   would need to set aside $5 billion in 2009 for loan losses, and would incur $6 billion in charge-

7   offs in 2008 and $7 billion in charge-offs in 2009.

8       88.    In the wake of these announcements, the price of the WaMu Certificates plunged

9   to only $0.6570 on the dollar, according to the Plaintiff's end-of-month account statement for the

10  month ending March 31, 2008.

11      89.    On April 8, 2008, an investor group led by David Bonderman's TPG pumped $7.2

12  billion into WaMu, getting just over 50 percent of the Company at $8.75 a share. WaMu

13  announced it would close its approximately 186 remaining stand-alone home-loan offices, laying

14  off 2,600 to 3,000 workers.

15      90.    With the news of this infusion of much needed outside capital into the Company,

16  the price of the WaMu Certificates increased to $0.7380 by the end of April 2008, and as high as

17  $0.7797 by May 31, 2008, according to the Plaintiff's monthly account statements for those

18  periods.

19      91.    Nevertheless, on June 9, 2008, the public gained a much fuller understanding of

20  the magnitude and severity of the loss exposure facing WaMu. On this date, UBS Investment

21  Research published a detailed analyst report, concluding, after an "extensive credit analysis of

22  WM's balance sheet," that cumulative losses on WaMu's mortgage portfolio will likely total

23  close to $21.7 billion through 2011, between 12.5 to 44% greater than the loss guidance of $12 to

24  $19 billion that the Company provided to the market in April 2008. Moreover, with respect to its

25  $21.7 billion loss estimate, UBS observed that it might still be too low, stating: "The attributes

26  of WM's remaining loan portfolio and broader economic weakening mean our bias is that losses

COMPLAINT FOR VIOLATION OF SECTIONS 11, 12
AND 15 OF THE SECURITIES ACT OF 1933 - 33
Case No.



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

010094-11 280145 V1

1 | could be worse than our projection." This report also estimated that WaMu would record $24.2-
2 | $24.7 billion in incremental loan loss provisions between now and 2010.

3 |     92.    Thereafter, on June 24, 2008, Lehman Brothers issued a report predicting that
4 | WaMu would suffer mortgage losses in excess of the Company's April 2008 loss guidance of
5 | $12 to $19 billion over the next 3 to 4 years. Specifically, Lehman Brothers' report estimated
6 | that WaMu's "lifetime real estate mortgage losses will be in the $21 billion to $28 billion range."

7 |     93.    WaMu then announced that it would be cutting another 1,200 jobs at its Seattle,
8 | Washington headquarters. The price of the WaMu Certificates following these announcements
9 | sank from $0.7797 to $0.7018 by June 30, 2008, according to the Plaintiff's account statement
10 | for that period.

11 |     94.    On July 14, 2008, Lehman Brothers issued another analyst report, further
12 | confirming its estimate of $21 billion to $28 billion for WaMu's lifetime real estate mortgage
13 | losses and predicting that "WM will take a $4B provision in the 2Q08, building reserves to
14 | $6.9B, producing another large loss for the quarter." Moreover, the report estimated that WaMu
15 | would report a loss of $1.48 per share in the second quarter because: "As Washington Mutual
16 | builds reserves to cover these losses, it should remain unprofitable until credit costs normalize"
17 | around the second half of 2009.

18 |     95.    On that same day, Ladenburg Thalmann analyst Richard Bove issued a report
19 | questioning WaMu's financial viability and ability to stay afloat. In particular, Bove reported
20 | that WaMu was on the edge of "the danger zone."

21 |     96.    On July 14, 2008, in an attempt to mitigate any further drops in the price of its
22 | common stock – which could have dire consequences for the thrift's survival – WaMu issued a
23 | press release, claiming that the Company's was sufficiently capitalized and had excess liquidity
24 | of more than $40 billion. The Company's mitigation efforts were successful. Nothing could
25 | have been further from the truth.

