Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| BOILERMAKERS NATIONAL ANNUITY TRUST FUND, on Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>WAMU MORTGAGE PASS-THROUGH CERTIFICATES, SERIES AR1, *et al.*,<br><br>Defendants. | Case No.: C09-0037 (MJP)<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br><u>**JURY DEMAND**</u><br><br><u>**ECF CASE**</u> |
| NEW ORLEANS EMPLOYEE'S RETIREMENT SYSTEM, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR WASHINGTON MUTUAL BANK, *et al.*,<br><br>Defendants. | |
| NEW ORLEANS EMPLOYEE'S RETIREMENT SYSTEM, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>THE FIRSTAMERICAN CORPORATION, *et al.*,<br><br>Defendants. | |

CONSOLIDATED CLASS ACTION COMPLAINT
Case No.: C09-0037 (MJP)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DORAL BANK PUERTO RICO, on Behalf of Itself and All Others Similarly Situated,

        Plaintiff,

   v.

WASHINGTON MUTUAL ASSET ACCEPTANCE CORPORATION, *et al.*

        Defendants.

**Case No.: C09-1557 (MJP)**

**ECF CASE**

CONSOLIDATED CLASS ACTION COMPLAINT
Case No.: C09-0037 (MJP)

1

TABLE OF CONTENTS

2  I.    SUMMARY OF THE ACTION ................................................................1

3  II.   JURISDICTION AND VENUE ...............................................................9

4  III.  PARTIES AND RELEVANT NON-PARTIES .....................................10

5  IV.   BACKGROUND .....................................................................................20

6        A.   The Proliferation of Subprime Mortgage-Backed Securities...............20

7        B.   WaMu's Origination and Securitization Operations...........................22

8             1.   Origination of Mortgage Loans By WMB................................23

9             2.   WCC's "Due Diligence" Review..............................................24

10            3.   The Roles of WCC and the Rating Agencies in the Securitization
                    of Subprime Loans and the Structuring of the Certificates.......25

11       C.   The Appraisal Defendants Inflated Property Valuations....................25

12       D.   WCC's Failure to Conduct Due Diligence .......................................29

13       E.   Collapse of the Mortgages Underlying the Certificates......................33

14       F.   The Ratings Agencies' Outdated Rating Models...............................34

15       G.   The Ratings Agencies Failure to Conduct Due Diligence ..................36

16       H.   Ratings Shopping ..........................................................................37

17       I.   The Rating Agencies' Hand in Forming and Structuring the Offerings...............38

18       J.   The Financial Conflicts of Interest between WaMu and the Rating
              Agencies......................................................................................39

20  V.   THE APPRAISER DEFENDANTS' FALSE VALUATIONS.................42

21  VI.  THE DEFENDANTS' MISTATEMENTS AND OMISSIONS ...............46

22       A.   The Offering Documents Included Material Misstatements and Omitted
              Information Regarding Stated Mortgage Loan Underwriting Guidelines............46

23       B.   The Offering Documents Included Material Misstatements and Omitted
              Information Regarding the Risks Associated with Appraisals ...............55

25       C.   The Offering Documents Included Material Misstatements and Omitted
              Information Regarding Credit Support ................................................61

26       D.   The Prospectus Supplements Misstated the True Loan-to-Value Ratios
              Associated with the Underlying Mortgages..........................................64

CONSOLIDATED CLASS ACTION COMPLAINT
Case No.: C09-0037 (MJP)

SCOTT+SCOTT
600 B Street, Suite 1500
San Diego, California
Telephone: (619) 233-4565

1

     E.     The Prospectus Supplements Misstated the Certificates' True Credit Ratings ..................................................................................................67

VII.    CLASS ACTION ALLEGATIONS ...............................................70

VIII.   CAUSES OF ACTION .................................................................71

IX.     PRAYER FOR RELIEF ...............................................................88

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSOLIDATED CLASS ACTION COMPLAINT
Case No.: C09-0037 (MJP)

## I. SUMMARY OF THE ACTION

1.     This action is brought pursuant to the Securities Act of 1933 (the "Securities Act") as amended by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 77a, *et seq.*, by court-appointed lead plaintiff Policemen's Annuity and Benefit Fund of the City of Chicago ("Chicago PABF" or "Lead Plaintiff"), plaintiff Boilermakers National Annuity Trust ("Boilermakers") and plaintiff Doral Bank Puerto Rico ("Doral") (collectively, "Plaintiffs") on their own behalf and on behalf of a class all persons and entities (the "Class") who purchased or otherwise acquired interests in specific Washington Mutual Mortgage Pass-Through Trusts (the "Issuing Trusts"), as set forth in ¶42, *infra*, pursuant to and traceable to two Registration Statements and accompanying Original Basic Prospectuses filed with the Securities and Exchange Commission (the "SEC") by Washington Mutual Asset Acceptance Corporation ("WMAAC") on (i) December 30, 2005 (SEC File No. 333-134461), thereafter amended on January 6, 2006 on pre-effective Registration Statement Form S-3/A (the "2006 Registration Statement"); and (ii) March 13, 2007 (SEC File No. 333-141255), thereafter amended on April 9, 2007 on pre-effective Registration Statement Form S-3/A (the "2007 Registration Statement") (collectively referred to herein as the "Registration Statements").

2.     Pursuant to the Registration Statements and the subsequently-filed Prospectus Supplements incorporated therein (collectively, the "Offering Documents"), Washington Mutual Capital Corporation a/k/a WaMu Capital Corporation ("WCC") underwrote and sold to Plaintiffs and the Class $47.25 billion of Washington Mutual Mortgage Pass-Through Certificates (the "Certificates"). The Certificates were issued in a series of thirty-six (36) offerings which took place between January 26, 2006 and June 26, 2007 (collectively, the "Offerings").

3.     As set forth below, the Offering Documents contained material misstatements and omissions. Defendants are strictly liable for these material misstatements and omissions under

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)          1

SCOTT + SCOTT
600 B Street, Suite 1500
San Diego, California
Telephone: (619) 233-4565

1  Sections 11, 12 and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.  In addition,

2  defendants are liable under the Washington State Securities Act ("WSSA"), RCW 20.21 et seq., for

3  violations of RCW 21.20.010 (2) and (3).  With respect to the Defendants' violations of the

4  Securities Act and WSSA, the Complaint asserts no allegations or claims sounding in fraud.

5          4.      Plaintiffs seek redress against Defendant WMAAC, who prepared and filed the

6  Registration Statements and was the depositor of the underlying mortgage collateral into the Issuing

7  Trusts; Defendants David Beck ("Beck"), Diane Novak ("Novak"), Thomas Green ("Green"),

8  Rolland Jurgens ("Jurgens") and Richard Careaga ("Careaga"), Thomas Lehmann ("Lehmann"),

9  Stephen Fortunato ("Fortunato") and Donald Wilhelm ("Wilhelm"), the officers of WMAAC and the

10  individual signatories to either or both of the Registration Statements filed by WMAAC; Defendant

11  WCC, the underwriter of the Offerings; and Defendants Moody's Investors Services, Inc.

12  ("Moody's") and McGraw-Hill Companies, Inc. ("McGraw-Hill") inclusive of its Standard & Poor's

13  Ratings Services ("S&P") division (collectively, the "Rating Agencies"), the nationally recognized

14  statistical ratings organizations that were engaged to rate the Certificates; and Washington Mutual,

15  Inc. ("WMI") which was the parent company to WMB.[1]   Plaintiffs also seek redress against First

16  American Corporation ("First American") and First American eAppraiseIT, LLC ("eAppraiseIT"),

17  appraisers of the properties that collateralized the mortgages underlying the Certificates.

18          5.      WMAAC, WMB and WCC, together with their affiliates and subsidiaries, are

19

20

21

22

23  _____

24  [1]     Washington Mutual Bank, the sponsor/seller for each of the Offerings, as well as the
25  originator and servicer for all of the underlying mortgage loan collateral for each of the Offerings is
    not named as a Defendant herein, solely due to the fact that on September 25, 2008 the Office of
26  Thrift Supervision seized Washington Mutual Bank and placed it into the receivership of the Federal
    Deposit Insurance Corporation ("FDIC"), which sold Washington Mutual Bank's assets to JPMorgan
27  Chase & Co.

28  CONSOLIDATED COMPLAINT
    Case No.: C09-0037 (MJP)                    2

collectively referred to herein as "WaMu."[2]

6.      This action arises from the role of WaMu in originating or acquiring and then converting approximately 75,608 mortgage loans, mainly sub-prime first-lien hybrid adjustable rate loans with an initial fixed-rate period, into $47.25 billion of purportedly "investment grade" mortgage-backed securities, which were then sold to Plaintiff and the Class in a series of thirty-six (36) public Offerings made pursuant to the Offering Documents.  The value of the Certificates was directly tied to the value of the underlying mortgages, as well as the repayment of the underlying mortgages by borrowers since the principal and interest payments due to investors were secured and derived from borrower payments.[3]

7.      WaMu controlled almost every aspect of the creation and issuance of the Certificates – from origination and pooling of the underlying mortgage loans, through the securitization of the loans and the sale of the Certificates representing interests in the loans to Plaintiffs and the Class. All of the mortgage loans underlying the Certificates were originated by WMB or otherwise acquired by WMB from various "correspondent" mortgage lenders throughout the Country.  WMB formed WMAAC, a special purpose entity, for the sole purpose of acquiring mortgage loans from WMB and transferring the mortgage loans into the Issuing Trusts, which, in turn, issued the Certificates.  The Certificates were then purchased by WCC, the underwriter, from the Issuing Trusts

[2]      Washington Mutual Mortgage Securities Corporation, a limited purpose subsidiary of Defendant WMB, served as the sponsor/seller of the mortgage loan collateral for certain WaMu Offerings.  WMB and WMMSC performed identical functions for the purposes of the Offerings complained of herein and as such, for the purposes of the Complaint, shall be referred to collectively as "WMB."
[3]      As the original borrowers on each of the underlying mortgage loans paid their mortgages, distributions were made to investors through the Issuing Trusts in accordance with the terms of the Offering Documents governing the issuance of the Certificates.  If borrowers failed to pay back their mortgages, defaulted, or were forced into foreclosure, the resulting losses flowed to the Certificate investors.  As set forth in the Prospectus Supplements, the Certificates were divided into classes, or "tranches," reflecting different priorities repayment, exposure to risk of default, and interest payments.

and sold to investors pursuant to the Offering Documents. Once the Certificates were issued and sold to investors, WMB's servicing division collected the mortgage payments submitted by borrowers and deposited the funds into the Issuing Trusts pursuant to the terms of each Issuing Trust's Indenture. The trustee that oversees the administration of each Issuing Trust periodically distributes payments to investors.

8.      In order for an Offering of Certificates to be marketable, a large proportion of the Certificates in the Offering had to be assigned the highest investment grade rating by at least two rating agencies. The reason is simple. Without high investment grade ratings, the Certificates could not be purchased by WaMu's principal clientele – institutional investors such as pension funds and insurance companies, because such investors' purchases are often restricted to securities rated above certain minimum allowable credit ratings.

9.      For this reason, WaMu did not leave the ratings assigned to the Certificates to chance. In fact, WaMu ensured such ratings were assigned by engaging firms such as Moody's and S&P to not only rate the Certificates at issuance, but also to directly participate in the securitization process. Undisclosed to Plaintiffs and the Class, the Rating Agencies played a significant role in determining which mortgage loans were to be included in the mortgage pools underlying the Certificates and in the structuring of the Offerings – *i.e.*, determining the number of classes, or tranches, each Offering would include, and the amount and type of investment protection or "credit enhancement" built into the Certificate structure.

10.     Also, WaMu did not disclose to Plaintiffs and the Class that WaMu engaged the Rating Agencies by way of "ratings shopping" - the practice of having the Rating Agencies provide proposed ratings on the Certificates as part of their bid for Certificate engagements.[4]

---

[4]     As former head of mortgage-backed securities at Moody's, Brian Clarkson stated in an

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                    4

11.    As a result, a substantial portion of the Certificates in each Offering were assigned the highest investment grade rating possible by the Rating Agencies at the time of their issuance – "Aaa" for Moody's and "AAA" for S&P (hereinafter collectively referred to as "AAA.")  Overall, the Rating Agencies assigned AAA ratings to over 93%, or $44.18 billion, of the Certificates.  In fact, none of the Certificates, at the time of their Offering, were assigned ratings below investment grade – "Ba1" and below for Moody's and "BB+" and below for S&P.

12.    The Certificates' ratings were material to investors because of the purchase restrictions stated above, as well as the fact that the ratings were a reflection of the risk or probability of default on the mortgages underlying the Certificates, according to the Offering Documents.

13.    Soon after the Certificates were issued, as a result of massive increases in borrower delinquency, foreclosures, repossessions and bankruptcies in the Certificates' underlying mortgage collateral, the value of the Certificates collapsed.  Plaintiffs and the Class have suffered realized losses of hundreds of millions of dollars as the value of the Certificates has plummeted.  Moreover, the likelihood of the value of the Certificates ever returning to par value is severely diminished by the fact that ***over 51%*** of the mortgage loans underlying the Certificates – the source of income for Certificate investors – are in some type of delinquency or default, or are subject to foreclosure or bankruptcy.  The delinquency and default rates on the Certificates' underlying mortgages  – arising from, among other things, faulty origination practices – has triggered unprecedented downgrades of the Certificates by the Rating Agencies.  Moody's and S&P have downgraded over 99%, or $46.75 billion, of the Certificates issued, of which 95%, or $44.56 billion, are now rated below investment grade.  Further, over 94%, or $41.62 billion, of the $44.18 billion of Certificates initially awarded AAA ratings have been downgraded to below investment grade.  As of the date of this filing, over

October 17, 2008 article in *Financial Times*, that in structured finance, including mortgage backed securities, "[y]ou start with a rating and build a deal around a rating."

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                    5

SCOTT + SCOTT
600 B Street, Suite 1500
San Diego, California
Telephone: (619) 233-4565

1   95% of the Certificates are rated speculative junk bond grade.

2        14.    Since the purchasers of the Certificates depended on the quality of the underlying

3   mortgage collateral for their financial returns, the descriptions of the loan origination practices

4   contained in the Offering Documents were highly material disclosures to them.  The Offering

5   Documents indicated that the underlying mortgage loans were originated pursuant to origination

6   guidelines that included an examination of borrower creditworthiness and an accurate, independent

7   appraisal of the property subject to each mortgage loan.

8

9        15.    The loan origination guidelines detailed in the Offering Documents contained

10  material misstatements and omissions since, as came to light only well after issuance of the

11  Certificates, the principal mortgage loan originator,   WMB, systematically disregarded the

12  underwriting guidelines in a number of ways.  The materiality of these misstatements and omissions

13  is reflected in the fact that the Rating Agencies, in downgrading the Certificates from the highest

14  investment grade to junk bond grade, specifically attributed the downgrades to "aggressive

15  underwriting" in the origination of the underlying mortgage loans.

16

17       16.    Compliance with the stated loan underwriting guidelines was highly material to

18  Certificate investors, who were dependent on the creditworthiness of the borrowers for interest and

19  principal payments throughout the lifespan of the Certificates.  In contrast, WaMu had no such

20  similar financial interest, since their compensation was earned once the Offerings were completed.

21  For this reason, among others, WaMu, specifically WCC, conducted inadequate due diligence with

22  respect to whether the underlying mortgage loans were originated in conformity with the

23  underwriting guidelines stated in the Offering Documents – ignoring deficient lending

24  documentation and inflated appraisals of the properties collateralizing the mortgages underlying the

25  Certificates.  In fact, WCC failed to conduct any of its own due diligence at the underwriting stage of

26  the Offerings.  Instead, WCC relied on wholly inadequate reviews of the underlying mortgages,

27

28

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                    6

conducted by third-party firms, who were engaged by WCC to examine small samples – 5-7% at most – of the mortgage loans in WMB's loan portfolio.[5]  WCC's "due diligence" was limited, inadequate and defective.

17.   The Offering Documents fail to disclose that, Rating Agencies' models for assigning rates were woefully outdated.  It was only disclosed well after the issuance of the Certificates, that S&P's models had not been materially updated since 1999 and Moody's models had not been materially updated since 2002.  The Rating Agencies' models employed obsolete statistical assumptions based on the performance of mortgage loans and underwriting standards for mortgage loans issued prior to 2003.  However, Certificates' underlying mortgage collateral includes a substantial proportion of certain types of loans which only began to be originated *en masse* from 2003 moving forward – *i.e.,* sub-prime and Alt-A loans, adjustable rate mortgage loans ("ARMs") and non-traditional or hybrid-ARMs (*i.e.,* negative amortization loans or interest-only loans) – all issued with limited borrower documentation or employment verification.[6]  Thus, the Rating Agencies' models could in no way predict the performance of the Certificates' underlying mortgage collateral.

18.   The Offering Documents also failed to disclose material financial conflicts of interest

_____

[5]   WaMu contracted out the inspection of loans for compliance with the underwriting guidelines to outside third-party appraisal firms – *i.e.,* Clayton Holdings, Inc. ("Clayton") and The Bohan Group ("Bohan") – and then conducted limited oversight of these subcontractors' activities. As disclosed as part of an ongoing investigation of investment banking and mortgage-backed securities issuer misconduct in underwriting mortgage-backed securities being conducted by the New York Attorney General (the "NYAG"), Clayton and Bohan routinely provided issuers with detailed reports of loans non-compliant with underwriting guidelines, but WaMu routinely overrode and/or ignored these reports. Further, Bohan's President stated that, by the time the Offerings of the Certificates took place, issuers were requiring a review of only 5-7% of the entire loan pools.

[6]   As discussed below, originations of non-traditional adjustable mortgages, interest only and negative amortization loans increased dramatically between 2005 and 2007. These types of loans presented the greatest potential for "payment shock" to the borrower since they both provide small initial fixed rates for a limited period of time which then reset thereafter to much higher monthly payment amounts.

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                    7

1   between the Rating Agencies and WaMu, including WaMu's engagement of the Rating Agencies

2   through ratings shopping.  These conflicts of interest began to be disclosed to the public in a report

3   released by the SEC in July 2008 (the "July 2008 SEC Report"), after a year-long investigation into

4   the Rating Agencies' activities relating to the issuance of mortgage-backed securities in the period

5   spanning 2005 through 2007.  The July 2008 SEC Report disclosed that the Rating Agencies were

6   typically chosen by way of ratings shopping whereby the Ratings Agency that was ultimately

7   engaged was the one which provided the most profitable rating to the investment bank in "bidding"

8   for the engagement.  The July 2008 SEC Report also explained that the Rating Agencies were

9   incentivized, due to the highly profitable nature of these mortgage-backed securities engagements,

10   to not update their models, as doing so would render the Ratings Agencies unable to provide to the

11   investment bank the necessary credit enhancement and rating structure for the mortgage

12   securitization.

13
14

15          19.     The conflicts of interest which plagued the relationship between mortgage-backed

16   securities issuers and the Rating Agencies were further discussed in a report issued by the

17   Congressional Oversight Panel in January 2009 (the "January 2009 Congressional Oversight Panel

18   Report") which stated, in no uncertain terms, that the conflicts of interest arising out of the fee-based

19   relationship between mortgage-backed securities issuers and the Rating Agencies and the use of

20   inadequate and incorrect ratings models played a key role in the catastrophic decline in the value of

21   mortgage-backed securities, resulting in billions of dollars of investor losses.

22
23          20.     As set forth herein, the Offering Documents contained material misstatements and

24   omissions of material facts in violation of Sections 11 and 12 of the Securities Act, including the

25   failure to disclose that: (i) the mortgage loans underlying the Certificates were not originated in

26   accordance with the loan underwriting guidelines stated in either the Registration Statements or the

27   Prospectus Supplements, WaMu having failed to conduct either a meaningful assessment of the

28

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                    8

borrowers' creditworthiness or an accurate appraisal of the mortgaged properties; (ii) WMAAC and WCC failed to conduct adequate, and in most cases any, due diligence with respect to compliance with the loan underwriting guidelines stated in the Offering Documents; (iii) the appraisals on many of the properties collateralizing the mortgages underlying the Certificates were inflated; (iv) there were material undisclosed conflicts of interest between WaMu and the Rating Agencies, including those reflected in undisclosed ratings shopping practices, which incentivized the Rating Agencies to inflate Certificate ratings to maintain business with WaMu; and (v) the amount of credit enhancement provided to the Certificates was inadequate to support AAA and investment grade ratings because those amounts were determined primarily by the outdated models of the Rating Agencies.

21.     As a result of these material misstatements and omissions, Plaintiffs and the Class have suffered damages for which named defendants are liable pursuant to Sections 11, 12 and 15 of the Securities Act and the WSSA.

22.     In addition, as described fully below, First American and eAppraiseIT allowed appraisals performed by eAppraiseIT to be improperly influenced by WaMu allowing for defective, inflated valuations of the mortgage properties underlying the Certificates, thereby, among other things, artificially inflating loan-to-value ("LTV") ratios reported in the Offering Documents.  As a result, First American and eAppraiseIT have caused Plaintiffs and the Class to suffer damages for which these entities are liable under Section 11 of the Securities Act and the WSSA.

## II.  JURISDICTION AND VENUE

23.     Claims alleged herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o and the WSSA.  Jurisdiction is conferred by Section 22 of the Securities Act, and venue is proper pursuant to Section 22 of the Securities Act.  The Court has supplemental jurisdiction over the Plaintiffs' claims under the WSSA pursuant to 28 U.S.C. § 1367.

SCOTT + SCOTT
600 B Street, Suite 1500
San Diego, California
Telephone: (619) 233-4565

24.    The violations of law complained of herein, including, but not limited to, the dissemination of the Offering Documents containing material misstatements and omissions, occurred in this District.  All of the Defendants named herein, as well as their affiliates and subsidiaries, conduct or conducted business in this District.

