1

Honorable Marsha J. Pechman

2

3

4

5

6

UNITED STATES DISTRICT COURT
7   WESTERN DISTRICT OF WASHINGTON AT SEATTLE

8

BOILERMAKERS NATIONAL ANNUITY TRUST       **Master Case No.: C09-0037 (MJP)**
9   FUND, on Behalf of Itself and All Others Similarly
Situated,
10                                                                      SECOND AMENDED
        Plaintiff,                                        CONSOLIDATED COMPLAINT
11                                                           FOR VIOLATIONS OF SECTIONS
        v.                                                    11, 12 AND 15 OF THE
12                                                           SECURITIES ACT OF 1933
WAMU MORTGAGE PASS-THROUGH
13   CERTIFICATES, SERIES AR1, *et al.,*
                                                                    **JURY DEMAND**
14        Defendants.

15                                                                  **ECF CASE**

16

DORAL BANK PUERTO RICO, on Behalf of Itself       **CLASS ACTION**
17   and All Others Similarly Situated,

18        Plaintiff,

19        v.

20   WASHINGTON MUTUAL ASSET ACCEPTANCE
CORPORATION, *et al.*
21
        Defendants.
22

23

24

25

26

27

28

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS                    **SCOTT + SCOTT LLP**
OF THE SECURITIES ACT OF 1933                                          600 B Street, Suite 1500
Case No. C09-0037 (MJP)                                              San Diego, California 92101
                                                                              Telephone: (619) 233-4565

1

## TABLE OF CONTENTS

2

_Toc257889544

3  I.      SUMMARY OF THE ACTION ..................................................................1

4  II.     JURISDICTION AND VENUE...............................................................9

5  III.    PARTIES ........................................................................................9

6  IV.     ALLEGATIONS ..................................................................................19

7          A.     Exponential Growth in Mortgage Securitizations..................................19

8          B.     WaMu's Defective Origination and Securitization Operations.........................21

9          1.     Lack of Meaningful Due Diligence Review Prior to Securitization.....................29

10         2.     The Role of WCC in Offloading the Certificates ..................................30

11         3.     The Rating Agencies' Broken Models and Material Conflicts of Interest ...........31

12                a.     Rating Agencies Announce Mass Downgrades of the Certificates ..........34

13                b.     The Rating Agencies Outdated Models Excluded Relevant and
                        Material Data ................................................................38

14                c.     Improper Ratings Shopping Drove the Rating Process ...........................41

15                d.     The Rating Agencies Structured the Trusts for.........................................42
                  Maximum Profitability for WaMu and Themselves..............................................42

16         C.     Delinquency and Defaults on the Loans Underlying the Certificates..................44

17  V.     THE DEFENDANTS' MISTATEMENTS AND OMISSIONS...................................46

18         A.     The Offering Documents Included Material Misstatements and Omitted...........46
                  Material Information Regarding Mortgage Loan Underwriting Guidelines..........46

19                1.     The Registration Statements ................................................46

20                2.     The Prospectus Supplements ................................................49

21         B.     The Offering Documents Included Material Misstatements and Omitted...........55
                  Material Information Regarding the Risks Associated with Appraisals.................55

22                1.     The Registration Statements ................................................55

23                2.     The Prospectus Supplements ................................................57

24         C.     The Offering Documents Included Material Misstatements............................61
                  and Omitted Material Information Regarding Credit Support..............................61

25         D.     The Prospectus Supplements Materially Misstated the True................................64

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - i
Case No. C09-0037 (MJP)

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

1          Loan-to-Value Ratios Associated with the Underlying Mortgages.......................64

2      E.      The Prospectus Supplements Misstated the Certificates' True Credit Ratings .....66

3  VI.    CLASS ACTION ALLEGATIONS ...............................................................................69

4  VII.   CAUSES OF ACTION ................................................................................................70

5  VIII.  PRAYER FOR RELIEF.............................................................................................78

6  _Toc257889581

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiffs, as defined in ¶1 below, allege the following upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters.  Plaintiffs' information and belief is based on the investigation of their counsel. The investigation included, for example:  (i) review and analysis of the offering materials for the Certificates; (ii) examination of the SEC filings, press releases and other public statements of Washington Mutual, Inc. and its subsidiaries and affiliates ("WaMu"); (iii) review and analysis of court filings cited herein; (iv) review and analysis of media reports, Congressional testimony and additional material; (v) the New York Attorney General's investigations into the role of Nationally Recognized Statistical Ratings Organizations ("NRSRO") in the ratings shopping process and into WaMu's manipulation and use of inflated appraisals in underwriting mortgages; (vi) analysis of the Securities and Exchange Commission's Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit Rating Agencies ("SEC Report") and additional documents cited herein; and (vii) interviews with confidential witnesses. Many of the facts related to Plaintiffs' allegations are known only by the Defendants named herein, or are exclusively within their custody or control.  Plaintiffs believe that substantial additional evidentiary support for the allegations set forth below will be developed after a reasonable opportunity for discovery.

I.      **SUMMARY OF THE ACTION**

1.      This action is brought pursuant to the Securities Act of 1933 (the "Securities Act") as amended by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 77a, *et seq.*, by Court-appointed Lead Plaintiffs  Doral Bank Puerto Rico ("Doral Bank") and Policemen's Annuity and Benefit Fund of the City of Chicago ("Chicago PABF") and Plaintiff Boilermakers National Annuity Trust ("Boilermakers") (collectively, "Plaintiffs") on their own behalf and on behalf of a class all persons and entities (the "Class") who purchased or otherwise acquired interests in specific Washington Mutual Mortgage Pass-Through Trusts (the "Issuing Trusts"), as set forth in

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 1
Case No: C09-0037 (MJP)

**SCOTT + SCOTT LLP**
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

¶¶38-39, *infra*, pursuant to two (2) Registration Statements and accompanying Original Basic Prospectuses filed with the Securities and Exchange Commission (the "SEC") by Washington Mutual Asset Acceptance Corporation ("WMAAC") on December 30, 2005 (SEC File No. 333-134461), thereafter amended on January 6, 2006 on pre-effective Registration Statement Form S-3/A (the "2006 Registration Statement") and on March 13, 2007 (SEC File No. 333-141255), thereafter amended on April 9, 2007 on pre-effective Registration Statement Form S-3/A (the "2007 Registration Statement") (collectively, the "Registration Statements").

2.     Pursuant to the Registration Statements and the subsequently-filed Prospectus Supplements incorporated therein (collectively, the "Offering Documents"), Washington Mutual Capital Corporation a/k/a WaMu Capital Corporation ("WCC") underwrote and sold to Plaintiffs and the Class $47.25 billion of WaMu Mortgage Pass-Through Certificates (the "Certificates"). The Certificates were issued pursuant to common Registration Statements in a series of thirty-six (36) public offerings which took place between January 26, 2006 and June 26, 2007 (collectively, the "Offerings").

3.     As set forth below, the Offering Documents contained material misstatements and omissions. Defendants are strictly liable for these material misstatements and omissions under Sections 11, 12 and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.

4.     Plaintiffs seek redress against Defendant WMAAC, who prepared and filed the Registration Statements and was the depositor of the underlying mortgage collateral into the Issuing Trusts; Defendants David Beck ("Beck"), Diane Novak ("Novak"), Thomas Green ("Green"), Rolland Jurgens ("Jurgens"), Richard Careaga ("Careaga"), Thomas Lehmann ("Lehmann"), Stephen Fortunato ("Fortunato") and Donald Wilhelm ("Wilhelm"), the officers of WMAAC and the individual signatories to the Registration Statements filed by WMAAC (collectively, the "Individual Defendants"); Defendant WCC, the underwriter of the Offerings; and Defendants Moody's Investors

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 2
Case No: C09-0037 (MJP)

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

Services, Inc. ("Moody's") and McGraw-Hill Companies, Inc. ("McGraw-Hill") inclusive of its Standard & Poor's Ratings Services ("S&P") division (collectively, the "Rating Agencies"), NRSROs that were engaged to rate the Certificates.[1]

5.    WMAAC, WMB and WCC, together with their affiliates and subsidiaries, are collectively referred to herein as "WaMu."[2]

6.    This action arises from the role of WaMu in originating or acquiring and then converting approximately 75,608 mortgage loans, mainly sub-prime first-lien hybrid adjustable rate loans with an initial fixed-rate period, into $47.25 billion of purportedly "investment grade" mortgage-backed securities ("MBS"), which were then sold to Plaintiffs and the Class in a series of thirty-six (36) public Offerings made pursuant to the Offering Documents.

7.    The value of the Certificates was directly tied to the value of the underlying mortgages, as well as the repayment of the underlying mortgages by borrowers, since the principal and interest payments due to investors were secured and derived from borrower payments. As the original borrowers on each of the underlying mortgage loans paid their mortgages, distributions were made to investors through the Issuing Trusts in accordance with the terms of the Offering Documents. If borrowers failed to pay back their

---

[1]    Washington Mutual Bank, the sponsor/seller for each of the Offerings, as well as the originator and servicer for all of the underlying mortgage loan collateral for each of the Offerings is not named as a Defendant herein, solely due to the fact that on September 25, 2008 the Office of Thrift Supervision seized Washington Mutual Bank and placed it into the receivership of the Federal Deposit Insurance Corporation ("FDIC"), which sold Washington Mutual Bank's assets to JPMorgan Chase & Co.

[2]    Washington Mutual Mortgage Securities Corporation ("WMMSC"), a limited purpose subsidiary of Defendant WMB, served as the sponsor and seller of the mortgage loan collateral for certain WaMu Offerings. WMB and WMMSC performed identical functions for the purposes of the Offerings complained of herein and as such, for the purposes of the Complaint, shall be referred to collectively as "WMB."

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 3
Case No: C09-0037 (MJP)

mortgages, defaulted, or were forced into foreclosure, the resulting losses flowed to the Certificate investors.  As set forth in the Prospectus Supplements, the Certificates were divided into classes, or "tranches," reflecting different priorities for repayment, exposure to risk of default, and interest payments.

8.      During at least 2005 through 2007, WaMu, in a hunt for massive short-swing profits, was pressing its sales agents to pump out loans while disregarding borrowers' incomes and assets. WaMu gave mortgage brokers handsome commissions for selling the riskiest loans, which carried higher fees, bolstering profits and ultimately the compensation of the bank's executives.  "It was the Wild West," said Steven M. Knobel, founder of an appraisal company, Mitchell, Maxwell & Jackson, that did business with WaMu until 2007. "If you were alive, they would give you a loan. Actually, I think if you were dead, they would still give you a loan."  Because WaMu was selling many of these loans to investors, it did not worry about defaults: by the time loans went bad, they were often in other hands.

9.      For this reason, among others, WaMu conducted inadequate due diligence with respect to whether the underlying mortgage loans were originated in conformity with the underwriting guidelines stated in the Offering Documents – ignoring deficient lending documentation and inflated appraisals of the properties collateralizing the mortgages underlying the Certificates.  In fact, WaMu failed to conduct any of its own due diligence of the underlying mortgage loans at the underwriting stage of the Offerings.  Instead, WaMu relied on wholly inadequate reviews of the underlying mortgages conducted by third-party firms engaged to examine small samples – 5%-7% at most – of the mortgage loans in WMB's loan portfolio.

10.     In order to complete 36 Offerings of purportedly investment-grade Certificates in 17 months, the Defendants worked cooperatively:

- WMB, as sponsor of each Offering, acquired the underlying mortgage loan collateral it

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 4
Case No: C09-0037 (MJP)

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

had itself originated or had acquired from correspondent or third party lenders;

- WMAAC, a special purpose entity formed by WMB, deposited the mortgage loans in each of the Issuing Trusts and filed the common Registration Statements signed by each of the Individual Defendants;

- The Rating Agencies controlled and determined the policies and terms of the Issuing Trusts, dictating the structure and levels of credit support required for each of the Issuing Trusts to be formed in each of the Offerings (including the rights of each Certificate class in the event of default) and assigned investment grade ratings to each of the Certificate classes in each of the Offerings – without which the Certificates would have never been issued;

- WMAAC filed the common Registrations signed by each of the Individual Defendants; and,

- WCC underwrote each of the Certificate Offerings.

After the Certificates were issued and sold to investors, a servicing division of WMB collected mortgage payments submitted by borrowers and deposited the funds into the Issuing Trusts pursuant to the terms of each Issuing Trust's Indenture.  The trustee that oversees the administration of each Issuing Trust periodically distributed payments to investors as specified by the terms of the Certificates.

11.   The Rating Agencies provided ratings for the Certificates and determined the structure and credit support of each of the Issuing Trusts which purportedly justified the ratings These ratings assigned by the Rating Agencies, which were expressly included in each of the Prospectus Supplements, helped determine the price for the Certificates.   Moody's highest investment rating is "Aaa;"  S&P's highest rating is "AAA" (hereinafter referred to, collectively, as "triple-A.")  These ratings mean that a security is the *highest* investment-grade possible, considered "maximum safety" and to carry the smallest possible degree of risk.  Ratings of "AA," "A," and "BBB" represent high credit quality, upper-medium credit quality and medium credit quality, respectively.  These ratings are all considered "investment-grade ratings."  Any instrument rated lower than Baa3 for Moody's or BBB- for S&P is considered to be rated below investment-grade.

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 5
Case No: C09-0037 (MJP)

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

Based on the Rating Agencies' purported analysis of the loan pools, all of the Certificates were awarded investment-grade ratings. Overall, the Rating Agencies assigned triple-A ratings to *over 93%,* or $44.18 billion, of the Certificates. This was achieved through a process known as "ratings shopping" – having the Rating Agencies provide proposed ratings on the Certificates as part of their bid for the engagements. The Credit rating agencies were supposed to evaluate and report on the risk associated with investment alternatives. The ratings assigned to the Certificates by the Rating Agencies enabled investors to compare the risk of the Certificates with that of other investment alternatives.

12.   The Certificates were then marketed to institutional investors – public pension funds, banks, insurance companies, and mutual funds – who were **prohibited** by regulation from purchasing securities not rated "investment-grade." Thus, the sale of the Certificates was expressly conditioned on the Ratings Agencies assigning an investment-grade rating to the Certificates. WaMu did not leave the ratings assigned to the Certificates to chance. WaMu ensured that the Certificates received the highest ratings by engaging firms such as Moody's and S&P to not only rate the Certificates at issuance, but also to directly participate in determining which mortgage loans would be included in the mortgage pools underlying the Certificates and then dictating the structure of each Issuing Trust in each Offering – *i.e.*, the number of classes or tranches in each and the amount and type of investment protection or "credit enhancement" built into the Certificate Issuing Trust structure.[3] As

---

[3]      Credit enhancement is a key part of the securitization transaction in structured finance, and is important for credit rating agencies when rating a securitization. The three types of credit enhancement utilized in the Certificates were excess spread, overcollateralization and subordination. Excess spread is the difference between the interest rate received on the underlying mortgage collateral and the coupon rate on the Certificate. Each Certificate was overcollateralized to the extent that the face value of the underlying pool of mortgages was greater than the principal amount of the Certificate. Subordination refers to the hierarchy of loss absorption among the tranches of a Certificate where any default or delinquency in the underlying mortgage collateral are allocated first to the lowest tranche until it loses all its principle amount and then to the next lowest tranche up the capital structure.

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 6
Case No: C09-0037 (MJP)

**SCOTT + SCOTT LLP**
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

former head of mortgage-backed securities at Moody's Brian Clarkson stated in an October 17, 2008 article in *Financial Times*, "[y]ou start with a rating and build a deal around a rating."

13.     In the months after each of the thirty-six (36) Offerings the delinquency and default rates on the underlying mortgage collateral underlying each Certificate increased exponentially and the ratings of the Certificates *all* collapsed. The Rating Agencies downgraded ***over 98.9%,*** or $46.8 billion, of the Certificates issued to "junk bond" status.  Further, over 94.1%, or $41.6 billion, of the $44.2 billion of Certificates initially awarded AAA ratings have been downgraded to "junk bond" levels.  As of the filing of the initial complaint in this Action, over 94% of the Certificates are rated as below investment grade "junk."  Also,  ***over 51%*** of the mortgage loans underlying the Certificates – the source of income for Certificate investors – are currently in some stage of default or are in foreclosure.

14.     Significantly, the Certificates were not downgraded because of events subsequent to the Offerings, but rather because of "abusive" and "aggressive" loan underwriting in the underlying collateral that was undisclosed at the time of issuance of the Certificates.  The Offering Documents represented that the underlying mortgage loans were originated pursuant to stated origination guidelines that included an examination of borrower creditworthiness and an accurate, independent appraisal of the property subject to each mortgage loan.  These representations were materially misleading and omitted necessary information.

15.     The Offering Documents also failed to disclose that the Rating Agencies' models for assigning ratings and determining the structure of each Issuing Trust were woefully outdated and inaccurate.  The Rating Agencies' models employed obsolete statistical assumptions based on the performance of mortgage loans and underwriting standards for mortgage loans issued prior to 2003.  However, the Certificates' underlying mortgage collateral includes a substantial proportion of certain types of loans which only began to be originated *en masse* from 2003 onwards – *i.e.,* sub-prime and

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

Alt-A loans, adjustable rate mortgage loans ("ARMs") and non-traditional or hybrid-ARMs (*i.e.,* negative amortization loans or interest-only loans) – all issued with limited borrower documentation or employment verification.[4]   Thus, the Rating Agencies' models could in no way predict the performance of the Certificates' underlying mortgage collateral.

16.   As set forth herein, the Offering Documents contained material misstatements and omissions of material facts in violation of Sections 11 and 12 of the Securities Act, including the failure to disclose that: (i) the mortgage loans underlying the Certificates were not originated in accordance with the loan underwriting guidelines stated in either the Registration Statements or the Prospectus Supplements, based on WaMu having failed to conduct either a meaningful assessment of the borrowers' creditworthiness or an accurate appraisal of the mortgaged properties; (ii) WMAAC and WCC failed to conduct adequate, and in most cases any, due diligence with respect to the mortgage loan originators' compliance with the loan underwriting guidelines stated in the Offering Documents; (iii) the appraisals on many of the properties collateralizing the mortgages underlying the Certificates were inflated; (iv) there were material undisclosed conflicts of interest between WaMu and the Rating Agencies, including those reflected in undisclosed ratings shopping practices, which incentivized the Rating Agencies to inflate Certificate ratings to do business with WaMu; and (v) the amount of credit enhancement provided to the Certificates was inadequate to support triple-A and investment-grade ratings because those amounts were determined by outdated statistical models.

17.   As a result of these material misstatements and omissions, Plaintiffs and the Class

---

[4]   As discussed below, originations of non-traditional adjustable mortgages, interest only and negative amortization loans increased dramatically between 2005 and 2007.  These types of loans presented the greatest potential for "payment shock" to the borrower since they provide small initial fixed rates for a limited period of time which then "reset" to require much higher monthly payment amounts.

**SCOTT + SCOTT LLP**
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

have suffered damages for which named Defendants are liable pursuant to Sections 11, 12 and 15 of the Securities Act.  The Rating Agencies are liable under Section 15 as control persons of each Issuing Trust which is strictly liable for the misstatements and omissions in the Offering Documents.

## II.   JURISDICTION AND VENUE

18.   Claims alleged herein arise under Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.  Jurisdiction is conferred by Section 22 of the Securities Act, and venue is proper pursuant to Section 22 of the Securities Act.

19.   The violations of law complained of herein, including, but not limited to, the dissemination of the Offering Documents containing material misstatements and omissions, occurred in this District.  All of the Defendants named herein, as well as their affiliates and subsidiaries, conduct or conducted business in this District.

