# EXHIBIT A

Opening Statement of David Beck                                                April 13, 2010
Permanent Subcommittee on Investigations                                        Page 1 of 6
Senate Committee on Homeland Security and Governmental Affairs

Chairman Levin, Doctor Coburn, and members of the Permanent Subcommittee, my name is David Beck.  From April 2003 through September 2008 I worked at Washington Mutual Bank, which I will call WaMu for the purposes of my testimony today.  I appreciate the Subcommittee's invitation to appear to discuss my experiences at WaMu.  I hope that I can provide information that will assist the Subcommittee in its investigation of the causes and consequences of the financial crisis.

I understand that the Subcommittee is interested in various topics related to my work in WaMu's capital markets organization and to my role and responsibilities with respect to three WaMu subsidiaries:  WaMu Capital Corp., which was called "WCC"; WaMu Asset Acceptance Corp., which was called "WAAC"; and Washington Mutual Mortgage Securities Corp., which was called "WMMSC" (pronounced "WIM-zic").  I also understand that the Subcommittee is interested in learning about my role and responsibilities with respect to Long Beach Mortgage Corporation, which was a separate subsidiary, first of Washington Mutual, Inc., then of WaMu.  My comments are organized along the lines provided in the Committee's invitation to me.

## An Overview of WMMSC, WAAC, and WCC

Like most other banks that originated mortgage loans, WaMu originated substantially more loans than it could keep on its balance sheet for investment purposes.  And so WaMu's capital markets organization managed WaMu's overall strategy for selling mortgage loans that WaMu did not retain on its books.

During the time that I was head of capital markets for WaMu, people who reported to me were responsible for overseeing the entities that purchased and held loans that were to be sold into the secondary market (WMMSC and WAAC, depending on the time period).  WMMSC and WAAC purchased loans from WaMu, and from other mortgage originators, and held the loans until they were sold into the secondary market.  WCC was a registered broker dealer and acted as an underwriter of securitization deals for a period of time beginning in 2004 and ending in the middle of 2007.

In addition to buying and selling mortgage loans, WMSSC acted as a "master servicer" of securitizations.  The master servicer collects and aggregates the payments made on loans in a securitized pool and forwards those payments to the Trustee who, in turn, distributes those payments to the holders of the securities backed by that loan pool.  These distributions are made in accordance with the terms of the securitization documents, and each securitization has detailed rules setting out how loan payments are to be distributed to securities holders.  The distribution rules can be referred to as the "waterfall."

Opening Statement of David Beck  April 13, 2010
Permanent Subcommittee on Investigations  Page 2 of 6
Senate Committee on Homeland Security and Governmental Affairs

## WCC's Structure and Operations

### Sales of Mortgage-Backed Securities

As I mentioned, WCC was a registered broker dealer and acted as underwriter of securitization transactions generally involving WMMSC or WAAC. In such instances, WMMSC or WAAC would sell, or "deposit," loans into a securitization trust in exchange for securities backed by the loans in question. WMMSC or WAAC would then sell these securities to WCC as underwriter, and WCC would sell the securities in the secondary market. As part of the underwriting process, WCC conducted due diligence on the loans in the securitization loan pool through the use of third-party due diligence providers. WCC conducted this diligence regardless of whether the loans in question had been originated by WaMu or a third-party originator. The diligence process generally involved the review of loan files for a statistically appropriate number of loans to be pooled in each securitization trust. A portion of the reviewed loan files were selected at random, while some were adversely selected based on various negative traits.

WCC sold mortgage-backed securities to a large variety of institutional investors including hedge funds, mutual funds, commercial banks, insurance companies, pension funds, and the like. In many instances, the individuals making the investment decision had long-term, hands-on experience creating and selling mortgage-backed securities. The buyers were thus in a position to be selective about the types of securities they would purchase based on their judgment, specific investment needs and objectives. As a result, mortgage-backed securitization deals were customized transactions. The loans included in a pool to support the securities as well as the actual securities themselves were constructed based in part on negotiations with the initial buyers, which often would express a desire for securities with specific credit ratings or maturities, for example, or for the loan pools to fall within certain credit parameters or geographical distributions.

Not surprisingly, different buyers are interested in acquiring different types of mortgage-backed securities, and each makes its own decisions about whether to participate in any given transaction based, for example, on:

- Institutional investment guidelines. Some buyers' guidelines (or indentures or prospectuses) might allow the purchase of only AAA-rated securities. Others might be specifically focused on higher risk, higher-returning securities.

