# EXHIBIT 1

HONORABLE MARSHA J. PECHMAN

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

|  |  |
|---|---|
| IN RE WASHINGTON MUTUAL MORTGAGE BACKED SECURITIES LITIGATION<br><br>This Document Relates to: ALL CASES | Master Case No. 2:09-cv-00037-MJP<br><br>**CLASS ACTION** |

**DAUBERT MOTION DECLARATION OF IRA HOLT**

**MAY 25, 2012**

CONFIDENTIAL

## I.    ASSIGNMENT

I, Ira Holt, have prepared this declaration describing my work, findings and opinions since the date of my Expert Report, dated March 2, 2012, and in response to the motion filed by Defendants to exclude my own testimony and the testimony of Dr. Charles D. Cowan (the "Daubert Motion"), at the request of Cohen Milstein Sellers & Toll PLLC and Scott + Scott, LLP, attorneys for the Boilermakers National Annuity Trust Fund, Doral Bank Puerto Rico,  Policemen's Annuity Benefit Fund for the City of Chicago, and the class, the plaintiffs in this matter.

Defendants have previously submitted as Exhibit 1 to the Declaration of J. Wesley Earnhardt a copy of the Expert Report of Charles D. Cowan, dated March 2, 2012, and as Exhibit 2 thereto my Expert Report dated March 2, 2012.  The reader is referred to those exhibits where they are referenced rather than attaching them again hereto.

Since the date of my Expert Report, my team and I have spent 3,437.55 additional hours re-underwriting a sample of loans in the six securitizations at issue in this matter.  To date, my team and I have re-underwritten 1,451 loans, which includes the initial 424 loans.

I have not been deposed in connection with this action.  I have not been asked to and have not endeavored to respond to each and every assertion in Defendants' expert rebuttal reports but would be prepared to do so at trial.  In this declaration, I respond only to certain points raised in the Daubert Motion, or to points in Defendants' expert's report explicitly referenced therein.

## II.    RESPONSES TO DAUBERT MOTION

## A.    OPTION ARM LOANS

This section of the Daubert Motion states that I improperly required:  (i) an upward adjustment of one percent of the qualifying interest rate used to calculate Debt-to-Income ("DTI") ratio and (ii) an upward adjustment of the mortgage loan amount used in the DTI ratio calculations to at least 110 percent of the actual

CONFIDENTIAL

loan amount, due to the potential for the principal to increase over time. This was not an error: these adjustments were explicitly required by the guidelines and by best industry practice.

As to point (i), Defendants fail to mention that the 1% adjustment to the fully indexed rate for 1-, 3-, 6-, & 12-month Options ARMs using MTA indexes was outlined in WMB's own underwriting guidelines. *See* Exhibit 3. In addition, the guideline reflects the fact that loans with a COFI index required a 0.50% upward adjustment to the fully indexed rate for the same type of loans, which Defendants also ignore. *Id.*

As to point (ii), an interest-only loan with the potential for upward adjustment of the principal by at least 110% (I found 157 of the 172 Option Arm loans in the sample with the potential for negative amortization of up to 110% and 15 of the 172 Option ARM loans in the sample with the potential for a 125% increase in principal), has the ability to recast within one to three years based on how the fully indexed interest rate changes. Recasting means that the borrower's loan payment would be calculated using the new principal balance at the fully indexed rate amortized over the remaining term, not the initial term. WMB states throughout its Consumer Underwriting Guidelines ("CUGs") that "[p]rudent underwriting standards will be applied to each transaction." *See, e.g.*, 1/27/06 CUG 1-35. To prudently calculate DTI on an Option ARM loan, when such a calculation was not addressed within the CUGs, one would take the original principal balance multiplied by the negative amortizing factor at the fully indexed rate amortized over the remaining term to prudently calculate housing expenses. This type of calculation is standard practice in the industry and one that I used to calculate HDTI/DTI. HDTI stands for housing debt to income and is the relationship between a mortgage loan payment (including taxes, insurance, and homeowner's fee) and the borrower's income. The DTI is the total debt to income and is the relationship between debt and income. To arrive at a debt-to-income ratio, the total debt and/or housing costs are divided by the gross income. The HDTI/DTI definition referenced in the Daubert Motion that Defendants claim suggests a different calculation was ambiguous and lacked any reference to Option ARM loans in the CUGs.

