# EXHIBIT A

THE HONORABLE MARSHA J. PECHMAN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| IN RE: WASHINGTON MUTUAL MORTGAGE BACKED SECURITIES LITIGATION,<br><br>This Document Relates to: ALL CASES | Master Case No.: C09-0037 (MJP)<br><br>[Consolidated with: Case Nos. CV09-0134 MJP, CV09-0137 MJP, and CV09-01557 MJP]<br><br>**DECLARATION OF DIANA JEANTY IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT** |
|---|---|

*Declaration of Diana Jeanty in Support of Plaintiffs' Opposition to Motion for Summary Judgment*
Case No. C09-037 MJP

STATE OF FLORIDA      )
                      )  SS:
COUNTY OF Duval       )

I, Diana Jeanty, declare and state as follows:

I am a resident of Jacksonville, Florida, and am over eighteen years of age. If called as a witness, I could and would competently testify to the following facts, of which I have personal knowledge.

I was employed by Washington Mutual (hereinafter, "WaMu") from January 2000 to October 2009. I first worked in the Bethel Park PA Loan Fulfillment Center (hereinafter "LFC") until 2004, when I moved to Florida and worked in the West Palm Beach Loan Fulfillment Center until April 2006. I then transferred to the Jacksonville, Florida LFC and worked there until I was laid off in October 2009. I was originally hired as a "junior underwriter," and by the end of 2001, I was a "senior underwriter." For the duration of my employment, I worked specifically in the WaMu retail channel where mortgage loans were originated by WaMu loan agents and internally called "loan consultants."

Underwriters and loan consultants were given weekly and monthly "goals" by management, which employees in each organization generally referred to as their "numbers." For underwriters, this goal referred to the number of loans we were each expected to underwrite in a given period. Underwriters were required to complete underwriting on an average of eight files per day in order to maintain salary grades, and by exceeding this goal we qualified for incentive bonuses. Loan consultants were also given goals expressed in numbers of approved and closed loans only, and were paid bonuses over and above their commissions for exceeding those "numbers." Both loan consultants and underwriters received their bonuses at the close of each month, so there was always a big push at month's end to close as many loans as possible. From 2004 through about mid-2007 management at each LFC I was employed urged everyone to make their numbers throughout every month.

As an underwriter, when I first began working for WaMu, along with other underwriters,

*Declaration of Diana Jeanty in*
*Support of Plaintiffs' Opposition*
*to Motion for Summary Judgment*
Case No. C09-037 MJP                      1

I attended various training meetings. Management emphasized the importance of thorough and objective underwriting to protect WaMu from making "bad loans" and exposing the bank to unacceptable risk. However, in the period of 2004 through 2007 when WaMu was making "stated income-stated asset" loans, and offering Option-ARMs and other loans where borrowers were qualified at temporarily low interest rates, the role of underwriters was very different from what WaMu management described it should be. The daily underwriting and sales practices I witnessed were basically the same at each location I worked during this period, in the Bethel Park, PA LFC, the West Palm Beach Fl LFC, and the Jacksonville FL LFC.

The normal practice when underwriters determined that loans did not meet applicable written underwriting guidelines was that management ignored the guidelines so that borrowers who did not qualify were approved for loans anyway, and this happened regularly every day. These loans made by WaMu should have been declined for failure to meet underwriting guidelines if management were to have based underwriting decisions solely on those guidelines.

Making exceptions to underwriting guidelines was not a new concept or procedure at WaMu in the 2004 through 2007 period. Underwriters were trained by WaMu to recognize where exceptions may be appropriate. We were taught by underwriting and credit managers that in unique situations, a borrower who fell short of a specific underwriting requirement, but who had additional resources or other information of creditworthiness (referred to internally as "compensating factors"), may be considered for an exception.

Underwriters in the LFC were trained by WaMu management to determine if those compensating factors substantially exceeded other requirements the borrower had actually met, and if the borrower's failure to meet a guideline was not to a substantial degree. In those situations where we found a relatively small shortfall to meet an underwriting guideline, and a substantial compensating factor or factors that outweighed any failure, such that declining the loan would be unfair or even illogical, that such findings might warrant an exception.

