# EXHIBIT B

THE HONORABLE MARSHA J. PECHMAN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| IN RE: WASHINGTON MUTUAL MORTGAGE BACKED SECURITIES LITIGATION, <br><br> This Document Relates to: ALL CASES | Master Case No.: C09-0037 (MJP) <br><br> [Consolidated with: Case Nos. CV09-0134 MJP, CV09-0137 MJP, and CV09-01557 MJP] <br><br> **DECLARATION OF DENISE LUEDTKE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT** |
|---|---|

*Declaration of Denise Luedtke in Support of Plaintiffs' Opposition to Motion for Summary Judgment*
Case No. C09-037 MJP

1    I, Denise Luedtke, declare and state as follows:

2    That I am over eighteen years of age and a resident of San Jose, CA. If called as a witness, I could and would testify to the following facts, of which I have personal knowledge:

3    I was employed by Washington Mutual (hereinafter, "WaMu") from January 2002 through March of 2006 at a Loan Fulfillment Center in Campbell, CA (hereinafter the "LFC" or the "Campbell LFC"). I was hired as a "Team Manager" in the Wholesale Division, where loans were originated by independent brokers and submitted to the LFC for processing, underwriting and closing. I moved up to the position of "Senior Team Manager" in 2004, and again in the fall of that year to the position of "Underwriting Senior Team Manager". In the summer of 2005 I transferred to the Retail Division, still in the same position of Underwriting Senior Team Manager. In January 2006, I was promoted to be the "LFC Manager" until the Campbell LFC closed in March. The LFC then moved to Pleasanton, CA but I chose not to remain employed as it was too far from my home.

4    As Underwriting Senior Team Manager, I had upwards of forty direct reports, supervising LFC staff including Loan processors, Underwriters, and Closers. We had production goals each month, to close a certain number of loans submitted to us by independent wholesale Brokers and then in retail by WaMu Loan Consultants, as both regularly supplied the LFC with loan applications from their own clientele. I worked first in the Wholesale Division dealing with loans from brokers until 2005, when I moved into the Retail Division working with loans from Loan Consultants in the LFC.

5    WaMu underwriters were provided with written underwriting guidelines in WaMu's Underwriting Manual specific for each loan program. Underwriters were trained by WaMu management that if these guidelines were met, the underwriter's decision should be to approve the loan, and if not, then the decision should be to decline. However, early on in my tenure as loan volume increased, there were always exceptions made permitting borrowers who did not meet underwriting guidelines to get loans anyway.

*Declaration of Denise Luedtke in Support of Plaintiffs' Opposition to Motion for Summary Judgment*
Case No. C09-037 MJP        1



In approximately late 2004 or early 2005 the WaMu corporate office came out with some new policies. There had been some issues with rate locks, where rates were not locked until the time of closing, and WaMu had already committed rates and prices to borrowers. Loan-to-Value ("LTV") exceptions, and Debt-to-Income ("DTI") exceptions were commonly approved during the loan origination process, and these affected pricing as well, which also prompted WaMu to develop a price-lock policy and an exceptions policy. These were then included as sections of the WaMu Underwriting Manual. Prior to this, the same types of exceptions were routinely approved by Team Managers, the Credit Manager or the LFC manager. However, this was an informal process based on the level of exception and total circumstances where there was no clear authority level prescribed for specific exception ranges.

The written underwriting policy did provide certain levels of exception authority, depending on underwriter experience and position and hierarchy of management. However, there were no limits on the extent and size of exceptions that were regularly approved. Matrices or grids defined the level of authority required for approval up to and beyond common exception ranges, and then the higher levels of management authority for exceptions beyond the defined ranges. The policy identified exception authority for Underwriters, Senior Underwriters, Team Managers, the LFC Manager, and then the highest level at the LFC who was the Credit Manager. If none of these people approved the exception, or it went beyond the Credit Manager's authority, there was still another higher level of management in the Seattle Corporate office that would approve the exception. At times, there were large loans that needed significant exceptions, which was recognized by experienced, high-producing sales agents who bypassed the LFC altogether and went directly to a main Credit Manager in Seattle to get approvals.

