# EXHIBIT 1

# EXPERT REPORT OF
# PROF. CHRISTOPHER M. JAMES

In re Washington Mutual Mortgage-Backed Securities Litigation

June 22, 2011

000155

Confidential            Page 1

WaMu. Even among those who did not, many had the means and incentive to conduct individual due diligence of WaMu's underwriting practices.

B.  *Differences in Information Available at Time of Purchase*

88.  The putative class period spans over two years, beginning on June 26, 2006 (the date of the Series 2006 AR-7 Offering) and ending on August 1, 2008. While thinly traded relative to securities traded in efficient markets, there were purchases for the majority of these securities throughout the putative class period. For example, plaintiff Chicago PABF purchased tranche 1A1 of Series 2006 AR-12 on June 8, 2008. Exhibit 20 summarizes for each security the secondary market trades designated as purchases occurring more than one year after each Offering relative to the number of secondary market purchases over the entire putative class period.

89.  Increased knowledge of the alleged underwriting deficiencies can be imputed to plaintiffs who purchased later in the putative class period due to the availability of additional information regarding mortgage group/security performance relative to expectations, as well as public discussions regarding mortgage performance and the potential role of underwriting issues.

90.  Exhibit 21 shows cumulative loss and delinquency information for the mortgage pools and groups at issue in this matter. Detailed data regarding security financial performance, including a breakdown of principal and interest payments to each tranche, the extent to which any losses had occurred, and delinquencies, default and foreclosure information for each loan group, was provided in monthly trustee reports. Such information was available not only for the securities purchased, but also for other similar products, enabling comparison of financial

000199

performance along a number of dimensions. Van Tassel provides evidence that putative class members analyzed such data prior to making acquisitions. When during his deposition he was asked, "What kind of due diligence or analysis does your group do prior to making a recommendation about a mortgage-backed security?" he stated (p. 39):

> It—it varies by sector. But generally we—we first understand the collateral. So in a residential mortgage-backed transaction, we have loan level data. So we'll look at the history of the mortgage loan pool. We look at the characteristics of the loans. We look at delinquencies, defaults, losses, if there had been defaults, loans that had been modified, borrower characteristics. We map home price appreciation to each zip code that—we have data down to zip code level. We don't have property addresses, but we'll calculate current loan-to-values for the properties based on this macro home price data we have. And then we'll look at transition rates, the pace at which borrowers are going—missing one payment, missing two, missing three, going into forecast, liquidated, et cetera. And with that we will produce some expectations in terms of where we think those transitions are going to continue over time. And then we'll run a wide range of scenarios around those expectations to look at expected returns, average life volatility, et cetera, to arrive at whether or not we think a security is attractive. And then on an ongoing basis each month we'll update that information from electronic data received through the trustee.

91.   Van Tassel also discussed a source for loan-level data on MBS (Van Tassel Deposition, p. 41):

Q: ...How do you get the loan level data mortgage-backed securities?

A: We subscribe to a third party service.

Q: What's that called?

A: ...Loan Performance...

92.   Loan Performance is one source of loan level data. Another such source is Intex Solutions, which Maulik Bhansali, Head of Portfolio Strategies at Wells Capital Management, explains (Bhansali Deposition, p. 102) "provides loan-level information for a lot of non-agency

000200

deals, including this one" and "would be our primary source for getting the information on individual FICO scores, geography, documentation type, and loan-to-value ratios." From Intex's web site (http://www.intex.com/main/company.php):

> Since 1990, Intex has modeled nearly every public deal and numerous privately issued deals, and creates ongoing updates for each deal each month or quarter using investor reports and, when available, loan- or asset-level information obtained directly from trustees, servicers and issuers. Intex's products help foster new deal issuance, increase the liquidity of the secondary marketplace, and improve deal surveillance and transparency.

