UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| IN RE WASHINGTON MUTUAL MORTGAGE BACKED SECURITIES LITIGATION,<br><br>This Document Relates To: ALL CASES | MASTER CASE NO. C09-37 MJP<br><br>ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MOTIONS TO EXCLUDE |

        This matter comes before the Court on Defendants' motion for summary judgment.  (Dkt. No. 383.)  Having reviewed the motion, the response (Dkt. No. 414), the reply (Dkt. No.  426), the surreply (Dkt. No. 431), and all related papers, and having heard oral argument on July 12, 2012, the Court DENIES the motion.  The matter also comes before the Court on Defendants' three motions to exclude (Dkt. Nos. 406, 428, 435.)   Having reviewed the motions, the responses (Dkt. Nos. 424, 439, 444), the replies (Dkt. Nos. 437, 442, 446), and all related papers, the Court DENIES all three motions. (Dkt. Nos. 406, 428, 435.)

**Background**

Plaintiffs pursue claims under Section 11 of the Securities Act that Defendants made false and misleading statements in the offering documents of a series of mortgage-backed securities ("MBS") issued by Washington Mutual Bank ("WMB") and its two subsidiaries (collectively "WaMu").  The Court previously summarized the active allegations as follows:

> Plaintiffs' underwriting allegations survive dismissal because the statements may be misleading if they mask the extent to which the sponsor's underwriting guidelines were disregarded.  In essence, Plaintiffs allege the underwriting guidelines ceased to exist.  If proven true, the absence of underwriting standards could make could make the identified statements misleading.

(Dkt. No. 195 at 10.) Plaintiffs premise their claims on two statements in the offering documents: (1) that "[WMB's] underwriting guidelines generally are intended to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral"; and (2) that exceptions to WaMu's guidelines were made on a "case-by-case basis if compensating factors are present."  (Dkt. No. 414 at 40.)

The Court reviews the facts Plaintiffs present to oppose Defendants' motion for summary judgment before addressing the facts Defendants claim entitle them to summary judgment.

A.    <u>Plaintiffs' Claims</u>

Plaintiffs claim that WaMu not only lowered its underwriting guidelines, but also applied them in an uneven and improper manner that caused the offering documents' disclosures to be false or misleading.

Starting in at least, 2006 WaMu appeared to dramatically lower its underwriting guidelines in an effort to increase loan production.  By May 2006, Cheryl Feltgen, the Chief Risk Officer for the Home Loans group, confirmed "[w]e are going through a dramatic shift in our credit approach in Home Loans and all across Washington Mutual."  (Dkt. No. 415-2 at 154.)

1  She proclaimed "[w]e are shifting from a 'risk minimization' approach to 'risk and return

2  optimization.'"  (Id. at 155.)  This was a "profound change that we will have to get used to."

3  (Id.)  As David Schneider, president of the Home Loans group, wrote in June 2006: "In short, we

4  should do most of the loans that come in the door – at the right price."  (Dkt. No. 415-2 at 152.)

5  In late 2006, Feltgen explained that this also included lowering the guidelines, stating "[o]ur

6  appetite for credit risk was invigorated with the expansion of credit guidelines for various

7  product segments including the 620 to 680 FICO, low doc loans and also for home equity."  (Pl.

8  Ex. 25 at 623.)  Not only did Felgten help lower WaMu's guidelines, she also sought to give

9  every underwriter the ability to grant 40 point FICO exceptions on any loan.  (Feltgen Dep. at

10  72.)  If exceptions were made, underwriters were told to compensate for them, which usually

11  meant charging borrowers more upfront and/or higher interest rates.  (Id. at 72-73.)

12       Key tools in WaMu's effort to increase loan sales were reduced documentation and

13  stated-income/stated-asset ("SISA") loans, where the borrower's income and assets were not

14  necessarily verified.  In an email dated May 20, 2006, the Home Loans Chief of Credit Policy,

15  Michelle Joans, laid bare the problem with SISA loans: "a stated income loan is nothing but a

16  liar loan."  (Dkt. No. 415-2 at 156.)  She went on to explain that "[l]oan consultants and

17  definitely brokers, coach a borrower on the income to use on the 1003" to fudge their actual

18  income and/or assets.  (Id.)  And while WaMu had previously allowed stated income loans, it

19  required a high FICO score and verified assets to ensure the stated income was a limited liability.

20  Joans noted that the old standard was going to be altered to allow for simply "pricing for risk,"

21  and questioned "with a delinquency rate well above our peers, does pricing truly offset all risk?"

22  (Dkt. No. 415-2 at 156 (Pl. Ex. 16).)

23

24

ORDER DENYING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AND MOTIONS
TO EXCLUDE- 3

1    Plaintiffs assert the underwriters at WaMu had substantial authority to deviate from the

2    already lowered underwriting guidelines, making them nearly advisory.  Every underwriter at

3    WaMu had "what they called a certain level of RLA, which is residential lending authority."

4    (Brown Dep. at 119.)  For example, an underwriter with "the highest level of exception authority

5    could do just about any kind of kind of exception" although there were "very few people that had

6    that kind of limit." (Id. at 120.)  In an effort to show the use of exceptions was limitless,

7    Plaintiffs present the declarations of two underwriters.  One is Denise Luedtke, who worked in

8    California as an Underwriting Senior Team Manager, and stated that "there were no limits on the

9    extent and size of exceptions that were regularly approved." (Luedkte Decl. at 2.)  Luedkte

