HONORABLE MARSHA J. PECHMAN

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

IN RE WASHINGTON MUTUAL
MORTGAGE BACKED SECURITIES
LITIGATION

This Document Relates to: ALL CASES

Master Case No.: C09-0037 (MJP)

**AFFIDAVIT OF STEPHEN J. CIRAMI IN SUPPORT OF
LEAD COUNSEL'S APPLICATION FOR INITIAL DISTRIBUTION**

STATE OF NEW YORK   )
                    )  ss.:
COUNTY OF NASSAU    )

Stephen J. Cirami, being duly sworn, deposes and says:

1. I am the Senior Vice President of Operations for The Garden City Group, Inc. ("GCG"), which was retained as Claims Administrator in connection with the Settlement of the above-captioned class action lawsuit (the "Action"). This Affidavit is submitted in support of Lead Plaintiff's Application in Support of an Order for Distribution of the Class Settlement Fund. I have personal knowledge of the facts stated herein.

**DISSEMINATION OF NOTICE AND PROOF OF CLAIM**

**The May Notice Mailing**

2. Pursuant to the Stipulation, Agreed Motion and Order Approving the Form and Method for Distribution of Notice of Pendency of Class Action (the "Order") dated April 30, 2012, and as more fully described in the Affidavit of Jose C. Fraga dated June 25, 2012, previously filed herein, GCG disseminated the Notice of Pendency of Class Action (the "May

Notice") on May 17, 2012, to persons or entities who purchased or otherwise acquired the following Washington Mutual Mortgage-Pass Through Certificates: 2006 AR-7 tranche 2A; 2006 AR-12 tranche 1A1; 2006 AR-16 tranches 2A1, LB1, LB2, LB3, 3B1, 3B2, and 3B3; 2006 AR-17 tranche 1A; 2006 AR-18 tranche 2A1; and 2007-HY1 tranches 1A1 and 3A3 (the "WAMU Certificates") between June 1, 2006 through and including August 1, 2008 (the "Class Period"). GCG Communications, the media division of GCG, caused the Summary Notice of Pendency of Class Action to be published on May 17, 2012, in *Investor's Business Daily*. The Summary Notice was also posted to the DTC Electronic Legal Notice System (LENS) in conjunction with the aforementioned publications.

**The October Notice & Proof of Claim Mailing**

3.   Pursuant to the Stipulation of Settlement (the "Stipulation") dated September 4, 2012, a settlement was reached between Lead Plaintiff Policemen's Annuity Benefit Fund of the City of Chicago, Lead Plaintiff Doral Bank Puerto Rico, Plaintiff Boilermakers National Annuity Trust (collectively, "Plaintiffs"), and Defendants with a value of $26,000,000 in cash. In accordance with the Amended Order for Notice and Hearing dated September 19, 2011, and as more fully described in the Affidavit of Jose C. Fraga dated December 20, 2012, GCG disseminated the Notice of Proposed Settlement of Class Action, Motion for Attorney's Fees and Reimbursement of Expenses and Settlement Fairness Hearing (the "October Notice") and the Proof of Claim and Release Form (the "POC" and, together with the October Notice, the "Claim Packet") on October 19, 2012, to all persons or entities who purchased or acquired WAMU Certificates during the Class Period. GCG Communications caused the Summary Notice to be published in the *Investor's Business Daily* and posted on the DTC Electronic Legal Notice System (LENS) on October 24, 2012. As stated in the Order and Final Judgment, a hearing was held on January 11, 2013 where the Court approved the Settlement as fair and reasonable.

## **PROCEDURES FOLLOWED IN PROCESSING CLAIMS**

4.  Under the terms of the Stipulation, Class Members were required to submit a POC in order to obtain their share of Net Settlement Fund (the $26,000,000 Settlement Amount, together with any interest earned thereon, less (i) any Taxes; (ii) any amounts incurred for notice and/or administration expenses; (iii) the attorneys' fees and expenses awarded to Lead Counsel pursuant to any Fee and Expense Application; and (iv) expenses incurred by Plaintiffs as approved by the Court).