26 |



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

010094-11 280145 V1

1    97.    On July 22, 2008, and less than ten days after it falsely calmed concerns about the

2    Company's financial strength, WaMu once again shocked the market. Specifically, WaMu

3    announced its second quarter 2008 financial results, including that the Company suffered a net

4    loss of $3.3 billion, more than 65% greater than the Company's first quarter 2008 net loss of

5    $1.14 billion, driven by a significant increase in its loan loss reserves. The Company further

6    announced that it increased its loan loss reserves by $3.74 billion to $8.46 billion and that it took

7    a $5.9 billion loan loss provision in the quarter, an increase of 40% from the $3.5 billion

8    provision that the Company recorded in the first quarter 2008. In explaining its increased loan

9    loss provision, the Company stated that, "approximately one third of the second quarter

10    provision for loan losses related to significant changes in key assumptions the company used to

11    estimate incurred losses in its loan portfolio." Specifically, the Company shortened the time

12    period used to evaluate defaults for its prime mortgage portfolio to one year from three years "to

13    reflect the evolving risk profile of the loan portfolio and adjusted its severity assumptions for all

14    single family mortgages to reflect the continuing decline in home prices."

15    98.    In addition, WaMu announced that its unpaid mortgages, foreclosed homes and

16    other nonperforming assets continued to increase during the second quarter. For example,

17    WaMu stated that its net charge-offs rose to $2.17 billion from $1.37 billion in the prior quarter

18    and nonperforming assets increased $2 billion, representing 3.62% of total assets compared with

19    2.87% at the end of the prior quarter. WaMu also announced that it expected cumulative losses

20    in its residential mortgage portfolio to total $19 billion, the high end of its previous guidance,

21    and that 2008 would be the peak year for provisioning.

22    99.    Also on July 22, WaMu held a conference call to discuss the Company's second

23    quarter 2008 financial results. Killinger and Tom Casey, WaMu's CFO, participated in the call

24    along with WaMu's new Chief Enterprise Risk Officer John McMurray. During the call,

25    Killinger, Casey and Murray reviewed the results set forth in the Company's press release. They

26    also explained that, in 2008, the Company's Option ARM loans experienced the fastest rise in

COMPLAINT FOR VIOLATION OF SECTIONS 11, 12
AND 15 OF THE SECURITIES ACT OF 1933 - 35
Case No.



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

010094-11 280145 V1

1  delinquency rates and that they expected "other prime loans, to follow Option ARMs closely."

2  According to McMurray, home equity loans and subprime mortgages had experienced high

3  delinquency rates during the late 2006 to late 2007 time period.  Moreover, during the call, the

4  Company announced that it "significantly reduced our production of new mortgages and

5  tightened underwriting standards against our loan portfolio."  Similarly, the Company also

6  announced it had "eliminated negatively amortizing products including the Option ARM from

7  our product line."

8      100.    Indeed, Dominion Bond Rating Service Limited and Standard & Poor's

9  downgraded WaMu's ratings.  Moody's placed WaMu and its bank subsidiary on review for a

10  downgrade to junk status.  Piper Jaffray downgraded WaMu to "Sell" and Merrill Lynch cut the

11  Company's rating to "Underperform."

12      101.    The price of the WaMu Certificates following these announcements sank from

13  $0.7018 on June 30, 2008, to below $0.6000, and as of July 31, 2008, was only $0.5725

14  according to the Plaintiff's account statement for the period ended July 31, 2008.

15      102.    Since the Offerings were consummated, WaMu and WMB's true deficient

16  lending practices have come to light, which brought about WaMu's filing for Chapter 11

17  Bankruptcy protection on September 26, 2008, and federal regulators seizure of the assets of the

18  bank and large scale sell-off of assets to JPMorgan.

19  **D.    WCC Plays Major Role in the Collapse of the Subprime Market**

20      103.    WCC played a prominent role in rise and fall of the U.S. subprime mortgage

21  market, most importantly as part of the a Division of the largest commercial bank failure in

22  history.  Since 2002, WaMu has been going directly to Wall Street with its products securitized

23  through its Capital Markets Division, WaMu Capital Corp.  In 2005, WCC was officially made a

24  wholly owned subsidiary of WMB.  WCC has helped enabled WaMu to issue billions in asset-

25  backed securities without obtaining the assistance of outside investment bankers.

26

COMPLAINT FOR VIOLATION OF SECTIONS 11, 12
AND 15 OF THE SECURITIES ACT OF 1933 - 36
Case No.