## III.   PARTIES AND RELEVANT NON-PARTIES

25.    Lead Plaintiff Policemen's Annuity and Benefit Fund of the City of Chicago, is a public fund providing retirement, survivors and disability benefits to the City of Chicago Police officers.   Lead Plaintiff purchased the following Certificates pursuant and traceable to the Registration Statements and subsequent Prospectus Supplements and sustained realized losses of $14,727,986 thereby:

| Certificates Purchased | Amount of Units Purchased | Price Paid (Per Unit) |
|---|---|---|
| WaMu Mortgage-Pass Through Certificates, Series 2006-AR5 | 2,000,000 | $ 0.9947 |
| WaMu Mortgage-Pass Through Certificates, Series 2006-AR12 | 188,500 | $ 1.0021 |
| WaMu Mortgage-Pass Through Certificates, Series 2006-AR16 | 2,576,800 | $ 0.9950 |
| WaMu Mortgage-Pass Through Certificates, Series 2006-AR16 | 1,293,900 | $ 0.9857 |
| WaMu Mortgage-Pass Through Certificates, Series 2006-AR16 | 798,800 | $ 0.9628 |
| WaMu Mortgage-Pass Through Certificates, Series 2006-AR16 | 3,996,600 | $ 0.9987 |
| WaMu Mortgage-Pass Through Certificates, Series 2006-AR16 | 1,258,400 | $ 0.9693 |
| WaMu Mortgage-Pass Through Certificates, Series 2006-AR16 | 2,000,000 | $ 0.9908 |
| WaMu Mortgage-Pass Through Certificates, Series 2006-AR16 | 8,166,600 | $ 0.9971 |

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                    10

| | | |
|---|---|---|
| WaMu Mortgage-Pass Through Certificates, Series 2007-HY1 | 4,770,000 | $ 1.0093 |
| WaMu Mortgage-Pass Through Certificates, Series 2006-HY1 | 2,557,000 | $ 0.9860 |
| WaMu Mortgage-Pass Through Certificates, Series 2007-HY7 | 5,382,700 | $ 0.9983 |

26.     Plaintiff Boilermakers National Annuity Trust is a Taft-Hartley Pension Fund.  As reflected in the certification filed herein, Boilermakers purchased the following Certificates pursuant and traceable to the Registration Statements and subsequent Prospectus Supplements and has been damaged thereby.

| Certificates Purchased | Amount of Units Purchased | Price Paid (Per Unit) |
|---|---|---|
| WaMu Mortgage-Pass Through Certificates, Series 2006-AR7 | 4,025,923 | $ 1.0110 |
| WaMu Mortgage-Pass Through Certificates, Series 2006-AR7 | 160,272 | $ 0.9002 |
| WaMu Mortgage-Pass Through Certificates, Series 2007-HY7 | 2,700,000 | $ 0.9970 |

27.     Plaintiff Doral Bank Puerto Rico is a public diversified financial services company with offices located in Puerto Rico.  As reflected in the certification filed herein, Doral purchased the following Certificates pursuant and traceable to the Registration Statements and subsequent Prospectus Supplements and has been damaged thereby.

| Certificates Purchased | Amount of Units Purchased | Price Paid (Per Unit) |
|---|---|---|
| WaMu Mortgage-Pass Through Certificates, Series 2006-AR17 | 20,169,638 | $1.18 |
| WaMu Mortgage-Pass Through Certificates, Series 2006-AR18 | 77,406,568 | $0.68 |
| WaMu Mortgage-Pass Through Certificates, Series 2007-OA1 | 97,903,407 | $1.15 |
| WaMu Mortgage-Pass Through Certificates, Series 2007-OA4 | 87,911,350 | $1.07 |
| WaMu Mortgage-Pass Through | 66,050,534 | $1.05 |

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                    11

SCOTT + SCOTT
600 B Street, Suite 1500
San Diego, California
Telephone: (619) 233-4565

Certificates, Series 2007-OA5

| | | |
|---|---|---|
| WaMu Mortgage-Pass Through Certificates, WMALT Series 2007-OA5 | 62,402,082 | $1.11 |

28.     Defendant WMAAC, at all relevant times, was a wholly-owned subsidiary of WMB and was principally located at 1301 Second Avenue, WMC 3501A, Seattle, Washington 98101. WMAAC filed the Registration Statements and Prospectus Supplements with the SEC in connection with the Offerings and served as the depositor of the Certificate collateral with the Issuing Trust in each of the Offerings.  The role of WMAAC, a special purpose entity, was to purchase the mortgage loans from the WMB and then assign the mortgage loans and all of the rights and interest under the mortgage loan purchase agreement to the trustee for the benefit of the holders of certificates.

29.     WMB acted as the sponsor/seller for the Certificates issued pursuant to the Registration Statements.  All of the mortgage loans underlying the Certificates were originated pursuant to the stated underwriting guidelines of WMB.  WMB also serviced the underlying mortgage loans.  The principal offices for WMB's lending operations during the relevant period were located at 1301 Second Avenue, WMC 3501A, Seattle, Washington 98101.  As set forth in the Registration Statements, once originated or acquired by WMB, WMB would convey mortgages to a special purpose entity, WMAAC, which then deposited the mortgage collateral into the Issuing Trusts.  The Issuing Trusts then issued the Certificates supported by the cash flows from the mortgages and were secured by the mortgage assets.

30.     The FDIC, is a Relevant Non-party to this Action.  The FDIC is an independent agency of the U.S. Government.  The FDIC is organized and existing pursuant to the Federal Deposit Insurance Act, 12 U.S.C. §1811, *et seq.,* with its principle place of business located in Washington, D.C.  On September 25, 2008 the U.S. Office of Thrift Supervision seized WMB and appointed FDIC as receiver of WMB pursuant to 12 U.S.C. §1821(c).     Pursuant to 12 U.S.C.

1  §1821(c)(3)(A)(ii), the FDIC accepted appointment as receiver.  On January 28, 2009, the FDIC was

2  substituted in place of WMB in two of the now consolidated actions.

3      31.    Defendant WMAAC filed the 2006 and 2007 Registration Statements and

4  accompanying Prospectus Supplements with the SEC on Form S-3, as subsequently amended on

5  Form S-3/A as follows:

6

7  **Registration Statement File No. 333-134461**

8  | **Date Filed** | **Form Type** | **Amount Registered** |
| --- | --- | --- |
| December 30, 2005 | S-3 | $ 1,000,000.00 |
9  | January 3, 2006 | S-3/A | $ 100,000,000,000.00 |

10 **Registration Statement File No. 333-141255**

11 | **Date Filed** | **Form Type** | **Amount Registered** |
| --- | --- | --- |
| March 13, 2007 | S-3 | $ 1,000,000.00 |
12 | April 9, 2007 | S-3/A | $ 400,000,000,000.00 |

13     32.    Defendant Beck was, at all relevant times, WMAAC's President and Principal

14 Executive Officer as well as a Director of WMAAC.  Beck signed the Registration Statements for

15 the Offerings.

16     33.    Defendant Novak was, at all relevant times, a Director of WMAAC.  Novak signed

17 the Registration Statements.

18     34.    Defendant Green was, at all relevant times, WMAAC's Chief Financial Officer and

19 Principal Financial Officer.  Green signed the 2006 Registration Statement for the Offerings.

20

21     35.    Defendant Jurgens was, at all relevant times, WMAAC's Controller and Principal

22 Accounting Officer.  Jurgens signed the 2006 Registration Statement.

23     36.    Defendant Careaga was, at all relevant times, WMAAC's First Vice President and

24 served as its Attorney-in-Fact.  Careaga signed the 2006 Registration Statement.

25     37.    Defendant Lehmann was, at all relevant times, WMAAC's Director and President

26 (Principal Executive Officer).  Lehmann signed the 2007 Registration Statement.

27

28     38.    Defendant Fortunato was, at all relevant times, WMAAC's Chief Financial Officer

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)            13

SCOTT + SCOTT
600 B Street, Suite 1500
San Diego, California
Telephone: (619) 233-4565

1  (Principal Financial Officer).  Fortunato signed the 2007 Registration Statement.

2      39.    Defendant Wilhelm was, at all relevant times, WMAAC's Controller (Principal
3  Accounting Officer).  Wilhelm signed the 2007 Registration Statement.
4
5      40.    The Defendants identified in ¶¶33-39 are referred to herein as the "Individual
6  Defendants."  The Individual Defendants functioned as directors of the Issuing Trusts as they were
7  officers and/or directors of WMAAC and signed one or both of the Registration Statements for the
8  registration of the Certificates thereafter issued by the Issuing Trusts.

9      41.    The Individual Defendants participated with and/or conspired with the remaining
10 Defendants in the wrongful acts and course of conduct, or otherwise caused the damages and injuries
11 claimed herein, and are responsible in some manner for the acts, occurrences and events alleged in
12 this Complaint.
13
14     42.    Defendant WCC was, at all relevant times, an SEC-registered broker-dealer
15 principally located at 1301 Second Avenue, WMC 3501A, Seattle, Washington 98101.  WCC was a
16 wholly-owned subsidiary of Washington Mutual, Inc. ("WMI").  Defendant WCC served as the
17 underwriter for all of the Certificate Offerings and was intimately involved in all of the Offerings.
18 WCC failed to perform the requisite level of due diligence not merely once, but at all times in
19 connection with all of the Offerings complained of herein.  The Prospectus Supplements
20 disseminated in connection with each of the Offerings contained the same material misstatements
21 and omissions of material fact relating to the guidelines employed in originating and securitizing the
22 underlying mortgage loans.  WCC abdicated its duty to conduct due diligence on the underlying
23 mortgage loans, relying rather on the cursory review of the mortgage loans conducted by WMB and
24 third-party contractors, including Bohan and Clayton.  WCC was, during the relevant period, one of
25 the leading underwriters of mortgage-backed securities in the United States.  WCC served as the
26 underwriter and in the sale of the Certificates and assisted in drafting and disseminating the Offering
27
28
CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)          14          SCOTT + SCOTT
                                              600 B Street, Suite 1500
                                              San Diego, California
                                              Telephone: (619) 233-4565

Documents for the following Offerings of Certificates which were issued pursuant to the Registration Statement:

| Trust | Approximate Principal Amount | Approximate Offering Date | Underwriter(s) | Depositor/Issuer | Sponsor |
|---|---|---|---|---|---|
| WaMu Mortgage Pass-Through Certificates, Series 2006 - AR1 | $1,474,488,100 | January 26, 2006 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2006 - AR2 | $332,239,100 | February 15, 2006 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2006 - AR3 | $990,012,100 | February 21, 2006 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2006 - AR4 | $909,714,200 | April 20, 2006 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2006 - AR5 | $778,198,100 | May 23, 2006 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2006 - AR6 | $448,667,100 | June 22, 2006 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2006 - AR7 | $1,255,863,100 | June 23, 2006 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                    15

| | | | | |
|---|---|---|---|---|
| WaMu Mortgage Pass-Through Certificates, Series 2006 - AR8 | $1,208,887,100 | July 25, 2006 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2006 - AR9 | $1,087,842,100 | October 24, 2006 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2006 - AR10 | $1,328,647,642 | August 21, 2006 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2006 - AR11 | $1,615,625,100 | August 22, 2006 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2006 - AR12 | $1,694,778,749 | September 22, 2006 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2006 - AR13 | $1,468,050,100 | September 25, 2006 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2006 - AR14 | $1,683,891,100 | October 20, 2006 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2006 - AR15 | $868,034,100 | October 23, 2006 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2006 - AR16 | $1,444,737,100 | November 16, 2006 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                    16

| | | | | |
|---|---|---|---|---|
| WaMu Mortgage Pass-Through Certificates, Series 2006 - AR17 | $1,124,131,100 | November 17, 2006 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2006 - AR18 | $1,554,983,100 | December 18, 2006 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2006 - AR19 | $1,187,632,100 | December 19, 2006 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2007 - HY1 | $3,007,814,100 | January 22, 2007 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2007 - HY2 | $1,570,407,100 | February 13, 2007 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2007 - HY3 | $2,970,344,100 | February 23, 2007 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2007 - HY4 | $1,684,955,100 | March 22, 2007 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2007 - HY5 | $1,619,028,100 | April 23, 2007 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2007 - HY6 | $3,417,433,100 | May 21, 2007 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                    17

| | | | | |
|---|---|---|---|---|
| WaMu Mortgage Pass-Through Certificates, Series 2007 - HY7 | $2,795,936,100 | June 21, 2007 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2007 – OA4 | $1,600,429,100 | April 24, 2007 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2007 – OA5 | $1,443,025,100 | May 22, 2007 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2007 – OA6 | $1,420,586,100 | June 22, 2007 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, WMALT Series 2007 – OA4 | $467,571,100 | May 23, 2007 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, WMALT Series 2007 – OA4 | $578,412,100 | June 25, 2007 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, WMALT Series 2007 – OC1 | $513,969,100 | May 10, 2007 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, WMALT Series 2007 – OC2 | $473,070,100 | June 25, 2007 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, WMALT Series 2007 – 1 | $459,533,342 | April 24, 2007 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                    18

| | | | | | |
|---|---|---|---|---|---|
| WaMu Mortgage Pass-Through Certificates, WMALT Series 2007 – 2 | $390,678,089 | May 23, 2007 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, WMALT Series 2007 – 3 | $385,977,600 | June 26, 2007 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |

43.     Each of the Issuing Trusts for the Offerings was a common law trust formed for the sole purpose of holding and issuing the Certificates.  Each of the Issuing Trusts issued hundreds of millions of dollars worth of Certificates pursuant to a Prospectus Supplement, incorporated by reference into its corresponding Registration Statement, which each listed numerous classes of offered Certificates.

44.     Defendant Washington Mutual, Inc. was, at all relevant times located at 1301 Second Avenue, WMC 3501A, Seattle, Washington 98101 and served as the parent company to the sponsor/seller, WMB.

45.     Defendant Moody's is a subsidiary of Moody's Corporation and is principally located at 250 Greenwich Street, New York, New York 10007.  Moody's provides credit ratings, risk evaluation, investment research and data to investors.  Moody's worked with WaMu in structuring the securitization transactions related to the Certificates and assigning credit ratings for the Certificates, which are set forth in the Prospectus Supplements.

46.     Defendant S&P was, at all relevant times, a New York corporation with its principal place of business located at 1221 Avenue of the Americas, New York, New York 10020.  Standard & Poor's Ratings Service is a division of Defendant McGraw-Hill which provides credit ratings, risk evaluation, investment research and data to investors.  S&P worked with WaMu in structuring the securitization transactions related to the Certificates and assigning credit ratings for the Certificates,

SCOTT + SCOTT
600 B Street, Suite 1500
San Diego, California
Telephone: (619) 233-4565

which are set forth in the Prospectus Supplements.

47.    Defendant First American Corporation is a California Corporation and has its executive offices at 1 First American Way, Santa Ana, California 92707-5913.  First American, through its subsidiaries, provides business information and related products and services.

48.    Defendant First American eAppraiseIT, LLC is a wholly-owned subsidiary of First American and has its executive headquarters at 12395 First American Way, Poway, California 92064.  eAppraiseIT provides real estate appraisal services to savings and loans, banks, and other lending professionals as well as providing appraisals for the mortgages underlying the Certificates.

49.    First American and eAppraiseIT are collectively referred to herein as the "Appraiser Defendants."

## IV.   BACKGROUND

### A.    The Proliferation of Subprime Mortgage-Backed Securities

50.    As illustrated below, in a mortgage securitization, mortgage loans are acquired, pooled together, and then sold to investors, who acquire rights in the income flowing from the mortgage pools.



CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                        20

51.     When mortgage borrowers make interest and principal payments as required by the underlying mortgages, the resulting cash flow is distributed to the holders of the mortgage-based securities in order of priority based on the specific tranche held by the MBS investor.  The highest tranche (also referred to as the senior tranche) is first to receive its share of the mortgage proceeds and is also the last to absorb any losses should mortgage-borrowers become delinquent or default on their mortgages.

52.     Traditionally, an originator of a mortgage loan was economically vested in establishing the creditworthiness of the borrower and the true value of the underlying property through appraisal before issuing the mortgage loans.  The securitization of mortgage loans fundamentally shifted the risk of loss from the mortgage loan originator to the investor who purchased an interest in the securitized pool of loans.  Thus, in securitizations, the originator does not have the same economic interest in establishing borrower creditworthiness or a fair appraisal value of the property in the loan origination process.

53.     In the 1980s and 1990s, securitizations were generally only carried out by Government Sponsored Enterprises, *e.g.,* the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"), which would purchase loans from originators.  Investors in Government Sponsored Enterprise securities were provided protections because the underlying loans were originated pursuant to strict underwriting guidelines.

54.     Between 2001 and 2006, however, there was dramatic growth in mortgage loan securitizations by entities not sponsored by the government, for which there were no minimum underwriting standards.  This led to a commensurate increase in securitizations of subprime mortgage loans.

55.     A subprime mortgage loan is a mortgage loan to a borrower with substandard credit. In the decade since the inception of the subprime mortgage loan such loans have  flourished as the

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                    21

vehicle by which lenders funded loans to borrowers who, for various reasons ranging from poor credit histories to unstable income levels, would not generally qualify for traditional or prime rate loans.

56.     To compensate for the increased risk of making subprime loans, the upfront and continuing costs of a subprime loan are higher than that of a traditional loan.  For example, the majority of subprime loans tend to be ARMS or hybrid-ARMS.  Both shift the risk of rate fluctuation from the lender to the borrower.

57.     Many borrowers obtain ARMs under the impression that they will be able to refinance at favorable terms before the ARMs reset at a higher interest rate.  In the subprime mortgage context, ARMs created significant and widespread mortgage default risks because of the likelihood that subprime borrowers will be unable to make their mortgage payments after a rate adjustment.  According to a study by First American CoreLogic, in 2007 and 2008, "trillions of dollars of adjustable-rate mortgages [had] their payments reset."  It is estimated that well over $2 trillion in ARMs were originated from 2004 to 2006.

**B.      WaMu's Origination and Securitization Operations**

58.     Beginning in 2001 and extending into 2007, WMB experienced exponential growth in its subprime mortgage loan origination business.

59.     During this timeframe, WaMu purchased and securitized a significant portion of the subprime mortgage loans originated or acquired by WMB into Certificates.

60.     WaMu derived profit from the sale of the Certificates for a price in excess of the amount paid for the underlying mortgage loans.  The goal for WaMu was to sell the Certificates for a price above the par value of $1.00 per unit.

61.     Certificates were issued through the Issuing Trusts designated with a "shelf" name – specifically, "WaMu Mortgage Pass-Through Certificates Trust."  WaMu completed thirty-six (36)

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                    22

Certificate Offerings pursuant to the Offering Documents, between January 26, 2006 and June 26, 2007, which are all the subject of this action.

62.     For Certificates to be marketable to their target investors, *e.g.,* pension funds, approximately 80% of the Certificates had to have an AAA rating.   In order to ensure that a substantial portion of the Certificates were awarded the AAA ratings, WaMu had the Rating Agencies compete for the engagement by including their proposed ratings on the Certificates as part of their bid for the Certificate rating engagement.   This ratings shopping process resulted in ***over 94%*** of the Certificates being assigned the AAA rating.   Such ratings shopping began to be meaningfully disclosed to the public in July 2008.

63.     In addition to engaging in ratings shopping, WaMu made sure the Rating Agencies participated in all aspects of the formation and structuring of the Certificates in order to guarantee a sufficient proportion of the Certificates would be assigned an AAA rating.

**1.     Origination of Mortgage Loans By WMB**

64.     The underlying mortgages of the Certificates in the thirty-six (36) Offerings complained of herein was purportedly originated pursuant to the stated guidelines of WMB, either by WMB itself of various correspondent lenders.

65.     First, WaMu originated loans through WMB.   In 2000, WMB was originating $600 million of mortgage loans per month, or just over $7.0 billion for the year.   In stark contrast, by 2005, WMB originated over $19.0 billion in mortgage loans each month, translating into over $229.0 billion per year.   All of the loans originated by WMB were acquired by WMB pursuant to Purchase and Sale Agreements.   A computerized model priced the loans on a loan-by-loan basis. Once the loans were acquired by WMB, they were entered into WMB's computerized subprime loan "warehouse" database, which recorded the characteristics of each loan WMB acquired, including, among other things, the loan amount, the loan type, borrower credit information and appraisal

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                    23

SCOTT + SCOTT
600 B Street, Suite 1500
San Diego, California
Telephone: (619) 233-4565

1  information.

2     66.    WaMu's second method of acquiring mortgage loans for securitization was through

3  agreements entered into with small local and regional lenders, known as "correspondent" lenders,

4  dispersed throughout the U.S.

5          **2.     WCC's "Due Diligence" Review**

6     67.    Once WaMu had acquired possession of the mortgage loan collateral from WMB and

7  prior to securitization, a process of cursory "due diligence" on the mortgage loans was conducted by

8  WCC.  The review's ostensible purpose was to determine whether the loans contained the requisite

9  legal documentation, were based on an independent appraisal and were originated in accordance

10 with WMB's loan underwriting guidelines, which were detailed in the Offering Documents.  The

11 due diligence review that was conducted on the mortgage collateral was not specific to a securitized

12 pool of mortgage loans.  Rather, the due diligence that was performed, as set forth below, was

13 periodically performed on a small sample (5-7% at most) of WMB's entire "warehouse" of mortgage

14 loans.

15    68.    WCC contracted its due diligence work to outside firms – namely, Bohan and

16 Clayton.  WaMu's Due Diligence Team was responsible for overseeing the work.  The outside firms

17 were supposed to be examining the loans for their conformity with WMB's guidelines, as detailed in

18 the Offering Documents.  Each loan reviewed was rated as category "1," "2" or "3".  Category "3"

19 loans were found to be defective and recommended for exclusion from securitization.  However,

20 WaMu's Due Diligence Team exercised its discretion and rarely excluded category "3" rated loans.

21 WaMu was incentivized to hang on to category "3" loans because if WaMu rejected any significant

22 portion of the loans, the size of the securitization, and thus the size of the fees derived from the

23 securitization by WaMu, would be decreased significantly.  In addition, the loans would remain as

24 an asset on WaMu's mortgage ledger, subjecting WaMu to the risk of default or foreclosure.

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                    24

69.     Rather than conduct their own due diligence, WCC abdicated their duty to conduct any examination of the underlying collateral, and instead relied on the cursory due diligence conducted by third-party firms.