## III.   PARTIES

20.   Lead Plaintiff Doral Bank  is a public diversified financial services company with offices located in Puerto Rico.  Doral Bank purchased the following Certificates pursuant to the Registration Statements and subsequent Prospectus Supplements and has been damaged thereby:

| Certificates Purchased | Amount of Units Purchased | Price Paid (Per Unit) |
| --- | --- | --- |
| WaMu Mortgage-Pass Through Certificates, Series 2006-AR17 | 20,169,638 | $ 1.1800 |
| WaMu Mortgage-Pass Through Certificates, Series 2006-AR18 | 77,406,568 | $ 0.6800 |
| WaMu Mortgage-Pass Through Certificates, Series 2007-OA4 | 87,911,350 | $ 1.0700 |
| WaMu Mortgage-Pass Through Certificates, Series 2007-OA5 | 66,050,534 | $ 1.0500 |
| WaMu Mortgage-Pass Through Certificates, WMALT Series 2007-OA5 | 62,402,082 | $ 1.1100 |

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 9
Case No: C09-0037 (MJP)

21.     Lead Plaintiff Chicago PABF, is a public fund providing retirement, survivors and disability benefits to the City of Chicago Police officers.  Chicago PABF purchased the following Certificates pursuant to the Registration Statements and subsequent Prospectus Supplements and sustained damages thereby:

| Certificates Purchased | Amount of Units Purchased | Price Paid (Per Unit) |
|---|---|---|
| WaMu Mortgage-Pass Through Certificates, Series 2006-AR5 | 2,000,000 | $ 0.9947 |
| WaMu Mortgage-Pass Through Certificates, Series 2006-AR12 | 188,500 | $ 1.0021 |
| WaMu Mortgage-Pass Through Certificates, Series 2006-AR16 | 2,576,800 | $ 0.9950 |
| WaMu Mortgage-Pass Through Certificates, Series 2006-AR16 | 1,293,900 | $ 0.9857 |
| WaMu Mortgage-Pass Through Certificates, Series 2006-AR16 | 798,800 | $ 0.9628 |
| WaMu Mortgage-Pass Through Certificates, Series 2006-AR16 | 3,996,600 | $ 0.9987 |
| WaMu Mortgage-Pass Through Certificates, Series 2006-AR16 | 1,258,400 | $ 0.9693 |
| WaMu Mortgage-Pass Through Certificates, Series 2006-AR16 | 2,000,000 | $ 0.9908 |
| WaMu Mortgage-Pass Through Certificates, Series 2006-AR16 | 8,166,600 | $ 0.9971 |
| WaMu Mortgage-Pass Through Certificates, Series 2007-HY1 | 4,770,000 | $ 1.0093 |
| WaMu Mortgage-Pass Through Certificates, Series 2006-HY1 | 2,557,000 | $ 0.9860 |

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 10
Case No: C09-0037 (MJP)

**SCOTT + SCOTT LLP**
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

22.    Plaintiff Boilermakers is a Taft-Hartley Pension Fund.  Boilermakers purchased the following Certificates pursuant to the Registration Statements and subsequent Prospectus Supplements and has been damaged thereby:

| Certificates Purchased | Amount of Units Purchased | Price Paid (Per Unit) |
|---|---|---|
| WaMu Mortgage-Pass Through Certificates, Series 2006-AR7 | 4,025,923 | $ 1.0110 |
| WaMu Mortgage-Pass Through Certificates, Series 2006-AR7 | 160,272 | $ 0.9002 |

23.    WMB acted as the sponsor and seller for the Certificates issued pursuant to the Registration Statements.  All of the mortgage loans underlying the Certificates were originated pursuant to the stated underwriting guidelines of WMB.  WMB also serviced the underlying mortgage loans.  The principal offices for WMB's lending operations during the relevant period were located at 1301 Second Avenue, WMC 3501A, Seattle, Washington 98101.  As set forth in the Registration Statements, once originated or acquired by WMB, WMB would convey mortgages to a special purpose entity, WMAAC, which then deposited the mortgage collateral into the Issuing Trust.  The Issuing Trust then issued the Certificates.

24.    Defendant WMAAC, at all relevant times, was a wholly-owned subsidiary of WMB and was principally located at 1301 Second Avenue, WMC 3501A, Seattle, Washington 98101.  WMAAC filed the Registration Statements and Prospectus Supplements with the SEC in connection with the Offerings and served as the depositor of the Certificate collateral with the Issuing Trust in each of the Offerings.  The role of WMAAC, a special purpose entity, was to purchase the mortgage loans from the WMB and then assign the mortgage loans and all of the rights and interest under the mortgage loan purchase agreement to the trustee for the benefit of the holders of Certificates.

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 11
Case No: C09-0037 (MJP)

**SCOTT + SCOTT LLP**
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

25.     Defendant WMAAC filed the 2006 Registration Statement and accompanying Initial

Basic Prospectuses with the SEC on Form S-3, as subsequently amended on Form S-3/A as follows:

| Date Filed | Form Type | Amount Registered |
|---|---|---|
| December 30, 2005 | S-3 | $ 1,000,000.00 |
| January 3, 2006 | S-3/A | $ 100,000,000,000.00 |

26.     Defendant WMAAC filed the 2007 Registration Statement and accompanying Initial

Basic Prospectuses with the SEC on Form S-3, as subsequently amended on Form S-3/A as follows:

| Date Filed | Form Type | Amount Registered |
|---|---|---|
| March 13, 2007 | S-3 | $ 1,000,000.00 |
| April 9, 2007 | S-3/A | $ 400,000,000,000.00 |

27.     Defendant Beck was, during the relevant period, a Director, the President and

Principal Executive Officer of WMAAC.  Beck signed the 2006 and 2007 Registration Statements

pursuant to which the Certificates were offered, either on behalf of himself or by the authorized

Attorney-In-Fact.

28.     Defendant Novak was, during the relevant period, a Director of WMAAC.  Novak

signed the 2006 and 2007 Registration Statements pursuant to which the Certificates were offered,

either on behalf of herself or by the authorized Attorney-In-Fact.

29.     Defendant Green was, at all relevant times, WMAAC's Chief Financial Officer and

Principal Financial Officer.  Green signed the 2006 Registration Statement pursuant to which the

Certificates were offered, either on behalf of himself or by the authorized Attorney-In-Fact.

30.     Defendant Jurgens was, at all relevant times, WMAAC's Controller and Principal

Accounting Officer.   Jurgens signed the 2006 Registration Statement pursuant to which the

Certificates were offered, either on behalf of himself or by the authorized Attorney-In-Fact.

31.     Defendant Careaga was, at all relevant times, WMAAC's First Vice President and

served as its Attorney-in-Fact.  Careaga signed the 2006 Registration Statement pursuant to which

the Certificates were offered, either on behalf of himself or by the authorized Attorney-In-Fact.

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 12
Case No: C09-0037 (MJP)

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

1    32.    Defendant Lehmann was, during the relevant period, the Director and President

2  (Principal Executive Officer) of WMAAC.  Lehmann signed the 2007 Registration Statements

3
   pursuant to which the Certificates were offered, either on behalf of himself or by the authorized
4
   Attorney-In-Fact.
5
6         33.    Defendant Fortunato was, during the relevant period, the Chief Financial Officer

7  (Principal Financial Officer) of WMAAC.  Fortunato signed the 2007 Registration Statements

8  pursuant to which the Certificates were offered, either on behalf of himself or by the authorized

9  Attorney-In-Fact.

10        34.    Defendant Wilhelm was, at all times during the relevant period, the Controller

11 (Principal Accounting Officer) of WMAAC.  Wilhelm signed the 2007 Registration Statements

12
   pursuant to which the Certificates were offered, either on behalf of himself or by the authorized
13
   Attorney-In-Fact.
14
15        35.    The Defendants identified in ¶¶27-34 are referred to herein as the "Individual

16 Defendants."  The Individual Defendants functioned as directors of the Issuing Trusts as they were

17 officers and/or directors of WMAAC and signed the Registration Statements for the Certificates

18 issued by the Issuing Trusts.

19
          36.    The Individual Defendants participated with and/or conspired with the remaining
20
   Defendants in the wrongful acts and course of conduct, or otherwise caused the damages and injuries
21
22 claimed herein, and are responsible in some manner for the acts, occurrences and events alleged in

23 this Complaint.

24        37.    Defendant WCC was, at all relevant times, an SEC-registered broker-dealer

25 principally located at 1301 Second Avenue, WMC 3501A, Seattle, Washington 98101.  WCC was a

26 wholly-owned subsidiary of Washington Mutual, Inc..  Defendant WCC served as the underwriter

27 for all of the Certificate Offerings and was intimately involved in all of the Offerings.  WCC failed
28

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 13
Case No: C09-0037 (MJP)

**SCOTT + SCOTT LLP**
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

to perform the requisite level of due diligence not merely once, but at all times in connection with all of the Offerings complained of herein.  The Prospectus Supplements disseminated in connection with each of the Offerings contained the same material misstatements and omissions of material fact relating to the guidelines employed in originating and securitizing the underlying mortgage loans. WCC abdicated its duty to conduct due diligence on the underlying mortgage loans, relying instead on the cursory review conducted by WMB and third-party contractors, including Bohan and Clayton. WCC was, during the relevant period, one of the leading underwriters of mortgage-backed securities in the United States.

38.     WCC served as the underwriter in the sale of the Certificates and assisted in drafting and disseminating the Offering Documents for the following Offerings of Certificates issued pursuant to the 2006 Registration Statement:

| Trust | Approximate Principal Amount | Approximate Offering Date | Underwriter(s) | Depositor/Issuer | Sponsor |
|---|---|---|---|---|---|
| WaMu Mortgage Pass-Through Certificates, Series 2006 - AR1 | $1,474,488,100 | January 26, 2006 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2006 - AR2 | $332,239,100 | February 15, 2006 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2006 - AR3 | $990,012,100 | February 21, 2006 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2006 - AR4 | $909,714,200 | April 20, 2006 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 14
Case No: C09-0037 (MJP)

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

| WaMu Mortgage Pass-Through Certificates, Series 2006 - AR5 | $778,198,100 | May 23, 2006 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
|---|---|---|---|---|---|
| WaMu Mortgage Pass-Through Certificates, Series 2006 - AR6 | $448,667,100 | June 22, 2006 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2006 - AR7 | $1,255,863,100 | June 23, 2006 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2006 - AR8 | $1,208,887,100 | July 25, 2006 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2006 - AR9 | $1,087,842,100 | October 24, 2006 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2006 - AR10 | $1,328,647,642 | August 21, 2006 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2006 - AR11 | $1,615,625,100 | August 22, 2006 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2006 - AR12 | $1,694,778,749 | September 22, 2006 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2006 - AR13 | $1,468,050,100 | September 25, 2006 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2006 - AR14 | $1,683,891,100 | October 20, 2006 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 15
Case No: C09-0037 (MJP)

**SCOTT + SCOTT LLP**
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

| | | | | | |
|---|---|---|---|---|---|
| WaMu Mortgage Pass-Through Certificates, Series 2006 - AR15 | $868,034,100 | October 23, 2006 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2006 - AR16 | $1,444,737,100 | November 16, 2006 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2006 - AR17 | $1,124,131,100 | November 17, 2006 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2006 - AR18 | $1,554,983,100 | December 18, 2006 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2006 - AR19 | $1,187,632,100 | December 19, 2006 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2007 - HY1 | $3,007,814,100 | January 22, 2007 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2007 - HY2 | $1,570,407,100 | February 13, 2007 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2007 - HY3 | $2,970,344,100 | February 23, 2007 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2007 - HY4 | $1,684,955,100 | March 22, 2007 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |

39.     WCC served as the underwriter in the sale of the Certificates and assisted in drafting and disseminating the Offering Documents for the following Offerings of Certificates issued pursuant to the 2007 Registration Statement:

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 - 16
Case No: C09-0037 (MJP)

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

| Trust | Approximate Principal Amount | Approx. Offering Date | Underwriter(s) | Depositor/Issuer | Sponsor |
|---|---|---|---|---|---|
| WaMu Mortgage Pass-Through Certificates, Series 2007 - HY5 | $1,619,028,100 | April 23, 2007 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2007 - HY6 | $3,417,433,100 | May 21, 2007 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2007 - HY7 | $2,795,936,100 | June 21, 2007 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2007 – OA4 | $1,600,429,100 | April 24, 2007 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2007 – OA5 | $1,443,025,100 | May 22, 2007 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, Series 2007 – OA6 | $1,420,586,100 | June 22, 2007 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, WMALT Series 2007 – OA4 | $467,571,100 | May 23, 2007 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, WMALT Series 2007 – OA4 | $578,412,100 | June 25, 2007 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, WMALT Series 2007 – OC1 | $513,969,100 | May 10, 2007 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

| | | | | | |
|---|---|---|---|---|---|
| WaMu Mortgage Pass-Through Certificates, WMALT Series 2007 – OC2 | $473,070,100 | June 25, 2007 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, WMALT Series 2007 – 1 | $459,533,342 | April 24, 2007 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, WMALT Series 2007 – 2 | $390,678,089 | May 23, 2007 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |
| WaMu Mortgage Pass-Through Certificates, WMALT Series 2007 – 3 | $385,977,600 | June 26, 2007 | WaMu Capital Corporation | WaMu Asset Acceptance Corporation | Washington Mutual Bank |

40.     Each of the Issuing Trusts for the Offerings was a common law trust formed for the sole purpose of holding and issuing the Certificates.  Each of the Issuing Trusts issued hundreds of millions of dollars worth of Certificates pursuant to a Prospectus Supplement, incorporated by reference into the Registration Statements, which listed numerous classes of offered Certificates.

41.     Washington Mutual, Inc. was, at all relevant times located at 1301 Second Avenue, WMC 3501A, Seattle, Washington 98101 and served as the parent company to the sponsor and seller, WMB.

42.     Defendant Moody's is a subsidiary of Moody's Corporation and is principally located at 250 Greenwich Street, New York, New York 10007.  Moody's provides credit ratings, risk evaluation, investment research and data to investors.  Moody's assigned credit ratings to the Certificates, published in the Prospectus Supplements. In order to support its ratings of the Certificates, Moody's also determined the structure of each Issuing Trust and the rights and remedies of each Certificate purchaser in the event of default and thus is liable as a control person of the Issuing Trusts under Section 15 of the Securities Act of 1933.

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 18
Case No: C09-0037 (MJP)

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

43.     S&P was, at all relevant times, a New York corporation with its principal place of business located at 1221 Avenue of the Americas, New York, New York 10020.  S&P is a division of Defendant McGraw-Hill which provides credit ratings, risk evaluation, investment research and data to investors.  S&P assigned credit ratings to the Certificates, which were published in the Prospectus Supplements. In order to support its ratings of the Certificates, S&P determined the structure of each Issuing Trust and the rights and remedies of each Certificate purchasers in the event of default and thus is liable as a control person of the Issuing Trusts under Section 15 of the Securities Act of 1933.

## IV.  ALLEGATIONS

### A.  Exponential Growth in Mortgage Securitizations

44.     As illustrated below, in a mortgage securitization, mortgage loans are acquired, pooled together, and then sold to investors, who acquire rights in the income flowing from the mortgage pools.



45.     When mortgage borrowers make interest and principal payments as required by the underlying mortgages, the resulting cash flow is distributed to the holders of the mortgage-backed securities in order of priority, based on the specific tranche held by the MBS investor.  The highest

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 19
Case No: C09-0037 (MJP)

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

tranche (also referred to as the senior tranche) is first to receive its share of the mortgage proceeds and is also the last to absorb any losses should mortgage borrowers become delinquent or default on their mortgages.

46.   Traditionally, an originator of a mortgage loan was economically vested in establishing the creditworthiness of the borrower and the true value of the underlying property by an appraisal before issuing the mortgage loans.  The securitization of mortgage loans, however, fundamentally shifts the risk of loss from the mortgage loan originator to the investor who purchases an interest in the securitized pool of loans.  Thus, in securitizations, the originator no longer has the same economic interest in establishing borrower creditworthiness or a fair appraisal value of the property in the loan origination process.

47.   In the 1980s and 1990s, securitizations were generally only carried out by Government Sponsored Enterprises, *e.g.,* the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"), which would purchase loans from originators.  Investors in Government Sponsored Enterprise securities were protected because the loans underlying these securities were subject to underwriting guidelines.

48.   Between 2001 and 2006, however, there was dramatic growth in mortgage loan securitizations not sponsored by the government, for which there were no minimum underwriting standards.  This led to a commensurate increase in securitizations of subprime mortgage loans.

49.   A subprime mortgage loan is a mortgage loan issued to a borrower with substandard credit.  In the past decade, such loans have flourished as the vehicle by which lenders funded loans to borrowers who, for various reasons ranging from poor credit histories to unstable income levels, would not generally qualify for traditional or prime rate loans.

50.   To compensate for the increased risk of making subprime loans, the upfront fees and continuing costs, including interest, of a subprime loan are higher than that of a traditional loan.  For

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 20
Case No: C09-0037 (MJP)

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

example, the majority of subprime loans tend to be ARMs or hybrid-ARMs.  Both shift the risk of rate fluctuation from the lender to the borrower.

51.     Many borrowers obtain ARMs under the impression that they will be able to refinance at favorable terms before the ARMs reset at a higher interest rate.  In the subprime mortgage context, ARMs create significant and widespread mortgage default risks because of the likelihood that subprime borrowers will be unable to make their mortgage payments after a rate adjustment.  According to a study by First American CoreLogic in 2007 and 2008, "trillions of dollars of adjustable-rate mortgages [had] their payments reset."  It is estimated that well over $2 trillion in ARMs were originated from 2004 to 2006.

**B.     WaMu's Defective Origination and Securitization Operations**

52.     Beginning in 2001 and extending into 2007, WMB experienced exponential growth in its subprime mortgage loan origination business.

53.     During this timeframe, WaMu purchased and securitized a significant portion of the subprime mortgage loans originated or acquired by WMB into Certificates.

54.     In 2000, WMB was originating $600 million of mortgage loans per month, or just over $7.0 billion for the year.  In stark contrast, by 2005, WMB originated over $19.0 billion in mortgage loans each month, translating into over $229.0 billion per year.  Loans originated by WMB were acquired by WMB for securitizations.  A computerized model priced the loans on a loan-by-loan basis.

55.     Likewise, WMB also acquired mortgage loans for securitization through agreements with small local and regional lenders, known as "correspondent" lenders, dispersed throughout the U.S.

56.     The securitization mortgages acquired for securitization, whether originated by WMB itself or its correspondent lenders were purportedly originated pursuant to the stated guidelines of

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 21
Case No: C09-0037 (MJP)

**SCOTT + SCOTT LLP**
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

1  WMB.

2      57.    Appraisals were a critical component of the origination process. An accurate appraisal

3  is critical to determine the usable loan-to-value ("LTV") ratio for a mortgaged property.  The LTV

4  ratio is a financial metric that Wall Street analysts and investors commonly use when evaluating the

5  price and risk of mortgage-backed securities.  The LTV ratio is directly dependent on the appraised

6  value of a property because the LTV ratio is simply the mortgage amount divided by the appraised

7  value of the property, expressed as a percentage.  For example, if a borrower seeks to borrow

8

9  $350,000 to purchase a house worth $400,000, the LTV ratio is $350,000/$400,000, or 88%.  If,

10  however, the appraised value of the house is artificially increased to $450,000, the LTV ratio drops

11  to just 78% ($350,000/$450,000).

12      58.    From the perspective of a purchaser of mortgage-backed securities, a high LTV ratio

13  is riskier because borrowers with small equity positions in their property have less to lose if the

14  borrowers default on the loan.  In addition, particularly when home values are declining, a high LTV

15  ratio creates the heightened risk that, should the borrower default, the amount of the outstanding loan

16

17  may exceed the value of the property.

18      59.    The Prospectus Supplements filed with the SEC in connection with the sale of

19  Certificates to Plaintiffs and members of the Class made numerous representations regarding

20  purportedly favorable LTV ratios for mortgage loans supporting the Certificates.