- A buyer's current exposure to and appetite for different levels of credit risk. A buyer holding a significant amount of AAA-rated securities might be interested in taking on the additional credit risk, and the additional potential return, of lower-rated securities.

- The maturities of the securities being offered. Most buyers wanted to hold securities that provide cash flows matching their liabilities.

- The various risk concentrations of the loans in the securitization trust. A buyer with an investment strategy focused in low-FICO or high-LTV loans, for example, might not be interested in a deal backed only by prime mortgages.

Opening Statement of David Beck  April 13, 2010
Permanent Subcommittee on Investigations  Page 3 of 6
Senate Committee on Homeland Security and Governmental Affairs

- The issuer involved in the transaction. Buyers often would seek to diversify their portfolio investments across the mortgage finance industry by holding mortgage-backed securities issued by different issuers off many different registration statements.

Buyer interest in any given mortgage-backed securitization would also depend on the buyers' existing leverage and capitalization; how the varying returns on equity different buyers could generate and were targeting might be affected by acquiring different types of assets; the buyers' assessment of the market and economy; and other financial economic considerations. Given that buyers determine what to buy based on their unique interest in and assessment of a specific securitization and of the market in general, the value of and interest in any given offering, and the loans supporting that offering, would vary from buyer to buyer and from deal to deal. A deal supported by prime loans might be less valuable to a buyer with holdings already concentrated on lower risk loans than to other buyers. A security for a deal with very long final maturity might be less valuable to a buyer who needs shorter-term assets.

Potential buyers of mortgage-backed securities were given access to information about the securities in question and about the characteristics of the loans underlying the securities. This included not only the information in the prospectus supplement for each securitization (which described the types of loans in the loan pool, the underwriting process, and the characteristics of the borrowers and the security underlying the loans), but also a "loan tape" that included specific information about the nature of each loan in the pool (borrower's FICO score, loan-to-value information, information about the loan type and terms, and the like). Investors also had access to extensive information, released on a monthly basis, about the performance of prior securitizations of loan pools made up of the same type of loan product. Investors could review all of this information before deciding whether purchasing the particular offering would fit into their overall investment strategy.

In general, WCC concentrated on underwriting securities backed by prime or Alt-A loans that WaMu had originated or that WaMu or WMMSC had acquired from third-party originators. For most of my time at WaMu, sales and securitizations of loans originated by Long Beach Mortgage were done by Long Beach's separate capital markets group. As a result, while WCC may have participated as a "co-underwriter" in transactions involving the securitization of Long Beach loans, any such deals generally would have been led by other underwriters such as RBS Greenwich Capital, UBS Warburg, Credit Suisse First Boston and the like prior to mid to late 2006. WCC would have been the sole or lead underwriter of securities backed by Long Beach-originated sub-prime loans only thereafter.

Case 2:09-cv-00037-MJP   Document 275-1   Filed 07/15/11   Page 5 of 7

Opening Statement of David Beck                                                    April 13, 2010
Permanent Subcommittee on Investigations                                           Page 4 of 6
Senate Committee on Homeland Security and Governmental Affairs

### Whole Loan Sales

WCC also occasionally participated in whole loan transactions (in which a buyer would acquire an entire group of loans rather than securities backed by a group of loans).  WCC negotiated the terms of and helped to close whole loan sales undertaken by whatever entity then owned the loans in question.  Typically, these were sales of WaMu-originated loans, though on occasion WCC would participate in the sale of loans originated by third parties.

Whole loan purchasers were significant players in the financial services, real estate lending and loan servicing industries.  As a result, each bulk whole loan sale was in many ways a unique, highly negotiated transaction.  As with buyers of mortgage-backed securities, whole loan buyers assess their needs based on their current portfolio of whole loans and target future risk profile.  Some may find themselves concentrated in certain product types or other risk characteristics and want to buy different kinds of loans or loans to borrowers with different risk profiles (higher or lower FICO scores or LTVs, for example).  In any case, of course, buyers generally sought to diversify their risk and maximize their risk-adjusted return.