CONFIDENTIAL

B.    RETIREMENT ACCOUNT ASSETS

The Daubert Motion claims that I systematically and improperly reduced the value of retirement account assets used to determine whether borrowers held the required liquid reserves. The motion states that I applied a 30 percent reduction to the borrowers' retirement account assets instead of WMB's mandated 20 percent. The motion cites WMB's guidelines (8/17/06 CUG 5-24 ("[a] deduction of 20% from the vested balance must be taken into account for penalties and taxes, if applicable")). However, this loan policy relates to the "Sources of Funds" section of the guidelines. WMB's guidelines defined "Sources of Funds" but did not mention retirement accounts (8/17/06 CUG 5-9 ("All funds paid by the borrower in connection with the transaction must be from an acceptable source. The sources listed in this section may be used as specified and may not represent all possible sources.")). Indeed, the only reference to retirement accounts in the policy relating to reserves states that retirement accounts can be used for reserve purposes and further specifies that 80% of such accounts may be used for down payments and closing costs. *See* Exhibit 4.

In addition, Defendants' motion omits a part of the guideline regarding Asset Analysis (8/17/06 CUG 8-59) that contains an additional caveat regarding retirement accounts. This guideline states that for Desktop Underwriter Expanded Approval ("DU-EA") loans, only 70% of the vested amount should be considered, and proof of liquidation is required. *See* Exhibit 5. If the retirement account only allows withdrawals in connection with the borrower's employment termination, retirement or death, the funds may not be used as reserves. *Id.*

The formula worksheet that I used to calculate monthly reserves faithfully maintained the 70% limit imposed by the guidelines. However, when retirement accounts were used to qualify the borrower under the reserve requirements, I used an objective approach to ascertain whether the decrease in reduction from 30% to 20% would have materially affected the borrowers' reserves. If it would, then I would not tag the insufficient reserve flag.

CONFIDENTIAL

Notably, of 178 materially defective loans in the original 424 loans discussed in my March 2 Report, 56 had the insufficient reserve flag tagged with only 23 of those loans having sufficient assets after closing costs to actually calculate monthly reserves. Of those 23 loans, only 4 had retirement accounts that could be used in the reserve calculation and only 1 would have had the tag removed by using 80% instead of 70%. Because this particular loan was manually underwritten, however, we used the more conservative 70% rule since the Asset Analysis guideline (8/17/06 CUG 8-59) that contains the 80% provision refers to automated Desktop Underwriter approval loans and not manual approvals. We did this despite the fact that we did not find any documentation validating the withdrawal stipulations for any retirement account, as required by CUG 8-59, in this, or any, loan file. *See* Exhibit 5.

In the Defendants' expert's report (Ostendorf Rep. ¶ 167), Defendants' expert states that I erroneously considered retirement assets by using 70% instead of 80% for this same loan, which made the difference between the borrower qualifying or not for the required reserves. The difference between a 70% and 80% reduction in retirement account assets would result in a net difference of ██████, changing reserves from ██ months to ██ months. Per CUG guidelines dated 01/13/06, page 5-6, if rental income from the subject property is used to qualify, then 6 months' PITI is required for an LTV exceeding 75%. LTV for the subject property was ██ In addition, we did not use the statement of assets from ████████████████████ that were in the file. ████████ funds cannot be used for reserves due to ██████ guidelines' stating ██████ ████████████████████████████████████████████████ ████████████████ There were also additional issues with this loan that Ostendorf's report neglects to mention:

a.   There were five (5) approvals in the loan file and all were manual – no Automated Underwriting System ("AUS") decisions were located in the file. The underwriter made

4

CONFIDENTIAL

a ▓▓ LTV exception to the guidelines ( from ▓▓ LTV to ▓▓ LTV) on 03/08/06 even though the borrower accepted a counteroffer of ▓▓ LTV on ▓▓▓▓▓;

b.  The rate the underwriter used to qualify the borrower was ▓▓▓▓ but the actual note rate was ▓▓▓▓ (*see* Ostendorf Ex. 11);

c.  The executed note in the file allows for ▓▓▓ negative amortization potential, but the approval specifically states that title must cover ▓▓▓ potential and the final title policy is for ▓▓▓ not ▓▓▓. In addition, the internal loan tapes erroneously reflect a ▓▓▓ neg-am potential;

d.  The subject property had been owned for ▓▓▓▓▓▓▓▓▓▓ per the Loan Application Form 1003, appraisal, and title. The underwriter stated that the property had been owned for ▓▓▓, however, and used this as a compensating factor for approving the loan at the ▓▓▓ instead of the ▓▓▓ LTV guidelines;

e.  The appraiser gave a market rent opinion of ▓▓▓▓▓▓ stating that it was the actual rent for the subject property even though the market comps used showed ▓▓▓▓▓ and ▓▓▓ for an average of ▓▓▓▓▓. The lease provided by the borrower showed ▓▓▓ per month and not ▓▓▓. The lease was also in the name of ▓▓▓ ▓▓▓. There were no documents in the file showing the percentage of ownership of ▓▓▓ to determine whether the borrower was a member of ▓▓▓ and if so whether they could claim all the rental income; and

f.  Since there were numerous discrepancies between what the borrower disclosed regarding the subject property and what the verified documents disclosed, I decided to consult the Bureau of Labor Statistics to substantiate the borrower's stated income. Using the 90th percentile of ▓▓▓ and even increasing it by ▓▓▓, the borrower's annual income

CONFIDENTIAL

would be at most ███████, or only █████████ and not the ██████stated on Loan

Application Form 1003, an ██████decrease.