*Declaration of Diana Jeanty in Support of Plaintiffs' Opposition to Motion for Summary Judgment*
Case No. C09-037 MJP                              2



WaMu underwriters were taught by WaMu management that exceptions would be approved in only such unique situations, where the borrower had, through the evaluation process described above, clearly demonstrated that he or she did not pose any added risk beyond that of a borrower who completely met underwriting guidelines. However, in actual daily practice from 2004 through 2007, management approved exceptions and regularly made loans to borrowers regardless of the severity of failures to meet guidelines or the presence of sufficient compensating factors.

WaMu's Sales Department management clearly dominated the decisions made by the Underwriting Department, Credit Department, and LFC management, to the point where objective underwriting and risk management was not operative. WaMu management's goals for sales volume of closed loans drove underwriting decisions rather than the underwriting guidelines during this time period. Exceptions were approved regularly on loans that did not meet guidelines, many times based on no reason other than to just make more loans.

Borrowers who claimed ("stated") extraordinary incomes for their professions, questionable employment without longevity, but who had high credit scores, regularly got large mortgage loans through approved exceptions. Often the debt-to-income ("DTI") ratio for the size of loan borrowers wanted failed to meet guidelines even by wide margins. DTI exceptions were commonplace, and these were the most common type of exceptions approved by management.

The underwriting guidelines for FICO scores were in the mid-to-high 700s before or about early 2006. There were often exceptions approved for lower FICO scores before 2006, but then this became less necessary. The guidelines came down into the lower 600s, and other guidelines were relaxed as well. This was when no-doc and stated loans and the policy to qualify borrowers at low teaser rates of ARMs became the major part of the loan business, and loan volume substantially increased in early 2006 as well.

*Declaration of Diana Jeanty in Support of Plaintiffs' Opposition to Motion for Summary Judgment*
Case No. C09-037 MJP       3



Underwriting guidelines required that a borrower's total monthly income must exceed total monthly debt service, including the new mortgage payment amount, by a specified percentage; those guidelines averaged about 40% debt maximums. However, management consistently approved exceptions even when a borrower's monthly debt payments consumed over 50%-60% or more. Exceptions were granted where debt payments with the new loan qualified at temporary low interest rates added up to 70% of the borrower's total monthly income. Many times the loan payments alone exceeded 50%-60% of the borrower's total monthly income in loans made with DTI exceptions. This calculation still understated the added risk to WaMu as the DTI ratio was based on the borrower's gross income and assumed only the low early loan payment amounts derived from temporary low interest rates in Option ARMs.

I estimate that 80% or more of the loans being made at the LFC's where I worked from 2004 through 2007 were Option ARMs, the rest were other ARM and interest-only loan types. All of these had initial low interest rates that adjusted higher, many times substantially higher, in a certain number of months or years depending on loan type. When the loans adjusted, the DTI ratio for these borrowers who did not meet the initial underwriting guideline would be far higher. Underwriters discussed this added risk as I came to realize we were doing little more than "filling seats" to maintain the appearance of an underwriting department. We realized that our decisions did not really matter. Loans were made whether we recommended an approval or a decline. No matter how large a shortfall from guidelines, exceptions were routinely approved by underwriting managers and/or the Credit Manager, who was Mary Schubert in the Florida LFCs, but had exception authority for this location and others. As the Credit Manager, Schubert was designated as the manager in charge of exceptions.

Underwriting guidelines were readily available to WaMu employees in the "Underwriting Manual" in paper form, which was used by underwriters regularly in the course of doing our work. The manuals were also online for WaMu employees. Loan consultants and processors

*Declaration of Diana Jeanty in
Support of Plaintiffs' Opposition
to Motion for Summary Judgment*
Case No. C09-037 MJP                     4






also referred to the guidelines frequently, so experienced consultants were able to quickly identify when exceptions would be needed, and what level or degree the exception was from the underwriting guidelines. At some point in about 2004 or early 2005, there was a written "Exception Policy" included in the Underwriting Manual. This was not part of the underwriting guidelines for the various loan types, it was in a separate section along with other policies and procedures.

The Exception Policy included grids or matrices that described certain ranges of exceptions for certain underwriting guidelines, and defined the level of authority required for approvals. In practice, however, this written policy did not control the use of exceptions. There were often exceptions approved that were beyond the ranges addressed in the policy, exceptions that underwriters and I referred to as "outside the box." From 2006 to 2007, there were large amounts of borrowers trying to get loans from WaMu, "stated income / stated asset" and "no-doc" loans made it easier, especially for self-employed people to obtain a loan. There was a known tendency for many to claim whatever income they needed in order to get the loan they wanted.