In this area of California, most of the borrowers had high credit scores so there was not much of a need for FICO exceptions. Most exceptions were made on DTI ratios, as the borrowers tended to have more cumulative debt payments than underwriting guideline limits allowed. Loans submitted by brokers in the wholesale channel or by WaMu's own Loan

*Declaration of Denise Luedtke in
Support of Plaintiffs' Opposition
to Motion for Summary Judgment*
Case No. C09-037 MJP           2



Consultants in retail were first subjected to the Automated Underwriting System ("AUS") to determine if the loan met Fannie Mae or Freddie Mac standards. If so, Underwriters or Senior Loan Processors checked to ensure that all information was correctly input to verify the AUS approval. Once approved, those loans were targeted for sale to the secondary market. When a loan was not AUS approved, it was referred to Underwriting for a full manual underwrite to determine if WaMu would make the loan for its own "portfolio".

The vast majority of loans processed through the LFC during my tenure were "Stated Income / Stated Asset" Option ARMs. It was common for borrowers of these loan types to misrepresent higher incomes than the norm for their professions, and higher assets than they actually had, in order to get bigger loans for the homes they wanted to buy. Wholesale brokers and WaMu retail loan consultants who were usually well experienced with WaMu underwriting guidelines coached borrowers about the amount of income and assets to state on an application in order to get the maximum loan they could get with the permissive stated loan format and WaMu's practice of granting exceptions to make loans. This is one reason why the most common exception was for DTI ratios. WaMu qualified borrowers by underwriting at the temporary, low interest "teaser' rate payments, using their gross income. Most borrowers got large enough loans that even the temporarily low payment amounts, when added to the rest of their monthly debt service, equaled too large a percentage of their income to meet underwriting guidelines.

I estimate that a substantial majority of loans made at the Campbell LFC were to borrowers who overstated their income, assets, or both. At times, incomes appeared so inflated that underwriters requested documentation to at least verify assets. Most of the established WaMu brokers and loan consultants at that time produced a high volume of loans for WaMu. When underwriters requested documentation from these top producers, they routinely contacted management at the LFC and the loans were regularly approved with just the call.



Management communicated to the LFC production staff that WaMu was competing with Countrywide for market share. Whenever Countrywide had quoted pricing on a loan for a borrower who did not meet WaMu guidelines, WaMu always approved exceptions and made those loans as well.

Guidelines for the "back end" DTI ratio were usually around 40% to 60% total monthly debt payments to income. However, exceptions were routinely approved by underwriting at up to 50% debt, and then by the Credit Manager or LFC manager for anything above that percentage. DTI exceptions were almost always approved at all levels, and when a high producing salesman was involved, whether a Broker or Loan Consultant, they were always successful in getting any kind of exception approved without concern for underwriting findings.

Underwriters and Team Managers at the LFC expressed concerns and frustration about the widespread approval of exceptions in "water cooler" conversations, team meetings, and sometimes in discussions with the LFC Manager. I always believed that this practice of approving exceptions on stated loan applications added a critical level of risk, especially to stated-loan products that had added risk in the first place. I believed and expressed to management, as did other underwriters at the LFC, that this practice would result in high default rates. Management, including upper management at the LFC, shared these concerns. However, the directives for widespread use of exceptions, as an alternative method to underwriting guidelines for making more loans, came from corporate management and were company policy.