93. Yet another source for loan-level data is ABSNet, which I use frequently in my own analysis and have used in preparing this report. ABSNet is an aggregator of publicly available information regarding security- and loan-level performance and provides monthly information updates. Bloomberg is an additional source for monthly performance data and is relied upon in Exhibits C-1 to C-6 of the Hakala Declaration.

94. Plaintiffs concede that there is important information regarding underwriting in these performance data, which were available to certain putative class members prior to their purchases. For example, the Complaint (¶¶132–133) discusses delinquency and default rates four and six months after the offering dates and then states that "[t]hese early payment defaults and delinquency rates are reflective of a disregard for underwriting guidelines." This is consistent with discussion in the academic literature. For example:

> We define an "early default" as a mortgage that is 90 or more days delinquent within the first year after origination. We use this window since performance warranties by originators often covered the first year. The reasoning was that any serious underwriting problems with mortgages

000201

> typically manifest themselves within the first year. (Haughwout, Peach and Tracy (2008), p. 2)
>
> Evidently, there is a remarkable increase in early default rates for post-2004 originations, especially during 2006 and 2007. Such high and early defaults on subprime mortgages led both policy makers and academics alike to believe that there was a significant deterioration in underwriting within the subprime mortgage market.... (Bhardwaj and Sengupta (2008), p. 2)

95. It is important to note that plaintiffs' allegations do not appear to pertain to deterioration in underwriting standards (e.g., extending loans to borrowers with lower FICO scores or extending loans to more low-documentation borrowers), which is what is being discussed in the Bhardwaj and Sengupta article. The characteristics of the mortgage pool are summarized in the prospectus supplements and more detail is readily observable to any investor reviewing loan-level data, such as that available via Loan Performance, Intex, or ABSNet. One could thus track differences in characteristics across pools and groups. Rather, plaintiffs' allegations appear to pertain to alleged unobservable exceptions to stated underwriting standards (e.g., characterizing a loan as full-documentation when in fact the income was not adequately verified).

96. Data on early delinquencies and defaults for the securities at issues was available to putative class members. Available industry data showed an increase in early Alt-A defaults relative to earlier vintages. For example, Haughwout, Peach and Tracy (2008, Table 11) show an increase of 2.54% and 6.26% for 2006 and 2007 vintages, respectively, relative to the 2003 vintage. Moreover, Demiroglu and James (2011, Figure 5) show that the rate of cumulative losses began to pick up in early 2007.

97. Given these data and discussions, it is reasonable to assume that putative class members, particularly sophisticated putative class members, may have drawn inferences about underwriting practices from the performance data that they received. Differential knowledge for certain later purchasers can also be imputed from lower prices and ratings downgrades. Well before the end of the putative class period, putative class members appear to have purchased their securities for well below par, indicating their belief that, for whatever reason, expected future cash flows would be lower than those expected by the initial investors who purchased the securities at par. It is possible that these below-par purchases reflected (among other things) inferences regarding underwriting practices drawn from security performance data, public discussion, or individual inquiries. For example:

- Tattersall Advisory Group purchased tranche 2A3 of Series 2006-AR12 at $84.75 per unit on July 7, 2008 (WAMU_CANT_0000004).

- BTMC-Belvedere Trust Secured A purchased tranche B8 of Series 2006-AR7 on January 12, 2007 and February 1, 2007 at $79.28 and $79.34 per unit, respectively (WAMU_BARC_0000008).

- Goldman Sachs Asset Management purchased tranche 2A of Series 2006-AR7 on May 28, 2008 at $67.30 per unit (WAMU_LBI_0000003).

98. Plaintiffs do not point to any discrete disclosure or disclosures revealing the purported truth regarding WaMu's alleged disregard for underwriting standards. Rather, they assert that the market learned gradually over time as a result of performance data and anecdotal press reports (Complaint ¶130-134; Hakala Declaration, ¶3). Plaintiffs' proposed class period end date is entirely arbitrary, however. They point to no event on or around August 1, 2008 that

000203

Executed on this  21st  day of  June  in 2011 in  Gainesville, FL  .

_____
Christopher M. James