10   states that "the directives for widespread use of exceptions, as an alternative method to

11   underwriting guidelines for making more loans, came from corporate management and were

12   company policy." (Id. at 4.)  Luedtke estimates that 20% to 30% funding at her loan fulfillment

13   center ("LFC") did not meet underwriting guidelines and were made through management-

14   approved exceptions, and that around 30% were undocumented. (Id. at 6.)  The second

15   underwriter, Diane Jeanty, worked in the Bethel Park, Pennsylvania LFC from 2000 to 2004 and

16   then in Florida until 2009. (Jeanty Decl. at 2.)  Jeanty states that "[t]he normal practice when

17   underwriters determined that loans did not meet applicable written underwriting guidelines was

18   that management ignored the guidelines so that borrowers who did not qualify were approved for

19   loans anyway, and this happened regularly every day." (Id. at 2.)  She says "in actual daily

20   practice from 2004 through 2007, management approved exceptions and regularly made loans to

21   borrowers regardless of the severity of failures to meet guidelines or the presence of sufficient

22   compensating factors." (Id. at 3.)  "Exceptions were approved regularly on loans that did not

23   meet guidelines, many times based on no reason other than to just make more loans." (Id.)

24

ORDER DENYING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AND MOTIONS
TO EXCLUDE- 4

1       The guidelines allowed exceptions to be granted where adequate compensating factors

2   were present, and Plaintiffs criticize both the adequacy of those factors and the consistency in

3   their application.  Plaintiffs contend that no factors could compensate for the increased potential

4   for fraud in SISA loans, where income and assets were not verified.  They point out that Feltgen

5   agreed the low documentation loans have higher risk for fraud, and that fraud cannot be priced

6   for with compensating factors.  (Feltgen Dep. at 96.)  Without knowing whether the assets or

7   income are reasonable or true, there is no way to accurately price the exceptions.  (Id. at 97-98.)

8   Yet despite this, WaMu still used risk-based pricing with SISA and reduced-documentation

9   loans.  Feltgen admitted that by doing more low documentation loans she would be "increasing

10   the likelihood that there would be large numbers of additional fraudulent loans being made."  (Id.

11   at 151-52.)  David Beck, Executive Vice President of Capital Markets Group, also admitted that

12   increasing low documentation loans increased the credit losses—i.e., the risk of default.  (Beck

13   Dep. at 109-114.)  In addition, Defendants disclosed WaMu only granted exceptions if presented

14   with compensating factors such as a low loan-to-value ("LTV"), low debt-to-income ("DTI"),

15   good credit, other liquid assets, stable employment and time in residence.  Plaintiffs have shown

16   that exceptions were granted for other reasons, and that, in fact, the LTV and DTI were often

17   inaccurately calculated in the first instance.

18       Plaintiffs also highlight that some of WaMu's top loan producers were known to have

19   engaged in fraud in violation of the underwriting guidelines and that this may have impacted the

20   loans at issue.  Two LFCs in California, Downey and Montebello, were the subject of a serious

21   fraud inquiry in late 2005.  Thomas Ramirez and Luis Fragosa led Downey and Montebello, and

22   in 2005, Ramirez was WaMu's top loan consultant, and Fragosa the tenth highest, based on loan

23   origination.  (Pl. Ex. 52 at 086.)  An August 2005 internal investigation revealed "an extremely

24

ORDER DENYING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AND MOTIONS
TO EXCLUDE- 5

1   high incidence of confirmed fraud" at these two LFCs, showing 58% for Ramirez and 83% for

2   Fragosa.  (Pl. Ex. 50 at 525.)  This conclusion came from a review of 83 loans from Ramirez

3   constituting $15 million, and 48 loans from Fragosa totaling $8.7 million.  (Id. at 526-27.)  A

4   second report in November 2005, showed that of 129 loans flagged for possible fraud from a

5   pool of 751, 42% of the loans contained suspect activity of fraud "attributable to some sort of

6   employee malfeasance or failure to execute company policy," which included "intentional

7   circumvention of established processes, and overriding automated decisioning [sic]

8   recommendations."  (Pl. Ex. 58 at 96; Pl. Ex. 79.)  Despite these adverse findings, WaMu

9   executives worked to offer Ramirez and Fragosa even lower underwriting guidelines and more

10  flexibility to deviate from them.  In a February 2006 email, Steve Rotella, WaMu's Chief

11  Operating Officer, essentially demanded that Ramirez have "flexibility to have their local

12  underwriters go below 660 (to 600) on FICO rather than the cumbersome process of sending

13  these off to other 'senior' credit people."  (Dkt. No. 418-1 at 4 (Pl. Ex. 56).)  Plaintiffs contend

14  that the majority of loans in the offerings in this case were Californian, and suggest the fraud

15  impacted the MBS certificates in this case.  (Def. Ex. 9 at 691; Def. Ex. 10 at 609; Def. Ex. 11 at

16  617; Def. Ex. 12 at 627; Def. Ex. 13 at 635; Def. Ex. 14 at 646.)  Plaintiffs also rely on the

17  testimony of Randy Melby, Head of Internal Audit at WaMu, that fraud existed beyond

18  Montebello and Downey.  Melby testified that "absolutely" there was "fraud outside of these two

19  office[s]" and "certainly there was fraud occurring throughout the company, and that's based on

20  our investigations."  (Melby Dep. at 81.)  Defendants attack this portion of his testimony,

21  pointing out that he elsewhere said no fraud existed outside Downey and Montebello.  But the

22  testimony Defendants rely on was a response to a question related to a specific document, and it

23  is not accurate to say he contradicted his earlier remarks on which Plaintiffs rely.