5.  GCG undertook the following tasks in order to prepare to process the POCs: conferred with Lead Counsel to define the project and guidelines for claims processing and trained staff in the specifics of the project, and developed programs for entry of the Settlement Class Members' transaction information. More specifically, in support of the work described above, GCG's computer staff designed, implemented, and tested the following programs for this administration:

    a.  data entry screens which store claim information including all transactional data included on each POC, as well as message codes and, where necessary, text to denote conditions existing within the claim;

    b.  programs to load and analyze transactional data submitted electronically for all electronically-filed claims (the load program converts the data submitted into the format required by the calculation program; and the analysis program determines if the data is consistent and complete and sends a response to the electronic filer where appropriate);

    c.  a calculation program to analyze the transactional data for all claims, and calculate the Recognized Loss based on the calculation formula;

      d.      programs to generate various reports throughout, and at the conclusion of the administration, including lists of all eligible and ineligible claims; and

      e.      check-writing programs which calculate each eligible claimant's award amount by determining the proration factor for the Class and applying it against the Recognized Loss as calculated above.

6. GCG maintains an automated toll-free telephone number (1-800-757-9279) through which potential Class Members can obtain information about the Settlement and request that Claim Packets be mailed to them. The phone number is available 24 hours a day, 7 days a week. In connection with establishing and maintaining the toll-free telephone number, GCG, among other things, formulated a system to assure that proper responses were provided to all telephone inquiries. That work included developing and modifying an Interactive Voice Response system, or "IVR"; training telephone agents to respond to inquiries specific to the Settlement, and developing a series of common questions and the answers thereto, known as Frequently Asked Questions, or FAQs.

7. Class Members seeking to share in the Net Settlement Fund were directed in the October Notice to submit their POC to the following address:

> WaMu MBS Litigation
> c/o The Garden City Group, Inc.
> P.O. Box 9875
> Dublin, OH 43017-5775

Class Members were also advised in the October Notice to submit their POC by the filing deadline of March 18, 2013. GCG sorted incoming mail into POCs and administrative mail. Administrative mail includes all mail other than POCs and supporting documentation and responses to deficiency letters, such as requests for change of address, questions regarding the administration process, or inquiries concerning the status of the administration. Claim Packets

that were returned by the United States Postal Service with an undeliverable address were reviewed for better addresses and, where available, updated addresses were entered into the database and new Claim Packets were subsequently mailed to the new addresses. Administrative mail such as correspondence and requests for POCs were reviewed and appropriate responses given.

8. POCs were opened and scanned into a settlement-specific database created for this matter, along with all submitted documentation. If a POC did not have a pre-assigned claim number, it was assigned one during the initial processing phase. The information from each POC, including the name, address and other identifying and demographic information of the claimant, and the purchase and sale transactions listed on the POC was then entered into the database. The documentation provided by the claimant in support of each transaction was reviewed to ascertain whether the claimant had purchased or acquired WAMU Certificates during the Class Period.

9. POCs were also reviewed to ensure they were not from any Excluded Parties, defined in the Stipulation as: (1) Defendants; (2) any officers or directors of the Defendants; (3) any corporation, trust or other entity in which any Defendant has a controlling interest; or (4) members of the immediate families of David Beck, Diane Novak, Rolland Jurgens and Richard Careaga or their successors, heirs, assigns and legal representatives. Claims were also reviewed against the list of persons requesting exclusion in accordance with the May Notice and the October Notice.

**THE DEFICIENCY NOTICE AND CURE PROCESS**

10. GCG established internal claim codes to identify and classify types of claims and conditions that existed within the claims. These claim conditions included, among other things, notation about which claims were partially deficient and which claims were wholly deficient.