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

010094-11 280145 V1

104.    In connection with the Offerings, WCC failed to conduct meaningful due diligence, including in connection with the underwriting standards used to originate the Certificate collateral.

105.    WaMu announced in an article in the *New York Times,* in December 2007, that it would be closing its Capital Markets division and subsidiary, WCC as a cost-cutting measure.

<h3 style="text-align:center">COUNT I</h3>

<h3 style="text-align:center">VIOLATION OF SECTION 11 OF THE SECURITIES ACT<br>(Against All Defendants)</h3>

106.    Plaintiff repeats and realleges each and every allegation contained above.

107.    This claim is brought by Plaintiff pursuant to Section 11 of the Securities Act and asserted on behalf of all other members of the Class who purchased or acquired WaMu Certificates on or traceable to the Offerings.

108.    Defendant WMAAC is the registrant for the Offerings and filed the Registration Statement and Prospectuses as the issuer of the WaMu Certificates, as defined in Section 11(a)(1) of the Securities Act.

109.    The Individual Defendants were officers and/or directors of WMAAC at the time the Registration Statement filed in connection with the Offerings became effective, and at the time of the issuance of the Prospectuses, and with their consent were identified as such therein. The Individual Defendants are liable for the misstatements and omissions in the Registration Statement alleged herein under Section 11(a)(1) of the Securities Act.

110.    Defendant WCC served as the Underwriter for the Offerings and qualifies as such according to the definition in Section 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11).  As such, the Underwriter Defendant participated in the solicitation, offering, and sale of the WaMu Certificates to the investing public pursuant to the Registration Statement and the Prospectuses.

111.    The Registration Statement and the Prospectuses, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts



HAGENS BERMAN<br>SOBOL SHAPIRO LLP<br>1301 Fifth Avenue, Suite 2900 • Seattle, WA 98101<br>TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1    stated therein not misleading, as set forth above. The facts misstated and omitted would have

2    been material to a reasonable person reviewing the Registration Statement and the Prospectuses.

3    112.    The Defendants did not make a reasonable investigation and perform due

4    diligence and did not possess reasonable grounds for believing that the statements contained in

5    the Registration Statement and Prospectuses were true, did not omit any material fact, and were

6    not materially misleading.

7    113.    Plaintiff and the other Class members did not know, and in the exercise of

8    reasonable diligence, could not have known of the misstatements and omissions contained in the

9    Registration Statement and the Prospectuses.

10    114.    Plaintiff and other Class members sustained damages as a result of misstatements

11    and omissions in the Registration Statement and the Prospectuses, for which they are entitled to

12    compensation.

13    115.    Plaintiff brought this action within one year after the discovery of the untrue

14    statements and omissions, and within three years after the Offering.

15    <center>**COUNT II**</center>

16    <center>**VIOLATION OF SECTION 12(A)(2) OF THE SECURITIES ACT**
<center>**(Against all Defendants)**</center>

17

18    116.    Plaintiff repeats and realleges each and every allegation contained above.

19    117.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act on behalf

of the Class, against all Defendants.

20

21    118.    By means of the Registration Statement and Prospectuses, and by using means

22    and instruments of transportation and communication in interstate commerce and of the mails,

the Defendants through the Offerings sold WaMu Certificates to Plaintiff and other members of

23    the Class.

24

25    119.    Defendants WMAAC, WMB, the WaMu Trusts, the Individual Defendants and

26    the Underwriter Defendant each successfully solicited these purchases, motivated at least in part

COMPLAINT FOR VIOLATION OF SECTIONS 11, 12
AND 15 OF THE SECURITIES ACT OF 1933 - 38
Case No.



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

by their own financial interest. The Defendants each reviewed and participated in drafting the Prospectuses. Through ensuring the successful completion of the Offerings, the Underwriter Defendant obtained substantial underwriting fees.

120. The Registration Statement and the Prospectuses, at the time they became effective, contained material misstatements of fact and omitted facts necessary to make the facts stated therein not misleading, as set forth above. The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statement and the Prospectuses.