### 3.     The Roles of WCC and the Rating Agencies in the Securitization of Subprime Loans and the Structuring of the Certificates

70.     WCC was established in 2002 by WMB for the purpose of providing WaMu with direct access to investors.  Since 2002, WaMu has been going directly to Wall Street with its products securitized through WCC.  In 2005, WCC was officially made a wholly-owned subsidiary of WMB.  WCC has enabled WaMu to issue billions in mortgage-backed securities directly, without obtaining the assistance of outside investment bankers.

71.     The purpose of WCC, which was made up of a group of WMB employees working on the mortgage-backed securities sales desk, was to assess the demand for certain securities from the clients of the investment bank and to assist WaMu in structuring the Offerings of Certificates. This "pre-sell" of Certificates was critical for the quick sale of an Offering of Certificates. Therefore, WCC's role in assessing market demand and assuring WaMu that sale of the Certificates to investors would be completed immediately after securitization was key to the Offerings' success.

## C.     The Appraisal Defendants Inflated Property Valuations

72.     Independent and accurate real estate appraisals are essential to the mortgage lending and securitization process, providing borrowers, lenders and investors in mortgage-backed securities with supposedly independent and accurate assessments of the value of the mortgage properties. Accurate appraisals ensure that a residential mortgage or home equity loan is not under-collateralized, thereby protecting borrowers from financially over-extending themselves and protecting lenders and investors in mortgage-backed securities in the event a borrower defaults on a loan.  Importantly, accurate appraisals also provide investors with a basis for assessing the price and risk of mortgage-backed securities.

SCOTT + SCOTT
600 B Street, Suite 1500
San Diego, California
Telephone: (619) 233-4565

73.     An accurate appraisal is critical in determining the loan-to-value ("LTV") ratio for a mortgaged property.  The LTV ratio is a financial metric that Wall Street analysts and investors commonly use when evaluating the price and risk of mortgage-backed securities.  The LTV ratio is directly dependent on the appraised value of a property because the LTV ratio is simply the mortgage amount divided by the appraised value of the property, expressed as a percentage.  For example, if a borrower seeks to borrow $350,000 to purchase a house worth $400,000, the LTV ratio is $350,000/$400,000, or 88 percent.  If, however, the appraised value of the house is artificially increased to $450,000, the LTV ratio drops to just 78 percent ($350,000/$450,000).

74.     From the perspective of a purchaser of mortgage-backed securities, a high LTV ratio is riskier because borrowers with small equity positions in their property have less to lose if the borrowers default on the loan.  In addition, particularly when home values are declining, a high LTV ratio creates the heightened risk that, should the borrower default, the amount of the outstanding loan may exceed the value of the property.

75.     The Registration Statements and Prospectus Supplements state that the property collateralizing the mortgages has been subjected to real-estate appraisals performed by independent, objective, and unbiased appraisers, pursuant to the stringent standards of the Uniform Standards of Professional Appraisal Practice ("USPAP").  USPAP provides a minimum set of quality control standards for the conduct of appraisal in the U.S.  As the Ofiice of Thrift Supervision regulations emphasize:

> The soundness of a savings association's mortgage loans and real estate investments . . . depends to a great extent upon the adequacy of the loan underwriting used to support these transactions.  ***An appraisal standard is one of several critical components of a sound underwriting policy because appraisal reports contain estimates of the value of collateral held or assets owned.***

12 C.F.R. § 564.8(a) (emphasis in original).

76.     In an effort to prevent improper collusion between appraisers and loan originators,

SCOTT + SCOTT
600 B Street, Suite 1500
San Diego, California
Telephone: (619) 233-4565

USPAP guidelines also state that client (*i.e.* loan originators) objectives must never affect the appraiser's independence or objectivity.

77.     Because of the importance of appraisals in the home lending and mortgage-backed securities markets, state and federal statutes and regulations require that appraisals be accurate and independent.   Specifically, USPAP requires appraisers to: ". . . perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests.  In appraisal practice, an appraiser must not perform as an advocate for any party or issue."  USPAP rules also provide that "[a]n appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions."   In addition, each appraisal report must contain a certification signed by the appraiser, stating that his or her compensation for completing the assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client.  USPAP was incorporated into federal law by 12 C.F.R. § 34.44.

78.     In 2005, federal regulators, including the OTS, published guidelines regarding "Appraisal Regulations and the Interagency Statement on Independent Appraisal and Evaluation Functions" requiring, among other things, that: (1) loan production staff should not select appraisers; (2) loan productions staff should not be involved in developing or maintaining lists of appraisers; and (3) information provided by the regulated institution should not unduly influence an appraiser or in any way suggest the property's value.

79.     Appraiser Defendants addressed implementation of the new guidelines in a June 1, 2005 press release quoting Diane Valadez, Sr. VP of Valuation Consulting at eAppraiseIT:

> The predominant compliance concern requiring immediate attention is ensuing that the loan production staff is not involved in selecting, monitoring and approving appraisers.

> "As an independent valuation company, eAppraiseIT is committed to helping our lenders implement a plan that conforms to the new guidelines," said Valdez.  "We

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                          27

have a variety of tools and services that can ensure compliance in the wholesale, correspondent, and retail environments."

80.   The Registration Statements and Prospectuses included numerous representations about the quality of the mortgage loans underlying each of the Trusts, including the LTV ratios used to determine whether the underlying collateral was adequate, and the appraisal standards used to value the properties that collateralized the underlying mortgages.  Because the LTV ratio is directly dependent on the appraisal value, any error related to an appraisal will directly affect the loan's LTV ratio.

81.   The Prospectuses filed with the SEC in connection with the sale of Certificates to Plaintiffs and members of the Class made numerous representations regarding purportedly favorable LTV ratios for mortgage loans supporting the Certificates.

82.   The Registration Statements assured that:

The adequacy of the mortgaged property as collateral generally is determined by an appraisal made in accordance with pre-established appraisal guidelines.  At origination, all appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice Adopted by the Appraisal Standards Board of the Appraisal Foundation, and are made on forms acceptable to Fannie Mae and/or Freddie Mac.

WMAAC, Form S-3/A Registration Statement, filed January 3, 2006, at S-29; *see also,* WMAAC, Form S-3/A Registration Statement, filed April 9, 2007, at S-31 (Emphasis added).

83.   The Prospectus Supplements further stated that:

The adequacy of the mortgaged property as collateral generally is determined by an appraisal made in accordance with pre-established appraisal guidelines.  ***At origination, all appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation,*** and are made on forms acceptable to Fannie Mae and/or Freddie Mac.  Appraisers may be staff appraisers employed by the sponsor or independent appraisers selected in accordance with the pre-established appraisal guidelines.  Such guidelines generally require that the appraiser, or an agent on its behalf, personally inspect the property and verify whether the property is in adequate condition and, if the property is new construction, whether it is substantially completed.  However, in the case of mortgage loans underwritten through the sponsor's automated underwriting system, an automated valuation method may be used, under which the appraiser does not personally inspect the property but instead

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                    28

SCOTT+SCOTT
600 B Street, Suite 1500
San Diego, California
Telephone: (619) 233-4565

relies on public records regarding the mortgaged property and/or neighboring properties. In either case, the appraisal normally is based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, a replacement cost analysis based on the current cost of constructing or purchasing a similar property….

WaMu Series 2006-AR6 Trust, Prospectus Supplement Form 424B5, dated June 22, 2006, at S-20; *see also* Prospectus Supplement Form 424B5 for:

| Series | Page Number | Series | Page Number |
|---|---|---|---|
| WAMU 2006 - AR1 | S-29 | WAMU 2006 - AR19 | S-40 |
| WAMU 2006 - AR2 | S-21 | WAMU 2007 - HY1 | S-26 |
| WAMU 2006 - AR3 | S-26 | WAMU 2007 - HY2 | S-23 |
| WAMU 2006 - AR4 | S-36 | WAMU 2007 - HY3 | S-25 |
| WAMU 2006 - AR5 | S-32 | WAMU 2007 - HY4 | S-25 |
| WAMU 2006 - AR6 | S-20 | WAMU 2007 - HY5 | S-29 |
| WAMU 2006 - AR7 | S-39 | WAMU 2007 - HY6 | S-29 |
| WAMU 2006 - AR8 | S-23 | WAMU 2007 - HY7 | S-26 |
| WAMU 2006 - AR9 | S-39 | WAMU 2007 - OA4 | S-39 |
| WAMU 2006 - AR10 | S-25 | WAMU 2007 - OA5 | S-40 |
| WAMU 2006 - AR11 | S-51 | WAMU 2007 - OA6 | S-40 |
| WAMU 2006 - AR12 | S-27 | WMALT 2007 - OA4 | S-34 – S-35 |
| WAMU 2006 - AR13 | S-39 | WMALT 2007 - OA5 | S-34 – S-35 |
| WAMU 2006 - AR14 | S-21 | WMALT 2007 - OC1 | S-27 – S-28 |
| WAMU 2006 - AR15 | S-37 | WMALT 2007 - OC2 | S-27 – S-28 |
| WAMU 2006 - AR16 | S-23 | WMALT 2007 - 3 | S-31 – S-32 |
| WAMU 2006 - AR17 | S-38 | WMALT 2007 - 4 | S-28 |
| WAMU 2006 - AR18 | S-23 | WMALT 2007 - 5 | S-28 – S-29 |

84.     Contrary to these representations, the appraisals eAppraiseIT performed for WaMu did not conform to the USPAP standards and did not portray accurate market data and valuation. Because WaMu's profits were determined largely by the quantity of the loans successfully closed and not on the quality of those loans, WaMu pressured and influenced eAppraiseIT to "hit" the LTV ratios necessary to allow more loans to close and be eligible for pooling and sale to the securitization market.  WaMu then published the resulting defective LTV ratios in the Offering Documents.

**D.     WCC's Failure to Conduct Due Diligence**

85.     The Registration Statements provide that the loan underwriting guidelines used to originate the loan collateral is as specifically set forth in each of the Prospectus Supplements.  The

SCOTT + SCOTT
600 B Street, Suite 1500
San Diego, California
Telephone: (619) 233-4565

1  Prospectus Supplements provide that the mortgage loans underlying the Certificates were originated

2  pursuant to detailed underwriting guidelines adhered to by WMB and correspondent lenders in

3  originating the mortgage loans.  *Id.*

4
5      86.    As underwriter of the Certificate Offerings, WCC conducted inadequate due diligence

6  with respect to whether the underlying mortgages were originated in compliance with the guidelines

7  described in the Offering Documents.  In fact, very little, if any, due diligence was actually

8  conducted by WCC itself.  Instead, WCC largely relied on the examination by WMB and third-party

9  contractors, including Bohan and Clayton, of the underlying mortgage loan collateral in preparing

10 the Offering Documents.

11     87.    As delinquency and default rates began to skyrocket as early as four months after the

12
13 initial Offering dates, WCC was forced to write-down a significant portion of the value of its

14 mortgage-related securities holdings, has been and continues to be subject to Federal and State

15 investigations and in some cases, has been forced into bankruptcy from the resultant mortgage-

16 related losses.

17     88.    Indeed, in June 2007, the New York Attorney General ("NYAG") subpoenaed

18 documents from Bohan and Clayton related to their due diligence efforts on behalf of the investment

19
20 banks that underwrote mortgage-backed securities.  The NYAG, along with Massachusetts,

21 Connecticut and the SEC (all of which also subpoenaed documents) is investigating whether

22 investment banks held back information they should have provided in their disclosure documents

23 related to the sale of mortgage backed securities to investors.

24     89.    In a January 12, 2008 article titled "Inquiry Focuses on Withholding of Data on

25 Loans," *The New York Times* reported:

26
27         An investigation into the mortgage crisis by New York State prosecutors is now
           focusing on whether Wall Street banks withheld crucial information about the risks
           posed by investments linked to subprime loans.

28
CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                    30

Reports commissioned by the banks raised red flags about high-risk loans known as exceptions, which failed to meet even the lax credit standards of subprime mortgage companies and the Wall Street firms.  But the banks did not disclose the details of these reports to credit-rating agencies or investors.

The inquiry, which was opened last summer by New York's attorney general, Andrew M. Cuomo, centers on how the banks bundled billions of dollars of exception loans and other subprime debt into complex mortgage investments, according to people with knowledge of the matter.  Charges could be filed in coming weeks.

*     *     *

The inquiries highlight Wall Street's leading role in igniting the mortgage boom that has imploded with a burst of defaults and foreclosures.  The crisis is sending shock waves through the financial world, and several big banks are expected to disclose additional losses on mortgage-related investments when they report earnings next week.

As plunging home prices prompt talk of a recession, state prosecutors have zeroed in on the way investment banks handled exception loans.  In recent years, lenders, with Wall Street's blessing, routinely waived their own credit guidelines, and the exceptions often became the rule.

It is unclear how much of the $1 trillion subprime mortgage market is composed of exception loans.  Some industry officials say such loans made up a quarter to a half of the portfolios they saw.  In some cases, the loans accounted for as much as 80 percent.  While exception loans are more likely to default than ordinary subprime loans, it is difficult to know how many of these loans have soured because banks disclose little information about them, officials say.

Wall Street banks bought many of the exception loans from subprime lenders, mixed them with other mortgages and pooled the resulting debt into securities for sale to investors around the world.

*     *     *

Mr. Cuomo, who declined to comment through a spokesman, subpoenaed several Wall Street banks last summer, including Lehman Brothers and Deutsche Bank, which are big underwriters of mortgage securities; the three major credit-rating companies: Moody's Investors Service, Standard & Poor's and Fitch Ratings; and a number of mortgage consultants, known as due diligence firms, which vetted the loans, among them Clayton Holdings in Connecticut and the Bohan Group, based in San Francisco.  Mr. Blumenthal said his office issued up to 30 subpoenas in its investigation, which began in late August.

*     *     *

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                    31

To vet mortgages, Wall Street underwriters hired outside due diligence firms to scrutinize loan documents for exceptions, errors and violations of lending laws. But Jay H. Meadows, the chief executive of Rapid Reporting, a firm based in Fort Worth that verifies borrowers' incomes for mortgage companies, said lenders and investment banks routinely ignored concerns raised by these consultants,

"Common sense was sacrificed on the altar of materialism," Mr. Meadows said, "We stopped checking."

90.    On January 27, 2008, Clayton revealed that it had entered into an agreement with the NYAG for immunity from civil and criminal prosecution in the State of New York in exchange for agreeing to provide additional documents and testimony regarding its due diligence reports, including copies of the actual reports provided to its clients. On the same day, both the *New York Times* (Anderson, J. and Bajaj, V., "Reviewer of Subprime Loans Agrees to Aid Inquiry of Banks," Jan. 27, 2008), and the *Wall Street Journal* ran articles describing the nature of the NYAG's investigation and Clayton's testimony.

91.    The *Wall Street Journal* reported that the NYAG's investigation was focused on "the broad language written in prospectuses about the risky nature of these securities changed little in recent years, even as due diligence reports noted that the number of exception loans backing the securities was rising." According to the *New York Times* article, Clayton told the NYAG "that starting in 2005, it saw a significant deterioration of lending standards and a parallel jump in lending expectations" and "some investment banks directed Clayton to halve the sample of loans it evaluated in each portfolio."

92.    A March 23, 2008 *Los Angeles Times* article reported that Clayton and Bohan employees "raised plenty of red flags about flaws [in subprime home loans] so serious that mortgages should have been rejected outright – such as borrowers' incomes that seemed inflated or documents that looked fake – but the problems were glossed over, ignored or stricken from reports" as follows:

The reviewers' role was just one of several safeguards – including home appraisals,

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                    32

lending standards and ratings on mortgage-backed bonds – that were built into the country's mortgage-financing system.

But in the chain of brokers, lenders and investment banks that transformed mortgages into securities sold worldwide, no one seemed to care about loans that looked bad from the start.  Yet profit abounded until defaults spawned hundreds of billions of dollars in losses on mortgage-backed securities.

"The investors were paying us big money to filter this business," said loan checker Cesar Valenz.  "It's like with water.  If you don't filter it, it's dangerous.  And it didn't get filtered."

As foreclosures mount and home prices skid, the loan-review function, known as "due diligence," is gaining attention.

The FBI is conducting more than a dozen investigations into whether companies along the financing chain concealed problems with mortgages.  And a presidential working group has blamed the subprime debacle in part on a lack of due diligence by investment banks, rating outfits and mortgage-bond buyers.

*The Los Angeles Times*, "Subprime Watchdogs Ignored," March 23, 2008.

93.     Moreover, while earlier in this decade issuers would have sought to have Clayton review 25% to 40% of loans in a pool that was going to be securitized, by 2006 the typical percentage of loans reviewed for due diligence purposes was at most seven percent.  Bohan's President, Mark Bohan, stated that "[b]y contrast, buyers who kept the mortgages as an investment instead of packaging them into securities would have 50% to 100% of the loans examined."

94.     In December 2007, WaMu announced in an article in the *New York Times* that it would be closing WCC.

**E.    Collapse of the Mortgages Underlying the Certificates**

95.     The defective nature of the mortgage collateral underlying the Certificates is reflected by the recurring pattern of exponential increases in borrower delinquencies in the months after each of the thirty-six (36) Offerings.

96.     Four months after each of the Offerings were consummated, borrower delinquency and default rates on the underlying mortgage collateral increased by a staggering amount – from an

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                              33

average of 0.00% to over 3.4% of the mortgage loan balance.  Six months following issuance in each of the Offerings, that average increased to over 4.5% of the mortgage loan balance.  Borrower default and delinquency rates in the underlying mortgage collateral have continued to increase.

97.     In or around February 2009, the true deterioration of the underlying mortgage collateral began to surface to the public.  Borrower delinquency and default rates rose to an average of 39% of the mortgage loan collateral, forcing the Rating Agencies to downgrade substantially all of the Certificates to junk bond status.  As of the date of the filing of the Complaint, over 51% of mortgage collateral is considered to be in some form of delinquency or default.

98.     Despite assurances by WaMu in the Offering Documents that the mortgage loans collateralizing the Certificates were originated pursuant to the stated guidelines of WMB, nothing could have been further from the truth.

**F.     The Ratings Agencies' Outdated Rating Models**

99.     The Prospectus Supplements contain material misstatements and omissions of fact, including the failure to disclose that the amounts and forms of credit enhancement were understated and insufficient because they were largely determined by Rating Agencies' models that had not been materially updated since 1999 (for S&P) and 2002 (for Moody's).  The Ratings Agencies' models were based primarily on the performance of fixed interest loans and not subprime, Alt-A, zero or limited documentation loans, which were the types of loans that comprised a signiificant proportion of the Certificate collateralizations.

100.     The Rating Agencies' determinations of the amount and type of credit enhancement to be included in the Certificates were faulty.  These same faulty determinations were then used by the same firms to assign inflated and faulty AAA ratings to a substantial portion of the total Certificate value of the Offerings (93.50% of the aggregate value of the Offerings).  These ratings were unjustifiably high because they were determined pursuant to the same outdated models used to

SCOTT+SCOTT
600 B Street, Suite 1500
San Diego, California
Telephone: (619) 233-4565

determine credit enhancement.

101.   The Rating Agencies' use of outdated models in rating mortgage-backed securities deals only began to be disclosed to investors in 2008.  The inadequacy of the models used to rate (and determine the amount of credit enhancement needed to support the rating) was discussed in the April 2008 issue of *Mortgage Banking,* which explained that the Rating Agencies' models used statistical assumptions that were too heavily based on the performance of 30-year-fixed mortgages, which were not the kinds of complex, risky mortgages that had been securitized in the prior four years:

> S & P's Coughlin admits that "assumptions that went into decision-making [on credit ratings] were informed by what had happened in the past," and yet in this instance "previous loss data proved to be much less of a guide to future performance."

> But why?  Drexel University's Mason believes it's because the CRAs relied on statistical models that were misleading, at best.   "I think their [credit-rating] methodologies were demonstrably insufficient," he says.

> "Unlike the traditional rating processes for single-named issuers, which rely on empirical analysis at their core, structured-finance rating analysis is essentially driven by statistical models," write Mason and Rosner in their paper.  And the data that the rating agencies used when evaluating mortgage-backed securities--including those backed by subprime mortgages--were heavily biased by over-reliance on traditional 30-year fixed prime mortgage loans.  But it turns out that a subprime loan, as Mason explains during an interview, is a very different animal.

> "This is not your historical mortgage loan," he says.  "This is more like a credit-card loan."  Mason cites the increased popularity during the mortgage boom of so-called option ARMs, which are home loans that give the borrower a variety of monthly payment options and have variable cash-flow characteristics that are more like credit cards.

102.   *The New York Times* noted, with respect to Moody's April 2007 disclosure, in an article published on April 8, 2008, that it was "revising" its model which had not been revised since 2002:

> In April 2007, Moody's announced it was revising the model it used to evaluate subprime mortgages.  It noted that the model "was first introduced in 2002.  Since then, the mortgage market has evolved considerably."  This was a rather stunning admission; its model had been based on a world that no longer existed.

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                                    35

SCOTT+SCOTT
600 B Street, Suite 1500
San Diego, California
Telephone: (619) 233-4565

103.    The article explained that when Moody's had analyzed subprime delinquency data in 2007 it had found trends that its 2002 model never accounted for:

> Poring over the data, Moody's discovered that the size of people's first mortgages was no longer a good predictor of whether they would default; rather, it was the size of their first and second loans – that is, their total debt – combined.  This was rather intuitive; Moody's simply hadn't reckoned on it.  Similarly, credit scores, long a mainstay of its analyses, had not proved to be a "strong predictor" of defaults this time.  Translation: even people with good credit scores were defaulting.  Amy Tobey, leader of the team that monitored XYZ, told me, "it seems there was a shift in mentality; people are treating homes as investment assets."  Indeed.  And homeowners without equity were making what economists call a rational choice; they were abandoning properties rather than make payments on them.  Homeowners' equity had never been as high as believed because appraisals had been inflated.

## G.    The Ratings Agencies Failure to Conduct Due Diligence

104.    The Rating Agencies rated the Certificates based in large part on data about each mortgage loan that WaMu provided to them – including appraisal values, LTV ratios, borrower creditworthiness, loan documentation provided by borrowers used verify assets and/or income levels and quality control or oversight procedures followed by the Originators in underwriting the mortgage loans.