21

22      60.    The Registration Statements assured that:

23      The adequacy of the mortgaged property as collateral generally is determined by an
       appraisal made in accordance with pre-established appraisal guidelines.    At

24      origination, all appraisals are required to conform to the Uniform Standards of
       Professional Appraisal Practice Adopted by the Appraisal Standards Board of the

25      Appraisal Foundation, and are made on forms acceptable to Fannie Mae and/or
       Freddie Mac.

26

27  WMAAC, Form S-3/A Registration Statement, filed January 3, 2006, at S-29; WMAAC, Form S-
   3/A Registration Statement, filed April 9, 2007, at S-31.

28

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 22
Case No: C09-0037 (MJP)

61.     The Prospectus Supplements further stated that:

The adequacy of the mortgaged property as collateral generally is determined by an appraisal made in accordance with pre-established appraisal guidelines. *At origination, all appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation,* and are made on forms acceptable to Fannie Mae and/or Freddie Mac. Appraisers may be staff appraisers employed by the sponsor or independent appraisers selected in accordance with the pre-established appraisal guidelines. Such guidelines generally require that the appraiser, or an agent on its behalf, personally inspect the property and verify whether the property is in adequate condition and, if the property is new construction, whether it is substantially completed. However, in the case of mortgage loans underwritten through the sponsor's automated underwriting system, an automated valuation method may be used, under which the appraiser does not personally inspect the property but instead relies on public records regarding the mortgaged property and/or neighboring properties. In either case, the appraisal normally is based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, a replacement cost analysis based on the current cost of constructing or purchasing a similar property….

WaMu Series 2007-HY5 Trust, Prospectus Supplement Form 424B5, dated April 23, 2007, at S-29; *see also*, Prospectus Supplement Form 424B5 for:

| Series | Page Number | Series | Page Number |
|---|---|---|---|
| WAMU 2006 - AR1 | S-29 | WAMU 2006 - AR13 | S-39 |
| WAMU 2006 - AR2 | S-21 | WAMU 2006 - AR14 | S-21 |
| WAMU 2006 - AR3 | S-26 | WAMU 2006 - AR15 | S-37 |
| WAMU 2006 - AR4 | S-36 | WAMU 2006 - AR16 | S-23 |
| WAMU 2006 - AR5 | S-32 | WAMU 2006 - AR17 | S-38 |
| WAMU 2006 - AR6 | S-20 | WAMU 2006 - AR18 | S-23 |
| WAMU 2006 - AR7 | S-39 | WAMU 2006 - AR19 | S-40 |
| WAMU 2006 - AR8 | S-23 | WAMU 2007 - HY1 | S-26 |
| WAMU 2006 - AR9 | S-39 | WAMU 2007 - HY2 | S-23 |
| WAMU 2006 - AR10 | S-25 | WAMU 2007 - HY3 | S-25 |
| WAMU 2006 - AR11 | S-51 | WAMU 2007 - HY4 | S-25 |
| WAMU 2006 - AR12 | S-27 | | |
| WAMU 2007 - HY6 | S-29 | WMALT 2007 - OA5 | S-34 – S-35 |
| WAMU 2007 - HY7 | S-26 | WMALT 2007 - OC1 | S-27 – S-28 |
| WAMU 2007 - OA4 | S-39 | WMALT 2007 - OC2 | S-27 – S-28 |
| WAMU 2007 - OA5 | S-40 | WMALT 2007 - 3 | S-31 – S-32 |
| WAMU 2007 - OA6 | S-40 | WMALT 2007 - 4 | S-28 |
| WMALT 2007 - OA4 | S-34 – S-35 | WMALT 2007 - 5 | S-28 – S-29 |

62.     Contrary to these representations, WaMu's appraisals did not conform to the USPAP standards and did not portray accurate market data and valuation. Because WaMu's profits were determined largely by the quantity of the loans successfully closed and not on the quality of those

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 23
Case No: C09-0037 (MJP)

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

loans, WaMu pressured and influenced appraisers to "hit" the LTV ratios necessary to allow more loans to close and be eligible for pooling and sale to the securitization market.  WaMu then published the resulting defective LTV ratios in the Offering Documents

63.     WaMu balked at federal guidelines stating that: (1) loan production staff should not select appraisers; (2) loan production staff should not be involved in developing or maintaining lists of appraisers; and (3) information provided by the regulated institution should not unduly influence an appraiser or in any way suggest the property's value.[5]

64.     One of WaMu's primary appraisal firms, First American eAppraiseIT ("eAppraiseIT"), appraised a certain percentage the mortgages underlying the Certificates.  In doing so, eAppraiseIT and its corporate parent, First American Corporation ("First American") colluded with and unlawfully inflated the real property appraisals they performed for WaMu.[6]

65.     First American and eAppraiseIT abandoned their role of providing unbiased appraisals for WaMu, instead allowing WaMu's loan production executives to "hand-pick appraisers who bring in appraisal values high enough to permit WaMu's loans to close," and "improperly [permitting] WaMu to pressure eAppraiseIT appraisers to change appraisal values that are too low to permit loans to close."

66.     The terms of the contract between WaMu and eAppraiseIT allowed WaMu, in circumstances where its loan staff disagreed with an eAppraiseIT appraisal, to challenge an eAppraiseIT appraiser's valuation of a property by requesting a "Reconsideration of Value"

[5]     FDIC FIL-20-2005 - Frequently Asked Questions on the Appraisal Regulations and the Interagency Statement on Independent Appraisal and Evaluation Functions, March 22, 2005, The Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision and the National Credit Union Administration.

[6]     *See People of the State of New York v. First American Corporation and First American eAppraiseIT*, No. 07-406796 (N.Y.Sup.Ct. Nov. 1, 2007).

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 24
Case No: C09-0037 (MJP)

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

("ROV").  Washington Mutual routinely requested ROVs from eAppraiseIT appraisers in order to hit the LTV ratios for properties necessary for loans to close and be pooled with other loans for securitization.

67.     For example, on August 9, 2006, eAppraiseIT's President told WaMu executives that "We need to address the ROV issue . . . .  Many lenders in today's environment . . . have no ROV issue.  The value is the value.  I don't know if WAMU production will go for that . . . .The Wamu internal staff we are speaking with admonish us to be certain we solve the ROV issue quickly or we will all be in for some pretty rough seas."

68.     By e-mail dated September 29, 2006, a WaMu executive wrote to eAppraiseIT's senior executives to define the responsibilities of eAppraiseIT's Appraisal Business Managers ("ABMs") as to ROVs and value disputes:

> ... the four appraisers/reviewers would be directly involved in escalations dealing with: ROVs, Valuation issues where the purchase price and appraised value differ with no reconciliations/justifications by the appraiser, Value cuts which we continue to receive from your third party reviewers (Wholesale), ***proactively making a decision to override and correct the third party appraiser's value or reviewer's value cut,*** when considered appropriate and supported....

(Emphasis added.)

69.     On October 5, 2006, in response to "complaints from the WaMu production team particularly in Northern California," eAppraiseIT prepared a "WaMu Improvement Implementation Plan." The plan was unsuccessful, however. By December 2006, WaMu had reassigned all of its Northern California appraisal work to LSI.

70.     During this period, First American was seeking additional business from WaMu in other areas. But WaMu expressly conditioned giving any future business to First American on success with eAppraiseIT.

71.     By e-mail dated September 27, 2006, a First American senior executive advised other senior executives at First American and eAppraiseIT about a conversation he had with the President

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 25
Case No: C09-0037 (MJP)

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

of WaMu Mortgage about long-term business prospects.  The First American executive explained that:

> [WaMu] and I discussed our long-term relationship including the money we have on deposit there and our other current business relationships. I told him we would like to expand those relationships. And in exact terms, we would like one half of their flood business, which they currently give 100% to [Corporation A] and their tax business is divided 3 ways among [3 corporations] and that we would like to take [Corporation A's] tax business.

72.    According to the First American executive, WaMu responded as follows:

> He said that if the appraisal issues are resolved and things are working well he would welcome conversations about expanding our relationship including tax and flood.

73.    By e-mail dated December 2, 2006, eAppraiseIT noted internally that " ... we know [WaMu is] going to complain about the excessive number of low values because the majority of orders are not going to [WaMu's] preferred appraisers

74.    On December 18, 2006, an eAppraiseIT executive relayed to others that WaMu had advised him that its criticism was based on the fact that "values are coming in lower with EA [eAppraiseIT]" than with LSI, the competing appraisal management company that WaMu had also retained to provide appraisals. According to this executive, WaMu maintained that "[t]hey also see more WaMu preferred appraisers doing work for LSI and they think that is why they aren't having as many value issues with them. . . . The [WaMu] managers indicated that if the loan consultants had a choice they would prefer to use LSI over eAppraiseIT because they feel they will have less problem [SIC] with the values."

75.    In February 2007, WaMu's loan origination staff demanded that eAppraiseIT use a Proven Panel of appraisers selected by the loan origination staff, who were chosen because they provided high values.  Indeed, eAppraiseIT's President suggested to WaMu

> [W]e should have Wamu write the introduction letters to their appraisers, set the stage and let us do our magic. ... I assured her the noise from retail will stop. ... She brought up the fact that Wamu knows this means little money to no money for EA

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 26
Case No: C09-0037 (MJP)

**SCOTT + SCOTT LLP**
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

1   and LSI and they will fix that in the near future. But for now they need to stop the
2   noise or none of us will be around. I believe her.

3   76.   By e-mail dated February 22, 2007, eAppraiseIT's President explained to senior

4   executives at First American that eAppraiseIT would be staffing WaMu appraisals with "Proven

5   Appraisers" hand-selected by WaMu's loan origination staff:

6       We had a joint call with Wamu and LSI today.  The attached document outlines the
7       new appraiser assigning process.  In short, we will now assign all Wamu's work to
        Wamu's "Proven Appraisers" . . . .  We will pay their appraisers whatever they
8       demand.  Performance ratings to retain position as a Wamu Proven Appraiser will
        be based on how many come in on value, negating a need for an ROV.
9
    *Id.* at 13-14.
10

11  77.   In an e-mail dated March 1, 2007, eAppraiseIT's President told WaMu executives:

12      Recently, we have been notified that Lending would like us to use more of their
13      "Proven Appraisers" versus appraisers off our preselected appraiser panel. It seems
        the amount of Reconsideration of Value (ROV) requests associated with our
14      appraisers far exceeds those initiated when a WaMu proven appraiser completes a
        file.  Said differently, WaMu proven appraisers bring the value in a greater majority
15      of the time with minimal involvement of the vendor, sales and Appraisal Oversight.
16      I am fine with that, of course, and will happily assign WaMu orders to WaMu proven
        appraisers instead of eAppraiseIT's approved panel appraiser whenever possible.

17  *Id.* at 15.

18  78.   On April 17, 2007, eAppraiseIT's President wrote to senior executives at First

19  American, explaining issues with WaMu as follows:

20      In short, the issues are using their designated appraisers as mandated by the WaMu
21      production force at 20% gross margin and bypassing our panel.  We view this as a
        violation of the OCC, OTS, FDIC and USPAP influencing regulation.
22

23  *Id.* at 17.

24  79.   On April 17, 2007, eAppraiseIT e-mailed its staff appraisers to explain why the staff

25  appraisers had been removed from the WaMu Proven List. In these messages, eAppraiseIT's ABMs

26  acknowledged that WaMu loan origination staff were now choosing the appraisers for their loans:

27      I thought I [sic] pass on my thoughts regards the recent message that we all received
28      for [sic] Peter last weekend. I will be glad to tell you what I know. I have been told

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 27
Case No: C09-0037 (MJP)

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

that the lending folks at Wamu and [sic] were unhappy with the AMC's and felt they were not receiving a good level of appraisal work. They therefore decided to construct their own appraisal panel, now known as the wamu proven panel, and instructed the AMC's to utilize appraisers from this panel whenever possible. The end result is that if you are not on this proven panel it is very unlikely you will receive wamu work.

80.     Appraisers at First American and eAppraiseIT who did not comply with the predetermined values were subjected to threats of blacklisting by WaMu.  Specifically, on April 17, 2007, an appraiser wrote to eAppraiseIT and stated:

> This is the second Wamu Appraisal quality assurance issue I have received from Wamu in the past 2 months. Both as a result of an appraisal I completed that did not come in to their predetermined value for a "valued" Wamu client. ***I was pressured for 2 weeks to change both my value and the conditions of my appraisal report ••• both of which were violations of USPAP, FANNIE MAE and the Supplemental Standards I am required to observe and am bound by my license to complete.*** Since that time, I have been singled out by WaMu and have been pressured on every appraisal I have completed that did not reach a pre-determined value. I feel that WaMu is in process of "blacklisting" me as an approved WaMu appraiser by going after each appraisal I complete and looking for violations.

(Emphasis added).

81.     Realizing that the Company could suffer significant fallout if the facts concerning WaMu's manipulation of eAppraiseIT through the use of Proven Appraisers became public, on April 26, 2007, eAppraiseIT's President wrote an e-mail to senior management at First American regarding the issues they were encountering with WaMu and the use of Proven Appraisers.  In the e-mail, eAppraiseIT's President discussed the Proven Panel and eAppraiseIT's reputational risk:

> Sales is the driving force behind the Proven Appraiser List (PAL) which is questionable from regulatory perspective. We are required to use these appraisers at *80/20%* fee splits. This is dilutive to our P&L. Even with the implementation of such, we are still finding that we are being questioned surrounding what appraiser was assigned the order. ***We feel our reputation in the industry is being tarnished by the implementation of the Proven List since Production selects the appraiser.***

(Emphasis added).

82.     On May 11, 2007, eAppraiseIT's Executive Vice President wrote in an e-mail to eAppraiseIT's President that "currently WAMU is controlling the appraiser panel.  They are

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 28
Case No: C09-0037 (MJP)

selecting the appraisers and calling them 'proven' appraisers.  These appraisers are being chosen by their sales force.  First American eAppraiseIT [] is obligated to use these appraisers." According to eAppraiseIT's Executive Vice President, WaMu was using the "Proven Appraisers" because of the "low values" from other eAppraiseIT's appraisers.  *Id.* at 21.

83.     Indeed, according to the NYAG Complaint, eAppraiseIT's internal appraisal log entries indicate that its appraisers increased property values on appraisal reports after being told by WaMu loan origination staff that such increases would help loans to close.  For the period from November 2006 to May 2007, there were eight reviews performed relating to properties in New York, all of which were for WaMu.  The appraised values were increased in each of the eight reviews completed, as follows: from $825,000 to $850,000, $230,000 to $240,000, $415,000 to $420,000, $1,550,000 to $2,270,000, $720,000 to $730,000, $535,000 to $556,000, $580,000 to $587,000, $500,000 to $525,000.  *Id.* at 29.

84.     In this manner, the appraisals eAppraiseIT performed for WaMu did not portray accurate market data and valuation.  In order to earn business from WaMu, eAppraiseIT artificially inflated appraisal values to "hit" the LTV ratios necessary to allow more loans to close and be eligible for pooling and sale to the securitization market in complete disregard to appraiser independence requirements

### 1.     Lack of Meaningful Due Diligence Review Prior to Securitization

85.     Prior to securitization, a process of cursory "due diligence" on the mortgage loans was conducted.  The review's ostensible purpose was to determine whether the loans contained the requisite legal documentation, were based on an independent appraisal and were originated in accordance with WMB's loan underwriting guidelines, which were detailed in the Offering Documents.  The due diligence review that was conducted on the mortgage collateral was not specific to any securitized pool of mortgage loans.  Rather, the due diligence was performed

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 29
Case No: C09-0037 (MJP)

**SCOTT + SCOTT LLP**
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

periodically performed on a small sample (5%-7% at most) of WMB's entire "warehouse" of mortgage loans.

86.     WaMu contracted its due diligence work to outside firms – namely, Bohan and Clayton. WaMu's Due Diligence Team was responsible for overseeing the work. The outside firms were supposed to examine the loans for conformity with WMB's guidelines, as detailed in the Offering Documents. Each loan reviewed was rated as category "1," "2" or "3". Category "3" loans were defective and recommended for exclusion from securitization. However, WaMu's Due Diligence Team exercised its discretion and rarely excluded category "3" rated loans. WaMu was incentivized to hang on to category "3" loans because if WaMu rejected any significant portion of the loans, the size of the securitization, and thus the size of the fees derived from the securitization by WaMu, would decrease significantly. In addition, the defective loans would remain on WaMu's mortgage ledger, subjecting WaMu to the risk of default or foreclosure.

## 2.     The Role of WCC in Offloading the Certificates

87.     WCC was established in 2002 by WMB for the purpose of providing WaMu with direct access to investors. Since then, WaMu has been going directly to Wall Street with its products securitized through WCC. In 2005, WCC was officially made a wholly-owned subsidiary of WMB. WCC enabled WaMu to issue billions in mortgage-backed securities directly, without obtaining the assistance of outside investment bankers.

88.     The purpose of WCC, which was made up of a group of WMB employees working on the mortgage-backed securities sales desk, was to assess the demand for certain securities from the clients of the investment bank. This "pre-sell" of Certificates was critical for the quick sale of an Offering of Certificates. Quick sales were the key to a successful securitization, because, as WaMu knew, defaults and delinquencies on the mortgages underlying each Certificate would begin to accrue shortly after its issuance. Indeed, delinquency and default rates began to skyrocket as early as

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 30
Case No: C09-0037 (MJP)

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

1    four months after the initial Offering dates.

2        89.    WaMu derived profit from the sale of the Certificates for a price in excess of the

3    amount paid for the underlying mortgage loans.  The goal for WaMu was to sell the Certificates for a

4    price above the par value of $1.00 per unit.

5        90.    Certificates were issued through the Issuing Trusts designated with a "shelf" name –

6    specifically, "WaMu Mortgage Pass-Through Certificates Trust."  WaMu completed thirty-six (36)

7    Certificate Offerings pursuant to the Offering Documents, between January 26, 2006 and June 26,

8    2007, which are all the subject of this action.

9            **3.    The Rating Agencies' Broken Models and Material Conflicts of Interest**

10       91.    For Certificates to be marketable to their target investors, *e.g.,* pension funds, at least

11   80% of the Certificates had to have an AAA rating.  In order to ensure that a substantial portion of

12   the Certificates were awarded the AAA ratings, WaMu had the Rating Agencies compete for the

13   engagement by including their proposed ratings as part of their bid for the Certificate ratings

14   engagement.  Ratings shopping resulted in ***over 93%*** of the Certificates being awarded the triple-A

15   rating.  The process of ratings shopping began to be meaningfully disclosed to the public in July

16   2008.

17       92.    The Offering Documents make no mention of the material financial conflicts of

18   interest between WaMu and the Rating Agencies.  The July 2008 SEC Report confirmed significant

19   undisclosed conflicts of interest which gave the Rating Agencies an incentive to issue inflated

20   ratings.  The July 2008 SEC Report found, in violation of SEC Rules, that "key participants" in the

21   securitization process negotiated fees the Rating Agency would receive in exchange for its high

22   ratings.  July 2008 SEC Report, at 23-24.

23       93.    The July 2008 SEC Report also noted, *inter alia*, that analysts are "aware" of the

24   rating firm's "business interests when securing the rating of the deal" as follows:

- ***While each rating agency has policies and procedures restricting analysts from participating in fee discussions with issuers,*** these policies still allowed key participants in the ratings process to participate in fee discussions.

- Analysts appeared to be aware, when rating an Issuing Trust, of the rating agency's business interest in securing the rating of the deal. The Staff notes multiple communications that indicated that some analysts were aware of the firm's fee schedules, and actual (negotiated) fees. There does not appear to be any internal effort to shield analysts from e-mails and other communications that discuss fees and revenue from individual Issuing Trust.

- ***"Rating agencies do not appear to take steps to prevent considerations of market share and other business interests from the possibility that they could influence ratings or ratings criteria."***

July 2008 SEC Report, at 24-25 (emphasis added).

94.     The July 2008 SEC Report found that a number of factors unique to the rating of mortgage-backed securities may have "exacerbated" the effect of conflicts of interest inherent in the fact that the Issuing Trust or arranger pays for the ratings. These factors include that the arranger of the deal has:

- ***"More flexibility to adjust the deal to obtain a desired credit rating as compared to arrangers of non-structured asset classes."***

- "Second, there is a high concentration in the firms conducting the underwriting function… While 22 different arrangers underwrote subprime mortgage-backed securities deals, 12 arrangers accounted for 80% of the deals, in both number and dollar volume."