As a natural part of considering whole loan sale transactions, WCC and others in the capital markets organization were well positioned to help WaMu or WMMSC consider whether the best execution of a loan sale involved a whole loan sale transaction or a securitization, with the outcome depending on market demand, the needs and wants of interested buyers, and the like.  Of course, as I suggested earlier, in any given deal the assets in question are more attractive to one of the parties than to the other, and that difference is in part what allows the deal to be done in the first place.  For example, a lender with a heavy investment concentration in one type of loan product might be less interested in acquiring or holding loans of that type than a lender without the same concentration.  In such a case, the first lender might sell loans of that type to the second and thus create opportunities for both.

### Other Capital Markets Activities

#### Hedging

WaMu engaged in hedging activities for various purposes.  For example, WCC staff became responsible in 2005 for hedging the interest rate risk associated with unsold mortgage-backed security positions and with loans purchased in bulk for resale in the conduit program and held at WMMSC.  And personnel who worked for WaMu, not WCC, hedged (1) the interest rate risk on loans that had not yet closed, but for which WaMu had made loan commitments; (2) closed loans that were in a WaMu loan warehouse and awaiting sale; and (3) WaMu's mortgage servicing rights.  These interest rate risks were hedged by purchasing various types of securities (including mortgage-backed securities), swaps, options, and other derivatives.  Importantly, neither WCC nor WaMu was approved to trade in credit default swaps, and CDS were not used to bet against the performance of mortgage-backed certificates that WCC sold.

Case 2:09-cv-00037-MJP   Document 275-1   Filed 07/15/11   Page 6 of 7

Opening Statement of David Beck                                          April 13, 2010
Permanent Subcommittee on Investigations                                  Page 5 of 6
Senate Committee on Homeland Security and Governmental Affairs

### The Pricing of Mortgage Products

Because WaMu's capital markets organization was engaged in the secondary mortgage market, it had ready access to information regarding how the market priced loan products on any given day. Using this information, we determined the initial prices at which WaMu could offer loans to consumers by adding to the then-applicable market prices for private or agency mortgage-backed securities, the (1) cost to hedge the loan pipeline, (2) cost to sell to the secondary market and (3) cost to service and value of servicing the loans. Home Loans personnel would develop the prices at which they could offer loans to consumers by adding their own costs of origination and a margin.

### The Conduit Program

From time to time, WMMSC purchased from other loan originators loans that were then included in WaMu-sponsored securitizations. The goal of this conduit program was to purchase loans from various loan originators and pool them together to create a securitization that was attractive to the secondary market. WCC's role in such securitization transactions was the same as in those WCC-underwritten deals involving WaMu-originated loans: it helped construct and negotiate the loan pools, conducted due diligence (through independent third parties), created securitization structures attractive to investors (including by meeting their rating requirements), and sold the securities.

### Repurchase & Recovery

Your invitation asked specifically about the Repurchase and Recovery Team. In general, purchasers of loans, whether the buyer in a whole loan sale or the trustee of a trust holding loans underlying a securitization, can under certain circumstances demand that the seller of the loans repurchase a loan. While I do not have a lawyer's understanding of repurchase rights, I do know that, under appropriate circumstances, a purchaser may demand that the seller repurchase a loan on which the borrower fails to make a specified number of monthly payments owed (an early payment default), for example, or when there has been an a breach of a representation or warranty contained in the transaction documents for the loan sale or securitization. Like most other aspects of the sale and securitization of home loans, the repurchase and recovery process is filled with negotiation: buyers often take a very aggressive and expansive view of when a seller is obligated to repurchase a loan, and sellers often disagree. In some cases, the seller convinces the buyer that the seller is not obligated to repurchase the loan. In others, the seller agrees to make the repurchase. In still others, it is the seller that identifies problems with a loan in the first instance and initiates the repurchase process without demand from the buyer. Often the issue is resolved short of repurchase (through correction of documentation problems or the payment of a "make whole" amount, for example).

At some point in 2007 or 2008, the group at Washington Mutual responsible for evaluating and responding to repurchase requests was placed under me. That group reviewed repurchase requests to determine if they presented valid grounds for repurchase of the loan at issue, and then responded to the requests accordingly. When appropriate, the group was also responsible for

Opening Statement of David Beck  April 13, 2010
Permanent Subcommittee on Investigations  Page 6 of 6
Senate Committee on Homeland Security and Governmental Affairs

making repurchase demands to those financial institutions from which WaMu or WMMSC had acquired loans.  The group, which came to be called the Repurchase and Recovery Team, also created a computer modeling process to identify loans that might present a repurchase obligation.

## **Conclusion**

I hope that this brief introduction has been helpful to the Subcommittee and would be happy to answer any further questions you may have.