This analysis is representative of the careful, thorough analysis that my team gave every single

loan we re-underwrote.

C.    STATED INCOME

In the Daubert Motion, Defendants state that I relied "in every instance" on average salary statistics

from the Bureau of Labor Statistics of the U.S. Department of Labor ("BLS") for stated income loans.  This is

totally incorrect.  The motion clearly omits the following, which I distinctly addressed in my report:

*P 19*        *My team and I did not consider a stated income unreasonable unless, in light of third-*

*party data on income ranges and the credit and asset profile of the borrower, the income was plainly so*

*improbable that a reasonable and responsible underwriter could not have approved it without requiring*

*further documentation.*

*P 20*        *In some cases, it would be clear to a responsible underwriter based on his own judgment*

*that an income was reasonable given the profession.  In more difficult cases, such as where the normal*

*range of incomes was unknown; where the borrower's income appeared high; or where the loan was at*

*a high DTI; a responsible underwriter generally looked to an outside source of data on incomes to*

*inform her judgment.*

*P  21*       *In addition to the borrower's occupation, I also looked at the borrower's assets and*

*credit history, as is standard in the industry.  When reviewing assets, I used a common rule of thumb in*

*the industry that a borrower can be expected to have liquid assets equal to 25% of income.  Significantly*

*lower levels of assets may be a flag for unreasonableness (although the final analysis will depend on the*

*facts of the particular loan).   My team also checked whether the borrower had a credit profile*

*consistent with the claimed income.  Sometimes, borrowers may claim to have a long and stable history*

CONFIDENTIAL

*of high earnings, but their credit report shows a borrower with weak credit who regularly struggles to make relatively small credit card payments. I considered such circumstances to be a flag that the income may not be reasonable. Conversely, sometimes a borrower may claim to have a surprisingly high income given their occupation, but their credit history will support the income.*

*P 22        I also saw loans, which despite being approved as stated income, contained income documentation in the file that was inconsistent with the stated income. Where other evidence in the file contradicted the borrower's statement of income, I found the income to be unreasonable.*

The motion references the Verification of Income/Employment on Low Doc Loans (8/17/06 CUG at 1-14), and claims that my approach contradicts WMB's guidelines. My approach, as outlined above, corresponds precisely to the guidelines. Indeed, the guidelines state that inconsistencies in stated income require additional document verification such as a Form 4506-T (Request for Transcript of Tax Return), which we did not find in any loan file, or conversion to a Full/Alt Doc program, which we also did not find. *See* Exhibit 6.

The motion also references the Income History Requirement guideline (8/17/06 CUG at 4-3), stating that WMB underwriters were supposed to determine reasonableness of stated income by considering other factors in the loan application such as assets and credit history, as we did. However, the motion omits the fact that the Low Doc loan guidelines go on to state,

> If there is information in the file that appears to refute or contradict the level of income stated by the borrower, the credit Approve should require additional documentation or switch the loan to a Full/Alt Doc program.

*See* Exhibit 7.

To substantiate my team's re-underwriting decisions in both my initial report and this declaration, I found that there were 365 loans in the sample of the initial 424 under either a Low, Stated Income Verified

CONFIDENTIAL

Assets, or Stated Income Stated Assets documentation program.  Of these loans, I tagged only 37 that were materially defective due to unreasonable income, of which we chose to search the BLS data on only 11.  The remaining 26 loans did not even have sufficient information in the file to determine what the borrower's occupation was in order to verify the borrower's income.  For example, there was no way to determine the type of business conducted by John Doe who was owner of John Doe, LLC.

In addition, Defendants are mistaken as to what represents the reasonableness of income.  In their expert's report (Ostendorf Rep. ¶ 149), Ostendorf claims that loan number ████████ was missing income documentation per my review.  However, Ostendorf claims that he was able to locate three separate pieces of income documentation: (i) a satisfactory VVOE, (ii) a copy of the borrower's ███████████, and (iii) a CPA letter.  A VVOE, a copy of the ███████████, and a CPA letter, however, do not represent income documentation.  They represent employment documentation.  There was no documentation in the file suggesting the reasonableness of the claimed income for that loan.