Plus, WaMu's marketing slogan for this time frame was "The Power of Yes," and exceptions were the way WaMu management found to say "Yes" to loans that did not meet guidelines. The exceptions that were "outside of the box" from the written Exception Policy, required approval above underwriting from credit management, or higher, depending on the magnitude of an exception. These larger "exception requests" were usually submitted by high-producing consultants who had reputations for getting anything they wanted. Like other kinds of exceptions, upper management routinely approved these outside-of-the-box type exceptions as well.

When an underwriter recommended that a loan be declined, we documented the reasons why a loan should be declined and automatically sent it up to an underwriting manager. When I

*Declaration of Diana Jeanty in Support of Plaintiffs' Opposition to Motion for Summary Judgment*
Case No. C09-037 MJP                5



wrote up reasons why a loan should be declined based on guidelines, I knew that management would almost always approve an exception anyway. If a loan was declined by underwriting managers, this was not the end either. Loans that were declined were given a "second review," and it was not unusual that in the infrequent occurrences where loans were declined, that after the "second review" the same loans were made with approved exceptions. The second review process was described by management as an opportunity to make sure all information had been correctly analyzed, and that the borrower had an additional opportunity to provide any additional information that may increase qualification for the loan. However, in my experience, second reviews just looked at the very same information again and management simply made a different decision in order to make another loan.

Underwriters at the LFC were all under pressure to move loans through the process. We all had specified levels of underwriting and exception authority. When underwriters requested more information from loan consultants, I can describe that their usual reactions were to look at us as if we were committing a crime. Underwriting managers also reacted like they were being bothered at times when underwriters submitted files recommending a decision to decline or because they didn't want to approve an exception that was within their authority.

Underwriting managers could not approve exceptions that were beyond their authority level. They submitted those loans to the Credit Manager, Mary Schubert, who also approved the larger exceptions that underwriting managers either did not want to approve, or that were beyond their authority. In some cases, large exceptions were submitted to even higher WaMu management for approval. The management philosophy was clearly to find ways to make more loans by using exceptions, regardless of how far a loan deviated from underwriting guidelines.

I estimate that from January 2005 through January 2007, at least 30% to as much as 50% of the loans made at the West Palm Beach and Jacksonville LFCs did not meet underwriting guidelines and required management approval of exceptions. The remaining percentages largely consisted of loans that only appeared to meet guidelines as a function of very limited reviews

*Declaration of Diana Jeanty in Support of Plaintiffs' Opposition to Motion for Summary Judgment*
Case No. C09-037 MJP                        6



done under "low-doc" and "no-doc" loan categories. There were often times that something occurred or an issue was discovered in the underwriting process, or when a loan was being closed, that required a full-documentation manual underwrite in order to make the loan. Almost always, when these loans were submitted for full-doc reviews they did not meet guidelines and should have been declined.

These opportunities were like a window into the frequency and level of misrepresentations being made by borrowers on the low-doc and no-doc programs, as the subsequent full-doc reviews regularly revealed that incomes had been way overstated. For example, I saw borrower incomes represented to be about $7,000 per month in low-doc loans that were approved, come down to about $2,000 per month upon a full-doc review. Other examples include finding that a woman was on maternity leave without pay but buying property on stated income; that a borrower had only begun working at a job he represented to have had for many years; the "salary" claimed by some borrowers was actually commissions, and some that had been declining; and another borrower's tax returns showed substantial unreimbursed expenses that were not deducted from the stated salary, making the actual salary about half of what was stated.

In this ongoing process where some "stated loans" that WaMu initially deemed to meet guidelines were later subjected to full-doc reviews, it was consistently revealed that most of those loans did not meet guidelines and would require exceptions, mostly of the "outside of the box" type. The stated loans WaMu made with exceptions actually required greater exceptions or to be declined because of the level of non-disclosure and misrepresentation by borrowers. Underwriters were precluded from requesting documentation to support what was stated by the borrowers under these WaMu programs.