Exceptions were also regularly made to the guidelines for the percentage of Loan-to-Value (LTV). Underwriters all had authority to increase loan percentage an additional 5% LTV. Many times exceptions were made on Home Equity Line of Credit ("HELOC"s), as the most common loan program was the "80-10-10", with an 80% first, 10% second (the HELOC) and 10% down from the borrower. The typical exception that underwriters approved with their own authority was a 15% HELOC, so that the properties were 95% financed but with an 80% first, especially because mortgage insurance was required on any loan over 80% LTV. Management

*Declaration of Denise Luedtke in Support of Plaintiffs' Opposition to Motion for Summary Judgment*
Case No. C09-037 MJP                    4



often approved exceptions going up to 20% on the HELOC for 100% financing, up to a top limit exception of a 25% HELOC for 105% financing. For investor-borrowers, underwriting guidelines specified the maximum number of mortgage loans permitted per individual, and an aggregate dollar amount from WaMu. Exceptions were commonly made for these types of borrowers, who were almost always represented by a top producing Broker or Loan Consultant. WaMu consistently approved exceptions in these scenarios.

WaMu's investor/borrowers typically financed some of their properties as "second homes" in order to get lower interest rates than they would get for rental properties. Second home loans were basically the same pricing and rates as primary residences. Investment property loans cost additional points, interest rates were higher, and required more down as LTV was lower. It was almost always easy to tell when borrowers were misrepresenting that they were buying a second home, or in many cases, yet another second home. Underwriters were able to determine that these were seldom actually second homes, based on the areas and neighborhoods, appraisals and other information readily available and regularly used in the normal course of underwriting.

These alleged second homes were not in typical second home or vacation home type areas. Many were in areas with other rental properties, including areas with other rentals owned by the borrower. Many times the appraisals identified the home to have existing tenants. Underwriters were given creative explanations by the sales people and borrowers, such as the additional second home in a neighborhood of rentals was for the borrower to stay near his other properties at times and that although the appraisal reported a tenant in the home, that tenant had agreed to move. There was no proof given for such explanations, and WaMu had no practice to follow-up and determine if whatever borrowers represented would happen with a property's use actually did occur.

WaMu regularly approved exceptions allowing borrowers to get lower interest "second home" mortgages that were clearly evident as rental properties at the time of underwriting. I

*Declaration of Denise Luedtke in Support of Plaintiffs' Opposition to Motion for Summary Judgment*
Case No. C09-037 MJP                  5



estimate that about 25% of the loans made at the LFC were for rental properties bought by the investor-type borrowers. The great majority of those got WaMu secondary residence loans, and most were actually for rental properties.

I estimate that approximately 20% to 30% and possibly more of the loans funded and closed at the Campbell LFC did not meet underwriting guidelines and were made with management-approved exceptions. Sometimes exceptions were documented and sometimes not. To determine all loans made with exceptions would require a re-underwrite using the applicable guidelines at the time. I estimate that approximately 30% of the loans made at the LFC with exceptions were not documented in the loan files.

The multiple properties, investor-type borrower, often failed to meet underwriting guidelines for some of their loans, especially for the DTI ratio and LTV percentage. These borrowers were typically represented by high-producers in sales for WaMu, who were able to get the most problematic loans done by getting exceptions approved, by whatever level of management they needed to get. The Campbell LFC had some of the highest producing sales people in the company, in both categories of wholesale Brokers and retail Loan Consultants. High-producers had reputations in the LFC that they could anything approved that they submitted, including when borrower's stated incomes were far higher than normal for their profession, and when their DTI ratios were well beyond debt limits in guidelines.

These high producers and others in both the wholesale and retail channels often went directly to management in the LFC and at times to corporate for approvals on loans that they determined in the application stage would not meet WaMu guidelines, or if underwriters requested additional information. All other producers had to wait, for the most part, until loans had gone from the underwriters and up the management chain of approval until exceptions were approved. The LFC operations were driven by sales and sales goals dominated all disciplines, including underwriting.



*Declaration of Denise Luedtke in
Support of Plaintiffs' Opposition
to Motion for Summary Judgment*
Case No. C09-037 MJP           6



1     I declare, under penalty of perjury, that the foregoing is true and correct. Executed on
2 May 9, 2012.

3

4 _____
5 Denise Luedtke

*Declaration of Denise Luedtke in
Support of Plaintiffs' Opposition
to Motion for Summary Judgment*
Case No. C09-037 MJP      7