24

ORDER DENYING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AND MOTIONS
TO EXCLUDE- 6

1    Plaintiffs attempt to confirm the systematic deviations from the guidelines by pointing to

2   WaMu's internal assessment of the error rates in its loan portfolio.  Plaintiffs rely heavily on the

3   fact that as of July 2006, WaMu's internal risk assessment found 20.7% of loans had "medium"

4   events, meaning that there was "collateral, credit and document errors considered non-critical in

5   isolation but [which] have the potential to cause a material impact when combined with other

6   risk factors."  (Dkt. No. 415-2 at 1018 (Pl. Ex. 20).)  By January 2007, 44.2% of all retail home

7   loans were found to be less than satisfactory.  (Dkt. No. 426 at 12.)  And an internal review in

8   February 2007 concluded that only 40 to 60 percent of loans were underwritten on a satisfactory

9   basis.  (Pl. Ex. 39 at 856.)  Plaintiffs note that Hugh Boyle, the Chief Credit Officer through the

10   middle of 2006, believed the lending error rates at WaMu were unacceptable during his tenure.

11   Boyle testified "you should not have  . . . more than a couple of percent error rate on

12   underwriting. . . [a]nd when you are engaging in higher risk activities, the one thing you

13   absolutely need to be confident in is that when you underwrite a higher risk loan it's being –

14   underwriting [sic] consistent with policy and procedure."  (Boyle Dep. at 139.)  Boyle testified

15   the error rates in 2006, whether medium or high, were "higher than where they should be, just

16   period."  (Id.)

17    Plaintiffs' underwriting and statistical experts, Ira Holt and Dr. Charles Cowan, buttress

18   the above information, concluding the loans in the relevant offerings materially deviated from

19   the underwriting guidelines.  Dr. Cowan selected a purportedly random sample of 2,387 loans

20   from the full pool of 13,425 loans in the six offerings and then passed them to Holt, who

21   performed a full re-underwriting of 424 loans of the 2,387.  In his March 2, 2012, report,

22   Holt found 37.1% of the 424 loans he reviewed were materially defective.  (Dkt. No. 415-2 at 25,

23   76-77.)  A "materially defective" loan is one that should not have been made based on the

24

ORDER DENYING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AND MOTIONS
TO EXCLUDE- 7

1    underwriting guidelines in place at the time of origination.  (Id. at 25 n.3.)  Holt noted that many

2    of the loans suffered from defects in the calculation of LTV, debt-to-income ("DTI"), and a lack

3    of compensating factors that might qualify the loan for an exception.  (Id. at 49-60.)  He also

4    found that on average, over 40% of the loans across all six offerings were SISA loans, and that

5    over half of the SISA loans were made to borrowers who were salaried and could have provided

6    verifiable income statements.  (Id. at 13-14.)  Using Holt's re-underwriting sample, Dr. Cowan

7    extrapolates out to the entire pool of loans in the six offerings, concluding concluded that there

8    was only a 5% chance the true rate of loans being materially defective was below 33.3%.  (Dkt.

9    No. 415-2 at 75.)

10   B.    Defendants' Contentions

11          Defendants present a far different view of the relevant facts of this case.  First, they

12   contend that the underwriting guidelines were created and disseminated in a clear manner to all

13   underwriters.  Underwriting usually began with an automated underwriting system that measured

14   objective metrics to determine whether a loan could be sold.  This, Defendants claim, limited the

15   amount of manual underwriting and ensured consistency in the lending practices.  Second, if any

16   loans were given exceptions, the underwriters followed the guidelines to approve loans only

17   where there were adequate compensating factors.  This system, Defendants contend, was well

18   disclosed in the offering documents.  Third, the offering documents explained that WaMu sold

19   SISA and other low-documentation loans, such that Plaintiffs cannot claim their inclusion in the

20   MBS was misleading.  Fourth, Defendants point out that many loans in 2006 were denied

21   outright, and it cannot be said WaMu made loans to nearly any applicant.  Fifth, Defendants

22   point to internal risk analysis and outside oversight of the underwriting that they claim shows

23   only slight numbers of deviations from the underwriting guidelines were material and that

24

1   Plaintiffs misleadingly rely on errors that were not deemed material.  Lastly, Defendants dispute

2   the accuracy and validity of both Dr. Cowan's and Holt's expert opinions.  Based on these

3   arguments, Defendants ask the Court to find it impossible for Plaintiffs to sustain their claims the

4   offering documents contained false and misleading statements.

5       Defendants also argue they have satisfied the affirmative defense of negative loss

6   causation, which is an alternative basis on which to grant summary judgment.  Defendants rely

7   primarily on a statement from Plaintiffs' expert Scott Hakala, which they claim shows that the

8   information about WaMu's purportedly defective underwriting was not made public until after

9   Plaintiffs' first lawsuit was filed in August, 2008.

10      Defendants premise their summary judgment motion on both arguments.

11                                    **Analysis**

12  A.      <u>Motions to Exclude</u>

13      In three separate motions, Defendants move exclude information relevant to their

14  summary judgment motion.  Because the motions bear on the Court's decision on summary

15  judgment, the Court first resolves the motions to exclude.  First, Defendants ask the Court to

16  exclude the reports of Holt and Dr. Cowan on the theory they have employed a flawed