5

Accordingly, if a claim was determined to be wholly deficient (for example, if the claim was missing documentation for the entire claim, the claimant did not sign the claim or did not provide enough information to calculate the claim or if the claim was determined to have no Recognized Loss under the Court-approved Plan of Allocation), GCG mailed a letter entitled "Notice of Rejection of Your Entire Claim." The letter described to the claimant the defect within their claim and what, if anything, was necessary to complete the claim. The letter requested submission of the appropriate information and/or documentary evidence to complete the claim, and advised that the claim would otherwise be rejected in its entirety. The letter also advised the claimant that he, she or it had a 20-day period in which to cure the claim or to request Court review of GCG's determination.

11. If a claim was determined to be partially deficient (for example, if the claimant was missing documentation for part of the claim, or did not supply all transactional information), we mailed a letter entitled "Notice of Rejection of Part of Your Claim." This letter described to the claimant the defect(s) within their claim and what was necessary to complete the claim, or the claim would only be eligible to the extent it was complete and documented. This letter also advised the claimant that he, she or it had a 20-day period in which to cure the claim or to request Court review of GCG's determination. To date, no claimant has requested this Court's review of his or her claim. Attached hereto as Exhibit "A" are copies of the forms of letters used to notify claimants of the rejection of their claims in part or in their entirety.

12. Responses to these notices of rejection were carefully reviewed and evaluated. If the response cured the deficiency, the database was updated to reflect the change(s) within the claim.

13. Recognized Loss amounts were calculated pursuant to the Court-approved Plan of Allocation for claims which were properly filed and supported with adequate documentary evidence. The Plan of Allocation is described on pages 4 through 7 of the October Notice.

14. There must be a final cut-off date after which no more POCs will be processed so that there may be a proportional distribution of the Net Settlement Fund. Accordingly, it is respectfully requested that this Court order that no new POCs received, or deficient POCs corrected, after November 21, 2013 will be eligible for payment in the initial distribution. As agreed with Lead Counsel, GCG will continue to receive, review and process any new POCs or corrections to POCs previously submitted by claimants. And, if any new or corrected POCs received after November 21, 2013 are found to be eligible, GCG will report those claims to Lead Counsel to be considered for inclusion in any subsequent distributions that are approved.

## GCG QUALITY ASSURANCE REVIEW

15. An integral part of all of our claims administration projects is the quality assurance review. Once all of the POCs have been processed, deficiency letters and/or ineligibility letters have been mailed, and deficiency responses reviewed and processed, GCG's quality assurance unit performs a final project wrap-up in order to ensure correctness and completeness of all of the claims processed prior to preparing the final report to Lead Counsel. Here, in connection with this quality assurance process, GCG performed the following tasks:

    a. determined that valid claims have no messages denoting ineligibility;

    b. determined that claims that are ineligible have messages denoting ineligibility;

    c. determined that claims that contained purchases that occurred outside the Class Period contain appropriate ineligibility messages;

     d.    determined that claim detail (transaction) messages appear only on claim detail records;

     e.    determined that all claims requiring deficiency/ineligibility letters were sent such letters or received a personalized phone call;

     f.    performed a sample review of deficient claims;

     g.    reviewed claims with large dollar losses;

     h.    sampled claims that were determined to be ineligible, including those with no Recognized Loss calculated in accordance with the Plan of Allocation in order to verify that all transactions had been captured correctly; and

     i.    tested the accuracy of the calculation program.

## **CLAIMS DETERMINATION**

16. As of November 21, 2013, a total of 908 persons or entities have filed claims herein, of which 891 were filed timely and 17 were filed after March 18, 2013. A list of all the claims received and their ultimate dispositions is contained in the Administrator's Report (the "Report"), attached hereto as Exhibits "B-1" to "B-3". For privacy reasons, the Report lists provide only the Claim Number and Recognized Loss amount for the Authorized claimants (no name, address or Taxpayer ID numbers are disclosed).

17. GCG has determined that a total of 420 POCs have been provisionally accepted, representing a total Recognized Loss of $231,121,998.24. This includes total Recognized Losses of $230,198,615.99 from the 413 timely-filed eligible claims, and total Recognized Losses of $923,382.25 from the 7 late but otherwise eligible claims submitted after March 18, 2013. Attached hereto as Exhibit "B-1" and Exhibit "B-2" are summary schedules of the (1) timely-filed eligible Authorized claimants, and (2) the late but otherwise eligible Authorized claimants, respectively.