121. Defendants as "sellers" owed to the purchasers of the WaMu Certificates, including Plaintiff and other Class members, the duty to perform due diligence and make a reasonable and diligent investigation of the statements contained in the Registration Statement and the Prospectuses, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the IPO materials as set forth above.

122. Plaintiff and other members of the Class purchased or otherwise acquired WaMu Certificates pursuant to the defective Registration Statement and Prospectuses. Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Registration Statement and the Prospectuses.

123. Plaintiff, individually and representatively, hereby offers to tender to Defendants those securities which Plaintiff and other Class members continue to own, on behalf of all members of the Class who continue to own such securities, in return for the consideration paid for those securities together with interest thereon. Class members who have sold their WaMu Certificates are entitled to rescissionary damages.

124. By reason of the conduct alleged herein, these Defendants violated, and/or controlled a person who violated Section 12(a)(2) of the Securities Act. Accordingly, Plaintiff and members of the Class who hold WaMu Certificates purchased pursuant and/or traceable to



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

1    the Offerings have the right to rescind and recover the consideration paid for their WaMu

2    Certificates and hereby elect to rescind and tender their WaMu Certificates to the Defendants

3    sued herein. Plaintiff and Class members who have sold their WaMu Certificates are entitled to

4    rescissionary damages.

## COUNT III

### VIOLATION OF SECTION 15 OF THE SECURITIES ACT
### (Against Defendants WMAAC, the WaMu Trusts and the Individual Defendants)

125.    Plaintiff repeats and realleges each and every allegation contained above.

126.    This claim is brought by Plaintiff pursuant to Section 15 of the Securities Act and

asserted on behalf of all Class members who purchased or acquired WaMu Certificates in the

Offerings.

127.    The Individual Defendants at all relevant times participated in the operation and

management of WMAAC and the WaMu Trusts, and conducted and participated, directly and

indirectly, in the conduct of WMAAC and the WaMu Trusts' business affairs.

128.    As officers and/or directors of WMAAC, the Individual Defendants had a duty to

disseminate accurate and truthful information in the Registration Statement and the Prospectuses.

129.    Defendant WMAAC is the Parent Corporation and sole owner of the WaMu

Trusts, and at all relevant times participated in the operation and management of the WaMu

Trusts, and conducted and participated, directly and indirectly, in the conduct of the Trusts'

business affairs.

130.    As set forth above, it is alleged that the Registration Statement and Prospectuses

issued in connection with the WaMu Offerings contained material misstatements of fact, and

omitted facts necessary to make the facts contained therein not misleading, in violation of

Sections 11 and 12 of the Securities Act.

131.    Because of their positions of control and authority as senior officers and directors

of WMAAC, the Individual Defendants were able to, and did, control the contents of the

COMPLAINT FOR VIOLATION OF SECTIONS 11, 12
AND 15 OF THE SECURITIES ACT OF 1933 - 40
Case No.



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

010094-11 280145 V1

1    Registration Statement and Prospectuses which contained material misstatements of fact and

2    omitted facts necessary to make the facts stated therein not misleading. The Individual

3    Defendants were therefore "controlling persons" of WMAAC within the meaning of Section 15

4    of the Securities Act.

5        132.    In addition, because of its sole ownership of the WaMu Trusts and its control and

6    authority as Parent Corporation, Defendant WMAAC was able to, and did, control the contents

7    of the Registration Statement and the Prospectuses which contained material misstatements of

8    fact and omitted facts necessary to make the facts stated therein not misleading. Defendant

9    WMAAC was therefore a "controlling person" of the WaMu Trusts within the meaning of

10   Section 15 of the Securities Act.

11       133.    Plaintiff and other Class members purchased WaMu Certificates issued pursuant

12   to the Offerings. The Offerings were conducted pursuant to the Registration Statement and the

13   Prospectuses.

14       134.    The Registration Statement and Prospectuses, at the time they became effective,

15   contained material misstatements of fact and omitted facts necessary to make the facts stated

16   therein not misleading. The facts misstated and omitted would have been material to a

17   reasonable person reviewing the Registration Statement and the Prospectuses.

18       135.    Plaintiff and the Class did not know, and in the exercise of reasonable diligence,

19   could not have known of the misstatements and omissions in the Registration Statement and the

20   Prospectuses.

21       136.    Plaintiff and the Class have sustained damages as a result of the misstatements

22   and omissions of the Registration Statement and the Prospectuses, for which they are entitled to

23   compensation.