105.    As discussed herein, much of this data was inaccurate due to the inflated appraisal values, inaccurate LTV ratios, borrower income inflation, disregard of originator internal controls and origination guidelines in addition to other facets of defective underwriting addressed herein.  Neither Moody's nor S&P engaged in any due diligence or otherwise sought to verify the accuracy or quality of the loan data underlying the mortgage-backed securities pools they rated (and specifically disclaimed any due diligence responsibilities).  Nor did they seek representations from WaMu that due diligence had been performed.

106.    As a result of their lack of due diligence, Moody's and S&P were using flawed information and models to generate their ratings.  As a result, the ratings assigned to the Certificates did not accurately reflect their risk, and the Certificates were given investment-grade ratings when in

SCOTT + SCOTT
600 B Street, Suite 1500
San Diego, California
Telephone: (619) 233-4565

reality they were not of investment grade quality.  The artificially high ratings, which were published in the Prospectus Supplements, were false and misleading in that they did not reflect the true risk of the Certificates.

**H.    Ratings Shopping**

107.    The Registration Statements disclosed the engagement of Rating Agencies but omitted disclosure of the manner in which the Rating Agencies were engaged.

108.    WaMu ultimately chose the Rating Agencies through ratings shopping.  Initially, a WaMu collateral analyst would send the preliminarily structured deal to the Rating Agencies for feedback.  WaMu's in-house ratings analysts would oversee the communications with the Rating Agencies.  Thereafter, S&P, for example, would run the loan collateral through both its "LEVELS" and "SPIRE" Models and provide WaMu with the deal structuring results in an effort to obtain the ratings engagement.  Through the LEVELS Model, S&P would advise WaMu that, for example, 94.25% of the Certificates would be rated AAA as long as 5.75% of the total collateral balance supporting those Certificates was subordinate.  This 5.75% was the amount of loss coverage required.  WaMu would then again "negotiate" with S&P before the engagement was finalized, in order to decrease the amount of loss coverage and credit enhancement S&P's model required for the specific deal, while still maintaining the highest percentage of AAA-rated Certificates.[7]

109.    Likewise, Moody's would run the information provided by WaMu through its model – the "M-3" Model – which was intended to provide ratings based on a complete assessment of the quality of the collateral underlying the Certificates.

110.    All of this work by S&P and Moody's, referred to by S&P as "bid package" work,

---

[7]    S&P would also run the deal through its "SPIRE" Model in order to provide a deal structure that was within its acceptable levels of subordination or overcollateralization in order to obtain class, or tranche, sizes with the appropriate ratings.

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                            37

SCOTT + SCOTT
600 B Street, Suite 1500
San Diego, California
Telephone: (619) 233-4565

was performed without any compensation from WaMu and was an effort to engender goodwill so that WaMu would ultimately engage either of the Ratings Agencies to rate the loans at the underwriting stage.

111.   WaMu relied on the ratings shopping process to obtain the most profitable structure, to WaMu, on the Offerings.  The practice was effectively curtailed in many respects by way of an agreement entered into between the Rating Agencies and the New York Attorney General in 2008.

## I.   The Rating Agencies' Hand in Forming and Structuring the Offerings

112.   An article appearing in *The Financial Times* on October 17, 2008, entitled "When Junk Was Gold," addressed the unique role of the Rating Agencies in structured finance deals such as mortgage backed securities:

> The first mortgage-backed bonds were created in the late 1980's, well before Clarkson's time, by a trader called "Lewie" Ranieri.  Ranieri, the head of the mortgage trading desk at the former investment bank Salomon Brothers, was famous for the huge sums of money he netted for his employer and for the quantity of cheeseburgers he ate.  What he struck upon in structured finance was a process of pure alchemy: a way of turning myriad messy mortgage loans into standardized, regimented and easy-to-assess bonds.
>
> Ranieri knew that the magic of structuring was in the packaging.  Packaged in the right way, mortgages could come to create a huge, new tradable bond market.  And this is where the rating agencies came in.  Structured bonds, like any other bond, needed ratings in order to be sold.  ***But with a structured bond, the pools of debt could be built or modified in order to attain a particular rating.  This wasn't a matter of disguising the risk, rather a way of reapportioning it and allowing investors with different risk appetites to buy the right product for them.  "The rating is what gives birth to the structure in the first place," explains Sylvain Raynes, a financial modeling expert who was with Moody's in the 1990s, when Clarkson joined.  In some cases, the ratings are known before the bonds have even been inked.  "You start with a rating and build a deal around a rating," Clarkson told an investment magazine last year.***

(Emphasis added).

113.   The Rating Agencies' unique role in influencing the structure of the securitization was more fully discussed in the July 2008 SEC Report.  The July 2008 SEC Report confirmed that

SCOTT + SCOTT
600 B Street, Suite 1500
San Diego, California
Telephone: (619) 233-4565

S&P and Moody's provided "feed back" to the Sponsor of the Offerings as to the structure, which would result in the highest rating:

> The [] examined rating agencies generally followed similar procedures to develop ratings for subprime mortgage-backed securities and CDOs. The arranger of the mortgage-backed securities initiates the ratings process by sending the credit rating agency a range of data on each of the subprime loans to be held by the trust (e.g., principal amount, geographic location of the property, credit history and FICO score of the borrower, ratio of the loan amount to the value of the property and type of loan: first lien, second lien, primary residence, secondary residence), the proposed capital structure of the trust and the proposed levels of credit enhancement to be provided to each mortgage-backed securities trance issued by the trust. Typically, if the analyst concludes that the capital structure of the mortgage-backed securities does not support the desired ratings, this preliminary conclusion would be conveyed to the arranger. The arranger could accept that determination and have the trust issue the securities with the proposed capital structure and the lower rating or adjust the structure to provide the requisite credit enhancement for the senior tranche to get the desired highest rating. Generally, arrangers aim for the largest possible senior tranche, i.e., to provide the least amount of credit enhancement possible, since the senior tranche – as the highest rated tranche – pays the lowest coupon rate of the mortgage-backed securities' tranches and, therefore, costs the arranger the least to fund.

July 2008 SEC Report, at 22.

**J.     The Financial Conflicts of Interest between WaMu and the Rating Agencies**

114.     The Offering Documents make no mention of the material financial conflicts of interest between WaMu and the Rating Agencies. The July 2008 SEC Report confirmed significant undisclosed conflicts of interest which gave the Rating Agencies an incentive to issue inflated ratings. The July 2008 SEC Report found, in violation of SEC Rules, that "key participants" in the securitization process negotiated fees the Ratings Agency would receive in exchange for its high ratings. July 2008 SEC Report, at 23-24.

115.     The July 2008 SEC Report also noted, *inter alia*, that analysts are "aware" of the rating firm's "business interests when securing the rating of the deal" as follows:

- ***While each rating agency has policies and procedures restricting analysts from participating in fee discussions with issuers,*** these policies still allowed key participants in the ratings process to participate in fee discussions.

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                    39

- Analysts appeared to be aware, when rating an issuer, of the rating agency's business interest in securing the rating of the deal. The Staff notes multiple communications that indicated that some analysts were aware of the firm's fee schedules, and actual (negotiated) fees. There does not appear to be any internal effort to shield analysts from emails and other communications that discuss fees and revenue from individual issuers.

- *"Rating agencies do not appear to take steps to prevent considerations of market share and other business interests from the possibility that they could influence ratings or ratings criteria."*

July 2008 SEC Report, at 24-25 (emphasis added).

116.  The July 2008 SEC Report found that a number of factors unique to the rating of mortgage-backed securities may have "exacerbated" the effect of conflicts of interest inherent in the fact that the issuer or arranger pays for the ratings. These factors include that the arranger of the deal has:

- *"More flexibility to adjust the deal to obtain a desired credit rating as compared to arrangers of non-structured asset classes."*

- "Second, there is a high concentration in the firms conducting the underwriting function… While 22 different arrangers underwrote subprime mortgage-backed securities deals, 12 arrangers accounted for 80% of the deals, in both number and dollar volume."

- With a fast-changing market, rating processes are frequently and quickly changed. The high concentration of arrangers with the influence to determine the *choice of rating agency heightened the inherent conflicts in the "issuer pays" compensation model.* Compensation is calculated by volume of deals and total dollar volume, as a result arrangers prefer fast and predictable ratings processes.

- Rating Agencies may be pressured by arrangers to produce a more *favorable outcome or reduce credit enhancement levels,* thus reducing *the cost of the debt for a given level of cash inflows from the asset pool.* When the arranger also sponsors the mortgage-backed securities or CDO trust, pressure can influence an agency's decision to update a model when the update would lead to a less favorable outcome.

- *High profit margins may have provided an incentive for rating agencies to encourage the arrangers to route future business its way.* Unsolicited ratings were not available to provide independent checks on the rating agencies' ratings, nor was information regarding the structure of the security

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                    40

or portfolio of assets readily available to parties unrelated to the transaction, especially before issuance.

July 2008 SEC Report, at 31-33 (emphasis added).

117.   As reported in *The Washington Post* on June 6, 2008, the NYAG announced that it had reached an agreement with the credit-rating companies, S&P, Moody's and Fitch to:

… change the way they evaluate mortgage securities that have roiled financial markets for the past year.

The deal with Moody's Investors Service, Standard & Poor's and Fitch Ratings aims to restore confidence among investors -- who saw top-rated securities lose much of their worth in a matter of months -- by revising how the agencies are paid for issuing ratings.   The agreement also requires credit-rating agencies to direct investment banks to provide them with more data on the pools of mortgages that make up the bonds.

The agencies have been under fire for the role they played in the subprime mortgage crisis by awarding top ratings to securities that soured.   Regulators and investors have alleged that the agencies have a conflict of interest because they are paid by the investment banks issuing the securities, thus encouraging the credit agencies to give high ratings to win business.

The agreement seeks to end this practice by having the issuers pay the credit-rating agencies at four points during the rating process, not just at the end when the rating is given.

Credit-rating agencies will also be required to disclose information about all securities submitted for review, allowing investors to determine whether issuers sought, but subsequently decided not to use, ratings from a specific agency.   This will allow investors to see whether investment banks shopped around for the agency that would give their securities the best rating, said Andrew M. Cuomo, New York's attorney general.

118.   As reported in *The Washington Post*, the NYAG further stated that:

The mortgage crisis currently facing this nation was caused in part by misrepresentations and misunderstanding of the true value of mortgage securities," Cuomo said in a statement.   "By increasing the independence of the rating agencies, ensuring they get adequate information to make their ratings, and increasing industry-wide transparency, these reforms will address one of the central causes of that collapse.

119.   Furthermore, in January 2009, the Congressional Oversight Panel issued a the January 2009 Congressional Oversight Panel Report   The January 2009 Congressional Oversight Panel

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                    41

SCOTT + SCOTT
600 B Street, Suite 1500
San Diego, California
Telephone: (619) 233-4565

Report stated, in no uncertain terms:

> **Problem with current [Credit Ratings] system:** *The credit rating system is ineffective and plagued with conflicts of interest.*
>
> *The major credit rating agencies played an important-and perhaps decisive-role in enabling (and validating) much of the behavior and decision making that now appears to have put the broader financial system at risk.* In the subprime-related market specifically, high ratings for structured financial products - especially mortgage-backed securities … - were essential for ensuring broad demand for these products.  High ratings not only instilled confidence in potentially risk-averse investors, but also helped satisfy investors' regulatory requirements, which were often explicitly linked to ratings from the major credit rating agencies.  By 2006, Moody's business in rating structured financial products accounted for 44 percent of its revenues, as compared to 32 percent from its traditional corporate-bond rating business.  It has also been reported that "roughly 60 percent of all global structured products were AAA-rated, in contrast to less than 1 percent of corporate issues." Financial firms, from Fannie Mae to AIG, also benefited greatly from having high credit ratings of their own-especially AAA-allowing them not only to borrow at low rates on the short-term markets to finance longer-term (and higher yielding) investments but also to sell guaranties of various sorts, effectively "renting out" their credit rating.

January 2009 Congressional Oversight Panel Report, at 40-41.

## V.    THE APPRAISER DEFENDANTS' FALSE VALUATIONS

120.    First American and eAppraiseIT knew that their defective, inflated appraisals for WMB were the basis for mortgages that would be securitized and sold to Plaintiffs and members of the Class in the form of mortgage-backed securities.  In filings with the SEC in early 2007, First American acknowledged that its operating revenue had been adversely impacted "*by the decline in mortgage originations and the tightening of the credit markets which led to a decrease in mortgage securitization activity and therefore the demand for some of the mortgage analytic product offerings.*" Annual Report of First American on Form 10K/A filed with the SEC on October 8, 2009 at p. 19 (Emphasis added).

121.    The Appraiser Defendants violated USPAP guidelines and inflate the value of the properties collateralizing the mortgages underlying the Certificates in order to obtain appraisal business with WaMu.

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                    42

122.   Indeed, on November 1, 2007 the NYAG filed a lawsuit against eAppraiseIT and First American, alleging that eAppraiseIT appraisers unlawfully inflated the real property appraisals they performed for WaMu. *See People of the State of New York v. First American Corporation and First American eAppraiseIT*, No. 07-406796 (N.Y.Sup.Ct. Filed Nov. 1, 2007) (the "NYAG Complaint").

123.   The NYAG Complaint alleges that First American and eAppraiseIT abandoned their role of providing unbiased appraisals for WaMu, instead allowing WaMu's loan production executives to "hand-pick appraisers who bring in appraisal values high enough to permit WaMu's loans to close," and "improperly [permitting] WaMu to pressure eAppraiseIT appraisers to change appraisal values that are too low to permit loans to close." NYAG Complaint at 3.

124.   According to the NYAG complaint, the terms of the contract between WaMu and eAppraiseIT allowed WaMu, in circumstances where its loan staff disagreed with an eAppraiseIT appraisal, to challenge an eAppraiseIT appraiser's valuation of a property by requesting a "Reconsideration of Value" ("ROV"). *Id.* at 10.   Washington Mutual routinely requested ROVs from eAppraiseIT appraisers in order to hit the LTV ratios for properties necessary for loans to close and be pooled with other loans for securitization. *Id.* at 10.

125.   The NYAG Complaint contains numerous emails and other communications obtained by the NYAG through subpoenas issued to eAppraiseIT.   Among other things, the email communications demonstrate a pattern of improper conduct between First American, eAppraiseIT and Washington Mutual in connection with appraisals of properties collateralizing WaMu mortgages.

126.   For example, on August 9, 2006, eAppraiseIT's President told WaMu executives that "We need to address the ROV issue . . . .   Many lenders in today's environment . . . have no ROV issue.   The value is the value.   I don't know if WAMU production will go for that . . . .The Wamu

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                              43

SCOTT + SCOTT
600 B Street, Suite 1500
San Diego, California
Telephone: (619) 233-4565

1   internal staff we are speaking with admonish us to be certain we solve the ROV issue quickly or we

2   will all be in for some pretty rough seas." *Id.* at 11.

3        127.   On December 18, 2006, an eAppraiseIT executive relayed to others that WaMu had

4   advised him that its criticism was based on the fact that "values are coming in lower with EA

5   [eAppraiseIT]" than with LSI, the competing appraisal management company that WaMu had also

6   retained to provide appraisals. According to this executive, WaMu maintained that "[t]hey also see

7   more Wamu preferred appraisers doing work for LSI and they think that is why they aren't having as

8   many value issues with them. . . . The [WaMu] managers indicated that if the loan consultants had a

9   choice they would prefer to use LSI over eAppraiseIT because they feel they will have less problem

10  with the values." *Id.* at 13.

11

12       128.   By email dated February 22, 2007, eAppraiseIT's President explained to senior

13  executives at First American that eAppraiseIT would be staffing WaMu appraisals with "Proven

14  Appraisers" hand-selected by WaMu's loan origination staff:

15

16           We had a joint call with Wamu and LSI today.  The attached document outlines the
             new appraiser assigning process.  In short, we will now assign all Wamu's work to
17           Wamu's "Proven Appraisers" . . . .  We will pay their appraisers whatever they
             demand.  Performance ratings to retain position as a Wamu Proven Appraiser will
18           be based on how many come in on value, negating a need for an ROV.

19      *Id.* at 13-14.

20
21       129.   In an email dated March 1, 2007, eAppraiseIT's President told WaMu executives:

22           Recently, we have been notified that Lending would like us to use more of their
             "Proven Appraisers" versus appraisers off our preselected appraiser panel. It seems
23           the amount of Reconsideration of Value (ROV) requests associated with our
             appraisers far exceeds those initiated when a WaMu proven appraiser completes a
24           file. Said differently, Wamu proven appraisers bring the value in a greater majority
             of the time with minimal involvement of the vendor, sales and Appraisal Oversight.
25           I am fine with that, of course, and will happily assign Wamu orders to Wamu proven
             appraisers instead of eAppraiseIT's approved panel appraiser whenever possible.
26

27  *Id.* at 15.

28       130.   On April 17, 2007, eAppraiseIT's President wrote to senior executives at First

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                    44

American, explaining issues with WaMu as follows:

> In short, the issues are using their designated appraisers as mandated by the WaMu production force at 20% gross margin and bypassing our panel. We view this as a violation of the OCC, OTS, FDIC and USPAP influencing regulation.

*Id.* at 17.

131.   First American and eAppraiseIT knew that complying with the WaMu "Proven Panel" violated appraiser independence regulations. However, eAppraiseIT did not stop conducting appraisals for WaMu in this manner.

132.   On May 11, 2007, eAppraiseIT's Executive Vice President wrote in an email to eAppraiseIT's President that "currently WAMU is controlling the appraiser panel. They are selecting the appraisers and calling them 'proven' appraisers. These appraisers are being chosen by their sales force. First American eAppraiseIT [] is obligated to use these appraisers." According to eAppraiseIT's Executive Vice President, WaMu was using the "Proven Appraisers" because of the "low values" from other eAppraiseIT's appraisers. *Id.* at 21

133.   According to the NYAG Complaint, eAppraiseIT's internal appraisal log entries indicate that its appraisers increased property values on appraisal reports after being told by WaMu loan origination staff that such increases would help loans to close. For the period from November 2006 to May 2007, there were 8 reviews performed relating to properties in New York, all of which were for WaMu. The appraised values were increased in each of the 9 reviews completed, as follows: from $825,000 to $850,000, $230,000 to $240,000, $415,000 to $420,000, $1,550,000 to $2,270,000, $720,000 to $730,000, $535,000 to $556,000, $580,000 to $587,000, $500,000 to $525,000. *Id.* at 29.

134.   In this manner, the appraisals eAppraiseIT performed for WaMu did not portray accurate market data and valuation. In order to earn business from WaMu eAppraiseIT artificially inflated appraisal values to "hit" the LTV ratios necessary to allow more loans to close and be

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                    45

SCOTT + SCOTT
600 B Street, Suite 1500
San Diego, California
Telephone: (619) 233-4565

eligible for pooling and sale to the securitization market in complete disregard to appraiser

independence requirements.

## VI.   THE DEFENDANTS' MISSTATEMENTS AND OMISSIONS

### A.   The Offering Documents Included Material Misstatements and Omitted Information Regarding Stated Mortgage Loan Underwriting Guidelines

#### 1.   The Registration Statement

135.   The effective Registration Statements filed by WMAAC (¶) described that generally the adequacy of the property financed by the loan will have been determined by an appraisal according to guidelines as follows:

> In determining the adequacy of the property as collateral, an appraisal is made of each property considered for financing. The appraiser, or an agent on its behalf, is generally required to personally inspect the property and verify that it is in adequate condition and that construction, if new, has been substantially completed. However, in some cases an automated valuation method may be used, under which the appraiser does not personally inspect the property but instead relies on public records regarding the mortgaged property and/or neighboring properties. In either case, the appraisal normally is based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, a replacement cost analysis based on the current cost of constructing or purchasing a similar property. Some of the mortgage loans may be re-underwritten by a mortgage loan seller.

WMAAC, Form S-3/A Registration Statement, filed January 3, 2006, at 44; *see also,* WMAAC, Form S-3/A Registration Statement, filed April 9, 2007, at 45. (Emphasis added.)

136.   The excerpt from the Registration Statements in the above paragraph contained material misstatements and omission of fact because:

(a)   WaMu used independent appraisal firms, including Appraiser Defendants, to artificially inflate property appraisals, thereby increasing the value of their mortgage portfolio and, more importantly, the value of the securitizations from which multiple WaMu entities, including WMAAC, WMB and WCC, derived significant fees.  This practice of systematically improperly influencing appraisals resulted in the above misstatements of material fact regardless of whether in-person or automated appraisals were performed on the underlying properties.

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                    46

(b)    WaMu made no attempt to confirm the appraisal standards actually used by mortgage brokers, correspondents and other third-parties from which they acquired mortgages, as evident from the fact that, since issuance of the Certificates, public disclosures revealed that WMB ignored stated appraisal requirements and in many cases negligently employed underwriting practices that included the use of interested appraisers.

(c)    Higher deal fees and more profitable market conditions were motivation for WaMu not to spend the time and money to investigate the validity of appraisal values on the underlying mortgaged properties prior to securitization.  Specifically, only a small sampling of the mortgage loan pool, no more than 5-7%, was reviewed before WaMu securitized the loans, leaving a substantial amount of bad loans to escape inspection.  Further, with WaMu's use of the structuring software, the loans became numbers blindly plugged into a computer with little or no attention paid to the underlying collateral, as long as the averages of the loan pool fit within certain loosely defined parameters.

137.    According to Guidelines set forth in the Registration Statements, borrowers were required to submit applications to the originators that were then verified for creditworthiness.  For example, the Registration Statements provided:

> The mortgage loan seller's underwriting standards are intended to evaluate a prospective mortgagor's credit standing and repayment ability, and the value and adequacy of the proposed mortgage property as collateral. In the loan application process, prospective mortgagors generally will be required to provide information regarding such factors as their assets, liabilities, income, credit history, employment history and other related items. Each prospective mortgagor generally will also provide an authorization to apply for a credit report which summarizes the mortgagor's credit history. With respect to establishing the prospective mortgagor's ability to make timely payments, the mortgage loan seller may require evidence regarding the mortgagor's employment and income, and of the amount of deposits made to financial institution where the mortgagor maintains demand or savings accounts…

WMAAC, Form S-3/A Registration Statement, filed January 3, 2006, at 44; *see also,* WMAAC, Form S-3/A Registration Statement, filed April 9, 2007, at 45. (Emphasis added).