- With a fast-changing market, rating processes are frequently and quickly changed. The high concentration of arrangers with the influence to determine the ***choice of rating agency heightened the inherent conflicts in the "issuer pays" compensation model.*** Compensation is calculated by volume of deals and total dollar volume, as a result arrangers prefer fast and predictable ratings processes.

- Rating Agencies may be pressured by arrangers to produce a more ***favorable outcome or reduce credit enhancement levels,*** thus reducing ***the cost of the debt for a given level of cash inflows from the asset pool.*** When the arranger also sponsors the mortgage-backed securities or CDO trust, pressure can influence an agency's decision to update a model when the update would lead to a less favorable outcome.

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 32
Case No: C09-0037 (MJP)

- ***High profit margins may have provided an incentive for rating agencies to encourage the arrangers to route future business its way.*** Unsolicited ratings were not available to provide independent checks on the rating agencies' ratings, nor was information regarding the structure of the security or portfolio of assets readily available to parties unrelated to the transaction, especially before issuance.

July 2008 SEC Report, at 31-33 (emphasis added).

95.     As reported in *The Washington Post* on June 6, 2008, the NYAG announced that it had reached an agreement with the credit-rating companies, S&P, Moody's and Fitch to:

… change the way they evaluate mortgage securities that have roiled financial markets for the past year.

The deal with Moody's Investors Service, Standard & Poor's and Fitch Ratings aims to restore confidence among investors -- who saw top-rated securities lose much of their worth in a matter of months -- by revising how the agencies are paid for issuing ratings. The agreement also requires credit-rating agencies to direct investment banks to provide them with more data on the pools of mortgages that make up the bonds.

The agencies have been under fire for the role they played in the subprime mortgage crisis by awarding top ratings to securities that soured. Regulators and investors have alleged that the agencies have a conflict of interest because they are paid by the investment banks issuing the securities, thus encouraging the credit agencies to give high ratings to win business.

The agreement seeks to end this practice by having the Issuing Trust pay the credit-rating agencies at four points during the rating process, not just at the end when the rating is given.

Credit-rating agencies will also be required to disclose information about all securities submitted for review, allowing investors to determine whether Issuing Trust sought, but subsequently decided not to use, ratings from a specific agency. This will allow investors to see whether investment banks shopped around for the agency that would give their securities the best rating, said Andrew M. Cuomo, New York's attorney general.

96.     As reported in *The Washington Post*, the NYAG further stated that:

The mortgage crisis currently facing this nation was caused in part by misrepresentations and misunderstanding of the true value of mortgage securities," Cuomo said in a statement. "By increasing the independence of the rating agencies, ensuring they get adequate information to make their ratings, and increasing industry-wide transparency, these reforms will address one of the central causes of that collapse.

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 33
Case No: C09-0037 (MJP)

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

97.     Furthermore, in January 2009, the Congressional Oversight Panel issued the January 2009 Congressional Oversight Panel Report  The January 2009 Congressional Oversight Panel Report stated, in no uncertain terms:

> **Problem with current [Credit Ratings] system:** ***The credit rating system is ineffective and plagued with conflicts of interest.***
>
> ***The major credit rating agencies played an important-and perhaps decisive-role in enabling (and validating) much of the behavior and decision making that now appears to have put the broader financial system at risk.*** In the subprime-related market specifically, high ratings for structured financial products - especially mortgage-backed securities … - were essential for ensuring broad demand for these products.  High ratings not only instilled confidence in potentially risk-averse investors, but also helped satisfy investors' regulatory requirements, which were often explicitly linked to ratings from the major credit rating agencies.  By 2006, Moody's business in rating structured financial products accounted for 44 percent of its revenues, as compared to 32 percent from its traditional corporate-bond rating business.  It has also been reported that "roughly 60 percent of all global structured products were AAA-rated, in contrast to less than 1 percent of corporate issues." Financial firms, from Fannie Mae to AIG, also benefited greatly from having high credit ratings of their own-especially AAA-allowing them not only to borrow at low rates on the short-term markets to finance longer-term (and higher yielding) investments but also to sell guaranties of various sorts, effectively "renting out" their credit rating.

January 2009 Congressional Oversight Panel Report, at 40-41

### a.     Rating Agencies Announce Mass Downgrades of the Certificates

98.     The unprecedented ratings collapse of the Certificates is reflected in the magnitude of the decline in ratings levels. The Rating Agencies rated the Certificates pursuant to the following rating systems:

> Moody's
>
> Moody's long-term obligation ratings are opinions of the relative credit risk of fixed-income obligations with an original maturity of one year or more. They address the possibility that a financial obligation will not be honored as promised. Such ratings reflect both the likelihood of default and any financial loss suffered in the event of default.
>
> Moody's Long-Term Rating Definitions:

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

1

2    Aaa - Obligations rated Aaa are judged to be of the highest quality, with
     minimal credit risk.

3

4    Aa - Obligations rated Aa are judged to be of high quality and are subject to
     very low credit risk.

5    A - Obligations rated A are considered upper-medium grade and are subject
     to low credit risk.

6

7    Baa - Obligations rated Baa are subject to moderate credit risk. They are
     considered medium-grade and as such may possess certain speculative

8    characteristics.

9    Ba - Obligations rated Ba are judged to have speculative elements and are
     subject to substantial credit risk.

10

11   B - Obligations rated B are considered speculative and are subject to high
     credit risk.

12

13   Caa - Obligations rated Caa are judged to be of poor standing and are subject
     to very high credit risk.

14   Ca - Obligations rated Ca are highly speculative and are likely in, or very
     near, default, with some prospect of recovery of principal and interest.

15

16   C - Obligations rated C are the lowest rated class of bonds and are typically
     in default, with little prospect for recovery of principal or interest.

17

18   Note: Moody's appends numerical modifiers 1, 2, and 3 to each generic rating
     classification from Aa through Caa. The modifier 1 indicates that the

19   obligation ranks in the higher end of its generic rating category; the modifier
     2 indicates a mid-range ranking; and the modifier 3 indicates a ranking in the

20   lower end of that generic rating category.

21   v3.moodys.com/.../AboutMoodysRatingsAttachments/MoodysRatingsSymbolsand%20Defin
     itions.pdf

22

23       <u>S&P</u>

24   AAA: An obligation rated 'AAA' has the highest rating assigned by Standard
     & Poor's. The obligor's capacity to meet its financial commitment on the

25   obligation is extremely strong.

26

27   AA: An obligation rated 'AA' differs from the highest-rated obligations only
     to a small degree. The obligor's capacity to meet its financial commitment on
     the obligation is very strong.

28

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 35
Case No: C09-0037 (MJP)

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

A: An obligation rated 'A' is somewhat more susceptible to the adverse effects of changes in circumstances and economic conditions than obligations in higher-rated categories. However, the obligor's capacity to meet its financial commitment on the obligation is still strong.

BBB: An obligation rated 'BBB' exhibits adequate protection parameters. However, adverse economic conditions or changing circumstances are more likely to lead to a weakened capacity of the obligor to meet its financial commitment on the obligation.

BB, B, CCC, CC, and C: Obligations rated 'BB', 'B', 'CCC', 'CC', and 'C' are regarded as having significant speculative characteristics. 'BB' indicates the least degree of speculation and 'C' the highest. While such obligations will likely have some quality and protective characteristics, these may be outweighed by large uncertainties or major exposures to adverse conditions.

BB: An obligation rated 'BB' is less vulnerable to nonpayment than other speculative issues. However, it faces major ongoing uncertainties or exposure to adverse business, financial, or economic conditions, which could lead to the obligor's inadequate capacity to meet its financial commitment on the obligation.

B: An obligation rated 'B' is more vulnerable to nonpayment than obligations rated 'BB', but the obligor currently has the capacity to meet its financial commitment on the obligation. Adverse business, financial, or economic conditions will likely impair the obligor's capacity or willingness to meet its financial commitment on the obligation.

CCC: An obligation rated 'CCC' is currently vulnerable to nonpayment, and is dependent upon favorable business, financial, and economic conditions for the obligor to meet its financial commitment on the obligation. In the event of adverse business, financial, or economic conditions, the obligor is not likely to have the capacity to meet its financial commitment on the obligation.

CC: An obligation rated 'CC' is currently highly vulnerable to nonpayment.

C: A 'C' rating is assigned to obligations that are currently highly vulnerable to nonpayment, obligations that have payment arrearages allowed by the terms of the documents, or obligations of an Issuing Trust that is the subject of a bankruptcy petition or similar action which have not experienced a payment default. Among others, the 'C' rating may be assigned to subordinated debt, preferred stock or other obligations on which cash payments have been suspended in accordance with the instrument's terms or when preferred stock is the subject of a distressed exchange offer, whereby some or all of the issue is either repurchased for an amount of cash or replaced by other instruments having a total value that is less than par.

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 36
Case No: C09-0037 (MJP)

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

D: An obligation rated 'D' is in payment default. The 'D' rating category is used when payments on an obligation are not made on the date due even if the applicable grace period has not expired, unless Standard & Poor's believes that such payments will be made during such grace period. The 'D' rating also will be used upon the filing of a bankruptcy petition or the taking of similar action if payments on an obligation are jeopardized. An obligation's rating is lowered to 'D' upon completion of a distressed exchange offer, whereby some or all of the issue is either repurchased for an amount of cash or replaced by other instruments having a total value that is less than par.

www2.standardandpoors.com/.../Understanding_Rating_Definitions.pdf

99.     The materiality of the misstatements and omissions in the Offering Documents is reflected in the fact that the Rating Agencies, in downgrading the Certificates from the highest investment-grade to junk bond grade, specifically attributed the downgrades to "aggressive underwriting" in the origination of the underlying mortgage loans.

100.     As noted, relatively soon after issuance, the delinquency and foreclosure rates of the Certificate collateral began to increase.  This performance was an indication to S&P of pervasive underwriting failures in the origination of the collateral which ultimately led to widespread and deep downgrades of most of the Certificate classes.  On or about July 10, 2007, S&P publicly announced it was revising the methodologies used to rate numerous MBS Certificates because the performance of the underlying collateral "called into question" the accuracy of the loan data.

101.     In announcing the need for methodology revisions, S&P cited the increased need for greater "credit protection" for rated transactions.  S&P reiterated that it would also seek in the future to review and minimize the incidence of loan underwriting abuse given "the level of loosened underwriting at the time of loan origination, misrepresentation and speculative borrower behavior reported for the 2006 ratings."

102.     One day later, on July 11, 2007, Moody's announced it also was revising its methodology used to rate the Certificates and anticipated Certificate downgrades in the future.  Moody's did in fact significantly downgrade most of the Certificate classes, noting undisclosed

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 37
Case No: C09-0037 (MJP)

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

1    aggressive underwriting used in the origination of the collateral.

2        103.    The Rating Agencies initially assigned the triple-A ratings to 93.5%, or $44.2 billion,

3    of the Certificates.  The Certificates were downgraded as many as 22 levels with, for example,

4    94.2%, or $41.6 billion, of the total $44.2 billion of Certificates initially rated triple-A, now having

5    been downgraded to "Ba1" or below, meaning these Certificates were not only designated junk

6    bonds, but were assessed to be in danger of imminent default.  Over 98.9%, or $46.8 billion, of the

7    Certificate tranches have been downgraded, with 94.3%, or $44.6 billion, having been downgraded

8
9    to speculative junk status.

10       104.    In support of these downgrades, the Rating Agencies stated that the loans underlying

11   the Certificates "were originated in an environment of aggressive underwriting. This aggressive

12   underwriting, …has caused significant loan performance deterioration and is the primary factor in

13
14   the[] rating actions [downgrades]."  Moody's and S&P Downgrade Subprime Mortgage Bonds,

15   *Mortgage Banking*, Aug. 1, 2007.

16           **b.    The Rating Agencies' Outdated Models Excluded Relevant and
                     Material Data**
17

18       105.    The Prospectus Supplements contain material misstatements and omissions of fact,

19   including the failure to disclose that the amounts and forms of credit enhancement were understated

20   and insufficient because they were largely determined by Rating Agencies' models that had not been

21   materially updated since 1999 (for S&P) and 2002 (for Moody's).  The Rating Agencies' models

22   were based primarily on the performance of fixed interest loans and not subprime, Alt-A, zero or

23
24   limited documentation loans, which were the types of loans that comprised a significant proportion

25   of the Certificate collateralizations.

26       106.    The Rating Agencies' determinations of the amount and type of credit enhancement

27   to be included in the Certificates were faulty.  These same faulty determinations were then used by

28   the same firms to assign inflated and faulty AAA ratings to a substantial portion of the total

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 38
Case No: C09-0037 (MJP)

1    Certificate value of the Offerings (93.5% of the aggregate value of the Offerings).  These ratings

2    were unjustifiably high because they were determined pursuant to the same outdated models used to

3    determine credit enhancement.

4
        107.    The inadequacy of the models used to rate (and determine the amount of credit

5    enhancement needed to support the rating) was discussed in the April 2008 issue of *Mortgage*

6
     *Banking,* which explained that the Rating Agencies' models used statistical assumptions that were

7
     too heavily based on the performance of 30-year-fixed mortgages, which were not the kinds of

8
     complex, risky mortgages that had been securitized in the prior four years:

9

10          S & P's Coughlin admits that "assumptions that went into decision-making [on credit
            ratings] were informed by what had happened in the past," and yet in this instance
11          "previous loss data proved to be much less of a guide to future performance."

12
            But why?  Drexel University's Mason believes it's because the CRAs relied on
13          statistical models that were misleading, at best.   "I think their [credit-rating]
            methodologies were demonstrably insufficient," he says.
14
            "Unlike the traditional rating processes for single-named issuers, which rely on
15          empirical analysis at their core, structured-finance rating analysis is essentially
            driven by statistical models," write Mason and Rosner in their paper.  And the data
16          that the rating agencies used when evaluating mortgage-backed securities--including
            those backed by subprime mortgages--were heavily biased by over-reliance on
17          traditional 30-year fixed prime mortgage loans.  But it turns out that a subprime loan,
            as Mason explains during an interview, is a very different animal.
18
            "This is not your historical mortgage loan," he says.  "This is more like a credit-card
19          loan."  Mason cites the increased popularity during the mortgage boom of so-called
            option ARMs, which are home loans that give the borrower a variety of monthly
20          payment options and have variable cash-flow characteristics that are more like credit
            cards.
21

22
        108.    *The New York Times* noted, with respect to Moody's April 2007 disclosure, in an
23
     article published on April 8, 2008, that it was "revising" its model which had not been revised since
24
     2002:
25

26          In April 2007, Moody's announced it was revising the model it used to evaluate
27          subprime mortgages.  It noted that the model "was first introduced in 2002.  Since
            then, the mortgage market has evolved considerably."  This was a rather stunning
28          admission; its model had been based on a world that no longer existed.

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 39
Case No: C09-0037 (MJP)

109.    The article explained that when Moody's had analyzed subprime delinquency data in 2007 it had found trends that its 2002 model never accounted for:

> Poring over the data, Moody's discovered that the size of people's first mortgages was no longer a good predictor of whether they would default; rather, it was the size of their first and second loans – that is, their total debt – combined.  This was rather intuitive; Moody's simply hadn't reckoned on it.  Similarly, credit scores, long a mainstay of its analyses, had not proved to be a "strong predictor" of defaults this time.

110.    Confidential Witness 1 ("CW1"), a former S&P executive in the Ratings Services group, confirmed that S&P made a conscious decision between at least 2001 and 2008 to use an outdated version of its LEVELs model for rating MBS.  The decision was motivated by S&P's desire to continue to assign triple-A ratings with minimal credit enhancement in order to preserve its market share with MBS Issuing Trust.

111.    Likewise, Moody's made a conscious decision to employ outdated modeling procedures in rating MBS in order to compete with Moody's and Fitch, Inc ("Fitch"). The use of outdated models was acknowledged when, on April 3, 2007, Moody's published a report entitled *Moody's Revised US Mortgage Loan-by-Loan Data Fields*. This report revealed that the data fields that Moody's had been using to collect and assess mortgage loan data did not capture the relevant and obvious risks associated with hybrid and option ARM mortgage loans.

112.    Once Moody's incorporated new data fields specific to hybrid and option ARM mortgage loans, which constituted well over 75% of the subprime mortgage market at all times relevant to this complaint, its loss projections for Alt-A option ARMs increased by 50% and its loss projections for hybrid ARMs increased by 30%.  The implications for Alt-A security structuring were even more profound: credit enhancement levels for Baa ratings increased by 65% and 40% respectively; and credit enhancement levels for Aaa ratings increased by 65% and 49% respectively. As an August 15, 2007 Moody's presentation demonstrated, option ARM calculations using the

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 40
Case No: C09-0037 (MJP)

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

corrected methodology would require, for Aaa tranches to merit Aaa ratings, that such tranches have credit enhancement of 11.6%, whereas the outdated model in place at the time the Certificates were rated required only 7.05%.

113.    In this manner, the Rating Agencies deliberately failed to consider obvious, relevant and necessary data in order to satisfy WaMu's interest in obtaining AAA ratings for the Certificates with minimal credit enhancement.

c.    **Improper Ratings Shopping Drove the Rating Process**

114.    The Registration Statements disclosed the engagement of the Rating Agencies but omitted disclosure of the manner in which the Rating Agencies were engaged.

115.    In order to obtain the highest ratings for each Certificate, WaMu leveraged the "Big Three" credit rating agencies (Moody's, S&P and Fitch) off one another and shopped around until it found the best ratings.

116.    Initially, a WaMu collateral analyst would send the preliminarily structured deal to the rating agencies for feedback.  WaMu's in-house ratings analysts would oversee the communications with the rating agencies.

117.    Thereafter, S&P, for example, would run the loan collateral through both its "LEVELS" and "SPIRE" Models and provide WaMu with the deal structuring results in an effort to obtain the ratings engagement.  Through the LEVELS Model, S&P would advise WaMu that, for example, 94.25% of the Certificates would be rated AAA as long as 5.75% of the total collateral balance supporting those Certificates was subordinate.  This 5.75% was the amount of loss coverage required.  WaMu would then again "negotiate" with S&P before the engagement was finalized, in order to decrease the amount of loss coverage and credit enhancement S&P's model required for the

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 41
Case No: C09-0037 (MJP)

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

specific deal, while still maintaining the highest percentage of AAA-rated Certificates.[7] Without the use of the S&P and Moody's models, the Certificates could not have been awarded the necessary triple-A ratings which were a predicate to the formation of the trusts and issuance of the Certificates. These models allowed the Rating Agencies to control the structure and form of the WaMu Trusts and Certificates.

118.   Likewise, Moody's would run the information provided by WaMu through its model – the "M-3" or "Moody's Mortgage Metrics" Model – which was intended to provide ratings based on a complete assessment of the quality of the collateral underlying the Certificates.

119.   All of this work by S&P and Moody's, referred to by S&P as "bid package" work, was performed without any compensation from WaMu and was an effort to engender goodwill so that WaMu would ultimately engage either of the Rating Agencies to rate the loans at the underwriting stage.

120.   WaMu relied on the ratings shopping process to obtain the most profitable structure - to WaMu - on the Offerings.  The practice was effectively curtailed in many respects by way of an agreement entered into between the Rating Agencies and the New York Attorney General in 2008.

### d.   The Rating Agencies Structured the Trusts for Maximum Profitability for WaMu and Themselves

121.   The Rating Agencies reverse-engineered the structure of the Issuing Trust to "hit" the desired ratings for the Certificates.

122.   An article appearing in *The Financial Times* on October 17, 2008, entitled "When Junk Was Gold," explained that the structure of structured finance securities such as mortgaged backed securities, was determined by the rating and thus the rating agencies :

---

[7]   S&P would also run the deal through its "SPIRE" Model in order to provide a deal structure that was within its acceptable levels of subordination or overcollateralization in order to obtain class, or tranche, sizes with the appropriate ratings.