D.    UNDERWRITING GUIDELINES

This section of the Daubert Motion states that I simply applied the wrong guidelines to certain loans in my review.  In Defendants' expert's report (Ostendorf Rep. ¶ 172), Ostendorf claims that I applied outdated or incorrect guidelines to the loan files 23 times.  In particular, the report addresses loan number ███████ where Ostendorf states that I applied the Wholesale guidelines dated 8/21/2006 to the loan to which the 11/17/2006 Premier Broker Guidelines should have applied.  I always used the best information available and spent considerable time determining which guidelines to use; only in a small number of cases was there no way to ascertain exactly which guideline to use.  When I looked at policy guidelines, I reviewed the CUGs or the Premiere Broker Conventional Underwriting Guidelines ("PBCUG"), and the Product Parameter Guidelines ("PPG").  The CUGs and the PBCUGs define selected WMB standards for underwriting 1-4 unit residential, first mortgage loans originated under lending programs offered through WMB, while the PPGs provide product

8

CONFIDENTIAL

specific matrices. In the case of loan number ████████ the PBCUG that I used is dated 11/17/2006 and the PPG I used is dated 11/14/2006. However, when I reviewed the PPG dated 11/14/2006, the product parameters for the referenced loan had an effective date of ████████. *See* Exhibit 8. Therefore, I used the correct guideline for the product in force at the time of the loan approval. A further review of the actual guidelines by Ostendorf instead of the most current date listed in the file index would have reflected this fact.

I applied this same approach to every loan in my review. In order to ascertain which guidelines to use once I commenced the re-underwriting of a loan, I would review the contents of each loan file to discover the origination channel for that particular loan. I could usually obtain that information from either the EDE or manual approval documentation if it was in the file. Many times, the loan file did not specify where the loan originated and/or its particular doc type. Often, I could look at the comments on the approval and determine the doc type of the loan. I would then utilize the multiple sets of guidelines and their corresponding requirements to re-underwrite the loan. The claim that I simply applied the wrong guidelines would be appropriate, if, in fact, the loan file disclosed the appropriate loan type.

E.   COMPENSATING FACTORS

The Daubert Motion claims that I "imposed artificial and overly restrictive limitations on the use of 'compensating factors'" by not considering them "in conjunction with the loan file as a whole." Def. Mem. at 15. This is wrong and completely ignores the description of my methodology in my Report

Compensating factors were addressed in my report 52 times. I used these compensating factors in conjunction with a comprehensive analysis of the entire loan file in determining compliance within the guidelines. Some of the statements in my report that demonstrate that the Defendants' claim is totally false and contradict their assertion are:

> *P 30*        *WMB's Guidelines required that sufficient compensating factors, which the Guidelines*
>
> *define as "strong credit characteristics that can be used as a strength to offset risk factors," be present*

9

CONFIDENTIAL

*in order to offset the risk of loans that deviate from the Guidelines. When looking for compensating factors to offset an exception to the Guidelines, I did not consider any characteristic of the loan that was merely at or near the Guideline minimum to be a compensating factor. Consistent with industry norms and with the Guidelines, I did not consider information that was not supported by evidence in the file to be sufficient for a compensating factor.*

*P 31      When assessing compensating factors, I would look to **the risk profile of the loan as a whole**, including all Guideline breaches as well as other risks. These other risks may include: high LTVs, high DTIs, low FICOs, and unsatisfactory credit histories.*

*P 34      I took a conservative approach, putting myself in the shoes of an underwriter attempting to make loans where justified under the applicable Guidelines, **and looking for any and all documented "compensating factors"** that might offset the risk caused by any deviations from Guidelines. Where a loan deviated from the applicable Guidelines in a way that materially increased the risk of the loan relative to a loan that complied with the Guidelines, **taking into account all potential compensating factors** – that is, where the loan should not have been made by an underwriter adhering to the applicable Guidelines – I considered the loan to be Materially in Breach of the Guidelines.*

First, with respect to reserves, the motion states that any amount "in excess of product guidelines" could serve as a compensating factor (8/17/06 CUG 5-5 and 8/17/06 CUG 1-57). *See* Exhibits 9 and 10. CUG 5-5 does reflect the required cash reserves for loans secured by owner-occupied and second home properties. However, the policy states that

*...the required cash reserves in the table below are guidelines only and that individual transactions may require higher or lower reserves.*

It also states,

CONFIDENTIAL

*...the lack of reserves or less than the amount required for a program or product should be considered as an additional layer of risk.*

The Compensating Factors section under CUG 1-57 states,

*...verified liquidity/reserves in excess of product guidelines can be a compensating factor except if the loan is DU/LP Referred.*

Second, in fact, documented net worth substantial enough to evidence an ability to repay the debt, liquidity/reserves, high residual income, LTV below program maximums, and FICO significantly higher than the program minimum were not applicable if the loan was an Automated Underwriting System ("AUS") Refer (*i.e.*, a loan that had originally attempted to be processed through the automated underwriting system but filed that process and was referred for manual underwriting). Most of these factors were already considered in the AUS decision and could not be used again as offsetting strengths. However, I used a conservative approach in our re-underwriting by using 6-12 months of reserves or a 700 FICO if applicable as possible and prudent compensating factors. Sometimes the DU conditions required much more than my limits.