At the beginning of the underwriting process at WaMu from 2004 through 2007, loans were submitted to an "AUS" (Automated Underwriting System) to determine if the loan met

*Declaration of Diana Jeanty in Support of Plaintiffs' Opposition to Motion for Summary Judgment*
Case No. C09-037 MJP         7



Fannie Mae or Freddie Mac standards for those entities to purchase the loan for subsequent sale on the secondary market. The AUS guidelines were often referred to as "DU" (Desktop Underwriter), and were known to be generally looser than WaMu's own portfolio guidelines. When the DU system declined a loan for whatever reason, because it either fell short or was outside of the DU parameters, the loan was referred to the underwriters as a possible WaMu portfolio loan. Yet, even though these underwriting reviews were done on loans initially rejected by a more lenient set of guidelines, we rarely declined them as portfolio loans. Many loans that failed the more lenient AUS system reviews, as would be expected also failed to meet WaMu's underwriting guidelines when reviewed for the WaMu portfolio. However, by far most of these loans were made anyway as management approved exceptions.

As an experienced WaMu-trained senior underwriter, I found the regular approvals of exceptions to be personally disgusting. I believe that if underwriting decisions had been left to underwriters based on the underwriting guidelines that WaMu would still be in business and selling mortgages today.

Of those loans made with exceptions, I estimate that most (over 50%) were "outside of the box," meaning beyond the ranges written in the exception policy or grids, and those also required approval of the risk officer or above. Underwriters at the LFC often discussed that many of the borrowers seeking stated and no-doc Option ARMs, interest-only, or other ARM types of loans at the time were trying to borrow the most they could for the best homes they could get. Or, that those who were investors were trying to get more loans for the most properties they could get, which was more than what they could afford or qualify for under the underwriting guidelines. The exceptions practice became what defined how much a person could borrow or how many loans someone could get. This became the normal way of business from the beginning of the process as loan consultants appealed to their customers by aggressively assisting and even encouraging them to borrow more than underwriting guidelines permitted.

*Declaration of Diana Jeanty in Support of Plaintiffs' Opposition to Motion for Summary Judgment*
Case No. C09-037 MJP

8



Many "investor-type" borrowers during this period bought multiple properties, and many of them financed multiple properties with WaMu. These borrowers usually got interest-only, or Option-ARM loans that included an option to make interest-only payments, but still regularly needed management to approve exceptions in order to qualify at the low initial rates.

This was the subject of another type of exception, as WaMu underwriting guidelines specified an allowable maximum number of loans that could be made per borrower, provided that the borrower met all of the other underwriting guidelines. However, exceptions were often made that allowed borrowers to get more loans than guidelines permitted, usually for rental homes.

Further, in order to take advantage of lower interest rates, investor-type borrowers often misrepresented that they were applying for a mortgage on a "primary residence" when the loans were actually for rental properties. Upon reviews of these loan applications, it was very evident when this occurred as there were a host of indicators and scenarios that clearly demonstrated when these misrepresentations occurred. However, management at the LFCs regularly permitted multiple loan borrowers to get these "primary residence" loans when the facts demonstrated that many of those were actually for rental properties.

Underwriters regularly determined that a loan was not for a primary residence, as represented by the borrower, during the regular course of underwriting activities on the file. For example, we regularly looked into whether a borrower owned another property or properties as a part of evaluating the borrower's creditworthiness and ability to pay on a new loan. Underwriters at WaMu were trained to look for this type of information. There were instances where loan applications represented the subject new property as a primary residence, yet the borrowers still owned far more expensive primary residences, and usually in a much more desirable neighborhood. I recall such scenarios, like a borrower who owned a primary residence valued at around seven hundred thousand dollars, and was seeking a primary residence loan for a

*Declaration of Diana Jeanty in Support of Plaintiffs' Opposition to Motion for Summary Judgment*
Case No. C09-037 MJP                    9



home valued at about two hundred thousand. When loan consultants, and sometimes buyers themselves, were questioned by underwriters about these situations, a typical response was that the buyer was intending to sell the more expensive home. However, other facts were always present that further demonstrated these representations to be false.

Information concerning instances where borrowers owned other rental properties, sometimes with other mortgages from WaMu, was readily available to WaMu underwriters and management. WaMu also offered low rates on second home mortgages, and it was also common for multiple property borrowers to represent in applications for another property that the loan was going to be for a second home rather than another rental property. Again, there were many different pieces of information that demonstrated otherwise. For example, there were borrowers living in upscale neighborhoods with far less expensive rental properties in lower-income areas. When borrowers with these profiles represented they needed a loan for a second home that happened to be located in the same area and price range as the rental properties, this just logically did not make sense.