17  methodology rendering their opinions unreliable.  (Dkt. No. 406.)  Second, Defendants ask the

18  Court to exclude two declarations from Holt and Dr. Cowan that were submitted in Plaintiffs'

19  opposition to the <u>Daubert</u> motion.  (Dkt. No. 435.)  Third, Defendants ask to exclude 206

20  witnesses, including Jeanty and Luedtke, as having been late-disclosed.  ((Dkt. No. 428.)  The

21  Court DENIES all three motions.

22          1.      <u>Motion to Exclude Expert Reports</u>

23      The Court finds no basis on which to exclude either Holt's or Dr. Cowan's reports.

24

ORDER DENYING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AND MOTIONS
TO EXCLUDE- 9

1    With regard to experts, the Court acts as a gatekeeper.  An expert qualified by

2  "knowledge, skill, experience, training or education may testify" so long as:

3         (a) the expert's scientific, technical, or other specialized knowledge will help the
          trier of fact to understand the evidence or to determine a fact in issue;
4         (b) the testimony is based on sufficient facts or data;
          (c) the testimony is the product of reliable principles and methods; and
5         (d) the expert has reliably applied the principles and methods to the facts of the
          case.
6  Fed. R. Evid. 702.  The court must assess the reliability of the methods employed and determine

7  whether the testimony would aid the trier of fact.  Daubert v. Merrell Dow Pharms., Inc., 509

8  U.S. 579, 590-91 (1993).  "The inquiry envisioned by Rule 702 is . . . a flexible one."  Id. at 594.

9  "The Supreme Court in Daubert identified several factors that may bear on a judge's

10 determination of the reliability of an expert's testimony."  Cooper v. Smith & Nephew, Inc., 259

11 F.3d 194, 199 (9th Cir. 2001). Those include "(1) whether a theory or technique can be or has

12 been tested; (2) whether it has been subjected to peer review and publication; (3) whether a

13 technique has a high known or potential rate of error and whether there are standards controlling

14 its operation; and (4) whether the theory or technique enjoys general acceptance within a relevant

15 scientific community."  Id.  "Whether testimony is helpful within the meaning of Rule 702 is in

16 essence a relevancy inquiry."  Hemmings v. Tidyman's Inc., 285 F.3d 1174, 1184 (9th Cir.

17 2002).

18    Defendants attack Dr. Cowan's selection of the 2,387 loans as not being properly

19 random.  Defendants do not argue that systematic sampling, which Dr. Cowan used, is

20 unaccepted or junk science.  Rather, they point out that Dr. Cowan's application of the method

21 led to the exclusion of some loans from ever being part of his potential sample.  Defendants

22 calculate that roughly 11% of the overall pool of loans had no possibility of being included in Dr.

23 Cowan's sample, and that the selection of 2,387 loans was biased.  Dr. Cowan admits that he did

24

ORDER DENYING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AND MOTIONS
TO EXCLUDE- 10

1   exclude some loans, but that he did so out of a choice between two tradeoffs.   He claims his

2   chosen method avoided counting duplicates and Defendants have not shown any bias in his

3   sample.  The Court does not find it proper to exclude Dr. Cowan's report.  Defendants have not

4   shown that the creation of the random sample of 2,387 is biased or that the statistical method

5   employed by Dr. Cowan is unacceptable.  The Court is not convinced that the flaws Defendants

6   claim render Dr. Cowan's expert opinion unreliable to the point it must be excluded.  This is not

7   a case where the analytical gap is simply too great between the data and the opinion offered.  See

8   Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).  It is up to the jury to decide how much

9   weigh to give Dr. Cowan's analysis.

10          Defendants also take issue with how Dr. Cowan selected the 424 loans for Holt to review.

11   That sample was selected from a pool of only 2,387 loans across 303 strata.  Dr. Cowan has

12   explained that the distribution of loans fairly reflects the overall loan population, and that he

13   weighted the results of Holt's re-underwriting in order to correct for bias.  (Dkt. No. 425-2 at

14   16.)  The Court cannot discern any defect in the method Dr. Cowan employed to render his

15   opinion unreliable.  Again, it is up to the jury to determine whether there is some reason to

16   distrust his opinion.

17          The Court is also unconvinced that Holt's report should be excluded.  Defendants argue

18   that Holt improperly applied WaMu's underwriting guidelines in his efforts to re-underwrite the

19   424 loans.  Defendants have raised some question as to whether Holt properly applied each of

20   the guidelines.  But this hardly requires exclusion of his report, particularly where both sides

21   seem to agree that application of the underwriting guidelines requires some discretionary

22   decision-making.  It is up to a jury to determine whether the purported flaws in Holt's analysis

23   renders his opinion unworthy of merit.  The Court DENIES the motion.  (Dkt. No. 404.)

24

ORDER DENYING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AND MOTIONS
TO EXCLUDE- 11

1       2.    <u>Motion to Exclude Dr. Cowan's and Holt's Declarations</u>

2       Defendants move to exclude the declarations of Holt and Dr. Cowan submitted in

3 opposition to the <u>Daubert</u> motion. Defendants claim the declarations are untimely supplemental

4 reports that should be excluded under Rule 37. The Court DENIES the motion.