18. Of the 908 POCs that were received, a total of 488 claims were rejected in their entirely for the following reasons:

| SUMMARY OF REJECTED CLAIMS | |
|---|---|
| **Reason for Rejection** | **Number of Claims** |
| Proof of Claim Did Not Fit the Class Definition | 283 |
| Duplicate Proof of Claim | 26 |
| Deficient Proof of Claim Never Cured | 107 |
| Proof of Claim Did Not Result in a Recognized Loss | 72 |
| **TOTAL:** | **488** |

19. Contained in Exhibit "B-3" is a summary schedule of the 488 Ineligible or Rejected claimants whose claims were determined to be wholly ineligible or deficient, and the reason for the deficiency. As noted above, for privacy reasons, the Report lists provide only the Claim Number and reason for ineligibility (no name, address or Taxpayer ID numbers are disclosed).

20. GCG has thoroughly reviewed and processed the claims in order to protect the interests of the entire Class. No claims were rejected out-of-hand and adequate time was spent communicating with Class Members and suggesting appropriate ways they could document their claims and participate in the Settlement. GCG used every means available to contact claimants regarding their claims. Telephone calls and written letters from claimants to GCG were courteously handled. Class Members were assisted to the fullest extent possible.

## DISTRIBUTION OF THE NET SETTLEMENT FUND

21. It is respectfully requested that the Court enter an Order approving the above determinations accepting and rejecting the claims filed herein. In order to facilitate the final

9

distribution of the Net Settlement Fund, it is necessary to bar any further claims against the Net Settlement Fund and to provide that all persons involved in the review, verification, calculation, tabulation, or any other aspect of the processing of the claims submitted herein, or otherwise involved in the administration or taxation of the Net Settlement Fund, be released and discharged from any and all claims arising out of such involvement beyond the amount allocated to them.

22.  Should the Court concur with GCG's determinations concerning the provisionally accepted POCs, including the late but otherwise eligible POCs, GCG recommends the following distribution plan:

a.  GCG will distribute 100% of the available balance of the Net Settlement Fund, after deducting the payments previously allowed and requested herein and other litigation expenses that the Court may approve for reimbursement, and after the payment of any estimated taxes and the costs of preparing appropriate tax returns and any escrow fees, to all Authorized claimants (the "Distribution").

b.  In order to encourage Authorized claimants to cash their Distribution checks promptly, and to avoid or reduce future expenses relating to unpaid Distribution checks, all Distribution checks will bear the following notation "CASH PROMPTLY, VOID AND SUBJECT TO RE-DISTRIBUTION IF NOT CASHED WITHIN 120 DAYS AFTER ISSUE DATE."[1]

---

[1] In an effort to have as many Authorized claimants as possible cash their Distribution checks, GCG will perform extensive follow-up with those Authorized claimants whose Distribution checks are initially un-cashed, either because they are returned to GCG as undeliverable or because the Authorized claimant simply did not cash the Distribution check after a period of time elapses. For Authorized claimants whose Distribution checks are returned with an undeliverable address, GCG will endeavor to locate new addresses by running the undeliverable addresses through the United State Postal Service National Change of Address database and, where appropriate, via Internet search techniques and by calling the Authorized claimants. Where a new address is located, GCG will update the database accordingly and re-issue a Distribution check to the Authorized claimant at the new address. For Authorized claimants whose Distribution checks are not returned but who simply do not cash their Distribution checks, GCG will use a mix of automated and personalized telephone calls to urge such Authorized claimants to cash their Distribution checks. Authorized claimants will be informed on their Distribution check that, if they do not cash their Distribution checks within 120 days from the mail date, their Distribution check will lapse, their entitlement to a recovery from the Settlement will be irrevocably forfeited and the funds will be re-allocated to other Authorized

  c. Authorized claimants who do not cash their Distribution checks within the time allotted will irrevocably forfeit all recovery from the Settlement. The funds allocated to all such stale-dated checks will be available for re-distribution to other Authorized claimants.