24       137.    Plaintiff brought this action within one year after the discovery of the untrue

25   statements and omissions, and within three years after the Offerings.

26

COMPLAINT FOR VIOLATION OF SECTIONS 11, 12
AND 15 OF THE SECURITIES ACT OF 1933 - 41
Case No.



010094-11 280145 V1

1     **WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

2     A.     Determining that this action is a proper class action under Rule 23 of the Federal

3 Rules of Civil Procedure;

4     B.     Awarding compensatory damages in favor of Plaintiff and the other Class

5 members against all Defendants, jointly and severally, for all damages sustained as a result of

6 Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

7     C.     Rescinding the sale of the WaMu Certificates and compelling Defendants to

8 return to Plaintiff and the Class the consideration paid therefor;

9     D.     Awarding Plaintiff and the Class their reasonable costs and expenses

10 incurred in this action, including counsel fees and expert fees; and,

11     E.     Such other and further relief as the Court may deem just and proper.

12                    **JURY TRIAL DEMANDED**

13 Plaintiff hereby demands a trial by jury.

14 DATED: January 12, 2009.

15                HAGENS BERMAN SOBOL SHAPIRO LLP

16

17                By _____

18                    Steve W. Berman, WSBA #12536
                   Reed R. Kathrein

19                    1301 Fifth Avenue, Suite 2900
                   Seattle, Washington 98101

20                    Telephone: (206) 623-7292

21                    Joel P. Laitman
                   Christopher Lometti

22                    Frank R. Schirripa
                   Daniel B. Rehns (DR-5506)

23                    **SCHOENGOLD SPORN LAITMAN
                       & LOMETTI , P.C.**

24                    19 Fulton Street, Suite 406
                   New York, New York 10038

25                    Telephone: (212) 964-0046
                   Facsimile: (212) 267-8137

26                    *Counsel for Plaintiff and the Proposed Class*

COMPLAINT FOR VIOLATION OF SECTIONS 11, 12
AND 15 OF THE SECURITIES ACT OF 1933 - 42
Case No.



HAGENS BERMAN
SOBOL SHAPIRO LLP
1301 FIFTH AVENUE, SUITE 2900 • SEATTLE, WA 98101
TELEPHONE (206) 623-7292 • FACSIMILE (206) 623-0594

010094-11 280145 V1

## CERTIFICATION OF WASHINGTON MUTUAL MORTGAGE-BACKED
## CERTIFICATES SECURITIES CLASS ACTION COMPLAINT

I, Leonard G. Beauchamp, hereby certify that the following is true and correct to the best of my knowledge, information, and belief:

1.    I am the Acting Executive Administrator of The Boilermakers National Annuity Trust (the "Trust").

2.    I have reviewed the complaint filed in this case (the "Complaint"), and authorize the filing thereof.

3.    The Trust is willing to serve as a representative party on behalf of the Class (as defined in the Complaint), including providing testimony at deposition and trial, if necessary.

4.    During the Class Period (as defined in the Complaint), the Trust purchased and/or sold the security that is the subject of the Complaint as set forth on the attached.

5.    The Trust did not engage in the foregoing transactions at the direction of counsel or in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

6.    During the three-year period preceding the date of my signing this Certification, the Trust has not served nor sought to serve as a representative party on behalf of a class in any private action arising under the Securities Act or the Exchange Act.

7.    The Trust will not accept any payment for serving as a representative party on behalf of the Class beyond its pro rata share of any possible recovery except for an award, as ordered by the court, for reasonable costs and expenses directly relating to their representation of the Class.

Signed under the penalties of perjury, this 23 day of December, 2008.

Leonard G. Beauchamp, on behalf of The Boilermakers
National Annuity Trust

## SCHEDULE A

| DATE | BUY/SELL | NO. OF UNITS | PRICE PER UNIT |
|------|----------|--------------|----------------|
| 02/15/2007 | Buy | 4,025,923.15 | $101.1031 |
| 02/05/2008 | Buy | 160,271.93 | $90.0156 |