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                              47

138.    The excerpt from the Registration Statements in the above paragraph contained material misstatements and omission of fact because:

(a)    WaMu pressured independent appraisal firms, including Appraiser Defendants, to artificially inflate property appraisals, thereby increasing the value of their mortgage portfolio and, more importantly, the value of the securitizations from which multiple WaMu entities, including WMAAC, WMB and WCC, derived significant fees.

(b)    WaMu made no attempt to confirm the standards actually used by mortgage brokers, correspondents and other third-parties from which they acquired mortgages, as evident from the fact that, since issuance of the Certificates, public disclosures revealed that WMB ignored stated appraisal requirements and in many cases negligently employed underwriting practices that included the use of interested appraisers.

(c)    WMB and its correspondent lenders were instructed to push, onto unfit and unqualified borrowers, specific types of mortgage loans, namely hybrid adjustable mortgage products, or ARMs, which readjusted after two or three years to significantly higher rates. Furthermore, WaMu incentivized their origination branches and correspondent lenders with "kick-backs" for placing borrowers into higher interest rate mortgages than they had qualified for.

139.    The Registration Statements, with regards to documentation requirements for full documentation and less-than full documentation loans further stated:

> If a prospective mortgagor meets certain eligibility criteria, the mortgage loan seller may waive some of its documentation requirements and may not obtain information about the mortgagor's income and assets or may obtain but not verify such information.

WMAAC, Form S-3/A Registration Statement, filed January 3, 2006, at 44; *see also,* WMAAC, Form S-3/A Registration Statement, filed April 9, 2007, at 45. (Emphasis added).

140.    The excerpt from the Registration Statements in the above paragraph contained material misstatements and omission of fact because WaMu was not nearly as thorough in obtaining

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                    48

and verifying documentation from or about borrowers as these statements of "may waive" or "may not obtain" imply.  As set forth herein in detail, WaMu placed the emphasis not on adherence to the guidelines, but rather, on getting loans "done," severely hindering the quality of the mortgage loans and resulting in defective loan applications which, among other things, inflated borrower income levels, failed to contain employment verification, over-valued properties at appraisal or required, in many cases, no proof in the form of documentation at all.

## 2.    The Prospectus Supplements

141.    The underlying loan collateral for the Certificates issued by the Issuing Trusts was originated by, or pursuant to, the origination guidelines of WMB.  As set forth above, WMB originated all of the mortgage loan collateral underlying the Certificates, served as sponsor of the collateral and securitizations, and acted as servicer of the mortgage loans after securitization.  The Prospectus Supplements described WMB's Guidelines which WaMu claimed were implemented in originating the underlying collateral.

142.    The origination guidelines generally required a description of the borrower's income, employment documentation and a credit report.  For example, the Prospectus Supplements for stated:

> *The sponsor's underwriting guidelines [and Washington Mutual Bank's underwriting guidelines] generally are intended to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.* Some mortgage loans are manually underwritten, in which case an underwriter reviews a loan application and supporting documentation, if required, and a credit report of the borrower, and based on that review determines whether to originate a loan in the amount and with the terms stated in the loan application. Some mortgage loans are underwritten through the sponsor's automated underwriting system, [including Washington Mutual Bank's automated underwriting system,] described below.

WAMU Series 2006-AR6 Prospectus Supplement, Form 424B5, filed June 22, 2006, at S-19; *see also* Prospectus Supplement, Form 424B5, for:

| Series | Page Number | Series | Page Number |
|---|---|---|---|
| WAMU 2006 - AR1 | S-28 | WAMU 2006 - AR19 | S-39 |
| WAMU 2006 - AR2 | S-20 | WAMU 2007 - HY1 | S-25 |
| WAMU 2006 - AR3 | S-25 | WAMU 2007 - HY2 | S-22 |

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                    49

| WAMU 2006 - AR4 | S-35 | WAMU 2007 - HY3 | S-24 |
|---|---|---|---|
| WAMU 2006 - AR5 | S-31 | WAMU 2007 - HY4 | S-24 |
| WAMU 2006 - AR6 | S-19 | WAMU 2007 - HY5 | S-28 |
| WAMU 2006 - AR7 | S-38 | WAMU 2007 - HY6 | S-28 |
| WAMU 2006 - AR8 | S-22 | WAMU 2007 - HY7 | S-25 |
| WAMU 2006 - AR9 | S-38 | WAMU 2007 - OA4 | S-38 |
| WAMU 2006 - AR10 | S-24 | WAMU 2007 - OA5 | S-39 |
| WAMU 2006 - AR11 | S-50 | WAMU 2007 - OA6 | S-39 |
| WAMU 2006 - AR12 | S-26 | WMALT 2007 - OA4 | S-33 |
| WAMU 2006 - AR13 | S-38 | WMALT 2007 - OA5 | S-33 |
| WAMU 2006 - AR14 | S-20 | WMALT 2007 - OC1 | S-26 |
| WAMU 2006 - AR15 | S-36 | WMALT 2007 - OC2 | S-26 |
| WAMU 2006 - AR16 | S-22 | WMALT 2007 - 3 | S-30 |
| WAMU 2006 - AR17 | S-37 | WMALT 2007 - 4 | S-26 |
| WAMU 2006 - AR18 | S-22 | WMALT 2007 - 5 | S-27 |

143.    The excerpts in the above paragraph contained material misstatements and omission of fact because:

(a)    As set forth above, WMB, WCC and relevant third-parties failed to conduct proper due diligence and verify the information contained in borrower mortgage loan applications.

(b)    WaMu's emphasis on increasing the volume of loans at the expense of the quality of loans gave rise to an increasing number of defectively originated mortgage loans, with missing or completely fabricated borrower information, to go sight unseen by any review.

(c)    WMB lending officers regularly dealt with adverse information in a borrower's credit report by simply ignoring such information.  Consumer credit rating agencies must remove non-confirmable adverse information within a certain time period from consumer credit reports.  Lending officers and originators knew that borrowers frequently complained to consumer credit rating agencies about accurate adverse information in an effort to increase their credit scores, and thus would not take such information into account.

144.    The Prospectus Supplements describe the importance of information provided in borrower credit reports in determining whether or not to underwrite a specific mortgage loan.  For

example, the Prospectus Supplements also stated that:

> To evaluate a prospective borrower's credit history, the loan underwriter obtains a credit report relating to the borrower from one or more credit reporting companies, usually in the form of a merged credit report.

> *       *       *

> ***Minimum credit scores are required for some loan products and loan programs.*** For borrowers for which credit scores are not available, the loan underwriter will require alternative documentation indicating the borrower's creditworthiness, such as rental or utility payment history or payment history on other debt.

WAMU Series 2006-AR6 Prospectus Supplement, Form 424B5, filed June 26, 2006, at S-19-20 (emphasis added); *see also* Prospectus Supplement, Form 424B5, for:

| Series | Page Number | Series | Page Number |
|---|---|---|---|
| WAMU 2006 - AR1 | S-28 – S-29 | WAMU 2006 - AR19 | S-39 – S-40 |
| WAMU 2006 - AR2 | S-20 – S-21 | WAMU 2007 - HY1 | S-25 |
| WAMU 2006 - AR3 | S-25 – S-26 | WAMU 2007 - HY2 | S-22 |
| WAMU 2006 - AR4 | S-35 – S-36 | WAMU 2007 - HY3 | S-24 – S-25 |
| WAMU 2006 - AR5 | S-31 – S-32 | WAMU 2007 - HY4 | S-24 – S-25 |
| WAMU 2006 - AR6 | S-19 – S-20 | WAMU 2007 - HY5 | S-28 – S-29 |
| WAMU 2006 - AR7 | S-38 – S-39 | WAMU 2007 - HY6 | S-28 – S-29 |
| WAMU 2006 - AR8 | S-22 – S-23 | WAMU 2007 - HY7 | S-25 – S-26 |
| WAMU 2006 - AR9 | S-39 | WAMU 2007 - OA4 | S-38 – S-39 |
| WAMU 2006 - AR10 | S-24 – S-25 | WAMU 2007 - OA5 | S-39 – S-40 |
| WAMU 2006 - AR11 | S-50 – S-52 | WAMU 2007 - OA6 | S-39 – S-40 |
| WAMU 2006 - AR12 | S-26 – S-27 | WMALT 2007 - OA4 | S-34 |
| WAMU 2006 - AR13 | S-38 – S-39 | WMALT 2007 - OA5 | S-34 |
| WAMU 2006 - AR14 | S-20 | WMALT 2007 - OC1 | S-27 |
| WAMU 2006 - AR15 | S-36 | WMALT 2007 - OC2 | S-27 |
| WAMU 2006 - AR16 | S-22 | WMALT 2007 - 3 | S-30 – S-31 |
| WAMU 2006 - AR17 | S-37 – S-38 | WMALT 2007 - 4 | S-27 |
| WAMU 2006 - AR18 | S-22 | WMALT 2007 - 5 | S-28 |

145.    The Prospectus Supplements describe the importance of appraisals of mortgaged properties.  For example, the Prospectus Supplements also stated that:

> The adequacy of the mortgaged property as collateral generally is determined by an appraisal made in accordance with pre-established appraisal guidelines. At origination, all appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation, and are made on forms acceptable to Fannie Mae and/or Freddie Mac. Appraisers may be staff appraisers employed by the sponsor or

SCOTT + SCOTT
600 B Street, Suite 1500
San Diego, California
Telephone: (619) 233-4565

independent appraisers selected in accordance with the pre-established appraisal guidelines. Such guidelines generally require that the appraiser, or an agent on its behalf, personally inspect the property and verify whether the property is in adequate condition and, if the property is new construction, whether it is substantially completed. However, in the case of mortgage loans underwritten through the sponsor's automated underwriting system, an automated valuation method may be used, under which the appraiser does not personally inspect the property but instead relies on public records regarding the mortgaged property and/or neighboring properties. In either case, the appraisal normally is based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, a replacement cost analysis based on the current cost of constructing or purchasing a similar property. For mortgage loans underwritten under the sponsor's streamline documentation programs, the appraisal guidelines in some cases permit the appraisal obtained for an existing mortgage loan to be used. Title insurance is required for all mortgage loans, except that for mortgage loans secured by shares of cooperative apartments, title insurance is not required for the cooperative apartment building (but a lien search is provided by the title company). Specific additional title insurance coverage is required for some types of mortgage loans.

WAMU Series 2006-AR6 Prospectus Supplement, Form 424B5, filed June 22, 2006, at S-20; *see also* Prospectus Supplement, Form 424B5, for:

| Series | Page Number | Series | Page Number |
|--------|-------------|--------|-------------|
| WAMU 2006 - AR1 | S-29 | WAMU 2006 - AR19 | S-40 |
| WAMU 2006 - AR2 | S-21 | WAMU 2007 - HY1 | S-26 |
| WAMU 2006 - AR3 | S-26 | WAMU 2007 - HY2 | S-23 |
| WAMU 2006 - AR4 | S-36 | WAMU 2007 - HY3 | S-25 |
| WAMU 2006 - AR5 | S-32 | WAMU 2007 - HY4 | S-25 |
| WAMU 2006 - AR6 | S-20 | WAMU 2007 - HY5 | S-29 |
| WAMU 2006 - AR7 | S-39 | WAMU 2007 - HY6 | S-29 |
| WAMU 2006 - AR8 | S-23 | WAMU 2007 - HY7 | S-26 |
| WAMU 2006 - AR9 | S-39 | WAMU 2007 - OA4 | S-39 |
| WAMU 2006 - AR10 | S-25 | WAMU 2007 - OA5 | S-40 |
| WAMU 2006 - AR11 | S-51 | WAMU 2007 - OA6 | S-40 |
| WAMU 2006 - AR12 | S-27 | WMALT 2007 - OA4 | S-34 – S-35 |
| WAMU 2006 - AR13 | S-39 | WMALT 2007 - OA5 | S-34 – S-35 |
| WAMU 2006 - AR14 | S-21 | WMALT 2007 - OC1 | S-27 – S-28 |
| WAMU 2006 - AR15 | S-37 | WMALT 2007 - OC2 | S-27 – S-28 |
| WAMU 2006 - AR16 | S-23 | WMALT 2007 - 3 | S-31 – S-32 |
| WAMU 2006 - AR17 | S-38 | WMALT 2007 - 4 | S-28 |
| WAMU 2006 - AR18 | S-23 | WMALT 2007 - 5 | S-28 – S-29 |

146.    The excerpts in the above paragraph contained material misstatements and omission of fact because:

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                    52

(a)      As stated herein, WaMu's home loan appraisals were not obtained from independent appraisers or appraisal services, but rather from appraisers who ensured that their appraisals conform to predetermined levels at which a loan could be approved, or risk their association and employment with WaMu or brokers employed by WaMu correspondent lenders throughout the country.  The effect was that purportedly independent appraisals were not prepared in conformance with Fannie Mae or Freddie Mac appraisal standards.

(b)      WaMu failed to confirm that appraisers were following the Guidelines, and this, combined with the implied or express pressures placed on appraisers to appraise to the desired value, created enormous upward pressure on appraisal values, distorting loan-to-value ratios and making the mortgage loans in the pool much riskier than suggested by the Offering Documents.  This was particularly true in 2006 and 2007 when real estate values in many of the areas where the mortgage pools were located had stopped increasing at the rapid pace of 2004 and 2005.  Thus, the aggressive lending practices introduced during those years where, for example, borrowers with mortgages in excess of their ability to pay were assured that by the promise of refinancing to a lower rate, were unavailable.

147.      The Prospectus Supplements also set forth, in the identical or substantially similar fashion, guidelines for underwriting exceptions granted in cases where "compensating factors" were present:

> In evaluating a prospective borrower's ability to repay a mortgage loan, the loan underwriter considers the ratio of the borrower's mortgage payments, real property taxes and other monthly housing expenses to the borrower's gross income (referred to as the "housing-to-income ratio" or "front end ratio"), and the ratio of the borrower's total monthly debt (including non-housing expenses) to the borrower's gross income (referred to as the "debt-to-income ratio" or "back end ratio"). The maximum acceptable ratios may vary depending on other loan factors, such as loan amount and loan purpose, loan-to-value ratio, credit score and the availability of other liquid assets. Exceptions to the ratio guidelines may be made when compensating factors are present.

WAMU Series 2006-AR6 Prospectus Supplement, Form 424B5, filed June 22, 2006, at S-20; *see*

CONSOLIDATED COMPLAINT

Case No.: C09-0037 (MJP)                    53

*also* Prospectus Supplement, Form 424B5, for:

| Series | Page Number | Series | Page Number |
|---|---|---|---|
| WAMU 2006 - AR1 | S-29 | WAMU 2006 - AR19 | S-40 |
| WAMU 2006 - AR2 | S-21 | WAMU 2007 - HY1 | S-26 |
| WAMU 2006 - AR3 | S-26 | WAMU 2007 - HY2 | S-23 |
| WAMU 2006 - AR4 | S-36 | WAMU 2007 - HY3 | S-25 |
| WAMU 2006 - AR5 | S-32 | WAMU 2007 - HY4 | S-25 |
| WAMU 2006 - AR6 | S-20 | WAMU 2007 - HY5 | S-29 |
| WAMU 2006 - AR7 | S-39 | WAMU 2007 - HY6 | S-29 |
| WAMU 2006 - AR8 | S-23 | WAMU 2007 - HY7 | S-26 |
| WAMU 2006 - AR9 | S-39 | WAMU 2007 - OA4 | S-39 |
| WAMU 2006 - AR10 | S-25 | WAMU 2007 - OA5 | S-40 |
| WAMU 2006 - AR11 | S-51 | WAMU 2007 - OA6 | S-40 |
| WAMU 2006 - AR12 | S-27 | WMALT 2007 - OA4 | S-34 |
| WAMU 2006 - AR13 | S-39 | WMALT 2007 - OA5 | S-34 |
| WAMU 2006 - AR14 | S-21 | WMALT 2007 - OC1 | S-27 |
| WAMU 2006 - AR15 | S-37 | WMALT 2007 - OC2 | S-27 |
| WAMU 2006 - AR16 | S-23 | WMALT 2007 - 3 | S-31 |
| WAMU 2006 - AR17 | S-38 | WMALT 2007 - 4 | S-27 |
| WAMU 2006 - AR18 | S-23 | WMALT 2007 - 5 | S-28 |

Exceptions to the sponsor's loan program parameters may be made on a case-by-case basis if compensating factors are present. In those cases, the basis for the exception is documented, and in some cases the approval of a senior underwriter is required. Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt-to-income ratio, good credit standing, the availability of other liquid assets, stable employment and time in residence at the prospective borrower's current address.

WAMU Series 2006-AR6 Prospectus Supplement, Form 424B5, filed June 22, 2006, at S-21; *see also* Prospectus Supplement, Form 424B5, for:

| Series | Page Number | Series | Page Number |
|---|---|---|---|
| WAMU 2006 - AR1 | S-30 | WAMU 2006 - AR19 | S-41 |
| WAMU 2006 - AR2 | S-22 | WAMU 2007 - HY1 | S-27 |
| WAMU 2006 - AR3 | S-27 | WAMU 2007 - HY2 | S-24 |
| WAMU 2006 - AR4 | S-37 | WAMU 2007 - HY3 | S-26 |
| WAMU 2006 - AR5 | S-33 | WAMU 2007 - HY4 | S-26 |
| WAMU 2006 - AR6 | S-21 | WAMU 2007 - HY5 | S-30 |
| WAMU 2006 - AR7 | S-40 | WAMU 2007 - HY6 | S-30 |

SCOTT + SCOTT
600 B Street, Suite 1500
San Diego, California
Telephone: (619) 233-4565

| WAMU 2006 - AR8 | S-24 | WAMU 2007 - HY7 | S-27 |
|---|---|---|---|
| WAMU 2006 - AR9 | S-40 | WAMU 2007 - OA4 | S-40 |
| WAMU 2006 - AR10 | S-26 | WAMU 2007 - OA5 | S-41 |
| WAMU 2006 - AR11 | S-52 | WAMU 2007 - OA6 | S-41 |
| WAMU 2006 - AR12 | S-28 | WMALT 2007 - OA4 | S-36 |
| WAMU 2006 - AR13 | S-40 | WMALT 2007 - OA5 | S-36 |
| WAMU 2006 - AR14 | S-22 | WMALT 2007 - OC1 | S-29 |
| WAMU 2006 - AR15 | S-38 | WMALT 2007 - OC2 | S-29 |
| WAMU 2006 - AR16 | S-24 | WMALT 2007 - 3 | S-29 |
| WAMU 2006 - AR17 | S-39 | WMALT 2007 - 4 | S-29 |
| WAMU 2006 - AR18 | S-24 | WMALT 2007 - 5 | S-30 |

148.    The excerpts in the above paragraphs contained material misstatements and omission of fact because, as set forth above, WMB was very liberal in granting exceptions to its underwriting standards and was not nearly as thorough in getting documentation from or about borrowers as the underwriting guidelines set forth herein implied.  The emphasis was on getting loans done – meaning more volume led to higher fees and profits for WMB, and therefore, WaMu.  Exceptions not only were granted in situations where compensating factors existed but also were extensively granted to maintain loan volume.

**B.      The Offering Documents Included Material Misstatements and Omitted Information Regarding the Risks Associated with Appraisals**

**1.      The Registration Statement**

149.    The Registration Statements contained a section purportedly describing the decline in values that "may" result since the appraisals were obtained.

> In addition, for some mortgage loans, the values of the related mortgaged properties may have substantially declined since the appraisals were obtained in connection with the origination of those mortgage loans. In the event that such a mortgage loan becomes delinquent and is liquidated, a larger loss may occur than would otherwise be expected based on the appraised value.

WMAAC, Form S-3/A Registration Statement, filed January 3, 2006, at 6; *see also,* WMAAC, Form S-3/A Registration Statement, filed April 9, 2007, at 6.

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                      55

150.   The purported "Risk Factors" section in the Registration Statements also stated that inaccurate appraisals may lead to an increase in defaults and an increase in losses allocated to the Certificates.

> Moreover, some underwriting standards may result in a less accurate assessment of the borrower's credit standing and repayment ability and/or the value and adequacy of the related property as collateral. As a result, there may be a greater likelihood of default on mortgage loans originated under some underwriting standards, and a greater likelihood that the related mortgaged properties will fail to provide adequate security in the event of such default. In turn, there may be a greater likelihood that losses, to the extent not covered by credit support, will be allocated to the related securities.

WMAAC, Form S-3/A Registration Statement, filed January 3, 2006, at 7; *see also,* WMAAC, Form S-3/A Registration Statement, filed April 9, 2007, at 7.

151.   The Registration Statements contained a section which stated that WMAAC's limited and no documentation programs were based entirely on appraisal values of the mortgaged property.

> Limited documentation and no documentation mortgage loans are mortgage loans which require less documentation and verification than other mortgage loans, and which may be originated with minimal or no investigation into the related borrower's credit history and income profile by the originator. The underwriting for limited documentation or no documentation loans may be based primarily or entirely on an appraisal or other valuation of the mortgaged property and the LTV or combined LTV ratio at origination.

WMAAC, Form S-3/A Registration Statement, filed January 3, 2006, at 32; *see also,* WMAAC, Form S-3/A Registration Statement, filed April 9, 2007, at 33.

152.   The Registration Statements contained a section which described the requirements of an appraisal for each mortgaged property to determine the adequacy of the property as collateral.

> In determining the adequacy of the property as collateral, an appraisal is made of each property considered for financing. The appraiser, or an agent on its behalf, is generally required to personally inspect the property and verify that it is in adequate condition and that construction, if new, has been substantially completed. However, in some cases an automated valuation method may be used, under which the appraiser does not personally inspect the property but instead relies on public records regarding the mortgaged property and/or neighboring properties. In either case, the appraisal normally is based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, a replacement cost analysis based on the current cost of constructing or purchasing a similar property. Some of the mortgage loans may be re-underwritten by a mortgage loan seller.