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 42
Case No: C09-0037 (MJP)

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

1
2
3
4
5

The first mortgage-backed bonds were created in the late 1980's, well before Clarkson's time, by a trader called "Lewie" Ranieri. Ranieri, the head of the mortgage trading desk at the former investment bank Salomon Brothers, was famous for the huge sums of money he netted for his employer and for the quantity of cheeseburgers he ate. What he struck upon in structured finance was a process of pure alchemy: a way of turning myriad messy mortgage loans into standardized, regimented and easy-to-assess bonds.

6
7
8
9
10
11
12

Ranieri knew that the magic of structuring was in the packaging. Packaged in the right way, mortgages could come to create a huge, new tradable bond market. And this is where the rating agencies came in. Structured bonds, like any other bond, needed ratings in order to be sold. ***But with a structured bond, the pools of debt could be built or modified in order to attain a particular rating. This wasn't a matter of disguising the risk, rather a way of reapportioning it and allowing investors with different risk appetites to buy the right product for them. "The rating is what gives birth to the structure in the first place," explains Sylvain Raynes, a financial modeling expert who was with Moody's in the 1990s, when Clarkson joined. In some cases, the ratings are known before the bonds have even been inked. "You start with a rating and build a deal around a rating," Clarkson told an investment magazine last year.***

13

(Emphasis added).

14
15
16
17
18

123.    The Rating Agencies' hand in ultimately determining the structure of the securitization was more fully discussed in the July 2008 SEC Report. The July 2008 SEC Report confirmed that S&P and Moody's provided "feedback" to the Sponsor of the Offerings as to the structure, which would result in the highest rating:

19
20
21
22
23
24
25
26
27
28

The [] examined rating agencies generally followed similar procedures to develop ratings for subprime mortgage-backed securities and CDOs. The arranger of the mortgage-backed securities initiates the ratings process by sending the credit rating agency a range of data on each of the subprime loans to be held by the trust (e.g., principal amount, geographic location of the property, credit history and FICO score of the borrower, ratio of the loan amount to the value of the property and type of loan: first lien, second lien, primary residence, secondary residence), the proposed capital structure of the trust and the proposed levels of credit enhancement to be provided to each mortgage-backed securities trance issued by the trust. Typically, if the analyst concludes that the capital structure of the mortgage-backed securities does not support the desired ratings, this preliminary conclusion would be conveyed to the arranger. The arranger could accept that determination and have the trust issue the securities with the proposed capital structure and the lower rating or adjust the structure to provide the requisite credit enhancement for the senior tranche to get the desired highest rating. Generally, arrangers aim for the largest possible senior tranche, i.e., to provide the least amount of credit enhancement possible, since the senior tranche – as the highest rated tranche – pays the lowest coupon rate of the

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 43
Case No: C09-0037 (MJP)

SCOTT+SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

mortgage-backed securities' tranches and, therefore, costs the arranger the least to fund.

July 2008 SEC Report, at 22.

124.    The Process by which MBS, including the Certificates, were rated by S&P, as confirmed by CW1, demonstrates the control that the Rating Agencies had over the ultimate structure of the Issuing Trust.

125.    First, upon receiving a set of statistical data on a pool of mortgage loans from WaMu, S&P assigned a lead analyst to the transaction. Information provided to the lead analyst about the transaction included principal amount, geographic location of the property, credit history and the FICO score of the borrower, LTV ratio, type of loan, as well as the proposed capital structure of the trust and the proposed levels of credit enhancement to be provided to each tranche.

126.    The S&P analyst was responsible for analyzing the loan pool, proposed capital structure and proposed credit enhancement levels provided by the Issuing Trust.

127.    Junior analysts working under the lead analysts would then typically run the data through LEVELs in order to determine the level of credit enhancement required for each credit rating category.

128.    LEVELs generated subordination levels for the different tranches of loans and suggested subordination percentages and credit ratings for the tranches.  The junior analyst then took the proposed financing structure to an internal S&P committee.  CW1 stated that the committee process rarely changed suggested ratings and subordination levels.

129.    After the committee review, an S&P analyst called the counterpart at WaMu and reported the credit enhancement levels necessary to obtain the ratings desired by WaMu.

C.    **Delinquency and Defaults on the Loans Underlying the Certificates**

130.    As delinquency and default rates began to skyrocket as early as four months after the initial Offering dates, WCC was forced to write-down a significant portion of the value of its

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 44
Case No: C09-0037 (MJP)

mortgage-related securities holdings; has been and continues to be subject to Federal and State investigations, and in some cases has been forced into bankruptcy from the resultant mortgage-related losses.  In December 2007, WaMu announced in an article in *The New York Times* that it was closing WCC.  WCC's remaining operations were then sold to JPM in 2008.

131.   The defective nature of the mortgage collateral underlying the Certificates is reflected by the recurring pattern of exponential increases in borrower delinquencies in the months after each of the thirty-six (36) Offerings.

132.   Four months after each of the Offerings were consummated, borrower delinquency and default rates on the underlying mortgage collateral increased by a staggering amount – from an average of 0.00% to over 3.37% of the mortgage loan balance.  Six months following issuance in each of the Offerings, that average increased to over 4.53% of the mortgage loan balance.  Borrower default and delinquency rates in the underlying mortgage collateral have continued to increase.

133.   These early payment defaults and delinquency rates are reflective of a disregard for underwriting guidelines.  As reported by the Federal Bureau of Investigation ("FBI") in its 2006 and 2007 Mortgage Fraud Reports, a study of three million residential mortgage loans found that between 30% and 70% of early payment defaults were linked to significant misrepresentations in the original loan applications.  The study cited by the FBI and conducted by Base Point Analytics, found that loans that contained egregious misrepresentations were five times more likely to default in the first six months than loans that did not.  The misrepresentations included income inflated by as much as 500%, appraisals that overvalued the property by 50% or more, and fictitious employers and falsified tax returns.  The 2006 FBI report also cited studies by a leading provider of mortgage insurance, Radian Guaranty Inc., concluding that the same top states for mortgage fraud – including the states where the MBS collateral was principally originated – were also the same top states with the highest percentage of early payment defaults.

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 45
Case No: C09-0037 (MJP)

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

134.    Furthermore, in or around February 2009, the true deterioration of the underlying mortgage collateral began to surface to the public.  Borrower delinquency and default rates rose to an average of approximately 40% of the mortgage loan collateral, forcing the Rating Agencies to downgrade substantially all of the Certificates to junk bond status.  As of the date of the filing of this Complaint, **_over 51%_** of mortgage collateral is considered to be in some form of delinquency or default.

135.    Despite assurances by WaMu in the Offering Documents that the mortgage loans collateralizing the Certificates were originated pursuant to the stated guidelines of WMB, nothing could have been further from the truth.

## V.    THE DEFENDANTS' MISSTATEMENTS AND OMISSIONS

### A.    The Offering Documents Included Material Misstatements and Omitted Material Information Regarding Mortgage Loan Underwriting Guidelines

#### 1.    The Registration Statements

136.    The effective Registration Statements described that generally the adequacy of the property financed by the loan will have been determined by an appraisal according to guidelines as follows:

> In determining the adequacy of the property as collateral, an appraisal is made of each property considered for financing. The appraiser, or an agent on its behalf, is generally required to personally inspect the property and verify that it is in adequate condition and that construction, if new, has been substantially completed. However, in some cases an automated valuation method may be used, under which the appraiser does not personally inspect the property but instead relies on public records regarding the mortgaged property and/or neighboring properties. In either case, the appraisal normally is based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, a replacement cost analysis based on the current cost of constructing or purchasing a similar property. Some of the mortgage loans may be re-underwritten by a mortgage loan seller.

WMAAC, Form S-3/A Registration Statement, filed January 3, 2006, at 44; WMAAC, Form S-3/A Registration Statement, filed April 9, 2007, at 45.

137.    The excerpt from the Registration Statements in the above paragraph contained

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 46
Case No: C09-0037 (MJP)

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

1  material misstatements and omission of fact because:

2         (a)    WaMu improperly pressured interested appraisal firms, including

3  eAppraiseIT, to artificially inflate property appraisals, thereby increasing the value of their

4  mortgage portfolio and, more importantly, the value of the securitizations from which

5  multiple WaMu entities, including WMAAC, WMB and WCC, derived significant fees.

6  This practice of systematically improperly influencing appraisals resulted in the above

7  misstatements of material fact regardless of whether in-person or automated appraisals were

8  
9  performed on the underlying properties.

10         (b)    WaMu made no attempt to confirm the appraisal standards employed by

11  correspondent and third party lenders from which they acquired mortgages.

12         (c)    WaMu did not investigate the validity of appraisal values on the underlying

13  mortgaged properties prior to securitization.  Specifically, only a small sampling of the

14  mortgage loan pool, no more than 5%-7%, was reviewed before WaMu securitized the loans,

15  
16  leaving the majority of appraisal values to escape inspection.

17  138.   According to the Guidelines set forth in the Registration Statements, borrowers were

18  required to submit applications to the originators that were then verified for creditworthiness.  The

19  Registration Statements provided:

20  
> The mortgage loan seller's underwriting standards are intended to evaluate a prospective mortgagor's credit standing and repayment ability, and the value and adequacy of the proposed mortgage property as collateral. In the loan application process, prospective mortgagors generally will be required to provide information regarding such factors as their assets, liabilities, income, credit history, employment history and other related items. Each prospective mortgagor generally will also provide an authorization to apply for a credit report which summarizes the mortgagor's credit history. With respect to establishing the prospective mortgagor's ability to make timely payments, the mortgage loan seller may require evidence regarding the mortgagor's employment and income, and of the amount of deposits made to financial institution where the mortgagor maintains demand or savings accounts…

28  WMAAC, Form S-3/A Registration Statement, filed January 3, 2006, at 44; WMAAC, Form S-3/A

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 47
Case No: C09-0037 (MJP)

SCOTT+SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

Registration Statement, filed April 9, 2007, at 45.

139.    The excerpt from the Registration Statements in the above paragraph contained material misstatements and omission of fact because:

(a)    WaMu improperly pressured interested appraisal firms, including eAppraiseIT, to artificially inflate property appraisals.  This practice of systematically improperly influencing appraisals resulted in overstatement of both the value of the proposed mortgage property and the adequacy of the proposed mortgage property as collateral, rendering the evaluation to be inaccurate.

(b)    WaMu made no attempt to confirm the underwriting standards and appraisal standards employed by correspondent and third party lenders from which they acquired mortgages.

(c)    WaMu did not investigate the underwriting standards and the validity of appraisal values on the underlying mortgaged properties prior to securitization.  Specifically, only a small sampling of the mortgage loan pool, no more than 5-7%, was reviewed before WaMu securitized the loans.

140.    The Registration Statements, with regards to documentation requirements for full documentation and less-than full documentation loans further stated:

If a prospective mortgagor meets certain eligibility criteria, the mortgage loan seller may waive some of its documentation requirements and may not obtain information about the mortgagor's income and assets or may obtain but not verify such information.

WMAAC, Form S-3/A Registration Statement, filed January 3, 2006, at 44; WMAAC, Form S-3/A Registration Statement, filed April 9, 2007, at 45.

141.    The excerpt from the Registration Statements in the above paragraph contained material misstatements and omissions of fact because

(a)    WaMu was not nearly as thorough in obtaining and verifying documentation

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 48
Case No: C09-0037 (MJP)

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

1   from or about borrowers as these statements of "may waive" or "may not obtain" imply.

2   WaMu placed the emphasis not on adherence to the guidelines, but rather, on getting loans

3   "done," severely hindering the quality of the mortgage loans and resulting in defective loan

4   applications which, among other things, inflated borrower income levels, failed to contain

5   employment verification, over-valued properties at appraisal or required, in many cases, no

6   proof in the form of documentation at all.

7   

8       (b)    WaMu made no attempt to confirm the loan documentation obtained by

9   correspondent and third party lenders from which they acquired mortgages.

10      (c)    WaMu did not investigate the loan documentation on the underlying

11   mortgaged properties prior to securitization.  Specifically, only a small sampling of the

12   mortgage loan pool, no more than 5-7%, was reviewed before WaMu securitized the loans.

13          **2.     The Prospectus Supplements**

14   

15   142.    The underlying loan collateral for the Certificates issued by the Issuing Trusts was

16   originated by, or pursuant to, the origination guidelines of WMB.  As set forth above, WMB

17   originated all of the mortgage loan collateral underlying the Certificates, served as sponsor of the

18   collateral and securitizations, and acted as servicer of the mortgage loans after securitization.  The

19   Prospectus Supplements described WMB's Guidelines which WaMu claimed were implemented in

20   originating the underlying collateral.

21   

22   143.    The Guidelines generally required a description of the borrower's income,

23   employment documentation and a credit report.  For example, the Prospectus Supplements for stated:

24      ***The sponsor's underwriting guidelines [and Washington Mutual Bank's
        underwriting guidelines] generally are intended to evaluate the prospective
25      borrower's credit standing and repayment ability and the value and adequacy of
        the mortgaged property as collateral.*** Some mortgage loans are manually
26      underwritten, in which case an underwriter reviews a loan application and supporting
        documentation, if required, and a credit report of the borrower, and based on that
27      review determines whether to originate a loan in the amount and with the terms
        stated in the loan application. Some mortgage loans are underwritten through the

28

sponsor's automated underwriting system, [including Washington Mutual Bank's automated underwriting system,] described below.

WAMU Series 2007-HY5 Prospectus Supplement, Form 424B5, filed April 23, 2007, at S-28; *see also,* Prospectus Supplement, Form 424B5, for:

| Series | Page Number | Series | Page Number |
|---|---|---|---|
| WAMU 2006 - AR1 | S-28 | WAMU 2006 - AR13 | S-38 |
| WAMU 2006 - AR2 | S-20 | WAMU 2006 - AR14 | S-20 |
| WAMU 2006 - AR3 | S-25 | WAMU 2006 - AR15 | S-36 |
| WAMU 2006 - AR4 | S-35 | WAMU 2006 - AR16 | S-22 |
| WAMU 2006 - AR5 | S-31 | WAMU 2006 - AR17 | S-37 |
| WAMU 2006 - AR6 | S-19 | WAMU 2006 - AR18 | S-22 |
| WAMU 2006 - AR7 | S-38 | WAMU 2006 - AR19 | S-39 |
| WAMU 2006 - AR8 | S-22 | WAMU 2007 - HY1 | S-25 |
| WAMU 2006 - AR9 | S-38 | WAMU 2007 - HY2 | S-22 |
| WAMU 2006 - AR10 | S-24 | WAMU 2007 - HY3 | S-24 |
| WAMU 2006 - AR11 | S-50 | WAMU 2007 - HY4 | S-24 |
| WAMU 2006 - AR12 | S-26 | | |
| WAMU 2007 - HY6 | S-28 | WMALT 2007 - OA5 | S-33 |
| WAMU 2007 - HY7 | S-25 | WMALT 2007 - OC1 | S-26 |
| WAMU 2007 - OA4 | S-38 | WMALT 2007 - OC2 | S-26 |
| WAMU 2007 - OA5 | S-39 | WMALT 2007 - 3 | S-30 |
| WAMU 2007 - OA6 | S-39 | WMALT 2007 - 4 | S-26 |
| WMALT 2007 - OA4 | S-33 | WMALT 2007 - 5 | S-27 |

144.    The excerpts in the above paragraph contained material misstatements and omission of fact because:

(a)    As set forth above, WMB, WCC and relevant third parties failed to conduct proper due diligence and verify the information contained in borrower mortgage loan applications.

(b)    WaMu's emphasis on increasing the volume of loans at the expense of the quality of loans gave rise to an increasing number of defectively originated mortgage loans, with missing or completely fabricated borrower information, to go sight unseen by any review.

(c)    WMB lending officers regularly dealt with adverse information in a borrower's credit report by simply ignoring such information.   Consumer credit rating

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 50
Case No: C09-0037 (MJP)

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

agencies must remove non-confirmable adverse information within a certain time period from consumer credit reports.  Lending officers and originators knew that borrowers frequently complained to consumer credit rating agencies about accurate adverse information in an effort to increase their credit scores, and thus would not take such information into account.

145.   The Prospectus Supplements describe the importance of information provided in borrower credit reports in determining whether or not to underwrite a specific mortgage loan.  For example, the Prospectus Supplements also stated that:

> To evaluate a prospective borrower's credit history, the loan underwriter obtains a credit report relating to the borrower from one or more credit reporting companies, usually in the form of a merged credit report.
>
> *       *       *
>
> ***Minimum credit scores are required for some loan products and loan programs.***
> For borrowers for which credit scores are not available, the loan underwriter will require alternative documentation indicating the borrower's creditworthiness, such as rental or utility payment history or payment history on other debt.

WAMU Series 2007-HY5 Prospectus Supplement, Form 424B5, filed April 23, 2007, at S-28-29; *see also,* Prospectus Supplement, Form 424B5, for:

| Series | Page Number | Series | Page Number |
|---|---|---|---|
| WAMU 2006 - AR1 | S-28 – S-29 | WAMU 2006 - AR13 | S-38 – S-39 |
| WAMU 2006 - AR2 | S-20 – S-21 | WAMU 2006 - AR14 | S-20 |
| WAMU 2006 - AR3 | S-25 – S-26 | WAMU 2006 - AR15 | S-36 |
| WAMU 2006 - AR4 | S-35 – S-36 | WAMU 2006 - AR16 | S-22 |
| WAMU 2006 - AR5 | S-31 – S-32 | WAMU 2006 - AR17 | S-37 – S-38 |
| WAMU 2006 - AR6 | S-19 – S-20 | WAMU 2006 - AR18 | S-22 |
| WAMU 2006 - AR7 | S-38 – S-39 | WAMU 2006 - AR19 | S-39 – S-40 |
| WAMU 2006 - AR8 | S-22 – S-23 | WAMU 2007 - HY1 | S-25 |
| WAMU 2006 - AR9 | S-39 | WAMU 2007 - HY2 | S-22 |
| WAMU 2006 - AR10 | S-24 – S-25 | WAMU 2007 - HY3 | S-24 – S-25 |
| WAMU 2006 - AR11 | S-50 – S-52 | WAMU 2007 - HY4 | S-24 – S-25 |
| WAMU 2006 - AR12 | S-26 – S-27 | | |
| WAMU 2007 - HY6 | S-28 – S-29 | WMALT 2007 - OA5 | S-34 |
| WAMU 2007 - HY7 | S-25 – S-26 | WMALT 2007 - OC1 | S-27 |
| WAMU 2007 - OA4 | S-38 – S-39 | WMALT 2007 - OC2 | S-27 |
| WAMU 2007 - OA5 | S-39 – S-40 | WMALT 2007 - 3 | S-30 – S-31 |

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 51
Case No: C09-0037 (MJP)

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

| WAMU 2007 - OA6 | S-39 – S-40 | WMALT 2007 - 4 | S-27 |
| WMALT 2007 - OA4 | S-34 | WMALT 2007 - 5 | S-28 |

146.    The Prospectus Supplements describe the importance of appraisals of mortgaged properties.  For example, the Prospectus Supplements also stated that:

> The adequacy of the mortgaged property as collateral generally is determined by an appraisal made in accordance with pre-established appraisal guidelines. At origination, all appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation, and are made on forms acceptable to Fannie Mae and/or Freddie Mac. Appraisers may be staff appraisers employed by the sponsor or independent appraisers selected in accordance with the pre-established appraisal guidelines. Such guidelines generally require that the appraiser, or an agent on its behalf, personally inspect the property and verify whether the property is in adequate condition and, if the property is new construction, whether it is substantially completed. However, in the case of mortgage loans underwritten through the sponsor's automated underwriting system, an automated valuation method may be used, under which the appraiser does not personally inspect the property but instead relies on public records regarding the mortgaged property and/or neighboring properties. In either case, the appraisal normally is based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, a replacement cost analysis based on the current cost of constructing or purchasing a similar property. For mortgage loans underwritten under the sponsor's streamline documentation programs, the appraisal guidelines in some cases permit the appraisal obtained for an existing mortgage loan to be used. Title insurance is required for all mortgage loans, except that for mortgage loans secured by shares of cooperative apartments, title insurance is not required for the cooperative apartment building (but a lien search is provided by the title company). Specific additional title insurance coverage is required for some types of mortgage loans.