Third, there were times when the loan was approved by an AUS but a manual approval was also in the file. I found that the loans in the sample were manually approved 65.7% of the time instead of by an Automated Underwriting System ("AUS"). This means, as stated above, that the "risk layers of the loan must be fully assessed, documented and included in the loan file's comments." As long as the manual approval did not violate the Resubmission Requirements (8/17/06 CUG 8-22) requiring the loan to be resubmitted through DU and all compensating factors were valid and verified, we would not find the loan to be materially defective. *See* Exhibit 11. When WMB found additional compensating factors that could be used to offset layered risk identified by the AUS, the loan was to be resubmitted through DU.

CONFIDENTIAL

Finally, Compensating Factors, as described above (8/17/06 CUG 1-57,) falls under the section entitled "Risk Layering."  Risk Layering relates to loans where there is either an AUS Refer or Manual Approval in the file.  In regard to the Risk Layering guideline (8/17/06 CUG 1-54), the guideline states,

*...The final decision should result from balancing the weakness of one component against the strength of other components, provided each individual component is acceptable.*

Therefore, the guidelines do address individual weaknesses and strengths (compensating factors) in the comprehensive risk analysis of each loan file.  Based on my report as outlined above, I did identify all layers of risk, whether the layers of risk were addressed, and whether these risks were mitigated by compensating factors supported by evidence in the file.

<u>Dated: Birmingham, Alabama</u>

May 25, 2012

Respectfully submitted,

By:

Ira H. Holt, Jr.

Analytic Focus, LLC
200 Cahaba Park Circle
Suite 260
Birmingham, AL  35242
(205) 981-2322

*Expert Witness for Plaintiffs*

Exhibit 3

Show

## Qualifying Rates

**Last Update**

**Note:** Any pricing adjustments, or Portfolio Feature add-ons that will increase the start rate on a loan must be taken into consideration when determining the qualifying rate.

**CMT/LIBOR Saleable No Neg ARMs 1/1**

| | |
|---|---|
| Owner-occupied 80% LTV or less | Higher of 5.00% or Start Rate |
| Owner-occupied > 80% LTV with MI | Higher of 5.00% or Start Rate |
| Non-owner-occupied | Higher of 5.25% or Start Rate |

**CMT/LIBOR Saleable No Neg ARMs 3/1 & 5/1 and LIBOR Saleable No Neg ARMs 7/1 & 10/1**

Qualify at Note (Start) Rate.

**Flex 3 & Flex 5**

Qualify at Note (Start) Rate.

**MTA No Neg ARMs 3/1 and 5/1**

Qualify at Note (Start) Rate.

**Option ARMs - 1-Month,  3-Month, 6-Month & 12-Month MTA**

Quality at *Fully Indexed Rate (FIR) + 1.000%

**Option ARMs - 1-Month & 3-Month COFI**

Quality at *Fully Indexed Rate (FIR) + 0.500%

*Fully Indexed Rate (FIR) = Index + Margin + Margin Adjustments

CONFIDENTIAL

Exhibit 4


## Washington Mutual
### HOME LOANS

Production/Operations Policy Administration

## Sources of Funds, Continued

| | |
|---|---|
| **Retirement Accounts** | Vested funds from individual retirement accounts (IRA, Keogh) and tax deferred retirement savings accounts (401k) may be used as the source of funds for the down payment, closing costs, or cash reserves. |
| | A deduction of 20% from the vested balance must be taken to account for penalties and taxes, if applicable. |
| | **Note**: Roth IRA and Roth 401(k) accounts do not require the 20% deduction from the balance. |
| | A copy of the most recent retirement account statement showing the vested balance is required. |
| | As long as the retirement account is only being used to meet reserve requirements, documentation of the terms and conditions for loans or withdrawals is not necessary. |
| | Proof of liquidation **is not** required. |
| **Sale of Non-Liquid Assets** | The borrower may sell non-liquid or personal assets to use as part or all of the minimum 5% cash required to close. Certification of the value of the sold asset and verification of funds must be provided, as follows: |
| | ❑ **Antiques, Coin Collections, Jewelry, Gun Collections** – A copy of the appraisal or certification from the dealer and receipt of funds. |
| | ❑ **Automobile/RV/Boat** – A copy of the blue book value, bill of sale, and receipt of funds. |