Another type of scenario that occurred involved buyers with primary residences who applied for a second residence loan within close proximity but of greater value than their primary. During the period of 2004 through 2006, before housing prices began to decline, many of the multiple property investor-type of borrowers were able to flip properties for a profit, and refinance properties that had appreciated in order to pull out cash. Some then bought more properties, others bought a nicer, more expensive home, and kept their former residence as a rental. Some investors bought one property as a primary residence, fixed it up for rent, and then bought a new residence. In both of these scenarios, the borrowers had at least one rental property financed as an owner-occupied primary residence, along with their actual primary. Most multiple property borrowers during the 2004 to 2007 time frame had more than one "primary residence" with owner-occupied mortgages, when underwriting guidelines only

*Declaration of Diana Jeanty in Support of Plaintiffs' Opposition to Motion for Summary Judgment*
Case No. C09-037 MJP        10



permitted a borrower to get one primary residence loan for their actual main residence. Usually this was readily apparent through the borrower's property ownership records, and often WaMu was the lender for two or more of these primaries that existed simultaneously.

Most borrowers who bought two properties or more during the 2005 and 2007 time frame, got a "secondary home mortgage" for at least one of their properties that they represented to be a second home. Most of these so-called "secondary residence" loans, by far, were actually rental properties. Usually, just the price and location alone demonstrated that logically these were not second residences. Plus, there was other information readily available that demonstrated a property was a rental. For example, property histories showed that many had been rentals for years. The appraisals often reflected that the properties were renter-occupied with long term tenants even though the borrower was representing the loan was to be for the borrower's primary or secondary residence.

I refused to sign off on these misrepresented primary and secondary home mortgages. Instead, I informed an underwriting manager of my findings that contradicted what the borrower represented. I also conveyed my questions about these loans to management. For example, I asked things like "Why would this borrower who has money, a family in a nice big home, in a very good neighborhood, want to buy a small, run-down rental in a poor neighborhood as a second home or a vacation home?" I also asked questions like "Why is a borrower with a nice, big, primary residence in a nice neighborhood buying a new primary residence that is half as expensive and in a bad neighborhood, and when the nice big primary is not even for sale?"

Management consistently made these primary and secondary loans even though the borrowers had clearly misrepresented the purchases and the facts demonstrated that these were actually rental properties. This happened often, even when WaMu was the lender for a borrower's multiple primary residences, or multiple combinations that resulted in more than one primary, and/or more than one secondary. In general, those mortgages that were actually for

*Declaration of Diana Jeanty in
Support of Plaintiffs' Opposition
to Motion for Summary Judgment*
Case No. C09-037 MJP                 11

rental properties were many times misrepresented to be for primary or secondary residences, and this information was readily available and reviewed by underwriters and management.

I estimate that of all loans made at the West Palm Beach and Jacksonville LFCs from 2005 through mid-2007, about 30% were Option ARMs made as lower interest primary or secondary residences when in fact those were purchased by investors to be rental properties. The multiple property-type borrowers regularly used the same high producing consultant to submit their applications, and those consultants were almost always able to get any loan made the way they wanted. This is another example of how sales ran the LFCs and routinely overrode adverse underwriter decisions and the written underwriting guidelines.

Underwriting guidelines for loan-to-value (LTV) were also often bypassed and exceptions were routinely approved, permitting borrowers to make smaller down payments and borrow a higher percentage than permitted by those guidelines. All underwriters were given authority to approve a 5% exception, so borrowers immediately got an extra 5% in financing. Exceptions for more than 5% were regularly approved up to 90%, even 100% value. In addition, it was obvious that appraisals were often inflated by appraisers. I saw files where prior appraisals recently done by an appraiser were far lower than by a new appraisal re-done by another appraiser that reflected a significantly higher value before loans were submitted to underwriting.