5       Rule 26(a)(2) requires an expert to disclose a "complete statement of all opinions the

6 witness will express and the basis and reasons for them." Section 26(a)(2)(B) "contemplates that

7 the expert will supplement, elaborate upon, explain and subject himself to cross-examination

8 upon his report." <u>Thompson v. Doane Pet Care Co.</u>, 470 F.3d 1201, 1203 (6th Cir. 2006). If a

9 party fails to timely supplement an expert report, the party is not allowed to use the report at trial

10 unless it can show the failure was substantially justified or is harmless. Fed. R. Civ. P. 37(c)(1).

11       The Court finds the use of the declarations to respond to the <u>Daubert</u> motions to be

12 proper. The additional declarations from Holt and Cowan largely respond to the <u>Daubert</u> motion.

13 They explain the technical arguments made by Defendants' expert and assist the Court in

14 understanding the thrust of Defendants' motion. To the extent the declarations aid in the

15 understanding of Defendants' motion, the Court does not find them to be subject to exclusion as

16 improper expert reports. The Court thus DENIES the request to strike the declarations.

17       To the extent Holt has reviewed yet more loans and offered his view on whether they

18 materially comply with the underwriting guidelines, the Court finds this to be an untimely

19 supplementation of his expert report. The Court agrees with Defendants that Holt's continued

20 re-underwriting is the equivalent of offering new opinions, not just an amplification of his early

21 conclusion. His review of each loan and conclusion as to whether it complied with the

22 underwriting guidelines requires him to make a new expert opinion as to each loan. The

23 supplemental report, however, is not properly excluded. Defendants and Plaintiffs unilaterally

24

ORDER DENYING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AND MOTIONS
TO EXCLUDE- 12

1    altered the case schedule without leave of Court to engage in depositions of experts well after the

2    deadline.  Defendants have thus mooted their own claim of prejudice or harm, as they can depose

3    Holt on the question of his supplemental report.  The Court finds no basis to exclude this portion

4    of Holt's declaration.

5          The Court thus DENIES the motion to exclude in full.  (Dkt. No. 435.)

6          3.       Motion to Exclude Witnesses

7          Defendants seek to exclude 206 witnesses they claim were untimely disclosed.  Of the

8    206 individuals, Plaintiffs ask only to use six at trial: Michelle Joans, Timothy Bates, Teresa

9    Bondurant, Karen Fridley, Denise Luedtke, and Diana Jeanty.  (Dkt. No. 439 at 5.)

10         Rule 26(a) requires the parties to disclose the identity of individuals likely to be used to

11   support claims or defenses.  Rule 26(e) requires a party to supplement these initial disclosures if

12   it "learns that in some material respect the information disclosed is incomplete or correct and if

13   the additional and corrective information has not otherwise been made known to the other parties

14   during the discovery process or in writing."  If a party fails to timely supplement the disclosures,

15   the party is not allowed to use the witnesses at trial unless it can show that the failure was

16   substantially justified or is harmless. Fed. R. Civ. P. 37(c)(1).

17         First, the Court agrees with Plaintiffs that Defendants were aware of Joans and Bates as

18   possible witnesses well in advance of Plaintiffs' disclosure.  Both were senior corporate officers

19   known to Defendants Beck and Schneider, and their knowledge about the matters of this case are

20   well known to Defendants.  Their inclusion in Plaintiffs' case is no surprise and the Court finds

21   no basis to exclude them.  Second, the Court finds the disclosure of Jeanty, Luedtke, Bondurant,

22   and Fridley to have been timely.  Plaintiffs explain that they learned of these witnesses through

23   diligent review of the volumes of documents Defendants produced and through the use of a

24

ORDER DENYING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AND MOTIONS
TO EXCLUDE- 13

1   private investigator.  The Court finds this evidence of diligence sufficient to show the disclosure

2   was timely.  To remedy any harm of which Defendants complain, the Court grants Defendants

3   leave to depose the four individuals should they feel compelled.  Any deposition must be

4   completed within 20 days of entry of this order.  The Court does not find it necessary to await the

5   results of those depositions to rule on Defendants' motion for summary judgment.  Defendants

6   have provided substantial countervailing facts and the outcome of the summary judgment is not

7   dependent on Luedtke and Jeanty.  The Court DENIES the motion.  Given Plaintiffs' assertion

8   that none of the remaining 200 witnesses will be called, the Court finds the remainder of

9   Defendants' motion moot.

10   B.      Summary Judgment Standard

11          The Court shall grant summary judgment if no genuine issue of material fact exists and

12   the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving

13   party is entitled to judgment as a matter of law when the nonmoving party fails to make a

14   sufficient showing on an essential element of a claim in the case on which the nonmoving party

15   has the burden of proof.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1985). There is no genuine

16   issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to

17   find for the nonmoving party.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S.

18   574, 586 (1986).  A genuine dispute over a material fact exists if there is sufficient evidence

19   supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions

20   of the truth.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 253 (1986).

21   C.      Motions to Strike

22          Both parties ask the Court to strike certain declarations filed in relation to the motion for

23   summary judgment.  The Court GRANTS Plaintiffs' request and DENIES Defendants'.

24

1    In a surreply, Plaintiffs ask the Court to strike a declaration from one of Defendants'

2    attorneys who claims to have divined exactly how many loans in the offerings were originated at

3    Downey and Montebello.  Plaintiffs point out that Beck testified the loans could not be tracked to

4    specific loan centers, and Defendants' attorney has not fully contradicted that fact.  The Court

5    agrees with Plaintiffs that the declaration relies on a certain amount of speculation and is not

6    properly accepted as a conclusive fact on this issue.  The Court thus STRIKES the portion of the

7    declaration that claims a definitive number of loans were originated at these two LFCs.  The

8    exact number of loans within the offerings that came from Downey and Montebello remains in

9    dispute.