  d. If any funds remain in the Net Settlement Fund by reason of uncashed checks or otherwise, after GCG has made reasonable and diligent efforts (which efforts shall consist of the extensive follow-up efforts described in footnote 1) to have Authorized claimants who are entitled to participate in the distribution of the Net Settlement Fund cash their distribution checks, any balance remaining in the Net Settlement Fund six (6) months after the initial Distribution of such funds shall be used: (i) first, to pay any amounts mistakenly omitted from the initial Distribution to Authorized claimants or to pay any late, but otherwise valid and fully documented claims received after the cut-off date used to make the initial Distribution, which were not previously authorized by the Court to be paid, provided that such distributions to any late post-distribution claimants meet all of the other criteria for inclusion in the initial Distribution, including the $10.00 minimum check amount set out in the October Notice, (ii) second, to pay any additional fees and expenses incurred in administering the Settlement; and (iii) finally, to make a second distribution to Authorized claimants who cashed their checks from the initial Distribution and who would receive at least $10.00 from

---

claimants. In the event an Authorized claimant loses or damages his, her or its Distribution check, or otherwise requires a new Distribution check, GCG will issue replacements. Distribution re-issues will be undertaken only upon written instructions from the Authorized claimant, and provided that the Authorized claimant returns the first Distribution check where appropriate. If a Distribution check is deemed lost, GCG will void the initial Distribution check prior to re-issuing a payment. In addition, and to maximize GCG's efforts to have all Distribution checks cashed, GCG has trained the staff at its Call Center to handle the various issues that likely will arise during the distribution of the Net Settlement Fund. Typically, the Call Center receives calls with respect to the calculation of Proofs of Claim, distribution amounts, and the timing of this Distribution and any future distributions. GCG expects a higher than average call volume during the weeks immediately following dissemination of the Distribution checks. Requests for reissued Distribution checks in connection with any re-distribution will be handled in the same manner.

such second distribution, after payment of the estimated costs or fees to be incurred in administering the Net Settlement Fund and in making this second distribution, if such second distribution is economically feasible as determined by Lead Counsel after consulting with GCG; and

e. If after four (4) months after such second distribution, if undertaken, or if such second distribution is not undertaken, any funds shall remain in the Net Settlement Fund after GCG has made reasonable and diligent efforts to have Authorized claimants who are entitled to participate in this Settlement cash their checks, any funds remaining in the Net Settlement Fund shall be donated to the Council of Institutional Investors, a nonprofit, nonpartisan 501(c)(6) association of pension funds and other organizations that advocates sound corporate governance and strong shareholder rights.

## **FEES AND EXPENSES**

23. In connection with the October Notice and POC mailing, GCG's fees and expenses to date, and the anticipated fees and expenses through the initial distribution of the Net Settlement Fund, amount to $283,834.01.[2] GCG has received interim payments from the Net Settlement Fund in connection with the administration relating to the October Notice and POC mailing totaling $67,341.45. Accordingly, there is a balance due of $216,492.56 payable to GCG as shown on the invoice annexed as Exhibit "C". GCG respectfully requests payment for the remaining balance of its fees and expenses.

---

[2] The Stipulation states on page 13, paragraph 8 that "Lead Counsel may pay from the Settlement Fund the costs and expenses associated with the administration of the Settlement and the processing of submitted claims in excess of $200,000, upon Court approval."

**RECORDS RETENTION AND DESTRUCTION**

24.   GCG requests that the Court enter an Order providing that one year after distribution of the Net Settlement Fund it is authorized to destroy paper copies of the POC, and three years after distribution of the Net Settlement Fund, it is authorized to destroy electronic copies of the same.

_____
Stephen J. Cirami

Sworn to before me this
21st day of November, 2013

_____
Notary Public

VANESSA M. VIGILANTE
Notary Public, State of New York
No. 01VI6143817
Qualified in Queens County
My Commission Expires 4-12-2014