WMAAC, Form S-3/A Registration Statement, filed January 3, 2006, at 44; *see also,* WMAAC,

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                56

Form S-3/A Registration Statement, filed April 9, 2007, at 45.

153.   The excerpts from the Registration Statements in the above paragraphs contained material misstatements and omission of fact because the appraisals WaMu's appraiser, eAppraiseIT, performed for WaMu did not portray accurate market data and valuation. In order to earn business from WaMu eAppraiseIT artificially inflated appraisal values to "hit" the LTV ratios necessary to allow more loans to close and be eligible for pooling and sale to the securitization market.

## 2.   The Prospectus Supplements

154.   The Prospectus Supplements issued in connection with each of the Offerings contained statements which were purported "Risk Factors" regarding the appraisal of the properties underlying mortgage loan collateral.  These purported "Risk Factors" stated, in part:

> In addition, for some mortgage loans, the values of the related mortgaged properties may have substantially declined since the appraisals were obtained in connection with the origination of those mortgage loans. In the event that such a mortgage loan becomes delinquent and is liquidated, a larger loss may occur than would otherwise be expected based on the appraised value.

*     *     *

> Moreover, some underwriting standards may result in a less accurate assessment of the borrower's credit standing and repayment ability and/or the value and adequacy of the related property as collateral. As a result, there may be a greater likelihood of default on mortgage loans originated under some underwriting standards, and a greater likelihood that the related mortgaged properties will fail to provide adequate security in the event of such default. In turn, there may be a greater likelihood that losses, to the extent not covered by credit support, will be allocated to the related securities.

*WAMU* Series 2006-AR1 Prospectus Supplement, Form 424B5, filed January 26, 2006, at 6-7; *see also* Prospectus Supplement, Form 424B5, for:

| Series | Page Number | Series | Page Number |
|---|---|---|---|
| WAMU 2006 - AR1 | 6-7 | WAMU 2006 - AR19 | 6-7 |
| WAMU 2006 - AR2 | 6-7 | WAMU 2007 - HY1 | 6-7 |
| WAMU 2006 - AR3 | 6-7 | WAMU 2007 - HY2 | 6-7 |
| WAMU 2006 - AR4 | 6-7 | WAMU 2007 - HY3 | 6-7 |

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                         57

| | | | |
|---|---|---|---|
| WAMU 2006 - AR5 | 6-7 | WAMU 2007 - HY4 | 6-7 |
| WAMU 2006 - AR6 | 6-7 | WAMU 2007 - HY5 | 6-7 |
| WAMU 2006 - AR7 | 6-7 | WAMU 2007 - HY6 | 6-7 |
| WAMU 2006 - AR8 | 6-7 | WAMU 2007 - HY7 | 6-7 |
| WAMU 2006 - AR9 | 6-7 | WAMU 2007 - OA4 | 6-7 |
| WAMU 2006 - AR10 | 6-7 | WAMU 2007 - OA5 | 6-7 |
| WAMU 2006 - AR11 | 6-7 | WAMU 2007 - OA6 | 6-7 |
| WAMU 2006 - AR12 | 6-7 | WMALT 2007 - OA4 | 6-7 |
| WAMU 2006 - AR13 | 6-7 | WMALT 2007 - OA5 | 6-7 |
| WAMU 2006 - AR14 | 6-7 | WMALT 2007 - OC1 | 6-7 |
| WAMU 2006 - AR15 | 6-7 | WMALT 2007 - OC2 | 6-7 |
| WAMU 2006 - AR16 | 6-7 | WMALT 2007 - 3 | 6-7 |
| WAMU 2006 - AR17 | 6-7 | WMALT 2007 - 4 | 6-7 |
| WAMU 2006 - AR18 | 6-7 | WMALT 2007 - 5 | 6-7 |

155.    The excerpts from the Prospectus Supplements in the above paragraphs contained material misstatements and omissions of fact because the appraisals WaMu's appraiser, eAppraiseIT, performed for WaMu did not portray accurate market data and valuation. In order to earn business from WaMu eAppraiseIT artificially inflated appraisal values to "hit" the LTV ratios necessary to allow more loans to close and be eligible for pooling and sale to the securitization market.

156.    The Prospectus Supplements also contained the following language regarding "review appraisals":

> The underwriting standards of the mortgage loan originator or mortgage loan seller may require an internal review of the appraisal (a "review appraisal") used to determine the loan-to-value of a mortgage loan which may be performed by underwriters rather than a licensed appraiser. Where the review appraisal results in a valuation of the mortgaged property that is less than a specified percentage of the original appraisal, the loan-to-value ratio of the related mortgage loan will be based on the review appraisal.

WAMU Series 2006-AR1 Prospectus Supplement, Form 424B5, filed January 26, 2006, at 31-32; *see also* Prospectus Supplement, Form 424B5, for:

| Series | Page Number | Series | Page Number |
|---|---|---|---|
| WAMU 2006 - AR1 | 31-32 | WAMU 2006 - AR19 | 30 |

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)    58

| WAMU 2006 - AR2 | 31-32 | WAMU 2007 - HY1 | 30 |
| WAMU 2006 - AR3 | 31-32 | WAMU 2007 - HY2 | 30 |
| WAMU 2006 - AR4 | 31-32 | WAMU 2007 - HY3 | 30 |
| WAMU 2006 - AR5 | 31-32 | WAMU 2007 - HY4 | 30 |
| WAMU 2006 - AR6 | 31-32 | WAMU 2007 - HY5 | 32-33 |
| WAMU 2006 - AR7 | 31-32 | WAMU 2007 - HY6 | 32-33 |
| WAMU 2006 - AR8 | 31-32 | WAMU 2007 - HY7 | 32-33 |
| WAMU 2006 - AR9 | 31-32 | WAMU 2007 - OA4 | 32-33 |
| WAMU 2006 - AR10 | 31-32 | WAMU 2007 - OA5 | 32-33 |
| WAMU 2006 - AR11 | 31-32 | WAMU 2007 - OA6 | 32-33 |
| WAMU 2006 - AR12 | 31-32 | WMALT 2007 - OA4 | 32-33 |
| WAMU 2006 - AR13 | 31-32 | WMALT 2007 - OA5 | 32-33 |
| WAMU 2006 - AR14 | 31-32 | WMALT 2007 - OC1 | 32-33 |
| WAMU 2006 - AR15 | 31-32 | WMALT 2007 - OC2 | 32-33 |
| WAMU 2006 - AR16 | 30 | WMALT 2007 - 3 | 32-33 |
| WAMU 2006 - AR17 | 30 | WMALT 2007 - 4 | 32-33 |
| WAMU 2006 - AR18 | 30 | WMALT 2007 - 5 | 32-33 |

157.    Furthermore, the Prospectus Supplements, with respect to the importance of the appraisal in underwriting the mortgage collateral on less than "full-documentation" loans, stated:

> Limited documentation and no documentation mortgage loans are mortgage loans which require less documentation and verification than other mortgage loans, and which may be originated with minimal or no investigation into the related borrower's credit history and income profile by the originator. The underwriting for limited documentation or no documentation loans may be based primarily or entirely on an appraisal or other valuation of the mortgaged property and the LTV or combined LTV ratio at origination.

WAMU Series 2006-AR1 Prospectus Supplement, Form 424B5, filed January 26, 2006, at 32; *see also* Prospectus Supplement, Form 424B5, for:

| Series | Page Number | Series | Page Number |
|---|---|---|---|
| WAMU 2006 - AR1 | 32 | WAMU 2006 - AR19 | 31 |
| WAMU 2006 - AR2 | 32 | WAMU 2007 - HY1 | 31 |
| WAMU 2006 - AR3 | 32 | WAMU 2007 - HY2 | 31 |
| WAMU 2006 - AR4 | 32 | WAMU 2007 - HY3 | 31 |
| WAMU 2006 - AR5 | 32 | WAMU 2007 - HY4 | 31 |

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                   59

| WAMU 2006 - AR6 | 32 | WAMU 2007 - HY5 | 33 |
| WAMU 2006 - AR7 | 32 | WAMU 2007 - HY6 | 33 |
| WAMU 2006 - AR8 | 32 | WAMU 2007 - HY7 | 33 |
| WAMU 2006 - AR9 | 32 | WAMU 2007 - OA4 | 33 |
| WAMU 2006 - AR10 | 32 | WAMU 2007 - OA5 | 33 |
| WAMU 2006 - AR11 | 32 | WAMU 2007 - OA6 | 33 |
| WAMU 2006 - AR12 | 32 | WMALT 2007 - OA4 | 33 |
| WAMU 2006 - AR13 | 32 | WMALT 2007 - OA5 | 33 |
| WAMU 2006 - AR14 | 32 | WMALT 2007 - OC1 | 33 |
| WAMU 2006 - AR15 | 32 | WMALT 2007 - OC2 | 33 |
| WAMU 2006 - AR16 | 31 | WMALT 2007 - 3 | 33 |
| WAMU 2006 - AR17 | 31 | WMALT 2007 - 4 | 33 |
| WAMU 2006 - AR18 | 31 | WMALT 2007 - 5 | 33 |

158.   The excerpts from the Prospectus Supplements in the above paragraph contained material misstatements and omission of fact because, due to the artificially inflated appraisals (as detailed above) mortgages were extended to borrowers whose true LTV ratio did not support the amount of the mortgage loan.  Moreover, contrary to the statement that these many of the mortgages were in fact "limited documentation," or not "full documentation" loans, they were not extended to borrowers who have a credit history that demonstrates an established ability to repay indebtedness in a timely fashion.  In fact, the originators implemented policies designed to extend mortgages to borrowers regardless of whether they were able to meet their obligations under the mortgage such as:

- Coaching borrowers to misstate their income on loan applications to qualify for mortgage loans under the originators' underwriting standards, including directing applicants to no-documentation loan programs when their income was insufficient to qualify for full documentation loan programs.
- Steering borrowers to more expensive loans that exceeded their borrowing capacity.
- Encouraging borrowers to borrow more than they could afford by suggesting NINA and SISA loans when they could not qualify for full documentation loans based on their actual incomes.
- Approving borrowers based on "teaser rates" for loans despite knowing that the borrower would not be able to afford the "fully indexed rate" when the adjustable rate adjusted.

**SCOTT + SCOTT**
600 B Street, Suite 1500
San Diego, California
Telephone: (619) 233-4565

- Allowing non-qualifying borrowers to be approved for loans under exceptions to the originators' underwriting standards based on so-called "compensating factors" without requiring documentation for such compensating factors.
- Incentivizing their employees to approve borrowers under exceptions to the originators' underwriting policies.
- Failing to determine whether stated income or stated assets were reasonable.

**C.    The Offering Documents Included Material Misstatements and Omitted Information Regarding Credit Support**

159.    "Credit enhancement" refers to excess mortgage loan collateral which provides support to the mortgage collateral underlying the Offered Certificates and generates additional interest to protect security holders in the event of borrower default or other event which may impair the collateral underlying the certificates.

160.    With respect to credit enhancement, the Registration Statements provided explanations of the methods used by WaMu in the Certificate Offerings as follows:

**CREDIT ENHANCEMENTS**

**Subordination**. The senior certificates will receive all distributions of interest and principal that they are entitled to receive on each distribution date before the subordinate certificates receive any distributions on that distribution date. This provides credit enhancement to the senior certificates.  In a similar fashion, each class of subordinate certificates will provide credit enhancement to all other subordinate certificates with lower numerical class designations.

**Shifting of Interests**. The senior certificates generally will receive their pro rata share of scheduled principal payments received on the mortgage loans in the related loan group on each distribution date. In addition, unless credit enhancement to the senior certificates has reached a specified level and the delinquencies and losses received on the mortgage loans in the related loan group do not exceed specified limits, the senior certificates in the aggregate will receive 100% of all principal prepayments received on the mortgage loans in the related loan group, net of any portion thereof applied to reduce negative amortization, until the tenth anniversary of the first distribution date. During the next four years the senior certificates in the aggregate will generally receive a disproportionately large, but decreasing, share of principal prepayments. This will result in a quicker return of principal to the senior certificates and increases the likelihood that holders of the senior certificates will be paid the full amount of principal to which they are entitled. For a more detailed description of how principal prepayments are allocated among the senior certificates

SCOTT + SCOTT
600 B Street, Suite 1500
San Diego, California
Telephone: (619) 233-4565

and the subordinate certificates, see 'Description of the Certificates -- Principal Prepayments' in this prospectus supplement

WMAAC, Form S-3/A Registration Statement, filed January 3, 2006, at S-15; *see also,* WMAAC, Form S-3/A Registration Statement, filed April 9, 2007, at S-16.

161.    Each Prospectus Supplement set forth on the first page of the document a general description of the Credit Enhancement supporting the Offering.  The Prospectus Supplement for the WAMU Series 2006-AR1 Certificates Offering stated as follows:

> Credit enhancement for the offered certificates is being provided by five classes of privately offered certificates, which have an aggregate principal balance of approximately $41,700,658. Credit enhancement for the offered senior certificates is being provided by five classes of offered subordinate certificates.

WAMU Series 2006-AR1 Prospectus Supplement, Form 424B5, filed January 26, 2006, at Cover.

162.    Furthermore, the Prospectus Supplements each contained further explanation of the credit enhancement specific to each of the Offerings.  For example, the Prospectus Supplement for the WAMU Series 2006-AR1 Certificates Offering provided that credit enhancement would include:

CREDIT ENHANCEMENTS

**Subordination.** The Senior Certificates receive distributions of interest and principal to which they are entitled before distributions of interest or principal to the Subordinate Certificates. No class of Subordinate Certificates will receive distributions of interest or principal on any Distribution Date until the Subordinate Certificates senior to that class have received all distributions of interest and principal due on or before the Distribution Date. See "Description of the Certificates—Priority of Distributions'' in this prospectus supplement.

Losses on mortgage loans in a loan group will be allocated, in each case, until their Class Principal Balances have been reduced to zero, first, to the Junior Subordinate Certificates in reverse numerical order; second, to the Class B-9 Certificates; third, to the Class B-8 Certificates; fourth, to the Class B-7 Certificates; fifth, to the Class B-6 Certificates; sixth, to the Class B-5 Certificates; seventh, to the Class B-4 Certificates; eighth, to the Class B-3 Certificates; ninth, to the Class B-2 Certificates; tenth, to the Class B-1 Certificates; and eleventh, to the Senior Certificates as described under "Description of the Certificates—Subordination and Allocation of Losses'' in this prospectus supplement; provided, however, that after the Class Principal Balances of all of the Subordinate Certificates have been reduced to zero, any loss that would otherwise be allocated to the Class 1A-1A Certificates will be allocated to the Class 1A-1B Certificates, until its Class Principal Balance has been reduced to zero; provided, further, that losses allocated to principal and interest that

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                    62

SCOTT + SCOTT
600 B Street, Suite 1500
San Diego, California
Telephone: (619) 233-4565

would be allocable to the Class 2A-1A Certificates will be allocated (i) first, to the Class 2A-1C Certificates, until its Class Principal Balance has been reduced to zero and (ii) second, to the Class 2A-1B Certificates, until its Class Principal Balance has been reduced to zero; and provided, further, that any loss that would otherwise be allocated to the Class 2A-1B Certificates will be allocated to the Class 2A-1C Certificates, until its Class Principal Balance has been reduced to zero.

**Shifting of Interests.** The Senior Certificates in a Certificate Group in the aggregate generally will receive their pro rata share of scheduled principal payments received with respect to the mortgage loans in the related loan group on each Distribution Date. In addition, unless credit enhancement to the Senior Certificates has reached a specified level and the delinquencies and losses on the mortgage loans do not exceed specified limits, the Senior Certificates in a Certificate Group will receive 100% of principal prepayments received with respect to the mortgage loans in the related loan group, net of any portion thereof applied to reduce negative amortization, until the tenth anniversary of the first Distribution Date. During the next four years, the Senior Certificates generally will receive a disproportionately large, but decreasing, share of principal prepayments received with respect to the mortgage loans in the related loan group. This will result in an acceleration of the amortization of the Senior Certificates, enhancing the likelihood that holders of the Senior Certificates will be paid the full amount of principal to which they are entitled. See the second and third paragraphs of "Description of the Certificates—Distributions of Principal—Principal Prepayments'' in this prospectus supplement for important limitations on the accelerated amortization of the Senior Certificates.

WAMU Series 2006-AR1 Prospectus Supplement, Form 424B5, filed January 26, 2006, at S-89-90; *see also* Prospectus Supplement, Form 424B5, for:

| Series | Page Number | Series | Page Number |
|---|---|---|---|
| WAMU 2006 - AR1 | S-89-90 | WAMU 2006 - AR19 | S-18 |
| WAMU 2006 - AR2 | S-10 | WAMU 2007 - HY1 | S-12-13 |
| WAMU 2006 - AR3 | S-13-14 | WAMU 2007 - HY2 | S-11 |
| WAMU 2006 - AR4 | S-16-17 | WAMU 2007 - HY3 | S-11-12 |
| WAMU 2006 - AR5 | S-16 | WAMU 2007 - HY4 | S-12-13 |
| WAMU 2006 - AR6 | S-10 | WAMU 2007 - HY5 | S-13 |
| WAMU 2006 - AR7 | S-20 | WAMU 2007 - HY6 | S-13-14 |
| WAMU 2006 - AR8 | S-11-12 | WAMU 2007 - HY7 | S-12 |
| WAMU 2006 - AR9 | S-18 | WAMU 2007 - OA4 | S-16-17 |
| WAMU 2006 - AR10 | S-12 | WAMU 2007 - OA5 | S-17 |
| WAMU 2006 - AR11 | S-26 | WAMU 2007 - OA6 | S-17 |
| WAMU 2006 - AR12 | S-13 | WMALT 2007 - OA4 | S-15 |
| WAMU 2006 - AR13 | S-18 | WMALT 2007 - OA5 | S-15 |
| WAMU 2006 - AR14 | S-10-11 | WMALT 2007 - OC1 | S-10-11 |

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                    63

| WAMU 2006 - AR15 | S-17 | WMALT 2007 - OC2 | S-10 |
| WAMU 2006 - AR16 | S-75 | WMALT 2007 - 3 | S-12 |
| WAMU 2006 - AR17 | S-17-18 | WMALT 2007 - 4 | S-11 |
| WAMU 2006 - AR18 | S-11 | WMALT 2007 - 5 | S-11 |

163.    The excerpts from the Registration Statements and Prospectus Supplements in the above paragraphs contained material misstatements and omission of fact because:

(a)    These statements failed to disclose that the Rating Agencies largely determined the amount and kind of Credit Support or Credit Enhancement to be provided for each Certificate, both before and after Rating Agencies were formally "engaged" by WaMu, in order for the Certificates to be assigned predetermined ratings.

(b)    These statements also failed to disclose that the amounts and kind of Credit Support that was determined to be appropriate for the Certificates, as specifically set forth in each Prospectus Supplement, was faulty, erroneous and inaccurate since the models used to determine such had not been updated properly and failed to accurately or adequately reflect the performance of the underlying collateral.

(c)    In terms of what the statements purport to convey to the investor, specifically that credit support levels are determined by the exposure to risk of default or delinquency by the underlying borrowers, these statements were far from the truth.   In fact, credit enhancement levels were set at the absolute minimum level that was required not to protect investors, but rather to achieve and be awarded the highest possible credit rating from the Rating Agencies engaged on the securitization.

**D.    The Prospectus Supplements Misstated the True Loan-to-Value Ratios Associated with the Underlying Mortgages**

164.    Each of the Registration Statements included the identical language regarding the importance of accurate LTV ratios in forming the underlying mortgage pool.  *See* ¶¶162-63, *supra*.

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                    64

165.   Each of the Prospectus Supplements contained detailed information about the LTV ratios of the loans underlying the trusts.  In a series of charts, investors were provided with LTV ratio data, including information about the number of loans containing LTV ratios within a given range.   The following charts, taken from the Prospectus Supplements summarized the LTV characteristics of the mortgage pool underlying the Certificates in the following way, with only minor, if any, variation among the different Prospectus Supplements:

### Current Loan-to-Value Ratios of the Group 1 Loans

| Current Loan-to-Value Ratio (%) | Number of Mortgage Loans | Aggregate Principal Balance of the Mortgage Loans as of the Cut-Off Date | Percentage of the Aggregate Principal Balance of all Group 1 Loans |
|---|---|---|---|
| 60.00 or less . . . . . . . . . . . . . . | 83 | $ 17,207,402.15 | 8.20% |
| 60.01−70.00 . . . . . . . . . . . . . . | 325 | 70,909,518.59 | 33.79 |
| 70.01−75.00 . . . . . . . . . . . . . . | 212 | 44,281,715.02 | 21.10 |
| 75.01−80.00 . . . . . . . . . . . . . . | 210 | 47,394,633.11 | 22.59 |
| 80.01−85.00 . . . . . . . . . . . . . . | 109 | 25,778,553.27 | 12.28 |
| 85.01−90.00 . . . . . . . . . . . . . . | 9 | 1,925,995.25 | 0.92 |
| 90.01−95.00 . . . . . . . . . . . . . . | 10 | 2,345,256.65 | 1.12 |
| Total . . . . . . . . . . . . . . . | 958 | $209,843,074.04 | 100.00% |

WAMU Series 2006-AR1 Prospectus Supplement, Form 424B5, filed January 26, 2006, at S-102.