WAMU Series 2007-HY5 Prospectus Supplement, Form 424B5, filed April 23, 2007, at S-29; *see also,* Prospectus Supplement, Form 424B5, for:

| Series | Page Number | Series | Page Number |
| --- | --- | --- | --- |
| WAMU 2006 - AR1 | S-29 | WAMU 2006 - AR13 | S-39 |
| WAMU 2006 - AR2 | S-21 | WAMU 2006 - AR14 | S-21 |
| WAMU 2006 - AR3 | S-26 | WAMU 2006 - AR15 | S-37 |
| WAMU 2006 - AR4 | S-36 | WAMU 2006 - AR16 | S-23 |
| WAMU 2006 - AR5 | S-32 | WAMU 2006 - AR17 | S-38 |
| WAMU 2006 - AR6 | S-20 | WAMU 2006 - AR18 | S-23 |
| WAMU 2006 - AR7 | S-39 | WAMU 2006 - AR19 | S-40 |
| WAMU 2006 - AR8 | S-23 | WAMU 2007 - HY1 | S-26 |
| WAMU 2006 - AR9 | S-39 | WAMU 2007 - HY2 | S-23 |
| WAMU 2006 - AR10 | S-25 | WAMU 2007 - HY3 | S-25 |

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 52
Case No: C09-0037 (MJP)

| WAMU 2006 - AR11 | S-51 | WAMU 2007 - HY4 | S-25 |
| WAMU 2006 - AR12 | S-27 | | |
| WAMU 2007 - HY6 | S-29 | WMALT 2007 - OA5 | S-34 – S-35 |
| WAMU 2007 - HY7 | S-26 | WMALT 2007 - OC1 | S-27 – S-28 |
| WAMU 2007 - OA4 | S-39 | WMALT 2007 - OC2 | S-27 – S-28 |
| WAMU 2007 - OA5 | S-40 | WMALT 2007 - 3 | S-31 – S-32 |
| WAMU 2007 - OA6 | S-40 | WMALT 2007 - 4 | S-28 |
| WMALT 2007 - OA4 | S-34 – S-35 | WMALT 2007 - 5 | S-28 – S-29 |

147.    The excerpts in the above paragraph contained material misstatements and omission of fact because:

(a)    As stated herein, WaMu's home loan appraisals were not obtained from independent appraisers or appraisal services, but rather from appraisers who ensured that their appraisals conform to predetermined levels at which a loan could be approved, or risk their association and employment with WaMu or brokers employed by WaMu correspondent lenders throughout the country.  The effect was that purportedly independent appraisals were not prepared in conformance with Fannie Mae or Freddie Mac appraisal standards.

(b)    WaMu failed to confirm that appraisers were following the Guidelines, and this, combined with the implied or express pressures placed on appraisers to appraise to the desired value, created enormous upward pressure on appraisal values, distorting loan-to-value ratios, making the mortgage loans in the pool much riskier than suggested by the Offering Documents.  This was particularly true in 2006 and 2007 when real estate values in many of the areas where the mortgage pools were located had stopped increasing at the rapid pace of 2004 and 2005.  Thus, the specifics regarding aggressive lending practices introduced during those years, where, for example, borrowers with mortgages in excess of their ability to pay were assured that by the promise of refinancing to a lower rate, were unavailable to investors.

148.    The Prospectus Supplements also set forth, in the identical or substantially similar

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 53
Case No: C09-0037 (MJP)

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

fashion, guidelines for underwriting exceptions granted in cases where "compensating factors" were

present:

> In evaluating a prospective borrower's ability to repay a mortgage loan, the loan underwriter considers the ratio of the borrower's mortgage payments, real property taxes and other monthly housing expenses to the borrower's gross income (referred to as the "housing-to-income ratio" or "front end ratio"), and the ratio of the borrower's total monthly debt (including non-housing expenses) to the borrower's gross income (referred to as the "debt-to-income ratio" or "back end ratio"). The maximum acceptable ratios may vary depending on other loan factors, such as loan amount and loan purpose, loan-to-value ratio, credit score and the availability of other liquid assets. Exceptions to the ratio guidelines may be made when compensating factors are present.

WAMU Series 2007-HY5 Prospectus Supplement, Form 424B5, filed April 23, 2007, at S-29; *see also*, Prospectus Supplement, Form 424B5, for:

| Series | Page Number | Series | Page Number |
|--------|-------------|--------|-------------|
| WAMU 2006 - AR1 | S-29 | WAMU 2006 - AR13 | S-39 |
| WAMU 2006 - AR2 | S-21 | WAMU 2006 - AR14 | S-21 |
| WAMU 2006 - AR3 | S-26 | WAMU 2006 - AR15 | S-37 |
| WAMU 2006 - AR4 | S-36 | WAMU 2006 - AR16 | S-23 |
| WAMU 2006 - AR5 | S-32 | WAMU 2006 - AR17 | S-38 |
| WAMU 2006 - AR6 | S-20 | WAMU 2006 - AR18 | S-23 |
| WAMU 2006 - AR7 | S-39 | WAMU 2006 - AR19 | S-40 |
| WAMU 2006 - AR8 | S-23 | WAMU 2007 - HY1 | S-26 |
| WAMU 2006 - AR9 | S-39 | WAMU 2007 - HY2 | S-23 |
| WAMU 2006 - AR10 | S-25 | WAMU 2007 - HY3 | S-25 |
| WAMU 2006 - AR11 | S-51 | WAMU 2007 - HY4 | S-25 |
| WAMU 2006 - AR12 | S-27 | | |
| WAMU 2007 - HY6 | S-29 | WMALT 2007 - OA5 | S-34 |
| WAMU 2007 - HY7 | S-26 | WMALT 2007 - OC1 | S-27 |
| WAMU 2007 - OA4 | S-39 | WMALT 2007 - OC2 | S-27 |
| WAMU 2007 - OA5 | S-40 | WMALT 2007 - 3 | S-31 |
| WAMU 2007 - OA6 | S-40 | WMALT 2007 - 4 | S-27 |
| WMALT 2007 - OA4 | S-34 | WMALT 2007 - 5 | S-28 |

> Exceptions to the sponsor's loan program parameters may be made on a case-by-case basis if compensating factors are present. In those cases, the basis for the exception is documented, and in some cases the approval of a senior underwriter is required. Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt-to-income ratio, good credit standing, the availability of other liquid assets, stable employment and time in residence at the prospective borrower's current address.

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 54
Case No: C09-0037 (MJP)

*WAMU Series 2007-HY5 Prospectus Supplement, Form 424B5, filed April 23, 2007, at S-30; see also, Prospectus Supplement, Form 424B5,* for:

| Series | Page Number | Series | Page Number |
|---|---|---|---|
| WAMU 2006 - AR1 | S-30 | WAMU 2006 - AR13 | S-40 |
| WAMU 2006 - AR2 | S-22 | WAMU 2006 - AR14 | S-22 |
| WAMU 2006 - AR3 | S-27 | WAMU 2006 - AR15 | S-38 |
| WAMU 2006 - AR4 | S-37 | WAMU 2006 - AR16 | S-24 |
| WAMU 2006 - AR5 | S-33 | WAMU 2006 - AR17 | S-39 |
| WAMU 2006 - AR6 | S-21 | WAMU 2006 - AR18 | S-24 |
| WAMU 2006 - AR7 | S-40 | WAMU 2006 - AR19 | S-41 |
| WAMU 2006 - AR8 | S-24 | WAMU 2007 - HY1 | S-27 |
| WAMU 2006 - AR9 | S-40 | WAMU 2007 - HY2 | S-24 |
| WAMU 2006 - AR10 | S-26 | WAMU 2007 - HY3 | S-26 |
| WAMU 2006 - AR11 | S-52 | WAMU 2007 - HY4 | S-26 |
| WAMU 2006 - AR12 | S-28 | | |
| WAMU 2007 - HY6 | S-30 | WMALT 2007 - OA5 | S-36 |
| WAMU 2007 - HY7 | S-27 | WMALT 2007 - OC1 | S-29 |
| WAMU 2007 - OA4 | S-40 | WMALT 2007 - OC2 | S-29 |
| WAMU 2007 - OA5 | S-41 | WMALT 2007 - 3 | S-29 |
| WAMU 2007 - OA6 | S-41 | WMALT 2007 - 4 | S-29 |
| WMALT 2007 - OA4 | S-36 | WMALT 2007 - 5 | S-30 |

149.     The excerpts in the above paragraphs contained material misstatements and omission of fact because, as set forth above, WMB was very liberal in granting exceptions to its underwriting standards and was not nearly as thorough in getting documentation from or about borrowers as the underwriting guidelines set forth herein implied.  The emphasis was on getting loans done – meaning more volume led to higher fees and profits for WMB, and therefore, WaMu.  Exceptions not only were granted in situations where compensating factors existed but also were extensively granted to maintain loan volume.

**B.     The Offering Documents Included Material Misstatements and Omitted Material Information Regarding the Risks Associated with Appraisals**

**1.     The Registration Statements**

150.     The Registration Statements contained a section purportedly describing the decline in values that "may" result since the appraisals were obtained.

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 55
Case No: C09-0037 (MJP)

**SCOTT + SCOTT LLP**
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

In addition, for some mortgage loans, the values of the related mortgaged properties may have substantially declined since the appraisals were obtained in connection with the origination of those mortgage loans. In the event that such a mortgage loan becomes delinquent and is liquidated, a larger loss may occur than would otherwise be expected based on the appraised value.

WMAAC, Form S-3/A Registration Statement, filed January 3, 2006, at 6; WMAAC, Form S-3/A Registration Statement, filed April 9, 2007, at 6.

151.    The purported "Risk Factors" section in the Registration Statements also stated that inaccurate appraisals may lead to an increase in defaults and an increase in losses allocated to the Certificates.

Moreover, some underwriting standards may result in a less accurate assessment of the borrower's credit standing and repayment ability and/or the value and adequacy of the related property as collateral. As a result, there may be a greater likelihood of default on mortgage loans originated under some underwriting standards, and a greater likelihood that the related mortgaged properties will fail to provide adequate security in the event of such default. In turn, there may be a greater likelihood that losses, to the extent not covered by credit support, will be allocated to the related securities.

WMAAC, Form S-3/A Registration Statement, filed January 3, 2006, at 7; WMAAC, Form S-3/A Registration Statement, filed April 9, 2007, at 7.

152.    The Registration Statements contained a section which stated that WMAAC's limited and no documentation programs were based entirely on appraisal values of the mortgaged property.

Limited documentation and no documentation mortgage loans are mortgage loans which require less documentation and verification than other mortgage loans, and which may be originated with minimal or no investigation into the related borrower's credit history and income profile by the originator. The underwriting for limited documentation or no documentation loans may be based primarily or entirely on an appraisal or other valuation of the mortgaged property and the LTV or combined LTV ratio at origination.

WMAAC, Form S-3/A Registration Statement, filed January 3, 2006, at 32; WMAAC, Form S-3/A Registration Statement, filed April 9, 2007, at 33.

153.    The Registration Statements contained a section which described the requirements of an appraisal for each mortgaged property to determine the adequacy of the property as collateral.

In determining the adequacy of the property as collateral, an appraisal is made of each property considered for financing. The appraiser, or an agent on its behalf, is

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 56
Case No: C09-0037 (MJP)

generally required to personally inspect the property and verify that it is in adequate condition and that construction, if new, has been substantially completed. However, in some cases an automated valuation method may be used, under which the appraiser does not personally inspect the property but instead relies on public records regarding the mortgaged property and/or neighboring properties. In either case, the appraisal normally is based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, a replacement cost analysis based on the current cost of constructing or purchasing a similar property. Some of the mortgage loans may be re-underwritten by a mortgage loan seller.

WMAAC, Form S-3/A Registration Statement, filed January 3, 2006, at 44; WMAAC, Form S-3/A Registration Statement, filed April 9, 2007, at 45.

154.     The excerpts from the Registration Statements in the above paragraphs contained material misstatements and omission of fact because the appraisals obtained by WaMu did not portray accurate market data and valuation. In order to earn business from WaMu, appraisers artificially inflated appraisal values to "hit" the LTV ratios necessary to allow more loans to close and be eligible for pooling and sale to the securitization market.

### 2.     The Prospectus Supplements

155.     The Prospectus Supplements issued in connection with each of the Offerings contained statements which were purported "Risk Factors" regarding the appraisal of the properties underlying mortgage loan collateral.  These purported "Risk Factors" stated, in part:

In addition, for some mortgage loans, the values of the related mortgaged properties may have substantially declined since the appraisals were obtained in connection with the origination of those mortgage loans. In the event that such a mortgage loan becomes delinquent and is liquidated, a larger loss may occur than would otherwise be expected based on the appraised value.

*          *          *

Moreover, some underwriting standards may result in a less accurate assessment of the borrower's credit standing and repayment ability and/or the value and adequacy of the related property as collateral. As a result, there may be a greater likelihood of default on mortgage loans originated under some underwriting standards, and a greater likelihood that the related mortgaged properties will fail to provide adequate security in the event of such default. In turn, there may be a greater likelihood that losses, to the extent not covered by credit support, will be allocated to the related securities.

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 57
Case No: C09-0037 (MJP)

**SCOTT + SCOTT LLP**
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

1   WAMU Series 2007-HY5 Prospectus Supplement, Form 424B5, filed April 23, 2007, at 6-7; *see*
2   *also,* Prospectus Supplement, Form 424B5, for:

| Series | Page Number | Series | Page Number |
|---|---|---|---|
| WAMU 2006 - AR1 | 6-7 | WAMU 2006 - AR13 | 6-7 |
| WAMU 2006 - AR2 | 6-7 | WAMU 2006 - AR14 | 6-7 |
| WAMU 2006 - AR3 | 6-7 | WAMU 2006 - AR15 | 6-7 |
| WAMU 2006 - AR4 | 6-7 | WAMU 2006 - AR16 | 6-7 |
| WAMU 2006 - AR5 | 6-7 | WAMU 2006 - AR17 | 6-7 |
| WAMU 2006 - AR6 | 6-7 | WAMU 2006 - AR18 | 6-7 |
| WAMU 2006 - AR7 | 6-7 | WAMU 2006 - AR19 | 6-7 |
| WAMU 2006 - AR8 | 6-7 | WAMU 2007 - HY1 | 6-7 |
| WAMU 2006 - AR9 | 6-7 | WAMU 2007 - HY2 | 6-7 |
| WAMU 2006 - AR10 | 6-7 | WAMU 2007 - HY3 | 6-7 |
| WAMU 2006 - AR11 | 6-7 | WAMU 2007 - HY4 | 6-7 |
| WAMU 2006 - AR12 | 6-7 | | |
| WAMU 2007 - HY6 | 6-7 | WMALT 2007 - OA5 | 6-7 |
| WAMU 2007 - HY7 | 6-7 | WMALT 2007 - OC1 | 6-7 |
| WAMU 2007 - OA4 | 6-7 | WMALT 2007 - OC2 | 6-7 |
| WAMU 2007 - OA5 | 6-7 | WMALT 2007 - 3 | 6-7 |
| WAMU 2007 - OA6 | 6-7 | WMALT 2007 - 4 | 6-7 |
| WMALT 2007 - OA4 | 6-7 | WMALT 2007 - 5 | 6-7 |

156.    The excerpts from the Prospectus Supplements in the above paragraphs contained

material misstatements and omissions of fact because the appraisals obtained by WaMu did not

portray accurate market data and valuation. In order to earn business from WaMu, appraisers

artificially inflated appraisal values to "hit" the LTV ratios necessary to allow more loans to close

and be eligible for pooling and sale to the securitization market.

157.    The Prospectus Supplements also contained the following language regarding "review

appraisals":

> The underwriting standards of the mortgage loan originator or mortgage loan seller
> may require an internal review of the appraisal (a "review appraisal") used to
> determine the loan-to-value of a mortgage loan which may be performed by
> underwriters rather than a licensed appraiser. Where the review appraisal results in a
> valuation of the mortgaged property that is less than a specified percentage of the
> original appraisal, the loan-to-value ratio of the related mortgage loan will be based
> on the review appraisal.

WAMU Series 2007-HY5 Prospectus Supplement, Form 424B5, filed April 23, 2007, at 32-33; *see*
*also,* Prospectus Supplement, Form 424B5, for:

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 58
Case No: C09-0037 (MJP)

| Series | Page Number | Series | Page Number |
|---|---|---|---|
| WAMU 2006 - AR1 | 31-32 | WAMU 2006 - AR13 | 31-32 |
| WAMU 2006 - AR2 | 31-32 | WAMU 2006 - AR14 | 31-32 |
| WAMU 2006 - AR3 | 31-32 | WAMU 2006 - AR15 | 31-32 |
| WAMU 2006 - AR4 | 31-32 | WAMU 2006 - AR16 | 30 |
| WAMU 2006 - AR5 | 31-32 | WAMU 2006 - AR17 | 30 |
| WAMU 2006 - AR6 | 31-32 | WAMU 2006 - AR18 | 30 |
| WAMU 2006 - AR7 | 31-32 | WAMU 2006 - AR19 | 30 |
| WAMU 2006 - AR8 | 31-32 | WAMU 2007 - HY1 | 30 |
| WAMU 2006 - AR9 | 31-32 | WAMU 2007 - HY2 | 30 |
| WAMU 2006 - AR10 | 31-32 | WAMU 2007 - HY3 | 30 |
| WAMU 2006 - AR11 | 31-32 | WAMU 2007 - HY4 | 30 |
| WAMU 2006 - AR12 | 31-32 | | |
| WAMU 2007 - HY6 | 32-33 | WMALT 2007 - OA5 | 32-33 |
| WAMU 2007 - HY7 | 32-33 | WMALT 2007 - OC1 | 32-33 |
| WAMU 2007 - OA4 | 32-33 | WMALT 2007 - OC2 | 32-33 |
| WAMU 2007 - OA5 | 32-33 | WMALT 2007 - 3 | 32-33 |
| WAMU 2007 - OA6 | 32-33 | WMALT 2007 - 4 | 32-33 |
| WMALT 2007 - OA4 | 32-33 | WMALT 2007 - 5 | 32-33 |

158. Furthermore, the Prospectus Supplements, with respect to the importance of the appraisal in underwriting the mortgage collateral on less than "full-documentation" loans, stated:

> Limited documentation and no documentation mortgage loans are mortgage loans which require less documentation and verification than other mortgage loans, and which may be originated with minimal or no investigation into the related borrower's credit history and income profile by the originator. The underwriting for limited documentation or no documentation loans may be based primarily or entirely on an appraisal or other valuation of the mortgaged property and the LTV or combined LTV ratio at origination.