*Continued on next page*

1

CONFIDENTIAL

Exhibit 5



**HOME LOANS**

Production/Operations Policy Administration

## Asset Analysis, Continued

| | |
|---|---|
| **Gifts** | DU will issue a gift message indicating how the gift must be verified, however, for DU loans Washington Mutual guidelines are to be followed. |
| | For DU-EA loans, follow the verification requirements on the Underwriting Findings report. |
| | **Data Entry Tip:** Enter the amount of gift funds in Section VI A as a gift. Do not include the amount in another liquid asset account. |
| **Gifts of Equity** | The Credit Approver must confirm outside of DU that the borrowers have made the minimum contribution required, when applicable. The maximum gift of equity is calculated as follows: |
| | (Down payment + closing costs + prepaids) − borrower's minimum contribution (when applicable) = maximum gift of equity. |
| | A fully executed gift letter must be completed by the relative selling the home. |
| | **Data Entry Tip:** Enter the gift of equity in either Section VI A as a gift, or Section II, in the source of down payment, as cash-gift, in which case the amount of the gift equity must also be entered in Section VII as Other credit. |
| **Retirement Accounts** | For DU loans, if the borrower is liquidating a retirement account, such as a 401(k) or IRA account, enter 80% of the vested amount, regardless of the message received from DU. Proof of liquidation is not required. |
| | For DU-EA loans, enter 70% of the vested amount, and proof of liquidation is required. |
| | If the retirement account only allows withdrawals in connection with the borrower's employment termination, retirement or death, the funds may not be used as reserves. |
| **Other Asset Sources** | When other credits have been entered in Section VII, Line L of the loan application all credits applied in this section must be eligible and documented according to Washington Mutual's Conventional Underwriting Guidelines. For DU-EA loans, document other credits as required on the Underwriting Findings report. |

*Continued on next page*

CONVENTIONAL UNDERWRITING GUIDELINES
ISSUED: 08/17/06

DESKTOP UNDERWRITER • 8 -59

2

CONFIDENTIAL

Exhibit 6



**Washington Mutual**
HOME LOANS

Production/Operations Policy Administration

## Low Doc Program, Continued

| Verification of Income/ Employment | Any borrower, whether salaried, self-employed, or retired, is eligible for a Low Doc loan. Generally, the borrower who takes advantage of this program as an option is someone whose income is not easily documented. |
|---|---|

Verification of income is typically not required on the Low Doc Loan Program. Income stated on the loan application is evaluated for reasonableness based on the borrower's credit profile. The following questions should be asked when evaluating income stated on the loan application:

❑ Does the level of income appear reasonable when compared to the type of employment and the borrower's position?

❑ Based on the stated income, are assets as stated on the application reasonable?

Type of employment or self-employment must be verified as existing and legitimately connected with the borrower. A verbal verification of employment must be performed according to current Verbal VOE policy and procedure. See the *Income Analysis* chapter for specific policy and follow procedure as stated in the *Washington Mutual Online Home Loans Lending Manual*.

Income from a non-occupant co-borrower cannot be used to qualify when the property is a primary residence.

Inconsistencies require additional document verification such as, processing the 4506-T or changing to a Full/Alt Doc Program. While paper documentation of the amount of income is not ordinarily required, alternative methods of establishing the validity of the income source must be used. This can include, but is not limited to, verbal confirmation of various sources of information, such as state or regulatory agencies, licensed professionals (attorneys or accountants) and other independent third parties or sources.

All products with loan amounts greater than $3.0 million require an IRS Form 4506-T to be completed, signed, and dated at closing.

*Continued on next page*

3

CONFIDENTIAL

Exhibit 7



**Washington Mutual**
HOME LOANS                                    Production/Operations Policy Administration

## Income – General Requirements, Continued

**Income History Requirement,** Continued

**FULL/ALT DOC LOANS**

Generally, borrowers must have a history of receiving income from employment (including full time, part-time, second-job, or multiple job income) or other sources and a reasonable expectation that the income will continue in the foreseeable future.

**LOW DOC LOANS**

The income stated on the application must appear reasonable based on the source of income and the borrower's profile. If there is information in the file that appears to refute or contradict the level of income stated by the borrower, the Credit Approver should require additional documentation or switch the loan to a Full/Alt Doc program.

**Examples:**

The borrower claims $5,000 in monthly income as a free-lance artist. The documentation in the file reflects regular monthly deposits over the last few months totaling a similar amount and an open revolving account with an art supply store. The income appears reasonable.

The borrower claims $5,000 in monthly income based on a lawn service business operated and owned by the borrower. The documentation in the file reflects regular monthly deposits over that last several months of only $1,800 per month, and the business equipment listed on the 1003 consists of a single lawn mower worth $500. The borrower has no other liquid assets other than the bank account and recently took out a second on the subject property being refinanced. The income does not appear to be reasonable.

For Alt-A Program, refer to the Product and Pricing Guide (PPG) for guidelines.

**Consistent Level of Income Requirement**

Sources of income may vary. If the documentation shows that the borrower has maintained a consistent level of income despite changes in the sources of income and there is no evidence to the contrary, the stability of that income level may be presumed.

**Example:**

A borrower may change jobs frequently but is nonetheless able to earn consistent and predictable income.