Requests for exceptions were generally made in two ways. First, when an underwriter wrote up their reasons to decline a loan, this was documented in file notes in the WaMu loan system and in an email sent to the loan coordinator, their manager, and the assigned loan processor. This happened frequently, and the typical response from the sales consultant was to forward the underwriter's recommendation email to the risk officer (Schubert) and request approval of an exception. Usually the email was then forwarded back to me by Schubert saying to "go ahead and approve," or that she approved the loan herself. Sometimes when the file came

*Declaration of Diana Jeanty in Support of Plaintiffs' Opposition to Motion for Summary Judgment*
Case No. C09-037 MJP                                   12



back to me after I received emails approving exceptions, whether from Schubert or an underwriting manager, there was only their management signature approving with no explanation.

I often asked the approving manager about their basis for approval, and usually the response from underwriting managers or Mary Schubert was "We're ok with that," or "We're fine with that." Management just approved exceptions without any underwriting reason or any identified compensating factor, and without any new information from the borrower. Some of the reasons were pathetic to me, and I expressed my reactions at times by saying things like "Are you serious?" Sometimes, I was told that a borrower had a second job or some form of additional income not in the original application. Yet, usually there was no backup documentation to support that statement, or just some notes in the file by management or some document that looked to me it had been prepared by the loan consultant. In these situations, I never saw a document from an employer of the borrower proving more income than what an application originally reflected. Ultimately, exceptions were routine and loans were rarely declined during the 2004 through 2007 period.

Underwriting procedures at WaMu required exceptions to be documented in loan files. However, many times this was not done. To determine those loans that did not meet guidelines and were made anyway with exceptions, would require a full re-underwriting of the loans at the LFCs because it was common for exceptions to be approved without any documentation in the file itself. The notes made by underwriters and management in the electronic loan origination system sometimes explained exceptions and sometimes only approvals of exceptions were written there, however it was not common for those notes to be printed and put in files.

The second way requests were generated was when experienced and high-producing consultants recognized before submission of a loan to underwriting, that a large exception would be needed. These large producers had a lot of power and often went directly to Mary Schubert,

*Declaration of Diana Jeanty in Support of Plaintiffs' Opposition to Motion for Summary Judgment*
Case No. C09-037 MJP          13



1  or LFC management for approval, bypassing the processors, underwriters, and even underwriting
2  management right at the beginning. Typically these exceptions were approved like everything
3  else, and once upper management approved an exception the file came back to an underwriter to
4  complete for closing. Underwriters could see this process by reading the email string that came
5  with exception approvals in this scenario even before we got the loans to underwrite. This is
6  another example of why underwriters had no credibility, and how the sales department was really
7  in charge of the LFCs.

   Also, when underwriters requested additional information from loan consultants in order
to make underwriting decisions, many times the consultants did the same thing and went directly
to management. The bigger producers did not bother with these types of issues that delayed their
production of closed loans. Rather than obtain additional information from borrowers to try and
meet underwriting guidelines, the consultants usually just emailed either the Credit Manager or
higher management at the LFCs, or even risk management at the corporate office to request
approval of exceptions. Then the approving manager notified the underwriter by email that an
exception had been approved and to complete remaining work so the loan could be funded.

   I recall one woman who applied for a $500,000 loan on a home of about the same value.
She had no prior mortgages and was trying to get a 1-month ARM where she could qualify at the
low teaser rate. Her stated income was $25,000 for the year. The DTI ratio was ridiculously
high, but management cited her down payment and money she had in the bank. I calculated that
once the payment adjusted upward her money would be gone in a few months when making the
higher payment with her income. I asked underwriting managers "Are you serious?" and "Are
you sure about this?" I cautioned that the woman would not be able to keep up with the loan
once it adjusted, but management approved the DTI exception and made the loan anyway.

   Underwriters discussed internally how these exception processes were frustrating and just
wrong because WaMu's underwriting credibility was destroyed by the constant approval of

*Declaration of Diana Jeanty in
Support of Plaintiffs' Opposition
to Motion for Summary Judgment*
Case No. C09-037 MJP                    14



1 | exceptions by WaMu management. We often discussed that many people were getting loans
2 | they could not afford, and that there would be high default rates starting in the near future.
3 |
4 |     I declare, under penalty of perjury, that the foregoing is true and correct. Executed on
5 | May 7, 2012.

Diana Jeanty

*Declaration of Diana Jeanty in
Support of Plaintiffs' Opposition
to Motion for Summary Judgment*
Case No. C09-037 MJP      15