10    Defendants ask the Court to strike the Permanent Subcommittee of Investigations' Report

11    (PSI Report) conducted on "Wall Street and the Financial Collapse."  The report is presumed to

12    be admissible under FRE 803(8)(A)(iii), as the PSI is a report containing factual findings from a

13    legally authorized investigation.  Defendants thus bear the burden to prove the source of

14    information or other circumstances shows it to be untrustworthy.  Fed. R. Evid. 803(8)(B).

15    Defendants suggest that because the report is politicized, it is inherently untrustworthy.  The

16    Court does not find this argument adequate to sustain the motion.  Defendants have not pointed

17    to anything specific to this report that suggests it is untrustworthy.  The Court DENIES this

18    request to strike.

19    D.    Genuine Issue of Material Fact Remain in Dispute

20    The Court finds it inappropriate to grant summary judgment in favor of Defendants

21    where the facts remain hotly contested as to whether the offering documents contain false or

22    misleading statements about the underwriting guidelines at WaMu.

23

24

ORDER DENYING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AND MOTIONS
TO EXCLUDE- 15

1    As an initial matter, the Court clarifies the burden Plaintiffs face to prove their claim.

2    Defendants repeatedly contend Plaintiffs have to show the underwriting guidelines ceased to

3    exist in order to prevail in this case.  This is an inaccurate reading of the Court's previous ruling.

4    The Court has held that only Plaintiffs need show that Defendants "mask[ed] the extent to which

5    the sponsor's underwriting guidelines were disregarded."  (Dkt. No. 195 at 10.))   The Court

6    distilled the allegations in the complaint as essentially alleging "the underwriting guidelines

7    ceased to exist."  (Id.)  That was merely the Court's summary of the allegations, not a bright line

8    rule as to what Plaintiffs have to show to prove their claim.  A jury could find the offering

9    documents to contain false and misleading statements as to the actual underwriting guidelines if

10   Plaintiffs show a pattern of deviations from the underwriting practices caused the disclosures to

11   be materially misleading or false.  The Court applies this standard in considering the present

12   motion.

13   Plaintiffs have successfully raised a dispute of fact as to whether WaMu systematically

14   deviated from its underwriting guidelines so as to render the statements in the offering

15   documents false or misleading.  While some of the practices were disclosed in the offering

16   documents, there is a sufficient dispute as to whether those disclosures were adequate.  The

17   starting point of Plaintiffs § 11 claim is that WaMu's loosened its underwriting guidelines and

18   granted underwriters greater authority to deviate from the guidelines in a manner that far

19   exceeded any disclosures.  Pressured to approve more loans, underwriters used their increased

20   authority to grant exceptions based on their subjective review of a loan application.  Exceptions

21   to the objective underwriting metrics appear to have become the norm.  At the same time, WaMu

22   sold far more SISA and low-documentations loans, for which adequate pricing of exceptions

23   could not be performed, as Feltgen herself confirmed.  WaMu's biggest loan producers were

24

ORDER DENYING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AND MOTIONS
TO EXCLUDE- 16

1   known to be engaged in fraud and material deviations in underwriting, and yet it appears WaMu

2   executives looked the other way.  Luedtke, Jeanty and Melby confirm this trend existed outside

3   of the Montebello and Downey.  Plaintiffs further point out that WaMu's internal risk

4   management concluded there were substantial deviations in loan quality that far exceeded the

5   benchmarks.  Hugh Boyle testified the rates were "higher than where they should be, just

6   period."  (Boyle Dep. at 139.)  Whether the internal error rate showed material deviations in

7   underwriting or not turns on a dispute of material fact that cannot be resolved at summary

8   judgment.  Plaintiffs' expert reports finding that 37.1% of the loans sampled suffered from

9   material defects seems to support WaMu's internal reports showing substantial deviations in

10   underwriting.  The facts Plaintiffs present are sufficient to sustain the § 11 claims, and, as

11   explained below, Defendants contrary arguments do not entitle them to summary judgment.

12          Defendants urge the Court to find the disclosures in the offering documents preclude

13   Plaintiffs' claims.  The Court is not persuaded, and finds the disclosures merely highlight the

14   dispute of fact between the parties.  Defendants point out the offering documents disclosed that

15   WaMu used reduced documentation loans where the borrower's income and assets "either are

16   not required to be obtained or are obtained but not verified."  The offering documents even

17   disclosed the FICO scores and other details about the individual loans.  (Dkt. No. 426 at 14.)

18   These facts preclude Plaintiffs from arguing that SISA loans alone are evidence the disclosures

19   about WaMu's underwriting guidelines were misleading or false.  Yet, Plaintiffs claim is not so

20   narrowly premised.  Plaintiffs claim the use of the SISA loan allowed WaMu to deviate from its

21   underwriting guidelines in a material way that led to the offering documents' disclosures to be

22   false or misleading, particularly since any price-based exceptions were inadequate to cover the

23   fraud inherent in SISA loans.  Even Feltgen has agreed that the inherent fraud in those loans

24

ORDER DENYING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AND MOTIONS
TO EXCLUDE- 17

1  could not have been priced for with compensating factors.  (Feltgen Dep. at 96.)  Plaintiffs have

2  also shown a dispute of fact as to whether the disclosures regarding exceptions were accurately

3  reported to investors.  And Plaintiffs have shown that exceptions were granted for reasons other

4  than those disclosed in the offering documents.  The Court finds that these disclosures do not

5  foreclose Plaintiffs' § 11 claims.