SCOTT + SCOTT
600 B Street, Suite 1500
San Diego, California
Telephone: (619) 233-4565

## Current Loan-to-Value Ratios of the Group 2 Loans

| Current Loan-to-Value Ratio (%) | Number of Mortgage Loans | Aggregate Principal Balance of the Mortgage Loans as of the Cut-Off Date | Percentage of the Aggregate Principal Balance of all Group 2 Loans |
|---|---|---|---|
| 60.00 or less . . . . . . . . . . . . . | 214 | $  188,938,950.64 | 14.46% |
| 60.01−70.00 . . . . . . . . . . . . . | 346 | 304,705,357.29 | 23.33 |
| 70.01−75.00 . . . . . . . . . . . . . | 314 | 235,762,911.76 | 18.05 |
| 75.01−80.00 . . . . . . . . . . . . . | 400 | 279,443,250.96 | 21.39 |
| 80.01−85.00 . . . . . . . . . . . . . | 462 | 295,287,771.36 | 22.60 |
| 85.01−90.00 . . . . . . . . . . . . . | 2 | 912,240.03 | 0.07 |
| 90.01−95.00 . . . . . . . . . . . . . | 2 | 843,052.91 | 0.06 |
| 95.01−100 . . . . . . . . . . . . . | 1 | 452,149.28 | 0.03 |
| Total . . . . . . . . . . . . . . . | 1,741 | $1,306,345,684.23 | 100.00% |

WAMU Series 2006-AR1 Prospectus Supplement, Form 424B5, filed January 26, 2006 at S-111; *see also* Prospectus Supplement, Form 424B5, for:

| Series | Page Number | Series | Page Number |
|---|---|---|---|
| WAMU 2006 - AR1 | S-102, S-111 | WAMU 2006 - AR19 | S-123, S-128, S-132 |
| WAMU 2006 - AR2 | S-77, S-80 | WAMU 2007 - HY1 | S-105, S-110, S-114 |
| WAMU 2006 - AR3 | S-88 | WAMU 2007 - HY2 | S-95, S-98, S-101 |
| WAMU 2006 - AR4 | S-122, S-131, S-137, S-141 | WAMU 2007 - HY3 | S-97, S-100, S-103 |
| WAMU 2006 - AR5 | S-100 | WAMU 2007 - HY4 | S-105, S-108 |
| WAMU 2006 - AR6 | S-77, S-81 | WAMU 2007 - HY5 | S-104, S-108, S-110, S-113, S-116, S-119, S-122, S-125 |
| WAMU 2006 - AR7 | S-126, S-131, S-138 | WAMU 2007 - HY6 | S-102, S-105, S-108, S-111, S-114, S-117 |
| WAMU 2006 - AR8 | S-89, S-93, S-97 | WAMU 2007 - HY7 | S-95, S-101, S-98, S-101, S-104 |
| WAMU 2006 - AR9 | S-141, S-146, S-150, S-156, S-161, S-166 | WAMU 2007 - OA4 | S-119 |
| WAMU 2006 - AR10 | S-94, S-98, S-102 | WAMU 2007 - OA5 | S-122 |
| WAMU 2006 - AR11 | S-151, S-157, S-162 | WAMU 2007 - OA6 | S-122 |
| WAMU 2006 - AR12 | S-100, S-105, S-110 | WMALT 2007 - OA4 | S-113 |
| WAMU 2006 - AR13 | S-121, S-127 | WMALT 2007 - OA5 | S-111 |
| WAMU 2006 - AR14 | S-82, S-87 | WMALT 2007 - OC1 | S-95 |
| WAMU 2006 - AR15 | S-116, S-121 | WMALT 2007 - OC2 | S-93 |
| WAMU 2006 - AR16 | S-86, S-91, S-95 | WMALT 2007 - 3 | S-109 |
| WAMU 2006 - AR17 | S-119, S-125 | WMALT 2007 - 4 | S-99 |
| WAMU 2006 - AR18 | S-87, S-92, S-96 | WMALT 2007 - 5 | S-98 |

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                    66

166.    The excerpts from the Prospectus Supplements in the above paragraph contained material misstatements and omission of fact because:

(a)    The appraisal value of the properties underlying the mortgage loans and borrower incomes and credit were grossly inaccurate and significantly inflated.

(b)    Furthermore, due to hidden incentives, the stated sales price of properties underlying the mortgage loans did not accurately reflect the true value of the properties.  These inflated appraisals and misleading sales price figures were used to form the LTV ratios set forth in the Prospectus Supplements.  Incorporating an inflated appraisal into the LTV calculation will result in a lower LTV ratio for a given loan.  For example, if a borrower seeks to borrow $350,000 to purchase a house worth $400,000, the LTV ratio is $350,000/$400,000, or 88 percent.  If, however, the appraised value of the house is artificially increased to $450,000, the LTV ratio drops to just 78 percent ($350,000/$450,000).

(c)    Due to the inflated appraisals, the LTV ratios listed in the Prospectus Supplements were artificially low, making it appear that the loans underlying the trusts were less risky than they really were.  Due to the fact that such a large percentage of each pool of underlying mortgage loans contained mortgage loans on properties which had more than one mortgage (*i.e.,* a first and second lien mortgage), understated and misleading LTV ratios had a direct correlation to the skyrocketing delinquency and default rates within the first six months of the Offerings.  Moreover, since many of the loans underlying the Certificates were hybrid adjustable rates with biannual adjustments to interest rates and were made to low-quality borrowers, the resulting payments would be considerably more than what they could have been able to afford.

**E.    The Prospectus Supplements Misstated the Certificates' True Credit Ratings**

167.    The Registration Statements and Prospectus Supplements contained statements

SCOTT + SCOTT
600 B Street, Suite 1500
San Diego, California
Telephone: (619) 233-4565

1  regarding the ratings of the Certificates.  The Registration Statements referred the investor to the

2  Prospectus Supplements for specific information as to the ratings for each of the Certificates.

3      168.    Each of the Prospectus Supplements provided: (1) the Rating Agencies' actual rating

4  for each class of Offered Certificate within each Offering; or (2) stated that the Certificates in each

5  class would not be offered unless they received ratings from the Rating Agencies that were at least as

6  high as those set forth in the Prospectus Supplement. All of the ratings set forth in all of the

7  Prospectus Supplements were within the "Investment Grade" range of the various Rating Agencies,

8  namely Moody's (Aaa through Baa3) and S&P (AAA through BBB), and the vast majority of

9  Offered Certificates, over 93% of the aggregate Offering amount, received the highest rating of

10 AAA.

11

12     169.    The following chart, taken from the Prospectus Supplement for the WAMU Series

13 2006-AR1 Certificates Offering is an example of this representation:

14

| | Rating Agency | |
|---|---|---|
| Class | S&P | Moody's |
| 1A-1A | AAA | Aaa |
| 1A-1B | AAA | Aaa |
| 2A-1A | AAA | Aaa |
| 2A-1B | AAA | Aaa |
| 2A-1C | AAA | Aaa |
| X | AAA | Aaa |
| B-1 | AA+ | Aa1 |
| B-2 | AA | Aa1 |
| B-3 | AA– | Aa2 |
| B-4 | A+ | Aa3 |
| B-5 | A | A1 |
| B-6 | A– | A2 |
| B-7 | BBB+ | A2 |
| B-8 | BBB | A3 |
| B-9 | BBB– | Baa1 |
| R | AAA | Aaa |

*WAMU Series 2006-AR1 Prospectus Supplement, Form 424B5, filed January 26, 2006, at S-17; see*

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                    68

*also,*

| Class | Rating Agency S&P | Moody's | Class | Rating Agency S&P | Moody's |
|---|---|---|---|---|---|
| 1A-1A . . . . . . . . . . . . . . . . . . . . . . . | AAA | Aaa | B-3 . . . . . . . . . . . . . . . . . . . . . . . . | AA– | Aa2 |
| 1A-1B . . . . . . . . . . . . . . . . . . . . . . | AAA | Aaa | B-4 . . . . . . . . . . . . . . . . . . . . . . . . | A+ | Aa3 |
| 2A-1A . . . . . . . . . . . . . . . . . . . . . . | AAA | Aaa | B-5 . . . . . . . . . . . . . . . . . . . . . . . . | A | A1 |
| 2A-1B . . . . . . . . . . . . . . . . . . . . . . | AAA | Aaa | B-6 . . . . . . . . . . . . . . . . . . . . . . . . | A– | A2 |
| 2A-1C . . . . . . . . . . . . . . . . . . . . . . | AAA | Aaa | B-7 . . . . . . . . . . . . . . . . . . . . . . . . | BBB+ | A2 |
| X . . . . . . . . . . . . . . . . . . . . . . . . . . | AAA | Aaa | B-8 . . . . . . . . . . . . . . . . . . . . . . . . | BBB | A3 |
| B-1 . . . . . . . . . . . . . . . . . . . . . . . . . | AA+ | Aa1 | B-9 . . . . . . . . . . . . . . . . . . . . . . . . | BBB– | Baa1 |
| B-2 . . . . . . . . . . . . . . . . . . . . . . . . . | AA | Aa1 | R . . . . . . . . . . . . . . . . . . . . . . . . . . | AAA | Aaa |

WAMU Series 2006-AR1 Prospectus Supplement, Form 424B5, filed January 26, 2006, at S-97; *see also* Prospectus Supplement, Form 424B5, for:

| Series | Page Number | Series | Page Number |
|---|---|---|---|
| WAMU 2006 - AR1 | S-17 | WAMU 2006 - AR19 | S-20 |
| WAMU 2006 - AR2 | S-12 | WAMU 2007 - HY1 | S-15 |
| WAMU 2006 - AR3 | S-15 | WAMU 2007 - HY2 | S-13 |
| WAMU 2006 - AR4 | S-19 | WAMU 2007 - HY3 | S-14 |
| WAMU 2006 - AR5 | S-18 | WAMU 2007 - HY4 | S-14 |
| WAMU 2006 - AR6 | S-11 | WAMU 2007 - HY5 | S-16 |
| WAMU 2006 - AR7 | S-22 | WAMU 2007 - HY6 | S-16 |
| WAMU 2006 - AR8 | S-13 | WAMU 2007 - HY7 | S-14 |
| WAMU 2006 - AR9 | S-20 | WAMU 2007 - OA4 | S-19 |
| WAMU 2006 - AR10 | S-14 | WAMU 2007 - OA5 | S-20s |
| WAMU 2006 - AR11 | S-29 | WAMU 2007 - OA6 | S-20 |
| WAMU 2006 - AR12 | S-15 | WMALT 2007 - OA4 | S-17 |
| WAMU 2006 - AR13 | S-20 | WMALT 2007 - OA5 | S-17 |
| WAMU 2006 - AR14 | S-12 | WMALT 2007 - OC1 | S-12 |
| WAMU 2006 - AR15 | S-19 | WMALT 2007 - OC2 | S-12 |
| WAMU 2006 - AR16 | S-13 | WMALT 2007 - 3 | S-14 |
| WAMU 2006 - AR17 | S-20 | WMALT 2007 - 4 | S-13 |
| WAMU 2006 - AR18 | S-13 | WMALT 2007 - 5 | S-13 |

170.    The excerpts from the Prospectus Supplements in the above paragraph contained material misstatements and omission of fact because:

(a)      The ratings assigned, as set forth in the Prospectus Supplements, were based on outdated models, lowered ratings criteria, and inaccurate loan information as set forth in great detail

above.  These flaws produced artificially high credit ratings for the Certificates, making them appear less risky than they really were.

(b)     The Rating Agencies were intricately involved in the securitization process, as they were engaged and paid by WaMu in return for their granting substantially all of the Certificates the highest investment grade rating.  This process, referred to herein as "ratings shopping" resulted in the Certificates being assigned artificially high credit ratings, making them appear less risky than they really were.

## VII.     CLASS ACTION ALLEGATIONS

171.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons or entities who acquired the Certificates issued by the Issuers, as set forth in ¶¶42, above, pursuant and traceable to the false and misleading Registration Statements and Prospectuses, and incorporated Prospectus Supplements (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

172.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Defendants and/or Relevant Non-Parties, including, but not limited to, WMI, WMB, or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  Billions of dollars worth of Certificates were issued pursuant to the Registration Statement.

173.    Plaintiffs' claims are typical of the claims of the members of the Class as all members

of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

174.   The Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

175.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(3)

176.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are: whether Defendants violated the state and federal securities laws; whether the Offering Documents issued by Defendants to promote and sell the Certificates negligently omitted and/or misrepresented material facts about the Certificates; and to what extent the members of the Class have sustained damages and the proper measure of damages for the class.

177.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.   Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

## VIII.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**For Violations of § 11 of the Securities Act**
**(Against All Defendants)**

178.   Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

179.   This Cause of Action is brought pursuant to § 11 of the Securities Act, on behalf of

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                         71

Plaintiffs and the Class, against all defendants.  This Cause of Action is predicated upon defendants' strict liability for making material misleading statements and omitting material information from and in the Offering Documents.

180.   The Offering Documents were materially misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

181.   The defendants are strictly liable to Plaintiffs and the Class for making the misstatements and omissions in issuing the Certificates.

182.   The Individual Defendants each signed the Registration Statement.

183.   Defendant WCC acted as the underwriter in the sale of Certificates issued by the Issuing Trusts, directly and indirectly participated in the distribution of the Certificates, directly and indirectly solicited offers to purchase the Certificates, and directly and indirectly participated in drafting and disseminating the Offering Documents for the Certificates.

184.   The Ratings Agencies were intricately involved in the sale of Certificates issued by the Issuing Trusts, directly and indirectly participated in the distribution of the Certificates, directly and indirectly solicited offers to purchase the Certificates, and directly and indirectly participated in drafting and disseminating the Offering Documents for the Certificates.

185.   The Appraiser Defendants systematically provided appraisals that it certified as "independent," USPAP-compliant and otherwise in accordance with industry standards, for many, if not most, of the mortgages underlying the Certificates.  Without certified appraisals WaMu could not have credibly specified the LTV ratios of the mortgages in the Offering Documents.  Absent USPAP compliant appraisals for the underlying mortgages, the Certificates could not have issued.

186.   The defendants owed to the Plaintiffs and other Class members the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the

SCOTT + SCOTT
600 B Street, Suite 1500
San Diego, California
Telephone: (619) 233-4565

time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

187.   The defendants knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Offering Documents as set forth herein.

188.   The defendants failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure, that statements contained in the Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

189.   The defendants issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the Offering Documents, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.

190.   By reason of the conduct alleged herein, defendants violated § 11 of the Securities Act, and are liable to Plaintiffs and the Class.

191.   Plaintiffs and other Class members acquired the Certificates pursuant and traceable to the Registration Statement.  At the time Plaintiffs and Class members obtained their Certificates, they did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

192.   Plaintiffs and other Class members have sustained damages as a result of the wrongful conduct alleged and the violations of the defendants.  Specifically, as set forth herein, the delinquency, foreclosure, repossession and bankruptcy rates for the collateral underlying the Certificates - arising from defective collateral and faulty origination practices - triggered

SCOTT + SCOTT
600 B Street, Suite 1500
San Diego, California
Telephone: (619) 233-4565

unprecedented downgrades of the Certificates' credit ratings by the Rating Agencies and attendant declines in the value of the Certificates.

193.    By virtue of the foregoing, Plaintiffs and other Class members are entitled to damages, jointly and severally from each of the defendants, as set forth in § 11 of the Securities Act.

194.    This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents and within three years of the Certificates being offered to the public.  Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

## SECOND CAUSE OF ACTION

### For Violation of § 12(a)(2) of the Securities Act
### (Against Defendant WCC)

195.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

196.    This Cause of Action is brought pursuant to § 12(a)(2) of the Securities Act, on behalf of Plaintiffs and the Class, against WCC.

197.    Defendant WCC, as underwriter, promoted and sold the Certificates pursuant to the defective and misleading Prospectus Supplements for its own financial gain.  The Prospectus Supplements contained untrue statements of material fact, omitted to state facts necessary to make statements not misleading, and concealed and failed to disclose material facts.

198.    WCC owed to Plaintiffs and the other Class members who purchased Certificates pursuant to the Offering Documents, a duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents, to ensure that such statements were true and that there was no omission of material fact necessary to make the statements contained therein not misleading.  WCC knew of, or in the exercise of reasonable care should have known of, the

misstatements and omissions contained in the Offering Documents, as set forth herein.

199.   Plaintiffs and other Class members purchased or otherwise acquired Certificates pursuant to the defective Offering Documents from WCC.  Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of the misrepresentations and omissions contained in the Offering Documents.

200.   By reason of the conduct alleged herein, WCC violated § 12(a)(2) of the Securities Act, and is liable to Plaintiffs and other Class members who purchased Certificates pursuant to the Offering Documents.

201.   Plaintiffs and other Class members were damaged by WCC's wrongful conduct. Those Class members who have retained their Certificates have the right to rescind and recover the consideration paid for their Certificates, as set forth in § 12(a)(2) of the Securities Act.  Those Class members who have sold their Certificates are entitled to rescissory damages, as set forth in § 12(a)(2) of the Securities Act.  Specifically, as set forth herein, the delinquency and default rates for the collateral underlying the Certificates - arising from defective collateral and faulty origination practices - triggered unprecedented downgrades of the Certificates' credit ratings by the Rating Agencies and attendant declines in the value of the Certificates.

202.   This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents, within one year after reasonable discovery of the untrue statements and material omissions and within three years of when the Certificates were sold to the public.  Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

### THIRD CAUSE OF ACTION

**For Violations of § 15 of the Securities Act**
**(Against Individual Defendants and WCC)**

203.   Plaintiffs repeat and reallege each and every allegation above as if set forth in full

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                     75

herein, to the extent that such allegations do not sound in fraud.

204. This Cause of Action is brought pursuant to § 15 of the Securities Act against the Individual Defendants and Defendant WCC.

205. Each of the Individual Defendants, by virtue of his or her control, ownership, offices, directorship, and specific acts set forth above was, at the time of the wrongs alleged herein, a controlling person of WMAAC and the Issuing Trusts within the meaning of Section 15 of the Securities Act. Each of the Individual Defendants had the power to influence, and exercised that power and influence, to cause WMAAC and the Issuing Trusts to engage in violations of the Securities Act, as described above.

206. WCC, by virtue of its control, influence, participation and solicitation of offers to purchase the Certificates and specific acts set forth above were, at the time of the wrongs alleged herein, a controlling person of WMAAC and the Issuing Trusts within the meaning of Section 15 of the Securities Act. The Underwriter Defendant had the power to influence, and exercised that power and influence, to cause WMAAC and the Issuing Trusts to engage in violations of the Securities Act, as described above.

207. The Individual Defendants' and WCC's control, position and influence made them privy to, and provided them with actual knowledge of, the material facts and omissions concealed from Plaintiffs and the other Class members.

208. Each of the Individual Defendants was a participant in the violations alleged herein, based on their having prepared, signed or authorized the signing of the Registration Statements and having otherwise participated in the consummation of the Offerings detailed herein. The Defendants named herein were responsible for overseeing the formation and operation of the Issuing Trusts, including routing payments from the borrowers to investors.

209. Individual Defendants prepared, reviewed and/or caused the Registration Statements

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                                   76

1   and Prospectus Supplements to be filed and disseminated.

2      210.   Since the Defendants named herein controlled the ultimate decision of which

3   mortgage loans would be included and excluded from the securitized pools of loans as well as the

4   ultimate amount of credit enhancement required in order for the Certificates to be sold to investors,

5   they controlled all material aspects relating to the acquisition, structure and sale of the Certificates

6   and thus, the activities of the Issuing Trusts and Individual Defendants within the meaning of

7

8   Section 15 of the Securities Act.

9      211.   By virtue of the wrongful conduct alleged herein, the Individual Defendants and

10  WCC are liable to Plaintiffs and the other Class members for the damages sustained.  Specifically, as

11  set forth herein, the delinquency and default rates for the collateral underlying the Certificates -

12  arising from defective collateral and faulty origination practices - triggered unprecedented

13

14  downgrades of the Certificates' credit ratings by the Rating Agencies and attendant declines in the

15  value of the Certificates.

16                       **FOURTH CAUSE OF ACTION**

17              **For Violations of the Washington State Securities Act**
              **Seller/ Primary Liability, RCW § 21.20.010 (2) AND (3); RCW § 21.20.430(1)**
18                       **(Against All Defendants)**

19

20     212.   Plaintiffs repeat and reallege each and every allegation above as if set forth in full

21  herein.

22     213.   For their Fourth Claim of relief, Plaintiffs allege each defendant is liable as a seller of

23  the Certificates under RCW 21.20.430(1), for violations of RCW 21.20.010 (2) and (3).  These

24

25  violations of the Washington State Security Act ("WSSA"), RCW 20.21 *et seq.*, sound in negligence

26  and not in fraud.

27  **A.    The Certificates are Securities Covered by WSSA**

28     214.   The Certificates are a security within the meaning of RCW 21.20., *et seq.*

CONSOLIDATED COMPLAINT

Case No.: C09-0037 (MJP)                          77

215.    Washington state has more substantive contacts with the offer and sale of the Certificates than any other jurisdiction.  In particular, at all relevant times, the sponsor, issuer, and underwriter of the Certificates resided and were headquartered in Seattle, Washington.  Thus, mortgage origination and acquisition, securitization, due diligence, preparation of the Offering Documents and the marketing and sale of the Certificates was primarily managed and controlled, and, in large part conducted, from Seattle.  In addition, the Rating Agencies and Appraiser Defendants conducted significant business in Washington, including business related directly to the Certificates.  Such business, on information and belief, was conducted pursuant to contracts made with WaMu Defendants executed in Washington.  Further, the trustees of the Issuing Trusts contracted with WMB at the time of sale, for on-going servicing of the mortgage assets underlying the Certificates.  Finally, on information and belief, the bulk of the mortgages underlying the Certificates are physically located in Washington.

**B.    Each Defendant is a Seller of the Certificates under RCW 21.20.430(1).**

The WaMu Defendants

216.    WMACC, the Individual Defendants and WCC (the "WaMu Defendants") are each a seller within the meaning of 21.20.430(1) because they (1) directly or indirectly offered and sold the Certificates to Plaintiffs and the Class; and/or (2) their actions were a substantial contributing factor to the offer and sale of the Certificates.

217.    Activities of Defendant WMAAC that constitute an offer, a sale or a factor that substantially contributed to the offer and sale of the Certificates include, but are not limited to, the following:

    -WMAAC was the issuer of the Certificates and prepared and filed the Offering Documents with the SEC.

SCOTT + SCOTT
600 B Street, Suite 1500
San Diego, California
Telephone: (619) 233-4565

1    -WMACC was also the depositor in the securitization process and sold the Certificates to the

2    underwriter, WCC.