WAMU Series 2007-HY5 Prospectus Supplement, Form 424B5, filed April 23, 2007, at 33; *see also,* Prospectus Supplement, Form 424B5, for:

| Series | Page Number | Series | Page Number |
|---|---|---|---|
| WAMU 2006 - AR1 | 32 | WAMU 2006 - AR13 | 32 |
| WAMU 2006 - AR2 | 32 | WAMU 2006 - AR14 | 32 |
| WAMU 2006 - AR3 | 32 | WAMU 2006 - AR15 | 32 |
| WAMU 2006 - AR4 | 32 | WAMU 2006 - AR16 | 31 |
| WAMU 2006 - AR5 | 32 | WAMU 2006 - AR17 | 31 |
| WAMU 2006 - AR6 | 32 | WAMU 2006 - AR18 | 31 |
| WAMU 2006 - AR7 | 32 | WAMU 2006 - AR19 | 31 |
| WAMU 2006 - AR8 | 32 | WAMU 2007 - HY1 | 31 |
| WAMU 2006 - AR9 | 32 | WAMU 2007 - HY2 | 31 |

**SCOTT + SCOTT LLP**
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

| | | | |
|---|---|---|---|
| WAMU 2006 - AR10 | 32 | WAMU 2007 - HY3 | 31 |
| WAMU 2006 - AR11 | 32 | WAMU 2007 - HY4 | 31 |
| WAMU 2006 - AR12 | 32 | | |
| WAMU 2007 - HY6 | 33 | WMALT 2007 - OA5 | 33 |
| WAMU 2007 - HY7 | 33 | WMALT 2007 - OC1 | 33 |
| WAMU 2007 - OA4 | 33 | WMALT 2007 - OC2 | 33 |
| WAMU 2007 - OA5 | 33 | WMALT 2007 - 3 | 33 |
| WAMU 2007 - OA6 | 33 | WMALT 2007 - 4 | 33 |
| WMALT 2007 - OA4 | 33 | WMALT 2007 - 5 | 33 |

159.   The excerpts from the Prospectus Supplements in the above paragraph contained material misstatements and omission of fact because, due to the artificially inflated appraisals (as detailed above) mortgages were extended to borrowers whose true LTV ratio did not support the amount of the mortgage loan.  Moreover, contrary to the statement that many of the mortgages were in fact "limited documentation," or not "full documentation" loans, they were not extended to borrowers who had a credit history that demonstrated an established ability to repay indebtedness in a timely fashion.  In fact, the originators implemented policies designed to extend mortgages to borrowers regardless of whether they were able to meet their obligations under the mortgage such as:

- Coaching borrowers to misstate their income on loan applications to qualify for mortgage loans under the originators' underwriting standards, including directing applicants to no-documentation loan programs when their income was insufficient to qualify for full documentation loan programs.
- Steering borrowers to more expensive loans that exceeded their borrowing capacity.
- Encouraging borrowers to borrow more than they could afford by suggesting NINA and SISA loans when they could not qualify for full documentation loans based on their actual incomes.
- Approving borrowers based on "teaser rates" for loans despite knowing that the borrower would not be able to afford the "fully indexed rate" when the adjustable rate adjusted.
- Allowing non-qualifying borrowers to be approved for loans under exceptions to the originators' underwriting standards based on so-called "compensating factors" without requiring documentation for such compensating factors.
- Incentivizing their employees to approve borrowers under exceptions to the originators' underwriting policies.
- Failing to determine whether stated income or stated assets were reasonable.

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 60
Case No: C09-0037 (MJP)

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

1
2

### C.    The Offering Documents Included Material Misstatements and Omitted Material Information Regarding Credit Support

3
4

160.    "Credit enhancement" refers to excess mortgage loan collateral which provides

5

support to the mortgage collateral underlying the Offered Certificates and generates additional

6

interest to protect security holders in the event of borrower default or other event which may impair

7

the collateral underlying the certificates.

8

161.    With respect to credit enhancement, the Registration Statements provided

9

explanations of the methods used by WaMu in the Certificate Offerings as follows:

10

**CREDIT ENHANCEMENTS**

11
12

**Subordination**. The senior certificates will receive all distributions of interest and principal that they are entitled to receive on each distribution date before the subordinate certificates receive any distributions on that distribution date. This provides credit enhancement to the senior certificates.  In a similar fashion, each class of subordinate certificates will provide credit enhancement to all other subordinate certificates with lower numerical class designations.

13
14
15

**Shifting of Interests**. The senior certificates generally will receive their pro rata share of scheduled principal payments received on the mortgage loans in the related loan group on each distribution date. In addition, unless credit enhancement to the senior certificates has reached a specified level and the delinquencies and losses received on the mortgage loans in the related loan group do not exceed specified limits, the senior certificates in the aggregate will receive 100% of all principal prepayments received on the mortgage loans in the related loan group, net of any portion thereof applied to reduce negative amortization, until the tenth anniversary of the first distribution date. During the next four years the senior certificates in the aggregate will generally receive a disproportionately large, but decreasing, share of principal prepayments. This will result in a quicker return of principal to the senior certificates and increases the likelihood that holders of the senior certificates will be paid the full amount of principal to which they are entitled. For a more detailed description of how principal prepayments are allocated among the senior certificates and the subordinate certificates, see 'Description of the Certificates -- Principal Prepayments' in this prospectus supplement

16
17
18
19
20
21
22
23
24
25

WMAAC, Form S-3/A Registration Statement, filed January 3, 2006, at S-15; WMAAC, Form S-3/A Registration Statement, filed April 9, 2007, at S-16.

26
27

162.    Each Prospectus Supplement set forth on the first page of the document a general

28

description of the credit enhancement supporting the Offering.  The Prospectus Supplement for the

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 61
Case No: C09-0037 (MJP)

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

WAMU Series 2007-HY5 Certificate Offering stated as follows:

> Credit enhancement for the offered certificates is being provided by five classes of privately offered certificates, which have an aggregate principal balance of approximately $41,700,658. Credit enhancement for the offered senior certificates is being provided by five classes of offered subordinate certificates.

WAMU Series 2006-AR1 Prospectus Supplement, Form 424B5, filed January 26, 2006, at Cover; WAMU Series 2007-HY5 Prospectus Supplement, Form 424B5, filed April 23, 2007, at Cover; *see also,* Prospectus Supplement, Form 424B5, for all Offerings, at Cover.

163.   Furthermore, the Prospectus Supplements each contained further explanation of the credit enhancement specific to each of the Offerings.  For example, the Prospectus Supplement for the WAMU Series 2007-HY5 Certificate Offering provided that credit enhancement would include:

CREDIT ENHANCEMENTS

> **Subordination.** The Senior Certificates receive distributions of interest and principal to which they are entitled before distributions of interest or principal to the Subordinate Certificates. No class of Subordinate Certificates will receive distributions of interest or principal on any Distribution Date until the Subordinate Certificates senior to that class have received all distributions of interest and principal due on or before the Distribution Date. See "Description of the Certificates—Priority of Distributions" in this prospectus supplement.

> Losses on mortgage loans in a loan group will be allocated, in each case, until their Class Principal Balances have been reduced to zero, first, to the Junior Subordinate Certificates in reverse numerical order; second, to the Class B-9 Certificates; third, to the Class B-8 Certificates; fourth, to the Class B-7 Certificates; fifth, to the Class B-6 Certificates; sixth, to the Class B-5 Certificates; seventh, to the Class B-4 Certificates; eighth, to the Class B-3 Certificates; ninth, to the Class B-2 Certificates; tenth, to the Class B-1 Certificates; and eleventh, to the Senior Certificates as described under "Description of the Certificates—Subordination and Allocation of Losses" in this prospectus supplement; provided, however, that after the Class Principal Balances of all of the Subordinate Certificates have been reduced to zero, any loss that would otherwise be allocated to the Class 1A-1A Certificates will be allocated to the Class 1A-1B Certificates, until its Class Principal Balance has been reduced to zero; provided, further, that losses allocated to principal and interest that would be allocable to the Class 2A-1A Certificates will be allocated (i) first, to the Class 2A-1C Certificates, until its Class Principal Balance has been reduced to zero and (ii) second, to the Class 2A-1B Certificates, until its Class Principal Balance has been reduced to zero; and provided, further, that any loss that would otherwise be allocated to the Class 2A-1B Certificates will be allocated to the Class 2A-1C Certificates, until its Class Principal Balance has been reduced to zero.

> **Shifting of Interests.** The Senior Certificates in a Certificate Group in the aggregate

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 - 62
Case No: C09-0037 (MJP)

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

generally will receive their pro rata share of scheduled principal payments received with respect to the mortgage loans in the related loan group on each Distribution Date. In addition, unless credit enhancement to the Senior Certificates has reached a specified level and the delinquencies and losses on the mortgage loans do not exceed specified limits, the Senior Certificates in a Certificate Group will receive 100% of principal prepayments received with respect to the mortgage loans in the related loan group, net of any portion thereof applied to reduce negative amortization, until the tenth anniversary of the first Distribution Date. During the next four years, the Senior Certificates generally will receive a disproportionately large, but decreasing, share of principal prepayments received with respect to the mortgage loans in the related loan group. This will result in an acceleration of the amortization of the Senior Certificates, enhancing the likelihood that holders of the Senior Certificates will be paid the full amount of principal to which they are entitled. See the second and third paragraphs of "Description of the Certificates—Distributions of Principal—Principal Prepayments'' in this prospectus supplement for important limitations on the accelerated amortization of the Senior Certificates.

WAMU Series 2007-HY5 Prospectus Supplement, Form 424B5, filed April 23, 2007, at S-13; *see also,* Prospectus Supplement, Form 424B5, for:

| Series | Page Number | Series | Page Number |
|--------|-------------|--------|-------------|
| WAMU 2006 - AR1 | S-89-90 | WAMU 2006 - AR13 | S-18 |
| WAMU 2006 - AR2 | S-10 | WAMU 2006 - AR14 | S-10-11 |
| WAMU 2006 - AR3 | S-13-14 | WAMU 2006 - AR15 | S-17 |
| WAMU 2006 - AR4 | S-16-17 | WAMU 2006 - AR16 | S-75 |
| WAMU 2006 - AR5 | S-16 | WAMU 2006 - AR17 | S-17-18 |
| WAMU 2006 - AR6 | S-10 | WAMU 2006 - AR18 | S-11 |
| WAMU 2006 - AR7 | S-20 | WAMU 2006 - AR19 | S-18 |
| WAMU 2006 - AR8 | S-11-12 | WAMU 2007 - HY1 | S-12-13 |
| WAMU 2006 - AR9 | S-18 | WAMU 2007 - HY2 | S-11 |
| WAMU 2006 - AR10 | S-12 | WAMU 2007 - HY3 | S-11-12 |
| WAMU 2006 - AR11 | S-26 | WAMU 2007 - HY4 | S-12-13 |
| WAMU 2006 - AR12 | S-13 | | |
| WAMU 2007 - HY6 | S-13-14 | WMALT 2007 - OA5 | S-15 |
| WAMU 2007 - HY7 | S-12 | WMALT 2007 - OC1 | S-10-11 |
| WAMU 2007 - OA4 | S-16-17 | WMALT 2007 - OC2 | S-10 |
| WAMU 2007 - OA5 | S-17 | WMALT 2007 - 3 | S-12 |
| WAMU 2007 - OA6 | S-17 | WMALT 2007 - 4 | S-11 |
| WMALT 2007 - OA4 | S-15 | WMALT 2007 - 5 | S-11 |

164.    The excerpts from the Registration Statements and Prospectus Supplements in the above paragraphs contained material misstatements and omission of fact because:

(a)    These statements failed to disclose that the Rating Agencies largely determined the amount and kind of credit support or credit enhancement to be provided for

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 63
Case No: C09-0037 (MJP)

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

each Certificate, both before and after the Rating Agencies were formally "engaged" by WaMu, in order for the Certificates to be assigned predetermined ratings.

(b)     These statements also failed to disclose that the amounts and kind of credit support that was determined to be appropriate for the Certificates, as specifically set forth in each Prospectus Supplement, was faulty, erroneous and inaccurate since the models used to determine such had not been updated properly and failed to accurately or adequately reflect the performance of the underlying collateral.

(c)     In terms of what the statements purport to convey to the investor, specifically that credit support levels are determined by the exposure to risk of default or delinquency by the underlying borrowers, these statements were far from the truth.   In fact, credit enhancement levels were set at the absolute minimum level that was required not to protect investors, but rather to achieve and be awarded the highest possible credit rating from the Rating Agencies engaged on the securitization.

**D.     The Prospectus Supplements Materially Misstated the True
         <u>Loan-to-Value Ratios Associated with the Underlying Mortgages</u>**

165.    The Registration Statements included language regarding the importance of accurate LTV ratios in forming the underlying mortgage pool.  *See* ¶¶152-154, *supra*.

166.    Each of the Prospectus Supplements contained detailed information about the LTV ratios of the loans underlying the Trusts.  In a series of charts, investors were provided with LTV ratio data, including information about the number of loans containing LTV ratios within a given range.   The following charts, taken from the Prospectus Supplements, summarized the LTV characteristics of the mortgage pool underlying the Certificates in the following way, with only minor, if any, variation among the different Prospectus Supplements:

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 64
Case No: C09-0037 (MJP)

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

**Current Loan-to-Value Ratios of the Group 1 Loans**

| Current Loan-to-Value Ratio (%) | Number of Mortgage Loans | | Aggregate Principal Balance of the Mortgage Loans as of the Cut-Off Date | Percentage of the Aggregate Principal Balance of all Group 1 Loans |
|---|---|---|---|---|
| 60.00 or less | 104 | $ | 103,010,147.80 | 15.51 % |
| 60.01-70.00 | 194 | | 183,281,291.44 | 27.59 |
| 70.01-75.00 | 123 | | 95,827,616.46 | 14.42 |
| 75.01-80.00 | 384 | | 276,933,522.99 | 41.68 |
| 85.01-90.00 | 8 | | 5,304,414.90 | 0.80 |
| Total | 813 | $ | 664,356,993.59 | 100.00 % |

At origination, the weighted average loan-to-value ratio of the group 1 loans was approximately 70.5%. As of the Cut-Off Date, the weighted average loan-to-value ratio of the group 1 loans was approximately 70.5%.

WAMU Series 2006-AR15 Prospectus Supplement, Form 424B5, filed Oct. 24, 2006, at S-116-6; *see also,* Prospectus Supplement, Form 424B5, for:

| Series | Page Number | Series | Page Number |
|---|---|---|---|
| WAMU 2006 - AR1 | S-102, S-111 | WAMU 2006 - AR13 | S-121, S-127 |
| WAMU 2006 - AR2 | S-77, S-80 | WAMU 2006 - AR14 | S-82, S-87 |
| WAMU 2006 - AR3 | S-88 | WAMU 2006 - AR15 | S-116, S-121 |
| WAMU 2006 - AR4 | S-122, S-131, S-137, S-141 | WAMU 2006 - AR16 | S-86, S-91, S-95 |
| WAMU 2006 - AR5 | S-100 | WAMU 2006 - AR17 | S-119, S-125 |
| WAMU 2006 - AR6 | S-77, S-81 | WAMU 2006 - AR18 | S-87, S-92, S-96 |
| WAMU 2006 - AR7 | S-126, S-131, S-138 | WAMU 2006 - AR19 | S-123, S-128, S-132 |
| WAMU 2006 - AR8 | S-89, S-93, S-97 | WAMU 2007 - HY1 | S-105, S-110, S-114 |
| WAMU 2006 - AR9 | S-141, S-146, S-150, S-156, S-161, S-166 | WAMU 2007 - HY2 | S-95, S-98, S-101 |
| WAMU 2006 - AR10 | S-94, S-98, S-102 | WAMU 2007 - HY3 | S-97, S-100, S-103 |
| WAMU 2006 - AR11 | S-151, S-157, S-162 | WAMU 2007 - HY4 | S-105, S-108 |
| WAMU 2006 - AR12 | S-100, S-105, S-110 | | |
| WAMU 2007 - HY6 | S-102, S-105, S-108, S-111, S-114, S-117 | WMALT 2007 - OA5 | S-111 |
| WAMU 2007 - HY7 | S-95, S-101, S-98, S-101, S-104 | WMALT 2007 - OC1 | S-95 |
| WAMU 2007 - OA4 | S-119 | WMALT 2007 - OC2 | S-93 |
| WAMU 2007 - OA5 | S-122 | WMALT 2007 - 3 | S-109 |
| WAMU 2007 - OA6 | S-122 | WMALT 2007 - 4 | S-99 |
| WMALT 2007 - OA4 | S-113 | WMALT 2007 - 5 | S-98 |

167.    The excerpts from the Prospectus Supplements in the above paragraph contained material misstatements and omission of fact because:

(a)    The appraisal value of the properties underlying the mortgage loans and

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 65
Case No: C09-0037 (MJP)

borrower incomes and credit were grossly inaccurate and significantly inflated.

(b)     Furthermore, due to hidden incentives, the stated sales price of properties underlying the mortgage loans did not accurately reflect the true value of the properties. These inflated appraisals and misleading sales price figures were used to form the LTV ratios set forth in the Prospectus Supplements.  Incorporating an inflated appraisal into the LTV calculation will result in a lower LTV ratio for a given loan.  For example, if a borrower seeks to borrow $350,000 to purchase a house worth $400,000, the LTV ratio is $350,000/$400,000, or 88 percent.  If, however, the appraised value of the house is artificially increased to $450,000, the LTV ratio drops to just 78 percent ($350,000/$450,000).

(c)     Due to the inflated appraisals, the LTV ratios listed in the Prospectus Supplements were artificially low, making it appear that the loans underlying the trusts were less risky than they really were.  Due to the fact that such a large percentage of each pool of underlying mortgage loans contained mortgage loans on properties which had more than one mortgage (*i.e.,* a first and second lien mortgage), understated and misleading LTV ratios had a direct correlation to the skyrocketing delinquency and default rates within the first six months of the Offerings.  Moreover, since many of the loans underlying the Certificates were hybrid adjustable rates with biannual adjustments to interest rates and were made to low-quality borrowers, the resulting payments would be considerably more than what they could have been able to afford.

E.     **The Prospectus Supplements Misstated the Certificates' True Credit Ratings**

168.   The Registration Statements and Prospectus Supplements contained statements regarding the ratings of the Certificates.  The Registration Statements referred the investor to the Prospectus Supplements for specific information as to the ratings for each of the Certificates –

stating that "It is a condition to the issuance of the offered certificates that they receive the ratings from [the rating agencies] as indicated."

169.    Each of the Prospectus Supplements provided: (1) the rating agencies' actual rating for each class of Offered Certificate within each Offering; or (2) stated that the Certificates in each class would not be offered unless they received ratings from the Rating Agencies that were at least as high as those set forth in the Prospectus Supplement. All of the ratings set forth in all of the Prospectus Supplements were within the "Investment Grade" range of the rating agencies, namely Moody's (Aaa through Baa3) and S&P (AAA through BBB), and the vast majority of Offered Certificates, over 93% of the aggregate Offering amount, received the highest rating of AAA.

170.    The following charts, taken from the Prospectus Supplement for the WAMU Series 2006-AR1 Certificate Offering are examples of this representation:

|  | Rating Agency | |
| --- | --- | --- |
| Class | S&P | Moody's |
| 1A-1A | AAA | Aaa |
| 1A-1B | AAA | Aaa |
| 2A-1A | AAA | Aaa |
| 2A-1B | AAA | Aaa |
| 2A-1C | AAA | Aaa |
| X | AAA | Aaa |
| B-1 | AA+ | Aa1 |
| B-2 | AA | Aa1 |
| B-3 | AA– | Aa2 |
| B-4 | A+ | Aa3 |
| B-5 | A | A1 |
| B-6 | A– | A2 |
| B-7 | BBB+ | A2 |
| B-8 | BBB | A3 |
| B-9 | BBB– | Baa1 |
| R | AAA | Aaa |

WAMU Series 2006-AR1 Prospectus Supplement, Form 424B5, filed Jan. 26, 2006, at S-17.