Washington Mutual does not generally establish a minimum time period that all income must be received in order to be considered stable. However, the income used to qualify must reasonably be expected to continue to be received for at least three years based on the source and documentation required for verifying the income.

**Important:** For Full/Alt Doc programs, if verification of additional income disclosed on the application might result in a more favorable outcome for the borrower, the income must be verified.

*Continued on next page*

CONVENTIONAL UNDERWRITING GUIDELINES                        INCOME ANALYSIS • 4-3
ISSUED: 08/17/06

CONFIDENTIAL

Exhibit 8

# Washington Mutual

Channel Availability: ☑ Consumer Direct ☑ Retail ☑ Wholesale

## Jumbo - 5/1, 7/1 & 10/1 LIBOR Interest Only ARMs Low Doc Program
### (ALL STATES EXCEPT TEXAS)

PRODUCT PARAMETERS

Effective: 08/12/2006

### Owner-Occupied

| | | Purchase & Limited-Cash-Out Refinance | | | | | Cash-Out Refinance | | | | |
| | | Standard | | | AUS Approved | | Standard | | | AUS Approved | |
| Units | Max Loan | LTV | Secondary LTV CLTV | FICO (A) | LTV | Secondary LTV CLTV | LTV | Secondary LTV CLTV | FICO (A) | LTV | Secondary LTV CLTV |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 Unit | 650K (B) | 90% | 90% | 620 | 90% | 90% | 75% | 75% | 620 | 90% | 90% |
| | 650K | | | 640 | | | 90% | 90% | 640 | | |
| | 1.0 M | 90% | 90% | 640 (C) | 90% | 90% | 80% | 80% | 640 | 80% | 80% |
| | 1.5 M | 75% | 75% | 640 | | | 75% | 75% | 640 | | |
| | 3.0 M | 70% | 70% | 680 | 90% | 90% | 65% | 65% | 680 | 75% | 75% |
| 2 Units | 650K | 90% | 90% | 620 | 90% | 90% | 75% | 75% | 620 | 90% | 90% |
| | 650K | | | 640 | | | 90% | 90% | 640 | | |
| | 1.0 M | 90% | 90% | 640 | 90% | 90% | 80% | 80% | 640 | 80% | 80% |
| | 1.5 M | 75% | 75% | 640 | | | 75% | 75% | 640 | | |
| | 3.0 M | 70% | 70% | 680 | 90% | 90% | 65% | 65% | 680 | 75% | 75% |

### Second Home

| | | Purchase & Limited-Cash-Out Refinance | | | | | Cash-Out Refinance | | | | |
| | | Standard | | | AUS Approved | | Standard | | | AUS Approved | |
| Units | Max Loan | LTV | Secondary LTV CLTV | FICO (A) | LTV | Secondary LTV CLTV | LTV | Secondary LTV CLTV | FICO (A) | LTV | Secondary LTV CLTV |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 Unit | 650K (B) | 90% | 90% | 620 | 90% | 90% | 75% | 75% | 620 | 90% | 90% |
| | 1.0 M | 90% | 90% | 640 (C) | 90% | 90% | 80% | 80% | 640 | 80% | 80% |
| | 1.5 M | 75% | 75% | 640 | 90% | 90% | 75% | 75% | 640 | 80% | 80% |
| | 3.0 M | 70% | 70% | 680 | | | 65% | 65% | 680 | 75% | 75% |



| Jumbo Cash-Out Guidelines | |
| All Jumbo Loan Amounts and Property Types | |
|---|---|
| LTV / CLTV* | Max Cash-Out |
| > 80% | $400,000 |
| > 55% to 80% | $500,000 |
| ≤ 55% | No Limit |

\* Subject to maximum LTV/CLTV levels published above

(A) Minimum FICO score is required on manually underwritten loans.

(B) On Purchase/Limited-Cash-Out only. Standard parameters are allowed to $1.0 million in High Cost Areas. For manually underwritten loans, if the LTV is greater than 80%, minimum 680 FICO is required.

(C) For manually underwritten loans, if the LTV is greater than 80%, minimum 688 FICO is required.

Note:
1. LTVs greater than 80% require Borrower-paid Mortgage Insurance.
2. Always reference Pricing Guides for current pricing adjustments.
3. Jumbo Co-op properties are allowed under the same 1-Unit product parameters above.
4. Eligible lending areas for Co-ops are: New York, New Jersey, Washington DC, and Fairfield, Connecticut.