6       Defendants wrongly suggest that WaMu's internal risk management reviews cannot

7  possibly show violations of the underwriting guidelines.  Plaintiffs provide evidence that internal

8  reviews throughout 2006 showed high rates of deviation from the underwriting guidelines.

9  While WaMu did not deem many loans to have material defects, that judgment was subjective.

10 Plaintiffs are not precluded from arguing the WaMu internal reviews show substantial deviations

11 from the underwriting guidelines.  Indeed, Boyle, the Chief Credit Officer, found these numbers

12 objectively too high and well beyond the benchmarks.  Plaintiffs have also pointed to evidence

13 that the assignment of these ratings was hotly disputed within WaMu, with underwriters and loan

14 consultants taking pains to have "high" events re-categorized as "medium."  Defendants have

15 thus not shown why Plaintiffs cannot rely on this evidence.

16      Defendants' attack to the evidence of fraud does not convince the Court it is irrelevant.

17 First, Defendants indulge themselves by arguing that because the offering documents revealed

18 the loans were issued with reduced documentation "the inherent risk of borrower fraud was

19 known." (Dkt. No. 426 at 17.)  That is a stretch and accepting the argument would require the

20 Court to incorrectly construe the facts in Defendants' favor.  For example, the disclosures did not

21 necessarily explain that WaMu knew its top loan consultants were engaged in fraud and material

22 deviations from the underwriting guidelines.  Second, Defendants argue Plaintiffs have not

23 shown any specific evidence there was actual fraud in any of the loans backing the MBS at issue.

24

ORDER DENYING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AND MOTIONS
TO EXCLUDE- 18

1    That question remains to be presented at trial, and Plaintiffs have provided sufficient facts

2    supporting their contrary view.  Third, Defendants also take issue with internal finding of fraud

3    at Montebello and Downey, arguing that the sample of loans reviewed was too small to make

4    any grand conclusion.  That is not something that negates the overall finding that Montebello and

5    Downey were operating in derogation of the underwriting guidelines and it raises yet one more

6    issue for a jury to sort out.  At best Defendants have presented conflicting evidence about

7    whether fraud existed at WaMu and whether it affected the loans at issue in the offerings.

8           Defendants argue that because Luedkte and Jeanty were "low-level" employees, their

9    testimony is not enough to raise a genuine issue of material fact.  This is speculative and not a

10   basis for their exclusion.  Both worked as underwriters and were aware of and reported large

11   deviations from the underwriting guidelines.  This is probative evidence that joins the other

12   anecdotal evidence Plaintiffs have put together to sustain their claim.  The unpublished Ninth

13   Circuit case Defendants rely on is also distinguishable, given that the low-level employee's

14   statements were contradicted by undisputed facts showing the board members relied on

15   statements from senior engineering personnel.  Lilley v. Charren, 17 F. App'x 603, 607 (9th Cir.

16   2001) (unpublished).  Here, Defendants have not shown contradictory statements from high

17   officers, as was the case in Lilley.

18          The facts Defendants separately marshal also do not preclude Plaintiffs' claims.

19   Defendants point to five facts they claim preclude Plaintiff's claims: (1) WaMu denied a

20   substantial number of loans outright; (2) the automotive underwriting system had programmed

21   requirements from which deviations could not be made; (3) underwriters were trained and only

22   received incentive income if they met quality thresholds; (4) the procedures for exceptions were

23   "clearly delineated" and underwriters had "defined levels of Exception Authority," and (5) the

24

ORDER DENYING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AND MOTIONS
TO EXCLUDE- 19

1    Capital Group re-underwrote the loans in the MBS and found only three percent outside the

2    underwriting guidelines.  These are merely countervailing facts that a jury might consider in

3    reaching a verdict in Defendants' favor.  They do not negate the extensive evidence Plaintiffs

4    present.  The Court cannot grant summary judgment based largely on Defendants' self-serving

5    facts.

6         Taking the facts in the light most favorable to Plaintiffs, the court finds a dispute of

7    material fact as to Plaintiffs' § 11 claim.  The Court DENIES the motion.

8    E.    Loss Causation Defense Not Properly Applied

9         The Court does not find it proper to grant summary judgment on Defendants' affirmative

10   defense of loss causation.

11        In order to state a securities fraud claim, a plaintiff must allege that there was "loss

12   causation," which is "a causal connection between the material [omission] and the loss."  Dura

13   Pharms. Inc. v. Broudo, 544 U.S. 336, 342 (2005).  "That is, a plaintiff must ultimately prove

14   that the defendant's omission was the proximate cause of its loss."  WPP Luxembourg Gamma

15   Three Sarl v. Spot Runner, Inc., 655 F.3d 1039, 1053 (9th Cir. 2011).  "[L]oss causation is not

16   adequately pled unless a plaintiff alleges that the market learned of and reacted to the practices

17   the plaintiff contends are fraudulent, as opposed to merely reports of the defendant's poor

18   financial health generally."  In re Oracle Corp. Sec. Litig., 627 F.3d 376, 392 (9th Cir. 2010).