3

4    218.    Activities of Defendant WCC that constitute an offer, a sale or a factor that

5    substantially contributed to the offer and sale of the Certificates include, but are not limited to, the

6    following:

7    - WCC was the underwriter of the Certificates and assisted in preparation of the Offering

8    Documents.

9
     - As the underwriter, WCC was responsible for the due diligence required to verify the
10
     accuracy and completeness of the information uniformly presented to Plaintiffs and the Class
11
     through the Offering Documents.
12

13    - WCC promoted and sold the Certificates to Plaintiffs and the Class.

14

15    219.    Activities of the Individual Defendants that constitute an offer, a sale or a factor that

16
     substantially contributed to the offer and sale of the Certificates include, but are not limited to the
17
     fact that each signed the Offering Documents.
18

19    220.    The WaMu Defendants collectively controlled or contracted for virtually every aspect

20    of the mortgage origination, securitization, sales, and servicing related to the Certificates.  Discovery

21    is needed to verify precisely which entities and persons controlled or substantively participated in

22    each specific aspect of the process.  As such, Plaintiffs allege, on information and belief, that, in

23    addition to their respective activities described in herein, all of the WaMu defendants substantively

24    participated in each of the following activities such that they were a substantially contributing factor

25    to the offer and sale of the Certificates:

26

27    - Review of the mortgages, directly or indirectly, to ensure they were suitable for

28    securitization.

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                    79

- Structuring the pools of mortgages and other assets (e.g., credit enhancements) that collateralized the Certificates.

- Pre-shopping proposed mortgage and asset packages to the Ratings Agency Defendants and contracting or working with the agencies to obtain final Certificate ratings for publication in the Offering Documents.

- Promoting and marketing the Certificates to Plaintiffs and the Class.

The Ratings Agency Defendants

221.    Moody's and S&P (the "Ratings Agency Defendants") are each a seller because their actions were a substantial contributing factor to the offer and sale of the Certificates.

222.    The Ratings Agency Defendants systematically and by uniform methods purported to provide "independent" certification the Certificates were of a particular investment grade.  These rating were submitted to the SEC and published in the Offering Documents.

223.     Independent ratings are required by the SEC for securities to issue and are relied on by investors to evaluate a given investment product.  Absent the certified ratings, the Certificates could not have issued.  Thus, the conduct of the Ratings Agency Defendants was a substantially contributing factor to the offer and sale of the Certificates.

224.    Each of the Ratings Agency Defendants also, systematically and using uniform methods, participated in structuring the various mortgage pools and other assets that collateralized each series of Certificates by specifying the amount of credit enhancements or other assets needed for the Certificates to qualify for a specified rating.  If the Certificates were not supported by sufficient assets to yield a suitable rating, the Certificates could not have issued. Thus, their conduct was a substantially contributing factor to the offer and sale of the Certificates.

225.    The participation of the Ratings Agency Defendants went beyond provision of routine professional services because they knew WaMu would provide the ratings to investors to

1    induce them to purchase the Certificates.

2    226.    In addition, Plaintiffs allege each Ratings Agency Defendant negligently (1) reduced

3    or relaxed the rating standards applied to the Certificates; (2) delayed upgrading the models they

4    used to rate the Certificates when they knew or should have known the models were understating the

5    credit risk for the Certificates; and (3) continued to represent they were "independent" when they

6    knew they had allowed WaMu inappropriate influence over their ratings process; and did so because

7    they had become more invested in receiving future ratings contracts from WaMu than in fulfilling

8    their duty to protect Plaintiffs and the Class and the integrity of the ratings process.

9

10   The Appraiser Defendants

11   227.    The Appraiser Defendants are a seller because their actions were a substantial

12   contributing factor to the offer and sale of the Certificates.

13   228.    The Appraiser Defendants, pursuant to agreements with WaMu Defendants,

14   systematically provided appraisals that it certified as "independent," USPAP-compliant and

15   otherwise in accordance with industry standards, for many, if not most, of the mortgages underlying

16   the Certificates.

17   229.    Without certified appraisals the WaMu Defendants could not have credibly specified

18   the LTV ratios of the mortgages in the Offering Documents.  Absent USPAP compliant appraisals

19   for the underlying mortgages, the Certificates could not have issued.

20   230.    The participation of the Appraiser Defendants went beyond provision of routine

21   professional services because they knew, directly from WaMu Defendants and through their

22   involvement with the mortgage industry generally, that WaMu would provide the LTV ratios that

23   flowed directly and necessarily from the appraisals to investors to induce them to purchase the

24   Certificates.

25   231.    In addition, Plaintiffs allege the Appraiser Defendants negligently (1) reduced or

SCOTT + SCOTT
600 B Street, Suite 1500
San Diego, California
Telephone: (619) 233-4565

relaxed their appraisal standards for WaMu; and (2) continued to represent they were "independent" when they knew they had allowed WaMu inappropriate influence over the appraisal process ; and they did so because they had become more invested in receiving future contracts from WaMu for appraisal services than in fulfilling their duty to provide accurate unbiased appraisals.

## C.   All Defendants violated RCW 21.21.010(2)

232.   The Offering Documents omit or contain extensive and uniform sets of material omissions and misrepresentations that any reasonable investor would have deemed important in deciding whether to purchase the Certificates.  Such omissions and misrepresentations are fully described herein.

233.   Each Defendant violated RCW 21.20.010(2) because it systematically: (1) made or caused to be made some or all of the uniform untrue statements of material fact, and/or (2) omitted or caused to be omitted some or all of the uniform sets of material facts, disclosure of which was necessary, under these circumstances, to make the statements made not misleading.

WaMu Defendants

234.   By virtue of their respective roles as sponsor, issuer, underwriter and signatories of the Offering Documents each of the WaMu Defendants are liable for <u>all</u> the material misrepresentations and omissions contained in or omitted from the Offering Documents, regardless of who originally made the misstatement or failed to provide the omitted material.

235.   In addition, Plaintiffs allege each of the WaMu Defendants directly or indirectly (1) made the material misrepresentations and omitted material information from the Offering Documents, and/or (2) systematically and uniformly failed to perform adequate due diligence to ensure the information in the Offering Documents was accurate and complete such that it would not be misleading to investors.

Ratings Agency Defendants

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                         82

236.    The Ratings Agency Defendants are liable for the uniform sets of material misstatements and omissions in the Offering Documents regarding their certified ratings of the Certificates.

237.    Each of these Defendants knew or should have known the ratings were sought and provided to allow the offer and sale of the Certificates as a secured investment product and that their statements and omissions would be included in, or wrongly omitted from, the Offering Documents.

238.    The material information the Ratings Agency Defendants knew and failed to disclose includes, but is not limited to:

- The Rating Agency Defendants' independence from WaMu was compromised due to its pre-certification involvement in structuring the assets of the Issuing Trusts; its dependence on WaMu for future ratings contracts, and the degree of WaMu involvement and influence over the ratings process.

-The models the ratings Agency Defendants systematically used to develop ratings and specify needed credit enhancements for the Certificates were based on mortgages of a materially different type than the mortgages securitized for these offerings such that there was a significant risk the had materially understated the credit risk associated with the Certificates, and the Certificates were not worthy of the ratings they had certified.

The Appraiser Defendants

239.    The Appraiser Defendants are liable for the uniform sets of material misstatements and omissions in the Offering Documents regarding, and immediately derived from, the appraisals they certified for the mortgages underlying the Certificates.

240.    These Defendants knew or should have known the appraisals were sought and provided to allow the offer and sale of the Certificates as a secured investment product and that their statements and omissions would be included in, or wrongly omitted from, the Offering Documents.

SCOTT + SCOTT
600 B Street, Suite 1500
San Diego, California
Telephone: (619) 233-4565

241.   The material information the Appraiser Defendants knew and failed to disclose includes, but is not limited to, the following:

-The Appraiser Defendants independence from WaMu was compromised due to its dependence on WaMu for future appraisal contracts, and the degree of WaMu involvement and influence over the appraisal process;

-There is a significance risk the LTV ratios provided in the Offering Documents are understated due to the above stated compromise of the Appraiser Defendants' independence.

242.   Disclosure of this information was necessary to make statements made in the Offering Documents that assured certain appraisal standards had been met and that specified LTV ratios for the Certificates, were not misleading.

**D.   All Defendants Violated RCW 21.20.010(3)**

243.   All Defendant systematically engaged in acts, practices and/or a course of business connected to the offer and sale of the Certificates, that uniformly and predictably operated as a deceit upon Plaintiffs and Class Members in violation of RCW 21.20.010(3).  Such violations sound in negligence and not in fraud.

WaMu Defendants

244.   All WaMu Defendants systematically and negligently corrupted every aspect of the securitization and sales process associated with the sale of the Certificates by the acts described above; and by their systematic and negligent abandonment, in the course of their business, of accepted standards for (1) underwriting the mortgages underling the Certificates (including the appraisal process); (2) conducting due diligence on the assets of the Issuing Trusts; (3) drafting the Offering Documents; and (4) obtaining independent and valid ratings of credit risks associated with the Certificates.

245.   The undisclosed involvement and influence the WaMu Defendants systematically

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                    84

exercised over the Appraisal Defendants and Ratings Agency Defendants acted to deceive Plaintiffs and the Class as to (1) the reliability of material information provided in the Offering Documents; (2) the reliability of WaMu as an issuer and underwriter of mortgaged-back-certificates; and (3) the potential for future disclosure of these facts to negatively impact the value of the Certificates.

Ratings Agency Defendants

246.    The Ratings Agency Defendants systematically and negligently corrupted the ratings and securitization process associated with the sale of the Certificates by the acts described above; and their systematic and negligent abandonment in the course of their businesses of accepted procedures and standards for: (1) maintaining independence from the issuers and sellers of the Certificates; (2) conducting due diligence when rating mortgage backed securities; and (3) validating and updating the models used to assess and certify the credit risk associated with the Certificates.

247.    The undisclosed involvement and influence the Ratings Agency Defendants allowed WaMu to exercised over the ratings process acted to deceive Plaintiffs and the Class as to the independence of the Ratings Agency Defendants and the reliability of the ratings they certified for the Certificates as well as the potential for future disclosure of these facts to negatively impact the value of the Certificates.

248.    The undisclosed defects in, and failure to update or validate, the models the Ratings Agency Defendants used to develop the ratings and their potential to understate the credit risk of the certificates acted to deceive Plaintiffs and the Class as to the reliability of the ratings and the level of risk associated with the Certificates as well as the potential for future disclosure of these facts to negatively impact the value of the Certificates.

The Appraiser Defendants

249.    The Appraiser Defendants systematically and negligently corrupted the mortgage appraisal process associated with the sale of the Certificates by the acts described above; and their

SCOTT + SCOTT
600 B Street, Suite 1500
San Diego, California
Telephone: (619) 233-4565

systematic and negligent abandonment in the courses of their business of accepted procedures and standards to maintain their independence from their WaMu customer; and otherwise conduct reliable and USPAP-compliant appraisals.

250. The undisclosed involvement and influence the Appraiser Defendants allowed WaMu to exercise over the appraisal process in the course of their business acted to deceive Plaintiffs and the Class as to the Appraiser Defendants' independence and the reliability of the LTV ratios specified in the Offering Documents as well as the potential for future disclosure of these facts to negatively impact the value of the Certificates.

**E.      Plaintiffs and the Class are Entitled to a Presumption of Reliance**

251. Plaintiffs and the Class did not know and could not reasonably have known the material information regarding and relevant to the Certificates that each Defendant failed to disclose.

252. If the material information described above that Defendants omitted from the Offering Documents had been disclosed, the Certificates could not legally have been offered for sale. As such, the simple fact that Plaintiffs and the Class purchased the Certificates is evidence of their reliance on material omissions.

253. If the material information described above that Defendants omitted from the Offering Documents had been disclosed there would have been no market for the Certificates as such disclosures would have revealed the Certificates were an unsuitable investment for any potential investor in securities of this type. In other words, under all the circumstances alleged above, these Certificates had no business being offered or sold as legitimate mortgage-backed-securities.

254. The market for mortgaged-backed-securities like these Certificates is a highly efficient market. This is evidenced by the rapid downgrading of all the Certificates to junk bond status resulting, not from changes in the overall market, but from (1) the belated disclosure of the material facts omitted at the time of sale; and (2) the unexpected high rate of default on the

1   mortgages underlying the Certificates that was only unexpected primarily because of the material

2   information omitted from the Offering Documents.

3       255.    Under these circumstances, Plaintiffs and the Class are entitled to a presumption that

4   they each reasonably relied on Defendants' omissions and misrepresentations in deciding to

5   purchase the Certificates. F

6

7   **F.    All Defendants are Jointly and Severally Liable to Plaintiffs and the Class.**

8       256.    As a result of Defendants' primary violations of the 21.20.010 (2) and (3), each of

9   them are liable to Plaintiffs and the Class, jointly and severally, for the relief specified in RCW

10  21.20.430(1) which includes rescission or damages (if rescission is not available), interest and

11  attorneys' fees.

12      257.    Plaintiffs and Class Members have been damaged by Defendants' violations of

13  WSSA because, the false statements and omissions Defendants made at the time of Plaintiff's

14  purchases have since become known to the market and, as a direct result, the value of the Certificates

15  have declined by over 40%.

16

17                          **FIFTH CAUSE OF ACTION**

18              **For Violations of the Washington State Securities Act**
19              **Secondary/Control Person Liability, RCW § 21.20.430(3)**
                **(Against Individual Defendants and First American)**

20      258.    Plaintiffs repeat and reallege each and every allegation above as set forth in full

21  herein.

22

23      259.    For their Fifth Claim of relief Plaintiffs allege each defendant against whom this

24  claim is brought is liable as a control person of the Certificates under RCW 21.20.430(3) for each

25  seller's primary violation of 21.20.010(2) and/or(3). These violations of the Washington State

26  Security Act, RCW 20.21 et seq., sound in negligence and not in fraud.

27  **A.    Defendants are control persons of a liable seller within the meaning of RCW**
28  **21.20.430(3).**

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                    87

260.   261.   WMAAC and eAppraiseIT are liable sellers under RCW 21.20.430(1).

261.   At all relevant times, the Individual Defendants were officers, directors or employees of WMAAC.

262.   Alternatively, each named Individual Defendant (1) was an employee of WMAAC and (2) materially aided WMAAC in the offer and sale of the Certificates by signing one or both of the Registration Statements, or by, on information and belief, participating in the conduct forming the basis of liability for WMAAC.

263.   At all relevant times First American was the owner of eAppraiseIT and exercised or had the power to exercise control over eAppriasal's wrongful conduct alleged herein.

264.   As a results of these Defendants' secondary violations of the 21.20.010 (2) and (3) they are each of them liable to Plaintiffs and the Class, jointly and severally, for the relief specified in RCW 21.20.430(1) which includes rescission, damages (if rescission is not available), interest and attorneys' fees.

265.   Plaintiffs and Class Members have been damaged by Defendants' violations of WSSA as described herein.

## IX.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.   An order certifying the proposed plaintiff Class, designating Lead and Named Plaintiffs as representatives of the Class, and designating Lead Counsel as Class Counsel.

B.   An award of statutory, compensatory and/or all exemplary damages allowed by law in favor of Plaintiffs and the Class and against all Defendants, jointly and severally, in an amount to be proven at trial, including interest thereon;

C.   An award of rescission or a rescissory measure of damages;

D.   An award of Plaintiffs reasonable attorneys' fees and, costs as allowed by law;

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                              88

E.      An award of pre- and post-judgment interest as allowed by law;

F.      An order granting Plaintiffs and the Class leave to amend the Complaint to conform to the evidence produced at trial; and

G.      An award of such additional equitable, injunctive or other relief as the Court deems appropriate.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

Dated:  November 23, 2009                    Respectfully submitted,
                                             **SCOTT+SCOTT LLP**

                                             By:___/s/ Hal D. Cunningham_____
                                                     Hal D. Cunningham

                                             Arthur L. Shingler III
                                             Hal D. Cunningham
                                             600 B Street, Suite 1500
                                             San Diego, California
                                             Telephone: (619) 233-4565
                                             Facsimile: (619) 233-0508
                                             *ashingler@scott-scott.com*
                                             *hcunningham@scott-scott.com*

                                             Joseph P. Guglielmo
                                             29 West 57th Street
                                             New York, New York 10019
                                             Telephone: (212) 223-6444
                                             Facsimile: (212) 223-6334
                                             *jguglielmo@scott-scott.com*

                                             *Counsel for Lead Plaintiff and the Class*

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                    89

**TOUSLEY BRAIN STEPHENS PLLC**
Kim D. Stephens
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
Telephone: (206) 682-5600
Facsimile: (206) 682-2992
*kstephens@tousley.com*

*Liaison Counsel for the Class*

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Joel P. Laitman *(admitted pro hac vice)*
Christopher Lometti *(admitted pro hac vice)*
Daniel B. Rehns *(admitted pro hac vice)*
Kenneth M. Rehns *(admitted pro hac vice)*
150 East 52nd Street, Thirtieth Floor
New York, New York 10022
Telephone: (212) 838-7797
Facsimile: (212) 838-7745
*jlaitman@cohenmilstein.com*
*clometti@cohenmilstain.com*
*drehns@cohenmilstein.com*
*krehns@cohenmilstein.com*

Steven J. Toll
1100 New York Avenue, NW, Suite 500 West
Washington, D.C. 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
*stoll@cohenmilstein.com*

*Additional Plaintiffs' Counsel*

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)

90

**SCOTT + SCOTT**
600 B Street, Suite 1500
San Diego, California
Telephone: (619) 233-4565

**CERTIFICATE OF SERVICE**

I hereby certify that on the 23rd day of November, 2009, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system which will send notification of

such filing to the following:

Ramzi Abadou  - rabadou@btkmc.com,knguyen@btkmc.com

Naumon A. Amjed - namjed@btkmc.com,rcordisco@btkmc.com

Michael H. Barr - mbarr@sonnenschein.com

Walter Eugene Barton
gbarton@karrtuttle.com,nrandall@karrtuttle.com,danderson@karrtuttle.com

Steve W. Berman
steve@hbsslaw.com,robert@hbsslaw.com,heatherw@hbsslaw.com

Frank Busch - frank.busch@bingham.com,frank.downing@bingham.com

Steven P. Caplow - stevencaplow@dwt.com,belenjohnson@dwt.com

Kevin P. Chavous - kchavous@sonnenschein.com

Hal D. Cunningham - hcunningham@scott-scott.com

Kerry F. Cunningham  - kerry.cunningham@dlapiper.com

Leslie D. Davis - ldavis@sonnenschein.com

Corey E. Delaney
corey.delaney@dlapiper.com,kerry.cunningham@dlapiper.com,
lorna.bernard@dlapiper.com,richard.hans@dlapiper.com,patrick.smith@dlapiper.com

Joseph A. Fonti
jfonti@labaton.com,ElectronicCaseFiling@labaton.com

Jonathan Gardner - jgardner@labaton.com

Joseph P. Guglielmo
jguglielmo@scott-scott.com,efile@scott-scott.com

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                         91

1

2   Richard F. Hans
    richard.hans@dlapiper.com,dorinda.castro@dlapiper.com

3   David Daniel Hoff - dhoff@tousley.com,efile@tousley.com

4
    Christopher M. Huck
5   Christopher.huck@dlapiper.com,karen.hansen@dlapiper.com

6   Julie Hwang
    jhwang@labaton.com,ElectronicCaseFiling@labaton.com
7
    Reed R. Kathrein  - reed@hbsslaw.com,sf_filings@hbsslaw.com
8
    Stellman Keehnel
9   stellman.keehnel@dlapiper.com,patsy.howson@dlapiper.com

10
    John A. Kehoe
11  rabadou@btkmc.com,rcordisco@btkmc.com,bsharma@btkmc.com, jkehoe@btkmc.com

12  Joel P. Laitman - jlaitman@cohenmilstein.com

13  Bruce Earl Larson - blarson@karrtuttle.com,psteinfeld@karrtuttle.com

14  Mike Liles, Jr. - mliles@karrtuttle.com

15  Christopher E. Lometti - clometti@cohenmilstein.com

16  Bradley T. Meissner  - bradley.meissner@dlapiper.com

17
    Timothy Michael Moran
18  moran@kiplinglawgroup.com,cannon@kiplinglawgroup.com

19  Sharan Nirmul - snirmul@btkmc.com,rcordisco@btkmc.com

20  Lauren Wagner Pederson   lpederson@btkmc.com,rcordisco@btkmc.com

21  Erik D. Peterson
22  epeterson@btkmc.com,knguyen@btkmc.com

23  Kenneth J. Pfaehler
    kpfaehler@sonnenschein.com,nreeber@sonnenschein.com
24
    Daniel B. Rehns - drehns@cohenmilstein.com
25
    Serena Richardson
26  srichardson@labaton.com,ElectronicCaseFiling@labaton.com

27  Rogelio Omar Riojas
28  omar.riojas@dlapiper.com,nina.marie@dlapiper.com

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                    92

1

Stephen M. Rummage
steverummage@dwt.com,jeannecadley@dwt.com

2

3

Hollis Lee Salzman
hsalzman@labaton.com,ElectronicCaseFiling@labaton.com

4

5

Paul Scarlato
pscarlato@labaton.com,ElectronicCaseFiling@labaton.com

6

Frank R. Schirripa - frank@spornlaw.com

7

Bharati O. Sharma
bsharma@btkmc.com,rcordisco@btkmc.com

8

9

Arthur L. Shingler
ashingler@scott-scott.com,cmcgowan@scott-scott.com,efile@scott-scott.com

10

Kim D. Stephens - kstephens@tousley.com,bkinsey@tousley.com

11

12

Robert D. Stewart
stewart@kiplinglawgroup.com,cannon@kiplinglawgroup.com

13

Dennis H. Walters
dwalters@karrtuttle.com,wbarker@karrtuttle.com

14

15

DATED this 23rd day of November, 2009 at San Diego, California.

16

By:  /s/   Hal D.Cunningham
Hal D. Cunningham (*Pro Hac Vice*)
600 B Street, Suite 1500
San Diego, CA 92101
Telephone: (619) 233-4565
*hcunningham@scott-scott.com*

17

18

19

20

21

22

23

24

25

26

27

28

CONSOLIDATED COMPLAINT
Case No.: C09-0037 (MJP)                  93

SCOTT + SCOTT
600 B Street, Suite 1500
San Diego, California
Telephone: (619) 233-4565