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 67
Case No: C09-0037 (MJP)

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

| Class | Rating Agency S&P | Moody's | Class | Rating Agency S&P | Moody's |
|-------|-------------------|---------|-------|-------------------|---------|
| 1A-1A | AAA | Aaa | B-3 | AA− | Aa2 |
| 1A-1B | AAA | Aaa | B-4 | A+ | Aa3 |
| 2A-1A | AAA | Aaa | B-5 | A | A1 |
| 2A-1B | AAA | Aaa | B-6 | A− | A2 |
| 2A-1C | AAA | Aaa | B-7 | BBB+ | A2 |
| X | AAA | Aaa | B-8 | BBB | A3 |
| B-1 | AA+ | Aa1 | B-9 | BBB− | Baa1 |
| B-2 | AA | Aa1 | R | AAA | Aaa |

WAMU Series 2006-AR1 Prospectus Supplement, Form 424B5, filed Jan. 26, 2006, at S-97; *see also,* Prospectus Supplement, Form 424B5, for:

| Series | Page Number | Series | Page Number |
|--------|-------------|--------|-------------|
| WAMU 2006 - AR1 | S-17 | WAMU 2006 - AR13 | S-20 |
| WAMU 2006 - AR2 | S-12 | WAMU 2006 - AR14 | S-12 |
| WAMU 2006 - AR3 | S-15 | WAMU 2006 - AR15 | S-19 |
| WAMU 2006 - AR4 | S-19 | WAMU 2006 - AR16 | S-13 |
| WAMU 2006 - AR5 | S-18 | WAMU 2006 - AR17 | S-20 |
| WAMU 2006 - AR6 | S-11 | WAMU 2006 - AR18 | S-13 |
| WAMU 2006 - AR7 | S-22 | WAMU 2006 - AR19 | S-20 |
| WAMU 2006 - AR8 | S-13 | WAMU 2007 - HY1 | S-15 |
| WAMU 2006 - AR9 | S-20 | WAMU 2007 - HY2 | S-13 |
| WAMU 2006 - AR10 | S-14 | WAMU 2007 - HY3 | S-14 |
| WAMU 2006 - AR11 | S-29 | WAMU 2007 - HY4 | S-14 |
| WAMU 2006 - AR12 | S-15 | WAMU 2007 − HY5 | S-16 |
| WAMU 2007 - HY6 | S-16 | WMALT 2007 - OA5 | S-17 |
| WAMU 2007 - HY7 | S-14 | WMALT 2007 - OC1 | S-12 |
| WAMU 2007 - OA4 | S-19 | WMALT 2007 - OC2 | S-12 |
| WAMU 2007 - OA5 | S-20s | WMALT 2007 - 3 | S-14 |
| WAMU 2007 - OA6 | S-20 | WMALT 2007 - 4 | S-13 |
| WMALT 2007 - OA4 | S-17 | WMALT 2007 - 5 | S-13 |

171.     The excerpts from the Prospectus Supplements in the above paragraph contained material misstatements and omission of fact because:

(a)     The ratings assigned, as set forth in the Prospectus Supplements, were based on outdated models, lowered ratings criteria, and inaccurate loan information as set forth in great detail above.  These flaws produced artificially high credit ratings for the Certificates, making them appear less risky than they really were.

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 68
Case No: C09-0037 (MJP)

**SCOTT + SCOTT LLP**
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

(b)     The Rating Agencies were intricately involved in the securitization process, as they were engaged and paid by WaMu in return for their granting substantially all of the Certificates the highest investment-grade rating.  This process, referred to herein as "ratings shopping" resulted in the Certificates being assigned artificially high credit ratings, making them appear less risky than they really were.

## VI.  CLASS ACTION ALLEGATIONS

172.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons or entities who acquired the Certificates issued by the Issuing Trusts, as set forth in ¶¶38-39, *supra*, pursuant to the materially misleading Offering Documents (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

173.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Defendants and/or Relevant Non-Parties, including, but not limited to, WMI, WMB, or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  Billions of dollars worth of Certificates were issued pursuant to the Registration Statements.

174.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 69
Case No: C09-0037 (MJP)

175.   The Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

176.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(3).

177.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are: whether Defendants violated the state and federal securities laws; whether the Offering Documents issued by Defendants to promote and sell the Certificates negligently omitted and/or misrepresented material facts about the Certificates; and to what extent the members of the Class have sustained damages and the proper measure of damages for the class.

178.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VII.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION

#### For Violations of § 11 of the Securities Act
#### (Against WMAAC, the Individual Defendants and WCC)

179.   Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

180.   This Cause of Action is brought pursuant to § 11 of the Securities Act, on behalf of Plaintiffs and the Class, against WMAAC, the Individual Defendants and WCC.  This Cause of Action is predicated upon Defendants' strict liability for making material misleading statements and

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 70
Case No: C09-0037 (MJP)

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

1    omitting material information from and in the Offering Documents.

2        181.    The Offering Documents were materially misleading, contained untrue statements of

3    material fact, omitted to state other facts necessary to make the statements not misleading, and

4    omitted to state material facts required to be stated therein.

5        182.    These Defendants are strictly liable to Plaintiffs and the Class for making the

6    misstatements and omissions in issuing the Certificates.

7

8        183.    The Individual Defendants each signed the Registration Statements.

9        184.    Defendant WCC acted as the underwriter in the sale of Certificates issued by the

10   Issuing Trusts, directly and indirectly participated in the distribution of the Certificates, directly and

11   indirectly solicited offers to purchase the Certificates, and directly and indirectly participated in

12   drafting and disseminating the Offering Documents for the Certificates.

13

14       185.    These Defendants owed to the Plaintiffs and other Class members the duty to make a

15   reasonable and diligent investigation of the statements contained in the Offering Documents at the

16   time they became effective to ensure that such statements were true and correct and that there was no

17   omission of material facts required to be stated in order to make the statements contained therein not

18   misleading.

19       186.    These Defendants knew, or in the exercise of reasonable care should have known, of

20   the material misstatements and omissions contained in or omitted from the Offering Documents as

21   set forth herein.

22

23       187.    These Defendants failed to possess a reasonable basis for believing, and failed to

24   make a reasonable investigation to ensure, that statements contained in the Offering Documents were

25   true and/or that there was no omission of material facts necessary to make the statements contained

26   therein not misleading.

27       188.    These Defendants issued and disseminated, caused to be issued or disseminated, and

28

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 71
Case No: C09-0037 (MJP)

1  participated in the issuance and dissemination of material statements to the investing public which

2  were contained in the Offering Documents, which made materially misleading statements and/or

3  omitted or failed to disclose material facts, as set forth above.

4      189.    By reason of the conduct alleged herein,  WMAAC, the Individual Defendants and

5  WCC violated § 11 of the Securities Act, and are liable to Plaintiffs and the Class.

6      190.    Plaintiffs and other Class members acquired the Certificates pursuant to the

7  Registration Statements.  At the time Plaintiffs and Class members obtained their Certificates, they

8  did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

9

10     191.    Plaintiffs and other Class members have sustained damages as a result of the

11 wrongful conduct alleged and the violations of these Defendants.  Specifically, as set forth herein,

12 the delinquency, foreclosure, repossession and bankruptcy rates for the collateral underlying the

13 Certificates – arising from defective collateral and faulty origination practices – triggered

14 unprecedented downgrades of the Certificates' credit ratings by the Rating Agencies and attendant

15 declines in the value of the Certificates.

16

17     192.    By virtue of the foregoing, Plaintiffs and other Class members are entitled to

18 damages, jointly and severally from each of WMAAC, the Individual Defendants and WCC, as set

19 forth in § 11 of the Securities Act.

20     193.    This action is brought within one year after the discovery of the untrue statements and

21 omissions contained in the Offering Documents and within three years of the Certificates being

22 offered to the public.  Despite the exercise of reasonable diligence, Plaintiffs could not have

23 reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier

24 time.

25

26

27

28

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 72
Case No: C09-0037 (MJP)

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

1

2

3

## SECOND CAUSE OF ACTION

### For Violations of § 12(a)(2) of the Securities Act
### (Against Defendant WCC)

4

194.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full

5

herein, to the extent that such allegations do not sound in fraud.

6

195.    Plaintiffs purchased the Certificates pursuant to the Offerings and not in the

7

secondary market.

8

196.    This Cause of Action is brought pursuant to § 12(a)(2) of the Securities Act, on behalf

9

10

of Plaintiffs and the Class, against WCC.

11

197.    Defendant WCC, as underwriter, promoted and sold the Certificates pursuant to the

12

defective and misleading Prospectus Supplements for its own financial gain.  The Prospectus

13

Supplements contained untrue statements of material fact, omitted to state facts necessary to make

14

statements not misleading, and concealed and failed to disclose material facts.

15

198.    WCC owed to Plaintiffs and the other Class members who purchased Certificates

16

pursuant to the Offering Documents, a duty to make a reasonable and diligent investigation of the

17

18

statements contained in the Offering Documents, to ensure that such statements were true and that

19

there was no omission of material fact necessary to make the statements contained therein not

20

misleading.  WCC knew of, or in the exercise of reasonable care should have known of, the

21

misstatements and omissions contained in the Offering Documents, as set forth herein.

22

199.    Plaintiffs and other Class members purchased or otherwise acquired Certificates

23

pursuant to the defective Offering Documents from WCC.  Plaintiffs did not know, and in the

24

exercise of reasonable diligence could not have known, of the misrepresentations and omissions

25

26

contained in the Offering Documents.

27

200.    By reason of the conduct alleged herein, WCC violated § 12(a)(2) of the Securities

28

Act, and is liable to Plaintiffs and other Class members who purchased Certificates pursuant to the

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 73
Case No: C09-0037 (MJP)

1    Offering Documents.

2         201.    Plaintiffs and other Class members were damaged by WCC's wrongful conduct.

3    Those Class members who have retained their Certificates have the right to rescind and recover the

4    consideration paid for their Certificates, as set forth in § 12(a)(2) of the Securities Act.  Those Class

5    members who have sold their Certificates are entitled to rescissory damages, as set forth in §

6    12(a)(2) of the Securities Act.  Specifically, as set forth herein, the delinquency and default rates for

7

8    the collateral underlying the Certificates – arising from defective collateral and faulty origination

9    practices – triggered unprecedented downgrades of the Certificates' credit ratings by the Rating

10   Agencies and attendant declines in the value of the Certificates.

11        202.    This action is brought within one year after the discovery of the untrue statements and

12   omissions contained in the Offering Documents, within one year after reasonable discovery of the

13   untrue statements and material omissions and within three years of when the Certificates were sold

14

15   to the public.  Despite the exercise of reasonable diligence, Plaintiffs could not have reasonably

16   discovered the untrue statements and omissions in the Offering Documents at an earlier time.

17                              **THIRD CAUSE OF ACTION**

18                     **For Violations of § 15 of the Securities Act**
19                     **(Against Individual Defendants and WCC)**

20        203.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full

21   herein, to the extent that such allegations do not sound in fraud.

22        204.    This Cause of Action is brought pursuant to § 15 of the Securities Act against the

23   Individual Defendants and Defendant WCC.

24        205.    Each of the Individual Defendants, by virtue of his or her control, ownership, offices,

25   directorship, and specific acts set forth above was, at the time of the wrongs alleged herein, a

26

27   controlling person of WMAAC and the Issuing Trusts within the meaning of Section 15 of the

28   Securities Act.  Each of the Individual Defendants had the power to influence, and exercised that

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 74
Case No: C09-0037 (MJP)

**SCOTT + SCOTT LLP**
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

power and influence, to cause WMAAC and the Issuing Trusts to engage in violations of the Securities Act, as described above.

206.    WCC, by virtue of its control, influence, participation and solicitation of offers to purchase the Certificates and specific acts set forth above was, at the time of the wrongs alleged herein, a controlling person of WMAAC and the Issuing Trusts within the meaning of Section 15 of the Securities Act.  The Underwriter Defendant had the power to influence, and exercised that power and influence, to cause WMAAC and the Issuing Trusts to engage in violations of the Securities Act, as described above.

207.    The Individual Defendants' and WCC's control, position and influence made them privy to, and provided them with actual knowledge of, the material facts and omissions concealed from Plaintiffs and the other Class members.

208.    Each of the Individual Defendants was a participant in the violations alleged herein, based on their having prepared, signed or authorized the signing of the Registration Statements and having otherwise participated in the consummation of the Offerings detailed herein.  The Defendants named herein were responsible for overseeing the formation and operation of the Issuing Trusts, including routing payments from the borrowers to investors.

209.    Individual Defendants prepared, reviewed and/or caused the Registration Statements and Prospectus Supplements to be filed and disseminated, and as such maintained knowledge of and reasonable ground to believe in the existence of the facts alleged herein.

210.    Since the Defendants named herein controlled the ultimate decision of which mortgage loans would be included and excluded from the securitized pools of loans as well as the ultimate amount of credit enhancement required in order for the Certificates to be sold to investors, they controlled all material aspects relating to the acquisition, structure and sale of the Certificates and thus, the activities of the Issuing Trusts and Individual Defendants within the meaning of

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 75
Case No: C09-0037 (MJP)

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

1   Section 15 of the Securities Act.

2       211.   By virtue of the wrongful conduct alleged herein, the Individual Defendants and

3   WCC are liable to Plaintiffs and the other Class members for the damages sustained.  Specifically, as

4   set forth herein, the delinquency and default rates for the collateral underlying the Certificates -

5   arising from defective collateral and faulty origination practices – triggered unprecedented

6   downgrades of the Certificates' credit ratings by the Rating Agencies and attendant declines in the

7   value of the Certificates.

8

9                           **FOURTH CAUSE OF ACTION**

10                   **For Violations of § 15 of the Securities Act**
                     **(Against the Rating Agency Defendants)**

11

12      212.   Plaintiffs repeat and reallege each and every allegation above as if set forth in full

13  herein, to the extent that such allegations do not sound in fraud.

14      213.   This cause of action is brought pursuant to § 15 of the Securities Act against the

15  Rating Agencies as control persons of the Issuing Trusts, which were created for the purpose of

16  issuing the Certificates.

17

18      214.   As set forth above, the Issuing Trusts, as the issuing trusts of the Certificates herein,

19  are strictly liable for misstatements and omissions contained in the Offering Documents under

20  Section 11 of the Securities Act.

21      215.   Each of the Rating Agency Defendants, by virtue of this control over the Issuing

22  Trusts, was, at the time of the wrongs alleged herein, a controlling person of the Issuing Trusts

23  within the meaning of Section 15 of the Securities Act.

24

25      216.   The Issuing Trusts of the Certificates under the Securities Act were in all instances

26  common law trusts.  The Issuing Trusts were shell entities created solely for the purpose of issuing

27  the Certificates. The Issuing Trusts had no offices, officers, directors or assets (apart from the

28  mortgage loan collateral and any applicable insurance policies).   WaMu 2007-HY6 Prospectus

1  Supplement, Form 424B5, filed May 21, 2007, at S-31.

2      217.    As alleged herein, the policies and management of the Issuing Trusts were controlled

3  by a securitization structure devised jointly by WaMu and the Rating Agencies and which, in all

4  instances, required final approval of the Rating Agencies.  As alleged herein, since it was this

5  structure that supported assignment of the highest investment-grade credit ratings, the Certificates

6  could not be issued or sold absent the Rating Agencies approval of the structure.  The securitization

7  structure encompassed the specific design of senior and subordinate classes ( and the rights of those

8  classes of holders in the event of borrower default)

9

10     218.    The securitization structure determined by the Rating Agency Defendants also

11 encompassed the specific forms of credit support provided to Certificate purchases in the event of

12 borrower default including  subordination rights, rights to overcollateralization funds, reserve funds

13 and bond insurance.

14

15     219.    The securitization structure of each Issuing Trust in each Offering – designed by the

16 Rating Agency Defendants –  was accepted by the WaMu because it was the necessary condition to

17 the Certificates receiving the triple-A rating necessary for WaMu to sell the Certificates to pension

18 funds and insurance companies who required these ratings.  By virtue of this control over the Issuing

19 Trust's design and structure the Rating Agency Defendants were able to direct the actions of the

20 Issuing Trust, and thus the Rating Agency Defendants were control persons of such within the

21 meaning of Section 15 of the Securities Act.

22

23     220.    The Rating Agencies' control, position and influence made them privy to, and

24 provided them with actual knowledge of, the material facts and omissions concealed from Plaintiffs

25 and the other Class members.

26     221.    Each of the Rating Agency Defendants, by virtue of this control and because each had

27 an obligation to assess the underlying collateral as part of its rating function and design of the Trust

28

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 77
Case No: C09-0037 (MJP)

structure, the Rating Agency Defendants had knowledge of or reasonable ground to believe that the Offering Documents contained misstatements and omissions concerning compliance with the stated underwriting guidelines.

222.    The Rating Agency Defendants were responsible for periodic monitoring of the Trusts' assets and administration.  *See* WaMu 2007-HY6 Prospectus Supplement, Form 424B5, filed May 21, 2007, at S-49-56.  By virtue of the wrongful conduct alleged herein, the Rating Agencies are liable to Plaintiffs and the other Class members for the damages sustained.

## VIII.   <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.    An order certifying the proposed plaintiff Class;

B.    An award of statutory, compensatory and/or all exemplary damages allowed by law in favor of Plaintiffs and the Class and against all Defendants, jointly and severally, in an amount to be proven at trial, including interest thereon;

C.    An award of rescission or a rescissory measure of damages;

D.    An award of Plaintiffs' reasonable attorneys' fees and costs as allowed by law;

E.    An award of pre- and post-judgment interest as allowed by law;

F.    An order granting Plaintiffs and the Class leave to amend the Complaint to conform to the evidence produced at trial; and

G.    An award of such additional equitable, injunctive or other relief as the Court deems appropriate.

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 78
Case No: C09-0037 (MJP)

**SCOTT + SCOTT LLP**
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: April 1, 2010                        **SCOTT+SCOTT LLP**


By: /s/ Hal Cunningham

    Arthur L. Shingler III *(admitted pro hac vice)*
    Hal Cunningham *(admitted pro hac vice)*
600 B Street, Suite 1500
San Diego, California
Telephone: (619) 233-4565
Facsimile: (619) 233-0508
ashingler@scott-scott.com
hcunningham@scott-scott.com

    Joseph P. Guglielmo *(admitted pro hac vice)*
500 Fifth Avenue, 40th Floor
New York, New York 10110
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
jguglielmo@scott-scott.com

*Counsel for Lead Plaintiff Chicago PABF and the Proposed Class*

**COHEN MILSTEIN SELLERS & TOLL PLLC**
    Joel P. Laitman *(admitted pro hac vice)*
    Christopher Lometti *(admitted pro hac vice)*
    Daniel B. Rehns *(admitted pro hac vice)*
    Kenneth M. Rehns *(admitted pro hac vice)*
150 East 52nd Street, Thirtieth Floor
New York, New York 10022
Telephone: (212) 838-7797
Facsimile: (212) 838-7745
jlaitman@cohenmilstein.com
clometti@cohenmilstain.com
drehns@cohenmilstein.com
krehns@cohenmilstein.com

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 79
Case No: C09-0037 (MJP)

SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Telephone: (619) 233-4565

1

Steven J. Toll
Julie Reiser, WSBA #27485
1100 New York Avenue, NW, Suite 500 West
Washington, D.C. 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
*stoll@cohenmilstein.com*

*Counsel for Lead Plaintiff Doral Bank, Plaintiff
Boilermakers and the Proposed Class*

**TOUSLEY BRAIN STEPHENS PLLC**
Kim D. Stephens P.S., WSBA#11984
Nancy A. Pacharzina, WSBA# 25946
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101
Telephone: (206) 682-5600
Facsimile: (206) 682-2992
kstephens@tousley.com
npacharzina@tousley.com

*Liaison Counsel*

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 80
Case No: C09-0037 (MJP)

1

## CERTIFICATE OF SERVICE

2

3    I hereby certify that on the 1st day of April, 2010, I electronically filed the foregoing with the
Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel
of record for all parties who have appeared in the action.  Hard copies of the within will also be
served upon all parties who will not receive notificiation via the CM/ECF System.

4

5

6    DATED this 1st day of April, 2010 at San Diego, California.

7                                                    By:  /s/ Hal Cunningham
                                                          Hal Cunningham (*pro hac vice*)
8                                                    SCOTT+SCOTT LLP
                                                     600 B Street, Suite 1500
9                                                    San Diego, California 92101
                                                     Telephone: (619) 233-4565
10                                                   hcunningham@scott-scott.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AM. CONSOL. COMPLAINT FOR VIOLATIONS
OF THE SECURITIES ACT OF 1933 - 81
Case No: C09-0037 (MJP)