Page 2-36

Published: 11/14/2006

CONFIDENTIAL

Exhibit 9



**Washington Mutual**
H O M E   L O A N S

Production/Operations Policy Administration

## Cash Reserves

| | |
|---|---|
| **Required Cash Reserves** | A borrower's net worth is an indication of credit worthiness and overall financial strength. A borrower that has accumulated a strong net worth and liquid assets demonstrates an ability to manage financial affairs responsibly. Liquid assets provide a cushion to the borrower that may be used to service debt, supplement income when circumstances produce a short-term reduction in household income, or to handle unexpected expenses without endangering credit rating. |
| | In addition to the down payment, closing costs and prepaid items, the borrower may be required to have a certain amount of reserves available once the transaction is consummated. |
| | Reserves are calculated based either on the subject property's total monthly payment including taxes, insurance and HOA dues, if applicable, or on total monthly debt depending on the loan amount or product parameters. When multiple mortgages are in process for the same borrower, the Credit Approver must aggregate the amount of funds required to ensure the borrower has sufficient funds verified for closing and satisfies the reserve requirement for each of the mortgages. For example, if the reserve requirement for the first transaction is $3,000 and the reserve requirement for the second transaction is $1,500, the borrower must have a total of $4,500 in reserves. |
| | Although reserves may not be required for a particular loan, the lack of reserves or less than the amount required for a program or product should be considered as an additional layer of risk. |
| | The required cash reserves in the table below are guidelines only. Individual transactions may require higher or lower reserves based on product or program guidelines and/or at the discretion of the Credit Approver. |
| | For Alt A Program, refer to the Product and Pricing Guide (PPG) for guidelines. |

**LOANS SECURED BY OWNER-OCCUPIED AND SECOND HOME PROPERTIES**

Cash reserve requirements for loans secured by owner-occupied primary residences and second homes are as follows:

| Loan Amount | Required Cash Reserves |
|---|---|
| Up to $500,000 | 2 months' PITI |
| $500,001 to $1,000,000 | 6 months PITI |
| $1,000,001 to $3,000,000 | 6 months total monthly debt |
| $3,000,001 to $7,000,000 | 50% of the new aggregate loan amount with WaMu (included simultaneous 2nd, if applicable). |

*Continued on next page*

CONFIDENTIAL

Exhibit 10

 **Washington Mutual**
HOME LOANS

Production/Operations Policy Administration

## Risk Layering, Continued

**Compensating Factors**

Following is a list of compensating factors for both manually underwritten loans and those with an AUS referred decision. As indicated below, some factors have already been considered in the AUS decision and may not be used as offsetting strengths. When compensating factors are utilized, including those considered as offsets for AUS referred transactions; the file must contain the proper documentation to support the decision.

❏ A documented error in the credit history directly related to one or more of the credit score factors

❏ There is a demonstrated ability to accumulate savings

**Example:** Assets are seasoned demonstrating the ability to accumulate savings as opposed to funds received from a recent inheritance, etc.

❏ Potential for increased earnings based on education, job training, and time employed or time practiced in a profession

❏ Probability for increased earnings from trailing wage earner income, if not already used to qualify

❏ Verified income not used from an unqualified source, such as rent paid by an extended family member living in the unit, or income that is not expected to continue for three years

❏ Documented net worth substantial enough to evidence an ability to repay the debt (NA if DU/LP referred)

❏ There are verified liquidity/reserves in excess of product guidelines (NA if DU/LP referred)

❏ Demonstrated ability to devote a greater portion of income to basic needs such as housing expense; this includes consideration of residual income (NA if AUS referred)

❏ The LTV is below the program maximum (NA if AUS referred)

❏ The FICO is significantly higher than the program minimum (NA if AUS referred)

7

CONFIDENTIAL

Exhibit 11



**Washington Mutual**
HOME LOANS

Production/Operations Policy Administration

## Resubmission Requirements

| Overview | Generally, the terms of the loan must match the data that was submitted to DU. Loans must be resubmitted to DU: |
|---|---|

- ❑ When a different mortgage product or program is requested,
- ❑ If information about the property changes, or
- ❑ In certain circumstances, when verified data is different than the data used in the submission to DU.

The Credit Approver must review the verified documentation (values) to the data that was used to underwrite the loan.

This section describes the specific resubmission requirements when the data is different than the data used by DU. In all cases Washington Mutual's system of record must reflect accurate data even if resubmission to DU is not required.

**Interest Rate Tolerance**

**DU LOANS**

**Primary Residence and Second Homes:**

- ❑ For fixed rate loans, DU issues a verification message identifying the maximum interest rate that the loan can close at without having to resubmit the loan.

- ❑ For adjustable rate loans, increases in the interest rate that affect the total debt ratio by more than 2% must be updated and the loan resubmitted.

If the actual interest rate decreases from that used to underwrite, the loan does not have to be resubmitted (this applies to both fixed rate and adjustable rate loans.)

**Investments Properties:**

- ❑ There is no interest rate tolerance.

- ❑ If the borrower is offered a note rate that is different than the note rate used in the DU assessment, the note rate must be changed in DU and the loan must be resubmitted.

*Continued on next page*