19   The defendant may also invoke loss causation as an affirmative defense.  To satisfy this burden

20   Defendants must demonstrate that the losses at issue here were caused by factors other than the

21   alleged misleading or false material statements.  See 15 U.S.C. § 77k(e).  "The defendant has the

22   burden of proof on this defense."  In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1422 (9th

23   Cir. 1994).  "Though it has been recognized by courts as a 'heavy burden,' it is not

24

ORDER DENYING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AND MOTIONS
TO EXCLUDE- 20

1    insurmountable, and courts have awarded summary judgment to the defendant in appropriate

2    cases." Id.

3           Defendants claim they have met their burden "based on Plaintiffs' and their expert's

4    admissions about the lack of information in the marketplace regarding WMB's alleged deficient

5    underwriting." (Dkt. No. 426 at 26.) This is neither accurate nor sufficient to obtain relief.

6    Plaintiffs' expert has not admitted that there was no information released to the public prior to

7    the filing of the first complaint in August 2008 about WaMu's purported defective underwriting.

8    Defendants quote the following portion of Dr. Scott Hakala's report filed in support of class

9    certification: "[I]nformation regarding deficient underwriting practice specific to the prime, Alt-

10   A mortgage loans representing the collateral in this case did not come to light until August 2008

11   through April 2010." (Def. Ex. 117 at ¶ 25.) This ignores the full paragraph from the report:

12          I did not identify significant evidence of concerns with Washington Mutual's
            underwriting process with respect to the prime mortgage loans included in the
13          collateral for the six offerings in this case until after November 1, 2007. Even
            then, as will be discussed further, information regarding deficient underwriting
14          practice specific to the prime, Alt-A mortgage loans representing the collateral in
            this case did not come to light until August 2008 through April 2010.
15

16   (Id.) This particular statement from Dr. Hakala's report suggests that evidence about WaMu's

17   defective underwriting did come to light before August 2008. Dr. Hakala states further that there

18   were partial corrective disclosures about WaMu's poor underwriting practices, such as an April

19   14, 2008 article in the Seattle Times detailing problems with WaMu's prime underwriting. (Dkt.

20   No. 384-1 at 157.) He also explains that the MBS certificates themselves suffered losses in the

21   first half of 2008 and were downgraded in response to the erosion in the underlying collateral,

22   i.e., that the loans were suffering losses due to inadequate underwriting. (Dkt. No. 384-1 at 155-

23   56.) There were also a substantial number of reports about the inadequate underwriting of

24

ORDER DENYING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AND MOTIONS
TO EXCLUDE- 21

1    WaMu's subprime loans, though subprime loans were not part of the offerings.  That similar

2    problems in prime underwriting were identified in the April 14, 2008, Seattle Times article,

3    makes the known problems in subprime underwriting relevant to the loss causation issue here.

4    Taken together, there is adequate evidence showing that the marketplace knew of WaMu's

5    deficient underwriting guidelines before the first lawsuit was filed.  The Court is not faced with

6    the circumstances in Oracle.  627 F.3d at 293. In that case the plaintiffs alleged that problems

7    with one of Oracle's products were hidden from investors and when it was revealed the stock

8    dropped.  627 F.3d at 293.  The court in Oracle held the "overwhelming evidence . . . indicates

9    the market understood Oracle's earnings miss to be a result of several deals lost in the final

10   weeks of the quarter due to customer concern over the declining economy" not about the Oracle

11   product in question.  Id.  The same cannot be said here. The evidence is sharply disputed as to

12   what information was released to the investing public.  To say that there was nothing in the

13   marketplace about WaMu's questionable underwriting would be to ignore Plaintiffs' factual

14   assertions in contravention of the summary judgment standard.  Defendants have not met their

15   heavy burden of proof.

16         Defendants also argue that Plaintiffs cannot show loss causation because Plaintiffs' own

17   witnesses testified to the losses being caused by other factors.  (Def. Motion at 45.)  This

18   argument shows that the decline in the overall MBS market is potentially one of many proximate

19   causes for the losses in the certificates at issue.  It does not show that the disregard for the

20   underwriting guidelines at WaMu was not also a cause of Plaintiffs' losses.  The Court rejects

21   this argument.

22         The Court DENIES Defendants' motion on the issue of loss causation.

23

24

ORDER DENYING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AND MOTIONS
TO EXCLUDE- 22

1

**Conclusion**

2        The Court DENIES Defendants' motion for summary judgment.  The facts, construed in

3  the light most favorable to Plaintiffs, are sharply disputed.  The Court is not persuaded that

4  Plaintiffs cannot prove their § 11 claim.  Similarly, the Court does not find it proper to dismiss

5  this case on the basis of a loss causation defense where the record on this issue is in dispute.

6        The Court DENIES Defendants' motion to exclude the reports of Holt and Dr. Cowan.

7  Defendants have not raised questions as to these experts' reliability.  It is up to jury to weigh the

8  value of their opinions.  The Court finds no basis to exclude the reports.  The Court agrees that

9  the supplemental report within Holt's declaration is untimely, but DENIES Defendants' motion

10  to exclude because Defendants have given themselves an opportunity to depose Holt on this

11  issue.  The Court does not exclude the remainder of Holt's declaration or any of Dr. Cowan's

12  and DENIES this portion of the motion.  Lastly, the Court DENIES Defendants' motion to

13  exclude the use of six witnesses that they claim were untimely disclosed.  The Court accepts the

14  six contested witnesses as timely disclosed, but permits Defendants to depose them within 20

15  days of this order.

16        The clerk is ordered to provide copies of this order to all counsel.

17        Dated this 23rd day of July, 2012.

18

19

20        _____
           Marsha J. Pechman

21        United States District Judge

22

23

24